# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
                       :

*In re*                   :       **Chapter 11**
                       :

**OFFSHORE GROUP INVESTMENT**  :      **Case No. 15-_____ (___)**
**LIMITED,** *et al.,*          :
                       :       **Joint Administration Requested**

**Debtors.**[1]          :
                       :
-------------------------------------------------------x

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
## OFFSHORE GROUP INVESTMENT LIMITED AND ITS AFFILIATED DEBTORS

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Ronit J. Berkovich
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Debtors and*
*Debtors in Possession*

Dated:  December 2, 2015

---

[1] The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Offshore Group Investment Limited; Vantage Delaware Holdings, LLC; Dragonquest Holdings Company; Emerald Driller Company; P2020 Rig Co.; P2021 Rig Co.; PT. Vantage Drilling Company Indonesia; Sapphire Driller Company; Vantage Deepwater Company; Vantage Deepwater Drilling, Inc. (3668); Vantage Driller I Co; Vantage Driller II Co; Vantage Driller III Co; Vantage Driller IV Co.; Vantage Driller VI Co.; Vantage Driller ROCO S.R.L.; Vantage Drilling Africa; Vantage Drilling (Malaysia) I Sdn. Bhd.; Vantage Drilling Labuan I Ltd.; Vantage Drilling Netherlands B.V.; Vantage Holding Hungary Limited Liability Company; Vantage Holdings Cyprus ODC Limited; Vantage Holdings Malaysia I Co; and Vantage International Management Co.  The Debtors' mailing address is 777 Post Oak Boulevard, Suite 800, Houston, Texas 77056.

**THIS SOLICITATION OF VOTES (THE "*SOLICITATION*") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED HEREIN) *BEFORE* THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "*BANKRUPTCY CODE*").  BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO SEEK PROMPTLY ORDERS OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (ii) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (iii) CONFIRMING THE PLAN.**

**DISCLOSURE STATEMENT, DATED DECEMBER 2, 2015**

**Solicitation of Votes on the
Plan of Reorganization of**

**OFFSHORE GROUP INVESTMENT LIMITED, *ET AL.***

**from the holders of outstanding**

**REVOLVING CREDIT FACILITY CLAIMS
2017 SECURED TERM LOAN CLAIMS
2019 SECURED TERM LOAN CLAIMS
7.5% SECURED NOTES CLAIMS
7.125% SECURED NOTES CLAIMS
EXISTING OGIL INTERESTS**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON DECEMBER 31, 2015, UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS NOVEMBER 20, 2015 (THE "*RECORD DATE*").**

---

**RECOMMENDATION BY THE DEBTORS**

The Board of Directors of Offshore Group Investment Limited ("*OGIL*") and the Board of Directors or the sole member of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.  Holders of approximately 58% in outstanding principal amount of the Secured Debt Claims (defined herein) entitled to vote on the Plan (the "*Consenting Debtholders*") and holders of more than two-thirds (2/3) in outstanding principal amount of the Revolving Credit Facility Claims (the "*Consenting Revolver Lenders*") entitled to vote on the Plan have already agreed to vote in favor of the Plan.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW SECURED CONVERTIBLE PIK NOTES, THE SUBSCRIPTION RIGHTS (INCLUDING THE NEW SECOND LIEN NOTES ISSUED PURSUANT TO THE EXERCISE THEREOF IN THE RIGHTS OFFERING), AND THE NEW COMMON SHARES ISSUED TO HOLDERS OF ALLOWED SECURED DEBT CLAIMS AND THE ISSUANCE OF NEW COMMON SHARES UPON THE CONVERSION OF THE NEW SECURED CONVERTIBLE PIK NOTES SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.  THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE AVAILABIILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE ISSUANCE AND SALE, AS APPLICABLE, OF THE NEW SECOND LIEN NOTES TO THE BACKSTOP PARTIES (AS DEFINED HEREIN) UNDER THE BACKSTOP AGREEMENT (AS DEFINED HEREIN) (INCLUDING THE NEW SECOND LIEN NOTES COMPRISING THE BACKSTOP COMMITMENT PREMIUM (AS DEFINED HEREIN)) IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER.  SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER, OR AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF, THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE NEW SECURED CONVERTIBLE PIK NOTES, THE NEW COMMON SHARES, THE NEW COMMON SHARES TO BE ISSUED UPON THE CONVERSION OF THE NEW SECURED CONVERTIBLE PIK NOTES, AND THE NEW SECOND LIEN NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

WEIL:\95549520\1\78787.0003

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN.  DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, CUSTOMERS, AND EMPLOYEES OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

WEIL:\95549520\1\78787.0003

Table of Contents

Page

I. INTRODUCTION ............................................................................................................... 1

II. OVERVIEW OF THE DEBTORS' OPERATIONS ...................................................... 6

    A.    The Debtors' Business ......................................................................................... 6

    B.    The Debtors' Drilling Fleet and Drilling Contracts ........................................... 6

        1.    Emerald Driller .................................................................................. 6

        2.    Sapphire Driller ................................................................................. 6

        3.    Aquamarine Driller ........................................................................... 7

        4.    Topaz Driller .................................................................................... 7

        5.    Platinum Explorer ............................................................................. 7

        6.    Titanium Explorer ............................................................................. 7

        7.    Tungsten Explorer ............................................................................. 7

    C.    The Debtors' Organizational Structure ............................................................... 8

    D.    Directors and Officers ......................................................................................... 9

    E.    Regulation of the Debtors' Business ................................................................... 9

    F.    The Debtors' Capital Structure ......................................................................... 10

        1.    Equity Ownership ........................................................................... 10

        2.    Prepetition Indebtedness ................................................................. 10

    G.    Significant Prepetition Leases ........................................................................... 13

III. KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES .................... 13

    A.    Collapse in Oil Prices ....................................................................................... 13

    B.    Operation Carwash ........................................................................................... 14

    C.    Wrongful Termination of the Petrobras Contract ............................................. 15

    D.    Delisting of Vantage Ordinary Shares from New York Stock Exchange .......................... 15

    E.    Reduction in Workforce .................................................................................... 16

    F.    Deleveraging Initiatives .................................................................................... 16

IV. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES .................................... 17

    A.    Commencement of Chapter 11 Cases and First Day Motions ......................... 18

        1.    Cash Management System ............................................................... 18

        2.    Cash Collateral ................................................................................ 18

        3.    Vendors and Foreign Creditors ....................................................... 18

        4.    Taxes ............................................................................................... 19

        5.    Utilities ........................................................................................... 19

        6.    Insurance ......................................................................................... 19

        7.    Employee Wages and Benefits ....................................................... 19

    B.    Other Procedural Motions and Retention of Professionals .............................. 20

    C.    Confirmation Hearing ....................................................................................... 20

    D.    Timetable for the Chapter 11 Cases ................................................................. 20

V. MATTERS INVOLVING VANTAGE PARENT AND OTHER NON-DEBTORS ........................... 20

    A.    Obligations and Agreements of Vantage Parent and Other Non-Debtors ........................ 20

        1.    Indebtedness of Vantage Parent .................................................................. 20

        2.    Construction Supervision and Operations Management Agreements ................ 21

        3.    Leases of Other Non-Debtors ..................................................................... 21

    B.    Litigation Involving Other Non-Debtors ........................................................... 22

        1.    DSME Termination .................................................................................... 22

        2.    Nobu Su Litigation .................................................................................... 22

        3.    BP Oil Spill .............................................................................................. 25

    C.    Purchase of the Vantage Service Subsidiaries and Transfers of Essential Non-Debtor Contracts ........................................................................................... 25

    D.    The Related Cayman Islands Proceeding ........................................................... 27

VI. SUMMARY OF THE PLAN ...................................................................................... 27

    A.    Administrative Expense and Priority Claims ...................................................... 28

        1.    Treatment of Administrative Expense Claims ............................................... 28

        2.    Treatment of Fee Claims ............................................................................ 28

        3.    Treatment of Priority Tax Claims ................................................................ 28

    B.    Classification of Claims and Interests ................................................................ 28

        1.    Classification in General ............................................................................ 28

        2.    Formation of Debtor Groups for Convenience Only ...................................... 29

        3.    Summary of Classification of Claims and Interests ....................................... 29

    C.    Treatments of Claims and Interests ................................................................... 29

        1.    Priority Non-Tax Claims – Class 1 .............................................................. 29

        2.    Other Secured Claims – Class 2 .................................................................. 30

        3.    Revolving Credit Facility Claims – Class 3 ................................................... 30

        4.    Secured Debt Claims – Class 4 ................................................................... 30

        5.    General Unsecured Claims – Class 5 ........................................................... 30

        6.    Intercompany Claims – Class 6 ................................................................... 30

        7.    Subordinated Claims – Class 7 .................................................................... 31

        8.    Existing OGIL Interests – Class 8 ............................................................... 31

        9.    Intercompany Interests – Class 9 ................................................................. 31

    D.    Summaries of New Securities and the Amended and Restated Credit Facility ............... 31

        1.    Summary of the Amended and Restated Credit Facility ................................... 31

        2.    Summary of the New Second Lien Notes ..................................................... 42

        3.    Summary of the New Secured Convertible PIK Notes ..................................... 46

        4.    Summary of the New Common Shares .......................................................... 51

    E.    Means for Implementation .............................................................................. 51

        1.    Continued Corporate Existence ................................................................... 51

        2.    Plan Funding ............................................................................................ 52

WEIL:\95549520\1\78787.0003

|  | 3. | Cancellation of Existing Securities and Agreements | 52 |
|  | 4. | Cancellation of Certain Existing Security Interests | 52 |
|  | 5. | Officers and Boards of Directors | 53 |
|  | 6. | Management Incentive Program | 53 |
|  | 7. | New Shareholders Agreement | 53 |
|  | 8. | Authorization, Issuance, and Delivery of New Common Shares | 54 |
|  | 9. | Amended and Restated Credit Facility | 54 |
|  | 10. | New Secured Convertible PIK Notes | 54 |
|  | 11. | New Intercreditor Agreement | 54 |
|  | 12. | Rights Offering | 55 |
|  | 13. | Registration Rights | 55 |
|  | 14. | Intercompany Interests; Corporate Reorganization | 55 |
|  | 15. | Restructuring Transactions | 56 |
|  | 16. | Tax Matters | 56 |
|  | 17. | Separability | 56 |
| F. | | Distributions | 56 |
|  | 1. | Distributions Generally | 56 |
|  | 2. | No Postpetition Interest on Claims | 56 |
|  | 3. | Date of Distributions | 57 |
|  | 4. | Distribution Record Date | 57 |
|  | 5. | Disbursing Agent | 57 |
|  | 6. | Delivery of Distributions | 57 |
|  | 7. | Unclaimed Property | 58 |
|  | 8. | Satisfaction of Claims | 58 |
|  | 9. | Manner of Payment Under Plan | 58 |
|  | 10. | Fractional Shares and Notes and De Minimis Cash Distributions | 58 |
|  | 11. | No Distribution in Excess of Amount of Allowed Claim | 58 |
|  | 12. | Allocation of Distributions Between Principal and Interest | 59 |
|  | 13. | Exemption from Securities Laws | 59 |
|  | 14. | Setoffs and Recoupments | 59 |
|  | 15. | Rights and Powers of Disbursing Agent | 59 |
|  | 16. | Withholding and Reporting Requirements | 60 |
|  | 17. | Hart-Scott-Rodino Antitrust Improvements Act | 60 |
| G. | | Procedures for Resolving Claims | 60 |
|  | 1. | Disputed Claims Process | 60 |
|  | 2. | Objections to Fee Claims | 61 |
|  | 3. | Estimation of Claims | 61 |
|  | 4. | Claim Resolution Procedures Cumulative | 61 |
|  | 5. | No Distributions Pending Allowance | 61 |
|  | 6. | Distributions After Allowance | 61 |
| H. | | Executory Contracts and Unexpired Leases | 62 |

Page

| | | | |
|---|---|---|---|
| | 1. | General Treatment | 62 |
| | 2. | Determination of Cure Disputes and Deemed Consent | 62 |
| | 3. | Survival of the Debtors' Indemnification Obligations | 62 |
| | 4. | Compensation and Benefit Plans | 63 |
| | 5. | Insurance Policies | 63 |
| | 6. | Reservation of Rights | 63 |
| I. | | Conditions Precedent to the Occurrence of the Effective Date | 63 |
| | 1. | Conditions Precedent to the Effective Date | 63 |
| | 2. | Waiver of Conditions Precedent | 65 |
| | 3. | Effect of Failure of a Condition | 65 |
| J. | | Effect of Confirmation | 65 |
| | 1. | Binding Effect | 65 |
| | 2. | Vesting of Assets | 65 |
| | 3. | Discharge of Claims Against and Interests in the Debtors | 66 |
| | 4. | Pre-Confirmation Injunctions and Stays | 66 |
| | 5. | Injunction Against Interference with Plan | 66 |
| | 6. | Plan Injunction | 66 |
| | 7. | Releases | 67 |
| | 8. | Exculpation | 68 |
| | 9. | Injunction Related to Releases and Exculpation | 69 |
| | 10. | Subordinated Claims | 69 |
| | 11. | Retention of Causes of Action and Reservation of Rights | 69 |
| | 12. | Ipso Facto and Similar Provisions Ineffective | 69 |
| | 13. | Indemnification and Reimbursement Obligations | 69 |
| K. | | Retention of Jurisdiction | 70 |
| L. | | Miscellaneous Provisions | 71 |
| | 1. | Exemption from Certain Transfer Taxes | 71 |
| | 2. | Dates of Actions to Implement the Plan | 71 |
| | 3. | Amendments | 71 |
| | 4. | Revocation or Withdrawal of Plan | 72 |
| | 5. | Severability | 72 |
| | 6. | Governing Law | 72 |
| | 7. | Immediate Binding Effect | 72 |
| | 8. | Successors and Assigns | 73 |
| | 9. | Entire Agreement | 73 |
| | 10. | Computing Time | 73 |
| | 11. | Exhibits to Plan | 73 |
| | 12. | Notices | 73 |
| | 13. | Reservation of Rights | 74 |
| VII. FINANCIAL INFORMATION AND PROJECTIONS | | | 74 |

WEIL:\95549520\1\78787.0003

Table of Contents

A.    Consolidated Condensed Projected Financial Information ................................. 74

B.    Assumptions to the Projections ....................................................................... 77

    1.    General Assumptions ........................................................................ 77

    2.    Assumptions With Respect to the Projected Income Statement ......................... 78

    3.    Assumptions with Respect to the Projected Balance Sheet and Projected
          Statement of Cash Flows ................................................................. 78

VIII. VALUATION ANALYSIS .......................................................................... 79

A.    Estimated Reorganization Valuation of the Debtors ........................................ 79

IX. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES
    LAWS ................................................................................................. 81

X. CERTAIN TAX CONSEQUENCES OF THE PLAN ....................................... 82

A.    Certain U.S. Federal Income Tax Consequences of the Plan .......................... 82

    1.    Consequences to the Debtors ............................................................ 83

    2.    Consequences to Holders of Certain Claims ....................................... 83

    3.    Distributions in Discharge of Accrued Interest ................................... 87

    4.    Character of Gain or Loss ............................................................... 87

    5.    Treatment of Subscription Rights ..................................................... 88

    6.    Ownership of New Second Lien Notes ................................................ 89

    7.    Ownership and Disposition of Stapled Units ....................................... 90

    8.    Information Reporting and Backup Withholding ................................. 93

B.    Cayman Islands Tax Considerations ................................................................ 94

XI. CERTAIN RISK FACTORS TO BE CONSIDERED ...................................... 94

A.    Certain Bankruptcy Law Considerations ...................................................... 95

    1.    General ........................................................................................ 95

    2.    Risk of Non-Confirmation of the Plan ............................................... 95

    3.    Non-Consensual Confirmation ........................................................ 95

    4.    Risk of Non-Occurrence of the Effective Date ................................... 95

    5.    Risk of Termination of the Restructuring Support Agreement ............. 96

    6.    Conversion into Chapter 7 Cases ..................................................... 96

B.    Additional Factors Affecting the Value of the Reorganized Debtors ............... 96

    1.    Claims Could Be More than Projected ............................................. 96

    2.    Projections and Other Forward-Looking Statements Are Not Assured,
          and Actual Results May Vary ........................................................ 96

C.    Risks Relating to the Debtors' Business and Financial Condition .................. 96

    1.    Post-Effective Date Indebtedness .................................................... 96

    2.    Risks Related to Foreign Customers and Creditors ............................. 97

    3.    Risks Relating to the Debtors' Relationship with F3 Capital and Nobu Su ........ 97

D.    Factors Relating to Securities to Be Issued Under the Plan, Generally ........... 97

WEIL:\95549520\1\78787.0003

Page

|  |  |  |  |
|---|---|---|---|
|  | 1. | No Current Public Market for Securities | 97 |
|  | 2. | Potential Dilution | 98 |
| E. |  | Risks Related to an Investment in the New Secured Convertible PIK Notes | 98 |
|  | 1. | Insufficient Cash Flow to Meet Debt Obligations | 98 |
|  | 2. | Inability to Repurchase the New Secured Convertible PIK Notes and the New Second Lien Notes | 99 |
|  | 3. | Reorganized OGIL Will be a Holding Company | 99 |
|  | 4. | Insufficiency of Proceeds from Collateral Securing New Second Lien Notes and New Secured Convertible PIK Notes | 99 |
|  | 5. | Defects in Collateral Securing the New Second Lien Notes and the New Secured Convertible PIK Notes | 100 |
|  | 6. | Failure to Perfect Security Interests in Collateral | 100 |
|  | 7. | Limitations on Rights of Holders of New Second Lien Notes and New Secured Convertible PIK Notes with Respect to Collateral | 101 |
|  | 8. | Casualty Risk of Collateral | 101 |
|  | 9. | Risk of Recharacterization of New Secured Convertible PIK Notes | 101 |
|  | 10. | The Conversion Rate Will Only be Adjusted for Stock Splits | 102 |
|  | 11. | Changes to New Common Shares Affect Holders of New Secured Convertible PIK Notes | 102 |
|  | 12. | The New Second Lien Notes and the New Secured Convertible PIK Notes May Not Be Rated or May Receive a Lower Rating than Anticipated | 102 |
|  | 13. | Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors | 102 |
|  | 14. | Foreclosing on the Collateral May Be Difficult | 102 |
|  | 15. | Priority of Maritime Liens | 103 |
| F. |  | Risks Related to an Investment in the New Common Shares | 103 |
|  | 1. | Significant Holders | 103 |
|  | 2. | Equity Interests Subordinated to the Reorganized Debtors' Indebtedness | 103 |
|  | 3. | Implied Valuation of New Common Shares Not Intended to Represent the Trading Value of the New Common Shares | 104 |
|  | 4. | No Intention to Pay Dividends | 104 |
| G. |  | Factors Relating to the Rights Offering | 104 |
|  | 1. | Debtors Could Modify the Rights Offering Procedures | 104 |
|  | 2. | The Backstop Agreement Has Not Yet Been Executed | 104 |
|  | 3. | The Bankruptcy Court Might Not Approve the Backstop Agreement and the Rights Offering Procedures | 104 |
|  | 4. | Debtors Could Fail to Meet all Conditions Precedent to the Rights Offering | 105 |
| H. |  | Additional Factors | 105 |
|  | 1. | Debtors Could Withdraw Plan | 105 |
|  | 2. | Debtors Have No Duty to Update | 105 |

3.      No Representations Outside this Disclosure Statement Are Authorized ........... 105

4.      No Legal or Tax Advice Is Provided by this Disclosure Statement ................. 105

5.      No Admission Made ..................................................................................... 105

6.      Certain Tax Consequences ........................................................................... 105

XII. VOTING PROCEDURES AND REQUIREMENTS .................................................. 106

A.      Voting Deadline .................................................................................................. 106

B.      Voting Procedures ............................................................................................... 106

C.      Parties Entitled to Vote ....................................................................................... 107

1.      Beneficial Holders .................................................................................... 107

2.      Nominees .................................................................................................. 108

3.      Miscellaneous ........................................................................................... 109

4.      Fiduciaries And Other Representatives ..................................................... 110

5.      Agreements Upon Furnishing Ballots ....................................................... 110

6.      Change of Vote ......................................................................................... 110

D.      Waivers of Defects, Irregularities, etc. ............................................................... 110

E.      Further Information, Additional Copies ............................................................... 111

XIII. RIGHTS OFFERING PROCEDURES .................................................................... 111

A.      Introduction ....................................................................................................... 111

B.      Rights Offering ................................................................................................... 111

C.      The Backstop ...................................................................................................... 112

D.      Commencement/Expiration of the Rights Offering .............................................. 112

E.      Exercise of Subscription Rights .......................................................................... 112

1.      Exercise by Eligible Offerees ................................................................... 113

2.      Deemed Representations and Acknowledgements ..................................... 113

3.      Failure to Exercise Subscription Rights .................................................... 113

4.      Payment for Subscription Rights .............................................................. 114

5.      Disputes, Waivers, and Extensions ........................................................... 114

6.      Funds ........................................................................................................ 114

7.      Participating Eligible Offeree Release ...................................................... 115

F.      Miscellaneous .................................................................................................... 115

1.      Issuance .................................................................................................... 115

2.      Securities Law and Related Matters .......................................................... 115

G.      Rights Offering Conditioned Upon Consummation of the Plan; Reservation of
        Subscription Rights; Return of Rights Offering Amount ............................... 115

XIV. CONFIRMATION OF THE PLAN ........................................................................ 116

A.      Confirmation Hearing ......................................................................................... 116

B.      Objections To Confirmation ................................................................................ 116

    C.      Requirements for Confirmation of the Plan ................................................................. 117

          1.      Requirements of Section 1129(a) of the Bankruptcy Code ............................... 117

          2.      Additional Requirements for Non-Consensual Confirmation .......................... 120

XV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................ 121

    A.      Alternative Plan of Reorganization ................................................................................ 121

    B.      Sale Under Section 363 of the Bankruptcy Code ........................................................... 122

    C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ............................... 122

XVI. CONCLUSION AND RECOMMENDATION .............................................................................. 122

EXHIBIT A:    Prepackaged Plan

EXHIBIT B:    Restructuring Support Agreement

EXHIBIT C:    Liquidation Analysis

# I.
# <u>INTRODUCTION</u>

The Debtors submit this Disclosure Statement in connection with the Solicitation of votes on the *Joint Prepackaged Chapter 11 Plan of Offshore Group Investment Limited and its Affiliated Debtors*, dated December 3, 2015 (the "***Plan***") attached hereto as <u>**Exhibit A**</u>.  The Debtors under the Plan are Offshore Group Investment Limited ("***OGIL***") and its affiliates that are guarantors under OGIL's secured debt, other than Vantage Drilling Company, the ultimate parent company of all of the Debtors ("***Vantage Parent***").  The Debtors intend to commence chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") during the solicitation period.  Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

The Debtors are commencing this Solicitation after extensive discussions over the past several months among the Debtors, Vantage Parent, and their secured creditors.  As a result of these negotiations, certain secured creditors holding approximately 58% of the Debtors' Secured Debt Claims and more than two-thirds (2/3) of the Debtors' Revolving Credit Facility Claims entered into a restructuring support agreement (the "***Restructuring Support Agreement***") with the Debtors and Vantage Parent, a copy of which is attached hereto as <u>**Exhibit B**</u>.  Under the terms of the Restructuring Support Agreement, the creditor parties thereto agreed to a deleveraging transaction, as set forth in the term sheet (the "***Term Sheet***") consisting of (i) restructuring the existing debt obligations of the Debtors in chapter 11 through the Plan (the "***Restructuring***") and (ii) petitioning the Grand Court of the Cayman Islands (the "***Cayman Court***") for the official liquidation of Vantage Parent (the "***Cayman Proceeding***").

There are two primary creditor groups whose acceptances of the Plan are being solicited:

1.   Revolving Credit Facility Claims, which are claims arising out of OGIL's secured revolving credit agreement; and

2.   Secured Debt Claims, which are claims arising out of OGIL's secured term loan agreements and secured notes indentures.

Below is a short summary of the treatment of various creditor groups under the Plan.  Greater detail on such treatment is provided later on in this Disclosure Statement.

Holders of Allowed Revolving Credit Facility Claims will receive, on the Effective Date, at the option of the Debtors, such holder's pro rata share of either (i) payment in full in cash to the extent the Debtors elect to refinance OGIL's current revolving credit agreement), or (ii) a new or amended and restated senior secured term loan and letter of credit facility (the "***Amended and Restated Credit Facility Agreement***"), the material terms of which are described in the *Summary of the Plan—Summaries of the New Securities and the Amended and Restated Credit Facility*, and in the case of the lenders under the Revolving Credit Facility (defined herein) (other than the issuer of a letter of credit), a cash payment of $7 million.

Holders of Secured Debt Claims will receive their pro rata share of (i) $750 million of new Senior Subordinated Secured Third Lien Convertible Notes due 2030 (the "***New Secured Convertible PIK Notes***") to be issued by OGIL, the material terms of which are described in more detail in *Summary of the Plan—Summaries of the New Securities and the Amended and Restated Credit Facility*, (ii) 100% of the ordinary shares of reorganized OGIL (the "***New Common Shares***"), subject to dilution by the New Common Shares to be issued (a) on account of the Vantage Parent Secured Promissory Note (defined herein), (b) upon conversion of the New Secured Convertible PIK Notes, and (c) under the Management

Incentive Program; and (iii) subscription rights to acquire their corresponding pro rata share of $75 million of the New Second Lien Notes (defined herein) in the Rights Offering. The Secured Convertible PIK Notes will be "stapled" to (and thus only transferred with) a holder's New Common Shares and will be subject to conversion (either in whole or in part) into New Common Shares at plan value under various circumstances as described herein. OGIL will file documents with the SEC after the Effective Date as a voluntary filer under the Securities Exchange Act of 1934, as amended, but does not intend to list the New Common Shares for trading on any national securities exchange.

In addition, in respect of the Vantage Parent Secured Promissory Note Claim, which is expected to be owed by OGIL to Vantage Parent as consideration for the transfer of certain assets to OGIL prior to the Petition Date, Vantage Parent will receive New Common Shares with a value equal to the allowed amount of such claim. On account of Vantage Parent's equity interest in OGIL, Vantage Parent is receiving a release from the Debtors. Vantage Parent is entitled to vote under the Plan and, pursuant to the Restructuring Support Agreement, has agreed to vote to accept the Plan. The Vantage Parent Secured Promissory Note is an "Other Secured Claim" under the Plan.

The rights of holders of General Unsecured Claims shall be left unaltered by the Plan, and the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business.

THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO DO NOT SUBMIT A BALLOT TO ACCEPT OR REJECT THE PLAN OR WHO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

After the Petition Date, and after approval of the Rights Offering Procedures (defined herein), OGIL will launch a rights offering (the "***Rights Offering***") with an aggregate offering amount of up to $75 million, pursuant to which holders of Secured Debt Claims as of the Rights Offering Record Date (defined herein) (each, an "***Eligible Offeree***"), will be entitled to receive their pro rata share of subscription rights (the "***Subscription Rights***") to acquire $75 million of Senior Secured Second Lien Notes (the "***New Second Lien Notes***"). It is expected that shortly after the Petition Date, OGIL will enter into a backstop agreement (the "***Backstop Agreement***"), substantially in the form attached as an exhibit to the Restructuring Support Agreement, with certain holders of Secured Debt Claims (the "***Backstop Parties***") pursuant to which the Backstop Parties will backstop the Rights Offering in exchange for a premium as described herein (the "***Backstop Commitment Premium***"). The material terms of the Rights Offering are described in more detail in Section XIII—Rights Offering Procedures. The Debtors will use proceeds from the Rights Offering plus cash on hand to provide (i) additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented fees and expenses incurred by the Debtors in connection with the Restructuring, including the fees (which includes transaction fees) and expenses of their and their creditors' legal and financial advisers, (iii) fund distributions under the Plan, and (iv) fund the administrative expenses of the Chapter 11 Cases payable on or after the Effective Date.

The Restructuring will leave the Debtors business intact under OGIL and substantially de-lever it. The Debtors' balance sheet liabilities will be reduced from greater than $2.6 billion in secured debt to $969 million in secured debt or $219 million in secured debt upon conversion of the New Secured Convertible PIK Notes into New Common Shares. This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as a stronger, reorganized entity better able to withstand a persistent, depressed market for oil and natural gas.

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under

WEIL:\95549520\1\78787.0003

section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes, assuming an Effective Date of February 29, 2016, (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see Section VI—Summary of the Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis in Section VIII.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery |
|-------|-------------------------|-----------|-----------------------|-------------------------------|----------------------------|
| 1 | Priority Non-Tax Claims | The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (Deemed to accept) | 100% |
| 2 | Other Secured Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Deemed to accept) | 100% |

WEIL:\95549520\1\78787.0003

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 3 | Revolving Credit Facility Claims | On the Effective Date, each holder of an Allowed Revolving Credit Facility Claim shall receive, on account of such Allowed Claim and at the option of the Debtors or Reorganized Debtors, as applicable, its Pro Rata share of (i) payment in full in Cash to the extent the Debtors elect to refinance the Revolving Credit Facility in its entirety with one or more third-party lenders or (ii) a new or amended and restated senior secured term loan and letter of credit facility and, in the case of the holders of Allowed Revolving Credit Facility Claims (other than the issuer of any letter of credit under the Revolving Credit Agreement), a payment of Seven Million Dollars ($7,000,000) in Cash. | Impaired | Yes | 100% |
| 4 | Secured Debt Claims | On the Effective Date, on account of its Allowed Secured Debt Claims, each holder of an Allowed Secured Debt Claim shall receive: (i) its Pro Rata share of the New Secured Convertible PIK Notes; (ii) up to its Pro Rata share of the $75,000,000 New Second Lien Notes to be issued in the Rights Offering, to the extent it elects to exercise its Subscription Rights thereunder, which Subscription Rights will be made available to each holder of an Allowed Secured Debt Claim on a Pro Rata basis and in accordance with the Rights Offering Procedures; and (iii) its Pro Rata share of the New Common Shares, subject to dilution by New Common Shares issued upon the conversion of the New Secured Convertible PIK Notes, on account of the Vantage Parent Secured Promissory Note, and under the Management Incentive Program.  The New Secured Convertible PIK Notes will be "stapled" to (and thus only transferred with) a holder's New Common Shares. | Impaired | Yes | 42% - 50%[2] |
| 5 | General Unsecured Claims | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | Unimpaired | No (Deemed to accept) | 100% |

---

[2] Incorporates dilution from Vantage Parent Secured Note but not dilution from Management Incentive Program.

WEIL:\95549520\1\78787.0003

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 6 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion. | Unimpaired | No (Deemed to accept) | 100% |
| 7 | Subordinated Claims | Subordinated Claims are subordinated pursuant to the Plan and section 510(b) of the Bankruptcy Code. The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged. | Impaired | No (Deemed to reject) | 0% |
| 8 | Existing OGIL Interests | On the Effective Date, on account of its Existing OGIL Interests, each holder of an Existing OGIL Interest shall receive the releases from the Debtors set forth in section 10.7(a) hereof.  All Existing OGIL Interests (together with any certificates or other instruments evidencing such Existing OGIL Interests) shall be (i) deemed consensually foreclosed upon by all parties entitled to do so; (ii) immediately upon the issuance of the New Common Shares, surrendered to OGIL; and (iii) thereafter deemed cancelled by operation of the law of the Cayman Islands. | Impaired | Yes | 0% |
| 9 | Intercompany Interests | Intercompany Interests are Impaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.14 of the Plan. | Impaired | No (Deemed to reject) | 0% |

**WHERE TO FIND ADDITIONAL INFORMATION**:  Vantage Parent currently files annual reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement.  Later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede that information:

- Form 10-K for the fiscal year ended December 31, 2014, filed with the SEC on March 6, 2015

- Form 10-K/A for the fiscal year ended December 31, 2014, filed with the SEC on April 30, 2015

- Form 10-Q for the quarterly period ended March 31, 2015, filed with the SEC on May 7, 2015

- Form 10-Q for the quarterly period ended June 30, 2015, filed with the SEC on August 4, 2015

- Form 10-Q for the quarterly period ended September 30, 2015, filed with the SEC on November 9, 2015

WEIL:\95549520\1\78787.0003

- Forms 8-K filed with the SEC on February 17, 2015, June 23, 2015, July 7, 2015, August 3, 2015, September 2, 2015, September 15, 2015, and November 3, 2015

## II.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Business

The Debtors are an international offshore drilling company operating a fleet of modern, high-specification drilling units.  The Debtors' principal business is to contract their drilling units, related equipment, and work crews to drill oil and natural gas wells in deep water for customers.  The Debtors provide these services to major, national, and independent oil and natural gas companies.  The Debtors generally perform offshore contract drilling services on a dayrate basis (i.e., based on a fixed rate per day regardless of the number of days needed to drill the well).  In addition, the Debtors also utilize their technical expertise to provide construction supervision services for drilling units being built for other companies.

For the nine months ended September 30, 2015, the unaudited and consolidated financial statements of Vantage Parent and its Debtor and non-Debtor subsidiaries (collectively, the "***Vantage Group***"), reflected total revenues of approximately $638,402,000 and a net loss of $6,054,000.  As of September 30, 2015, Vantage Group's unaudited and consolidated financial statements reflected assets totaling approximately $3,507,372,000 and liabilities totaling approximately $2,954,141,000.  Substantially all of the Vantage Group's operations are conducted, and debt is held, by the Debtors.  As of November 23, 2015, the Debtors employed approximately 190 full-time employees worldwide.

### B.    The Debtors' Drilling Fleet and Drilling Contracts

The Debtors' drilling fleet is comprised of four jackup rigs and three drillships.  A jackup rig is a mobile drilling unit equipped with legs that lower to the ocean floor to establish a foundation before elevating the drilling platform into a position above the water from which drilling and workover operations may be conducted.  The Debtors' jackups are capable of drilling in water depths of up to 375 feet.  Drillships are self-propelled, dynamically-positioned drilling units, capable of drilling in water depths of up to 12,000 feet.  Because of their mobility and large, load-carrying capacity, drillships are well suited for drilling in remote locations.

#### 1.    Emerald Driller

The *Emerald Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2008 by PPL Shipyard in Singapore.  It is owned by Emerald Driller Company, a Debtor.  As of the date hereof, the *Emerald Driller* is conducting drilling operations off the coast of Thailand pursuant to a drilling contract by and between Vantage Driller I Co, a Debtor, and Salamander Energy (Bualuang) Limited, which commenced on August 1, 2015, and is for the duration required to complete three firm wells of up to 72 days and up to eight additional option wells of up to 89 days.

#### 2.    Sapphire Driller

The *Sapphire Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned by Vantage Driller VI Co. ("***Vantage Driller VI***"), a Debtor.  As of the date hereof, the *Sapphire Driller* is idle and being maintained in Port Gentil, Gabon.

### 3.    Aquamarine Driller

The *Aquamarine Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned and operated by P2020 Rig Co., a Debtor.  As of the date hereof, the *Aquamarine Driller* is being prepared for mobilization pursuant to a letter of award dated October 16, 2015.  In accordance with the letter of award, under the drilling contract that will be executed with Olio Energy Sdn. Bhd., which acts as the Debtors' agent in Malaysia, the *Aquamarine Driller* will conduct drilling operations off the coast of Malaysia and Thailand in a joint development area.  The drilling contract will last 18 months and will expire on May 1, 2017.  In addition, there are three extension options of three months each.

### 4.    Topaz Driller

The *Topaz Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned by P2021 Rig Co. and operated by Vantage Drilling Company Indonesia, PT ("***Vantage PT***"), both Debtors.  As of the date hereof, the *Topaz Driller* is conducting drilling operations off the coast of Indonesia pursuant to a drilling contract between Vantage PT and PC Ketapang II Ltd. ("***PC Ketapang***").  The drilling contract with PC Ketapang was set to expire on December 31, 2015; however, the contract contains an option for PC Ketapang to extend the contract for three months, which was exercised on September 1, 2015, and an additional option to extend for approximately six months by mutual agreement of the parties.

### 5.    Platinum Explorer

The *Platinum Explorer* is an ultra-deepwater drillship, built in 2010 by Daewoo Shipbuilding & Marine Engineering Co., Ltd. ("***DSME***") in the Republic of Korea.  It is owned and operated by Vantage International Management Company ("***VIMCO Cayman***"), a Debtor.  As of the date hereof, the *Platinum Explorer* is conducting drilling operations off the coast of India pursuant to a drilling contract between Oil & Natural Gas Corporation Limited ("***ONGC***") and VIMCO Cayman.  The drilling contract with ONGC is set to expire in the fourth quarter of 2015, but may be extended automatically under certain conditions.

### 6.    Titanium Explorer

The *Titanium Explorer* is an ultra-deepwater drillship, built in 2012 by DSME in the Republic of Korea.  It is owned by the Luxembourg branch of Vantage Driller ROCO S.R.L., a Debtor.  As of the date hereof, the *Titanium Explorer* is located in Port Fourchon, Louisiana.  Before August 31, 2015, the *Titanium Explorer* conducted drilling operations in the U.S. Gulf of Mexico pursuant to a drilling contract (the "***Petrobras Contract***") between Petrobras Venezuela Investments & Services B.V. ("***PVIS***") and Vantage Deepwater Company ("***Vantage Deepwater***"), a Debtor, as novated, respectively, to Petrobras America Inc. ("***PAI***") and Vantage Deepwater Drilling, Inc. ("***VDDI***"), a Debtor.  As discussed in more detail in *Key Events Leading to the Commencement of Chapter 11 Cases—Wrongful Termination of the Petrobras Contract*, on August 31, 2015, VDDI received a letter (the "***Petrobras Notice***") from PAI and PVIS, purporting to terminate the Petrobras Contract.  Had it not been improperly terminated, the Petrobras Contract was set to expire in December 2020, with an optional two-year extension exercisable by PVIS.

### 7.    Tungsten Explorer

The *Tungsten Explorer* is an ultra-deepwater drillship, built in 2013 by DSME in the Republic of Korea.  It is owned by Vantage Drilling Africa, a Debtor.  As of the date hereof, the *Tungsten Explorer* is conducting drilling operations off the coast of the Republic of Congo pursuant to a drilling contract

between Total E&P Congo and Vantage Drilling Africa.  The drilling contract with Total E&P Congo is set to expire in the fourth quarter of 2016; however, Total E&P Congo has the option to extend the initial term by up to four optional extension periods of six months each.  Any further extensions leading to an aggregate duration of more than three months shall be subject to mutual agreement by the parties.

### C.      The Debtors' Organizational Structure

Vantage Energy Services, Inc. ("***VESI***"), a non-Debtor, was founded in September 2006 as a Delaware special purpose acquisition company.  As a special purpose acquisition company, VESI lacked assets or operations, but conducted an initial public offering to raise capital for future acquisitions of drilling units.  Vantage Parent was founded in November 2007 as a Cayman Islands exempt company for the purpose of acquiring VESI and OGIL from F3 Capital, an entity wholly-owned and controlled by Hsin-Chi Su (a/k/a Nobu Su) ("***Nobu Su***").  Vantage Parent completed the acquisition of VESI and OGIL in June 2008.  The Debtors' tumultuous history with Nobu Su is described in more detail below in *Matters Involving Vantage Parent and Other Non-Debtors—Litigation Involving Other Non-Debtors—Nobu Su Litigation*.  All of the Debtors are direct or indirect subsidiaries of Vantage Parent.  As of the date hereof, the Debtors' drilling fleet is entirely owned and principally operated by certain subsidiaries of OGIL, which is a direct, wholly-owned subsidiary of Vantage Parent.

To facilitate the Debtors' operations and accommodate the complexities arising from such operations, Vantage Parent and the Debtors rely on the services of Vantage Parent subsidiaries in the United States, Singapore, and Dubai.  Additionally, Vantage Parent and the Debtors have incorporated entities in a number of jurisdictions, including Brazil, the Cayman Islands, Cyprus, Hungary, Indonesia, Luxembourg, Malaysia, Mexico, the Netherlands, Romania, Singapore, and the United States.  VESI, based in Houston, Texas, is an administrative office supporting various operations for Vantage Parent and the Debtors.  VESI's address is 777 Post Oak Boulevard, Suite 800, Houston, Texas  77056.

The following chart illustrates the Debtors' organizational structure, as of the date hereof:

WEIL:\95549520\1\78787.0003



### D. Directors and Officers

OGIL's current board of directors, which consists of the same nine individuals serving on Vantage Parent's board of directors, is composed of (i) Paul A. Bragg, Chairman, (ii) Jorge E. Estrada, (iii) Marcelo D. Guiscardo, (iv) John C.G. O'Leary, (v) Robert F. Grantham, (vi) Duke R. Ligon, (vii) Ong Tian Khiam, (viii) Steven M. Bradshaw, and (ix) Steinar Thomassen.

OGIL's current senior management team, which averages over 30 years of experience in the industry and consists of the same team serving on Vantage Parent's current senior management team, is composed of (i) Paul A. Bragg, Chief Executive Officer, (ii) Douglas G. Smith, Chief Financial Officer, (iii) Christopher G. DeClaire, Secretary, Vice President, and Vice President Administration, and (iv) Douglas W. Halkett, Chief Operating Officer. Other senior officers of Vantage Parent include (a) Edward G. Brantley, Chief Accounting Officer and Controller, (b) Mike R.C. Derbyshire, Vice President—Marketing, (c) William L. Thomson, Vice President—Technical Services, Supply Chain and Projects, (d) Linda J. Ibrahim, Vice President—Tax & Governmental Compliance, and (e) Nicholas Evanoff—General Counsel.

The composition of each board of directors of a Reorganized Debtor shall be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5).

### E. Regulation of the Debtors' Business

The Debtors' operations are conducted in the United States and foreign jurisdictions and are subject to governmental laws, regulations, and treaties in the countries in which they operate. The laws, regulations, and treaties that impact the Debtors' operations include those relating to the operation of drilling units,

9

environmental protection, health and safety, various restrictions on oil and natural gas exploration and development, taxation of the Debtors' earnings and the earnings of Debtors' expatriate personnel, immigration restrictions for expatriate personnel, minimum requirements for the use of local employees and suppliers, duties and restrictions on the importation and exportation of drilling units and other equipment, local currency requirements and restrictions on repatriated cash. Additional discussion of the regulatory environment of the Debtors' business can be found in the Form 10-K of Vantage Parent for the fiscal year ended December 31, 2014, filed with the SEC on March 6, 2015.

### F.    The Debtors' Capital Structure

#### 1.    Equity Ownership

Vantage Parent is a public company and files annual reports with, and furnishes other information to, the SEC. Before September 14, 2015, ordinary shares of Vantage Parent ("**Vantage Ordinary Shares**") were traded on NYSE MKT LLC (the "**Exchange**") under the symbol "VTG." As of September 14, 2015, there were 129 actual holders of record of Vantage Ordinary Shares. On September 14, 2015, Vantage Parent received a notice (the "**Suspension Notice**") from the staff of NYSE Regulation Inc. ("**NYSE Regulation**") that it had determined to commence proceedings to delist Vantage Ordinary Shares from the Exchange and that trading in Vantage Ordinary Shares had been suspended at the market open on that date. In the Suspension Notice, the NYSE Regulation staff stated its decision was made in accordance with the NYSE MKT Company Guide (the "**NYSE Company Guide**"), and that it was necessary and appropriate to initiate delisting proceedings due to the "abnormally low" trading price of Vantage Ordinary Shares. Since receipt of the Suspension Notice, Vantage Ordinary Shares have been trading on the over the counter markets under the trading symbol "VTGDF." On November 4, 2015, the Exchange notified the SEC of its intention to remove the Vantage Ordinary Shares from listing and registration on the Exchange on November 16, 2015.

#### 2.    Prepetition Indebtedness

The Vantage Group's significant prepetition indebtedness includes secured financing obligations in the amount of approximately $2,642,600,000, unsecured financing obligations in the amount of approximately $87.7 million, and, as of September 30, 2015, trade debt in the amount of approximately $48.2 million. The Debtors' secured and unsecured financing obligations are described in greater detail below. Such description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations, and their respective related agreements. As noted above, substantially all of the Vantage Group's operations are conducted, and debt is issued or guaranteed, by the Debtors.

(a)    Secured Revolving Credit Facility

Vantage Parent and OGIL are party to that certain Amended and Restated Credit Agreement, dated as of March 28, 2013, by and among Vantage Parent and OGIL, as borrowers, each of the Debtor-guarantors named therein, the various financial institutions party thereto from time to time as lenders (the "**Revolver Lenders**"), Royal Bank of Canada ("**RBC**"), as administrative agent, and RBC Capital Markets as sole lead arranger and sole bookrunner, as amended, modified, or otherwise supplemented from time to time (the "**Revolving Credit Agreement**"). The Revolving Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $168 million (the "**Revolving Credit Facility**") and letter of credit commitments in an aggregate amount of up to $32 million. The Revolving Credit Agreement matures on April 25, 2017. OGIL and Vantage Parent may prepay outstanding advances; provided that, with respect to partial prepayments, such prepayment shall be in an aggregate principal amount of not less than $1 million and in integral multiples in excess thereof. On or about September 2,

2015, OGIL requested and received an advance of $150 million from the Revolver Lenders.  At the time of such advance, OGIL made certain representations to the Revolver Lenders as required under the Revolving Credit Agreement.  On October 14, 2015, Vantage Parent received a reservation of rights letter from RBC on behalf of the Revolver Lenders, pursuant to which the Revolver Lenders requested return of the $150 million advance.  The letter stated that if Vantage Parent and OGIL refuse to return the advance, "at minimum" they must segregate such funds from other company funds and maintain them in the account in which such funds were initially deposited, and provide the Revolver Lenders with information regarding certain representations in the loan documents at the time the advance was made.  As of the date hereof, the aggregate amount outstanding under the Revolving Credit Agreement is $150 million in unpaid principal, plus interest, fees, and other expenses.  Additionally, as of the date hereof, there are $22,900,000 in undrawn letters of credit under the Revolving Credit Agreement.

(b)    2017 Secured Term Loan

OGIL and Vantage Delaware Holdings, LLC ("***Delaware Holdings***") are party to that certain Amended and Restated Term Loan Agreement, dated as of October 25, 2012, as amended and restated as of November 22, 2013, by and among OGIL and Delaware Holdings, as borrowers, each of the Debtor-guarantors named therein, the various financial institutions and other persons party thereto from time to time as lenders (the "***2017 Term Loan Lenders***"), Cortland Capital Markets Services LLC  ("***Cortland***"), as successor administrator agent to Citibank, N.A. ("***Citibank***"), Wells Fargo, as collateral agent, and Citigroup Global Markets Inc. as sole lead arranger, sole bookrunning manager, syndication agent, and documentation agent, as amended, modified, or otherwise supplemented from time to time (the "***2017 Term Loan Agreement***"), pursuant to which OGIL and Delaware Holdings obtained a term loan in the aggregate principal amount of $475 million  maturing on October 25, 2017 (the "***2017 Term Loan***").  As of the date hereof, the aggregate amount outstanding under the 2017 Term Loan Agreement is $323,543,428.90 in unpaid principal, plus interest, fees, and other expenses.

(c)    2019 Secured Term Loan

OGIL and Delaware Holdings are party to that certain Second Term Loan Agreement, dated as of March 28, 2013, by and among OGIL and Delaware Holdings, as borrowers, each of the Debtor-guarantors named therein, the various financial institutions and other persons party thereto from time to time as lenders (the "***2019 Term Loan Lenders***"), Cortland, as successor administrative agent to Citibank, Wells Fargo as collateral agent and various other financial institutions as joint lead arrangers, joint bookrunning managers, co-syndication agents, and co-documentation agents, as amended, modified, or otherwise supplemented (the "***2019 Term Loan Agreement***").  Pursuant to the 2019 Term Loan Agreement, OGIL and Delaware Holdings obtained a term loan in the aggregate principal amount of $350 million maturing on March 28, 2019 (the "***2019 Term Loan***").  As of the date hereof, the aggregate amount outstanding under the 2019 Term Loan Agreement is $341,250,000 in unpaid principal, plus interest, fees, and other expenses.

(d)    7.5% Secured Notes

OGIL is party to that certain Indenture, dated as of October 25, 2012, by and among OGIL, as issuer, each of the Debtor-guarantors named therein, and Wells Fargo, as indenture trustee and noteholder collateral agent, as amended, modified, or otherwise supplemented, pursuant to which OGIL issued 7.5% Senior Secured First Lien Notes due 2019 in the aggregate principal amount of $1.15 billion (the "***7.5% Notes***" and the holders of such notes, the "***7.5% Noteholders***").  The 7.5% Notes were issued at par and mature on November 1, 2019.  As of the date hereof, the aggregate amount outstanding under the 7.5% Notes is $1,086,815,000 in unpaid principal, plus interest, fees, and other expenses.

WEIL:\95549520\1\78787.0003

(e)    7.125% Secured Notes

OGIL is party to that certain Indenture, dated as of March 28, 2013, by and among OGIL, as issuer, each of the Debtor-guarantors named therein, and Wells Fargo, as indenture trustee and noteholder collateral agent, as amended, modified, or otherwise supplemented from time to time, pursuant to which OGIL issued 7.125% Senior Secured First Lien Notes due 2023 in the aggregate principal amount of $775 million (the "*7.125% Notes*" and the holders of such notes, the "*7.125% Noteholders*"). The 7.125% Notes were issued at par and mature on April 1, 2023. As of the date hereof, the aggregate amount outstanding under the 7.125% Notes is $727,622,000 in unpaid principal, plus interest, fees, and other expenses.

(f)    Security Agreement, Pledge Agreement, and Intercreditor Agreement

The obligations of OGIL, Delaware Holdings, and the Debtor-guarantors, as applicable, under the Revolving Credit Agreement, the 2017 Term Loan Agreement, the 2019 Term Loan Agreement, the 7.5% Notes, and the 7.125% Notes (the "*Pari Passu Obligations*") are secured pursuant to that certain Third Amended and Restated Pledge and Security Agreement, dated October 25, 2012 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "*Security Agreement*"). Pursuant to the Security Agreement and certain other local law collateral agreements, each of OGIL, Delaware Holdings, and the Debtor-guarantors granted a first-priority pari passu lien on substantially all its personal property, other than "*Excluded Property*," which includes, among other things, certain foreign deposit accounts and equity interests of subsidiaries that are not guarantors of the Pari Passu Obligations.

In addition, certain obligors under the Pari Passu Obligations executed ship mortgages, assignments of earnings, and assignments of insurance for each of the jackups and drillships in the Debtors' fleet.

The obligations of Vantage Parent with respect to the Pari Passu Obligations are secured pursuant to that certain Third Amended and Restated Pledge Agreement, dated October 25, 2012 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "*Parent Pledge Agreement*"). Pursuant to the Parent Pledge Agreement, Vantage Parent pledged the equity interests of all its direct subsidiaries that are borrowers or guarantors under the Pari Passu Obligations.

The rights of the Revolver Lenders, 2017 Term Loan Lenders, 2019 Term Loan Lenders, 7.5% Noteholders, and 7.125% Noteholders with respect to their shared collateral are governed by that certain Amended and Restated Intercreditor Agreement dated October 25, 2012 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "*Intercreditor Agreement*"). Pursuant to the Intercreditor Agreement, all Pari Passu Obligations are secured equally with respect to "*Common Collateral*," which expressly excludes (i) any cash, deposit accounts, or similar liquid assets to the extent on deposit or maintained with RBC or any other Revolver Lender to secure the obligations under the Revolving Credit Agreement (the "*Pari Passu Excluded Collateral*") and (ii) any compensation, damages, or other payments (including insurance proceeds) received in respect of an event of loss related to a vessel (the "*Credit Agreement Excluded Collateral*"). Only the obligations under the Revolving Credit Agreement are secured by the Pari Passu Excluded Collateral. In addition, under the payment priority waterfall established by the Intercreditor Agreement, the Revolving Credit Facility is entitled to receive any proceeds of Common Collateral until repaid in full, at which point all other Pari Passu Obligations are paid equally; provided that the proceeds of any Credit Agreement Excluded Collateral shall be applied first to any Pari Passu Obligations (other than the Revolving Credit Facility), to the extent such proceeds are subject to a mandatory redemption in favor of such other Pari Passu Obligations, until repaid in full.

12

(g)  Trade Payables

In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "***Trade Payables***") to various third-party providers of goods and services that facilitate the Debtors' business operations (the "***Trade Creditors***").  As of the date hereof, the Debtors estimate that the aggregate amount of Trade Payables outstanding is approximately $27.7 million.

(h)  Intercompany Claims

Certain non-Debtors, including the Vantage Service Subsidiaries (defined herein), which are expected to be subsidiaries of the Debtors as of the Effective Date, and Vantage Parent, hold Claims against the Debtors resulting from, among other things, the provision of intercompany services by the non-Debtors to the Debtors, including, without limitation, providing administrative support services, such as personnel, payroll, and retention services, acting as the primary contracting entity for insurance covering the rigs, and managing a capital spares program.  Other Intercompany Claims arise from the sale or transfer of rigs from non-Debtors to Debtors, as well as costs in connection with the development and construction of the Debtors' fleet.  As of September 30, 2015, the Debtors owed approximately $21 million in Intercompany Claims to the Vantage Service Subsidiaries and $108 million in Intercompany Claims to the other non-Debtors, in each case, net of setoffs.  As a result of the sale of the Vantage Service Subsidiaries to OGIL, as described below, the Vantage Service Subsidiaries' Intercompany Claims against the Debtors will be transferred to Vantage Parent.

## G.  **Significant Prepetition Leases**

The Vantage Group maintains offices, land bases, and other facilities worldwide, including a regional operational office in Singapore, and a marketing office in Dubai, all of which the Vantage Group leases.  Certain non-Debtors are lessees under lease agreements for the Debtors' headquarters and principal executive offices in Houston, Texas and the Debtors' regional operational office in Singapore, as described further in *Matters Involving Vantage Parent and Other Non-Debtors—Obligations and Agreements of Vantage Parent and Other Non-Debtors—Leases of Other Non-Debtors*.

As of the date hereof, Vantage Driller III Co, a Debtor, through its Dubai branch, is party to that certain Lease Agreement between Business Central Towers FZ-LLC (Heirs of Mohd Amin Al Kazem), as lessor, and Vantage Driller III Co, as lessee, for the lease of Unit No. BT2003B on the 20th floor of Business Central Towers in Dubai, United Arab Emirates.

As of the date hereof, VDDI is party to that certain Lease of Commercial Property between 566, L.L.C., as lessor, and VDDI, as lessee, for the lease of that certain Revised Tract 4 located at 566 South Hollywood Road, Houma, Louisiana 70360.

## III.
## KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES

### A.  **Collapse in Oil Prices**

As is common throughout the oilfield services industry, the demand for offshore drilling services is largely driven by actual or anticipated changes in oil and natural gas prices and, with it, capital spending by companies exploring for, and producing, oil and natural gas.  Consequently, the offshore drilling industry has historically been cyclical, with periods of high demand, limited rig supply, and high dayrates when the price of oil is high, alternating with periods of low demand, excess rig supply, and low dayrates when the price of oil is low.  Periods of low demand and excess rig supply intensify competition in the

WEIL:\95549520\1\78787.0003

industry and often result in drilling rigs—particularly older, less efficient rigs—becoming idle for longer periods of time.

Starting in the summer of 2014, oil prices began to decline precipitously. Over the next six months or so, the price of oil was cut in half. The rapid and unexpected decline in oil prices led to a significant decline in demand for offshore drilling services as major, national, and independent oil and natural gas companies—the Debtors' customers—implemented severe reductions in capital spending. The reduced demand is compounded by an oversupply of drilling units, as existing rigs compete for the limited, or almost non-existent, tendering activity for jackups and drillships, and deliveries of newly-built rigs continue to saturate the global fleet. As a result, the market for offshore drilling services is severely depressed. The Debtors expect these adverse market conditions to continue for the duration of 2015, into 2016, and possibly beyond.

Against this backdrop, the Debtors, like many of their competitors, have suffered as a result of the collapse in oil prices. Although the Debtors do not face any maturities on their secured debt until 2017, the severity and duration of the market downturn increased the risk that existing customer contracts, some of which are due to expire in the near term, would not be renewed or would be renewed at materially reduced prices. This made the Debtors increasingly reliant on revenue from longer-term contracts, such as the Petrobras Contract, to service debt.

## B.    Operation Carwash

As of December 31, 2014, the Petrobras Contract accounted for approximately $1.4 billion of the Debtors' contract backlog of approximately $2.1 billion. Petróleo Brasileiro S.A. and its affiliates (collectively, "*Petrobras*"), however, became embroiled in an ongoing investigation by Brazilian authorities into corrupt practices. Dubbed Operation Carwash (*Operação Lava Jato*), the investigation by Brazilian authorities began by identifying a group of "black market money exchange dealers" operating in Brazil and thereafter revealed a web of corruption involving Petrobras executives and high-ranking officials in the Brazilian government. Among other things, the Brazilian federal authorities allege that Petrobras executives received bribes in exchange for awarding contracts at above-market prices.

As part of Operation Carwash, the Brazilian Federal Police scrutinized interactions between Petrobras and Hamylton Pinheiro Padilha Junior, who acted as an agent for numerous international offshore drilling companies seeking to do business in Brazil. After being identified as a person of interest, Mr. Padilha cooperated with Brazilian authorities and ultimately entered into a plea agreement with the Brazilian Federal Prosecutor's Office (the "***Brazilian Prosecutor's Office***") in which he admitted he participated in the bribery of certain Petrobras executives.

Mr. Padilha was the Brazilian agent utilized by Vantage Parent during the contracting of the *Titanium Explorer* drillship with PVIS, an affiliate of Petróleo Brasileiro S.A. In his written plea agreement, Mr. Padilha stated under oath that he arranged with Nobu Su, then the owner of the *Titanium Explorer*, to carry out a bribery scheme with Petrobras executives. Nobu Su, who at the time of the alleged bribery payments was a director and significant shareholder of Vantage Parent, was not involved in any of the negotiations between Vantage Parent management and Petrobras representatives relating to the *Titanium Explorer* and never discussed his illegal conduct with any member of Vantage Parent's management. Mr. Padilha further indicated that Vantage Parent's management did not know about the alleged bribery scheme and that he would not have attempted to undertake such a scheme with any member of Vantage Parent's management because of the company's Foreign Corrupt Practices Act compliance program.

On July 30, 2015, the Brazilian media reported on the statements made in Mr. Padilha's plea agreement. On the same date, Vantage Parent issued a press release disclosing that it was unable to confirm

Mr. Padilha's statements and, to the extent Mr. Padilha committed any illegal acts, he was not acting on behalf of, or upon any instructions from, Vantage Parent or any of its subsidiaries.

On August 5, 2015, after reviewing case records, documents gathered in connection with the investigation, and a report issued by the Brazilian Federal Police, the Brazilian Prosecutor's Office indicted several individuals for the alleged bribery of certain Petrobras executives and political officials in connection with the Petrobras Contract. Messrs. Padilha and Su were among those indicted on evidence that they had committed crimes of corruption and money laundering at the time of the negotiation of the Petrobras Contract. Neither Paul Bragg nor any other director or officer of Vantage Parent or its subsidiaries has been indicted by the Brazilian Prosecutor's Office. On August 10, 2015, the 13th Federal Division of the Court of Law of Curitiba/PR accepted the indictment submitted by the Brazilian Prosecutor's Office and initiated a criminal lawsuit against Messrs. Padilha and Su, among others.

Vantage Parent's audit committee is conducting an internal investigation regarding the Brazilian authorities' allegations of wrongdoing by Messrs. Padilha and Su. In connection with this investigation, Vantage Parent also is investigating all current and former directors and officers. Whether the investigation is continued by the joint official liquidators in the Cayman Proceeding or by OGIL, the investigation is currently expected to be completed in the first half of 2016. In addition, Vantage Parent contacted the United States Department of Justice ("**DOJ**") and the SEC when it was first advised that Messrs. Padilha and Su were indicted in early August 2015. Vantage Parent provided periodic progress reports to the DOJ and SEC, cooperated with all DOJ and SEC requests related to this matter, and currently plans to report the conclusions of the company's audit committee investigation by way of "self-report" to the DOJ and SEC in the first half of 2016. Vantage Parent has neither been contacted by, nor engaged in discussions with, any other governmental unit for the United States or any other country with respect to these matters.

### C.   Wrongful Termination of the Petrobras Contract

On August 31, 2015, VDDI received the Petrobras Notice, in which PAI and PVIS purported to terminate the Petrobras Contract. The Petrobras Notice cites to provisions in the Petrobras Contract that permit PAI and PVIS to terminate the agreement in the event of a material breach, repeated failure to provide services in accordance with good oil and gas field practices, or if any representations and warranties are false in any material respect.

Vantage Parent, Vantage Deepwater, and VDDI strongly disagree with the allegations of contractual breaches made by PAI and PVIS in the Petrobras Notice and believe the company is in compliance with all of its obligations under the Petrobras Contract. On the same date, VDDI filed for arbitration to challenge the assertions made in the Petrobras Notice and to assert the Petrobras Notice is a wrongful attempt to terminate the Petrobras Contract that entitles VDDI to compensatory damages plus attorneys' fees. As of the date hereof, the arbitration with PVIS and PAI is ongoing. In accordance with the terms of that certain Third Novation and Amendment Agreement to the Agreement for the Provision of Drilling Services governing the Petrobras Contract, (i) disputes are subject to arbitration in Houston, Texas, under the Commercial Arbitration Rules of the International Center for Dispute Resolution of the American Arbitration Associations, and (ii) the governing law is general maritime law of the United States or, if such law is inapplicable, the laws of the state of Texas.

### D.   Delisting of Vantage Ordinary Shares from New York Stock Exchange

On September 14, 2015, Vantage Parent received the Suspension Notice from the staff of NYSE Regulation that it had determined to commence proceedings to delist Vantage Ordinary Shares from the Exchange and that trading in Vantage Ordinary Shares had been suspended at the market open on that

date.  In the Suspension Notice, the NYSE Regulation staff stated its decision was made in accordance with the NYSE Company Guide, and that it was necessary and appropriate to initiate delisting proceedings due to the "abnormally low" trading price of Vantage Ordinary Shares.  Vantage Parent exercised its right under the NYSE Company Guide to appeal the delisting determination and requested an oral hearing, which was set for November 5, 2015.  Since receipt of the Suspension Notice, Vantage Ordinary Shares has been trading on the over the counter markets under the trading symbol "VTGDF."  On November 4, 2015, the Exchange notified the SEC of its intention to remove the Vantage Ordinary Shares from listing and registration on the Exchange on November 16, 2015.

The supplemental indentures for the 7.875% Convertible Notes due 2042 (the "***7.875% Convertible Notes***") and the 5.5% Convertible Notes due 2043 (the "***5.5% Convertible Notes***") provide that, if Vantage Ordinary Shares are delisted, holders of those notes may require Vantage Parent to repurchase the notes at a price equal to 100% of the principal amount of such notes, plus accrued and unpaid interest.  On November 25, 2015, Vantage Parent provided a fundamental change notice (the "***Fundamental Change Notice***") to the holders of the 5.5% Convertible Notes, as a result of the effectiveness of the delisting on November 16, 2015 (the "***Fundamental Change***").  The Fundamental Change Notice notified the holders of their right to have purchased the 5.5% Convertible Notes on January 15, 2016, which must be exercised on or before January 12, 2016.  In addition, the Fundamental Change Notice disclosed that Vantage Parent currently has no plans to repurchase any notes in respect of the Fundamental Change.

### E.    Reduction in Workforce

In accordance with the Worker Adjustment and Retraining Notification Act, by letter dated October 21, 2015, Vantage Deepwater notified the Texas Workforce Commission of its intention to reduce the headcount associated with its Gulf of Mexico operations by approximately 135 employees.  This reduction in headcount is the result, in part, of the unexpected termination of drilling operations associated with the Petrobras Contract.

### F.    Deleveraging Initiatives

Through diligent and thoughtful management, the Debtors have historically been able to maintain revenues at a better than breakeven level, including debt service.  However, the significant and sustained drop in oil prices and related contraction of demand for offshore drilling services, coupled with loss of the Petrobras Contract, have caused uncertainty regarding the viability of the Debtors' capital structure in the long term.  Accordingly, the Debtors retained restructuring advisers to work closely with the Debtors' management to explore deleveraging options, and to engage key secured debtholders and their advisers in extensive arms' length and good faith negotiations regarding a potential restructuring transaction.  On November 2, 2015, the Debtors issued a press release announcing discussions with an informal group of holders of the Secured Debt Claims regarding a potential deleveraging transaction, and, in connection with those discussions, the Debtors have not made a $40.8 million interest payment on the 7.5% Notes, electing instead to utilize the grace period under such notes, which expires on December 2, 2015.

On December 1, 2015, the Debtors entered into the Restructuring Support Agreement with certain Revolver Lenders, Secured Term Loan Lenders, and Secured Noteholders holding, in the aggregate, more than two-thirds (2/3) of the outstanding principal amount of the Revolving Credit Facility Claims and approximately 58% of the outstanding principal amount of the Secured Debt Claims regarding the terms of a restructuring.

Under the Restructuring Support Agreement, each of the Consenting Debtholders and Consenting Revolver Lenders agreed to, among other things:  (i) vote any claim it holds against the Debtors to accept

16

the Plan and not (a) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, (b) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or (c) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization of the Debtors other than the Plan; (ii) forbear from exercising, directly or indirectly, its rights under the applicable finance documents with respect to its loans or notes resulting from certain actual or potential defaults or events of default specified therein; and (iii) subject to certain exceptions, limit its ability to transfer the indebtedness it holds.

Under the Restructuring Support Agreement, the Debtors agreed to, among other things, (i) commence the Chapter 11 Cases on or before the 10th calendar day after the commencement of the Solicitation, (ii) file the Plan and this Disclosure Statement on the Petition Date, (iii) file a motion seeking approval of the procedures relating to the Rights Offering on the Petition Date, and (iv) file a motion seeking approval of the Backstop Agreement within one calendar day of the execution of the Backstop Agreement.

The Restructuring Support Agreement also provides for various termination events.  Depending on the termination event, the Consenting Debtholders (other than Cortland, as successor administrative agent to Citibank) holding a majority of the aggregate outstanding principal amount of the Secured Term Loans and the Secured Notes held by all the Consenting Debtholders (the "***Requisite Consenting Debtholders***"), the Consenting Revolver Lenders holding a majority of the aggregate outstanding principal amount of indebtedness under the Revolving Credit Facility (the "***Majority Consenting Revolver Lenders***"), or the Debtors, along with Vantage Parent, could terminate the Restructuring Support Agreement.  The Restructuring Support Agreement could be terminated automatically upon the occurrence of any of the following events:

(a)    an order denying confirmation of the Plan is entered;

(b)    an order confirming the Plan is reversed or vacated;

(c)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring the Restructuring Support Agreement to be unenforceable; or

(d)    the occurrence of the Effective Date.

The Restructuring Support Agreement and the obligations of all parties thereto may be terminated by mutual agreement among the Debtors, along with Vantage Parent, the Requisite Consenting Debtholders, and the Majority Consenting Revolver Lenders.

## IV.
## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

In accordance with the Restructuring Support Agreement, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about December 3, 2015.  The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code.

The Debtors intend to continue to operate their business in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Petition Date.  To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important relief from

WEIL:\95549520\1\78787.0003

the Bankruptcy Court.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

### A.    Commencement of Chapter 11 Cases and First Day Motions

On the Petition Date, the Debtors intend to file multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course.  Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of the relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course.

#### 1.    Cash Management System

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors and non-Debtors.  In the ordinary course of business, the Debtors rely heavily on the services provided and goods procured by the Vantage Service Subsidiaries (defined herein), which are reimbursed by the Debtors on an arm's length basis for their costs of doing so.  On the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue the use of their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements with non-Debtors to avoid a disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases.

#### 2.    Cash Collateral

To address their working capital needs and fund their reorganization efforts, the Debtors require the use of cash subject to liens (the "*Cash Collateral*") granted in favor of the holders of the Revolving Credit Facility Claims and the Secured Debt Claims.  Accordingly, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to use the Cash Collateral in the ordinary course, subject to certain restrictions.  In exchange for the continued use of the Cash Collateral, the Debtors intend to provide holders of the Revolving Credit Facility Claims and the Secured Debt Claims with the following, as adequate protection for any diminution in value of their respective interests in the collateral securing the Pari Passu Obligations: (i) valid, perfected, and enforceable security interests, (ii) administrative expense claims, (iii) payment of the reasonable and documented fees of their advisers, (iv) reporting on the Debtors' finances and business operations, (v) access to the Debtors' management, books and records, and collateral securing the Pari Passu Obligations, and (vi) the continued payment of interest under the Revolving Credit Agreement.

#### 3.    Vendors and Foreign Creditors

In the ordinary course of business, the Debtors rely upon a variety of foreign and domestic vendors and service providers.  Pursuant to the Plan, the Debtors intend to pay all of their obligations to such vendors and service providers in full.  However, certain vendors or service providers may seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due.  To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to satisfy their obligations to vendors and service providers in the ordinary course.

Further, various foreign parties extend credit to the Debtors, and the Debtors satisfy such outstanding obligations in the ordinary course.  Maintaining good relationships with the Debtors' foreign creditors is

WEIL:\95549520\1\78787.0003

essential to the continued operation of the Debtors' business during the pendency of the Chapter 11 Cases.  Pursuant to the Plan, the Debtors intend to pay the claims of foreign creditors in full.  Accordingly, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to satisfy their obligations to foreign creditors in the ordinary course.

### 4.    Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and regulatory obligations in full.  To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' business.

### 5.    Utilities

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services, such as electricity, gas, water, and telecommunications.  Accordingly, on the Petition Date, the Debtors intend to seek (i) authority from the Bankruptcy Court to continue payments to such utility providers in the ordinary course and (ii) approval of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course.

### 6.    Insurance

As is common in the contract offshore drilling industry, the Debtors maintain a complex and comprehensive insurance program (the "***Vantage Insurance Program***") designed to protect their property, assets, key personnel, and business operations.  The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and contracts.  The Debtors believe that the satisfaction of their obligations relating to the Vantage Insurance Program, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and ensure the continued availability and commercially reasonable pricing of such insurance coverage.  Moreover, to ensure that all Debtors maintain uninterrupted insurance coverage, the Debtors are seeking the authority of the Bankruptcy Court to replace Vantage Parent as the named insured with OGIL under certain insurance policies, while continuing the existing coverage under such policies, because the Cayman Proceeding is expected to commence on or shortly following the Petition Date.  Accordingly, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to honor their obligations under the Vantage Insurance Program in the ordinary course.

### 7.    Employee Wages and Benefits

The Debtors' business, including the operation of the Debtors' drilling assets, is labor intensive and relies upon various employees, crew members, and contractors worldwide.  Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses; the Vantage Service Subsidiaries employ approximately two-thirds of the Debtors' workforce, and are reimbursed on an arm's length basis for their costs of doing so.  To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including (i) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (ii) the payment of pre- and postpetition accrued and unpaid employee benefits, (iii) the continuation of the Debtors' benefit programs

WEIL:\95549520\1\78787.0003

and policies, and (iv) the continuation of their intercompany arrangements with the Vantage Service Subsidiaries.

### B.    Other Procedural Motions and Retention of Professionals

The Debtors intend to file various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

### C.    Confirmation Hearing

Contemporaneously with the filing of the Petition, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith and (ii) confirmation of the Plan.  The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

### D.    Timetable for the Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors are obligated to proceed with the implementation of the Plan through the Chapter 11 Cases.  Among the milestones contained in the Restructuring Support Agreement is the requirement that the Bankruptcy Court enter the order approving the Disclosure Statement and the solicitation procedures and confirming the Plan within 60 calendar days after the Petition Date.  Although the Debtors will request that the Bankruptcy Court approve the timetable set forth in the Restructuring Support Agreement, there can be no assurance that the Bankruptcy Court will grant such relief.  Achieving the various milestones under the Restructuring Support Agreement is crucial to reorganizing the Debtors successfully.

## V.
## MATTERS INVOLVING VANTAGE PARENT AND OTHER NON-DEBTORS

### A.    Obligations and Agreements of Vantage Parent and Other Non-Debtors

#### 1.    Indebtedness of Vantage Parent

(a)    Pari Passu Obligations

Vantage Parent is a co-borrower under the Revolving Credit Agreement and a guarantor under the other Pari Passu Obligations.  As security for such obligations, Vantage Parent pledged, pursuant to the Parent Pledge Agreement, the equity interests of all its direct subsidiaries that are borrowers or guarantors under the Pari Passu Obligations.

(b)    7.875% Convertible Notes

Vantage Parent is party to that certain Indenture and First Supplemental Indenture, each dated as of August 21, 2012, by and between Vantage Parent, as issuer, and Wells Fargo, as indenture trustee, as amended, modified, or otherwise supplemented, pursuant to which Vantage Parent issued the 7.875% Senior Convertible Notes to the holders of such notes (the "***7.875% Convertible Noteholders***") in the aggregate principal amount of $56.5 million.  The 7.875% Convertible Notes mature on September 1, 2042.  The 7.875% Convertible Notes are senior, unsecured obligations, and rank senior in right of payment to all of Vantage Parent's existing and future subordinated indebtedness and equal in

right of payment with Vantage Parent's other existing and future senior unsecured indebtedness.  As of the date hereof, the aggregate amount outstanding under the 7.875% Convertible Notes is $20,000 in unpaid principal, plus interest, fees, and other expenses.

(c)    5.5% Convertible Notes

Vantage Parent is party to that certain Indenture, dated as of July 16, 2013, by and between Vantage Parent, as issuer, and Wells Fargo, as indenture trustee, as amended, modified, or otherwise supplemented, pursuant to which Vantage Parent issued the 5.5% Senior Convertible Notes to the holders of such notes (the "**5.5% Convertible Noteholders**") in the aggregate principal amount of $100 million. The 5.5% Convertible Notes mature on July 15, 2043.  The 5.5% Convertible Notes are senior, unsecured obligations, and rank senior in right of payment to all of Vantage Parent's existing and future subordinated indebtedness and equal in right of payment with any of Vantage Parent's other existing and future senior unsecured indebtedness.  As of the date hereof, the aggregate amount outstanding under the 5.5% Convertible Notes is $24,973,000 in unpaid principal, plus interest, fees, and other expenses.

(d)    F3 Capital Note

Vantage Parent is party to that certain Promissory Note, dated July 30, 2010, by and between Vantage Parent, as borrower, and F3 Capital, as lender (the "**F3 Capital Note**").  Vantage Parent issued the F3 Capital Note in the aggregate principal amount of $60 million.  As of the date hereof, the aggregate amount outstanding under the F3 Capital Note is $70,732,728 in unpaid principal and payable balance, plus interest, fees, and other expenses.  Vantage Parent disputes its liability with respect to the F3 Capital Note and the Debtors' transactions with Nobu Su, the owner of F3 Capital, are described in *Matters Involving Vantage Parent and Other Non-Debtors—Litigation Involving Other Non-Debtors—Nobu Su Litigation.*

**2.    Construction Supervision and Operations Management Agreements**

On September 2, 2013, Vantage International Management Company Pte. Ltd. ("**VIMCO Singapore**") entered into two separate agreements with Sociedade Nacional de Combustiveis de Angola, Sonangol, E.P. to supervise and manage the construction of two ultra-deepwater drillships by DSME, with Hull Numbers 3620 and 3621, respectively (together, the "**Sonangol Construction Contracts**").  For Hull Number 3620, VIMCO Singapore receives management fees in the amount of $9,900 per day and is reimbursed costs, subject to an aggregate maximum amount of $24,374,900.  For Hull Number 3621, VIMCO Singapore receives management fees in the amount of $8,910 per day and is reimbursed costs, subject to an aggregate maximum amount of $23,384,900.  Each of the agreements will terminate upon the earlier of (i) the date which falls 60 days after the delivery date of each vessel, (ii) the occurrence of certain enumerated events after the delivery date, and (iii) the termination by convenience of the parties upon written notice.

**3.    Leases of Other Non-Debtors**

As of the date hereof, VESI is party to that certain lease agreement, dated as of November 29, 2006, by and between Gateway Ridgecrest Inc., as lessor, and VESI, as lessee, as amended and supplemented from time to time, for the premises used as the Debtors' headquarters and principal executive offices in Houston, Texas.

As of the date hereof, VIMCO Singapore is party to that certain Tenancy Agreement for Pacific Centre, dated as of April 14, 2008, between HSBC Institutional Trust Services (Singapore) Limited and Vantage International Payroll Co. Pte. Ltd., a non-Debtor, for the lease of the seventh floor of the Pacific Tech

21

Centre Building in Singapore, which was novated to VIMCO Singapore pursuant to a Novation Agreement dated as of July 25, 2008.

### B.   Litigation Involving Other Non-Debtors

#### 1.   DSME Termination

Pursuant to that certain Contract for the Construction and Sale of Drillship, dated June 6, 2013, by and between Cobalt Explorer Holdings Company, as buyer ("**Cobalt Buyer**"), a non-Debtor affiliate of the Debtors, and DSME, as builder, DSME agreed to design, construct, complete, and deliver to Cobalt Buyer an ultra-deepwater drillship to be named the *Cobalt Explorer* (the "**Cobalt Construction Contract**").  Under the terms of the Cobalt Construction Contract, the contract price of $595 million would be paid in accordance with certain milestones:  (i) the first payment, representing 10% of the contract price (i.e., $59.5 million), would be paid on June 30, 2013, (ii) the second milestone payment, representing another 10% of the contract price, would be paid 18 months after July 2013, and (iii) the final payment would be paid upon delivery of the *Cobalt Explorer*.  In connection with the Cobalt Construction Contract, Vantage Deepwater Holdings Company, a non-Debtor, and Vantage Parent executed a deed of guarantee, as guarantor and supplemental guarantor, respectively.  The supplemental guarantee by Vantage Parent is conditioned upon Vantage Parent not taking any action that would cause a default under any existing agreement or indebtedness of Vantage Parent or any of its subsidiaries.

In July 2013, Cobalt Buyer made the initial milestone payment.  In February 2015, Cobalt Buyer agreed with DSME to defer the second milestone payment to July 15, 2015.  Cobalt Buyer sought to engage DSME in discussions regarding a further delay of the second milestone payment and possible extensions for the delivery of the *Cobalt Explorer* beyond the first half of 2016.  DSME would not meaningfully engage with Cobalt Buyer and Cobalt Buyer subsequently missed the second milestone payment.  On August 13, 2015, Cobalt Buyer terminated the Cobalt Construction Contract on the basis of DSME's insolvency in accordance with the terms of the Cobalt Construction Contract, and made a demand for all funds paid to DSME, totaling approximately $59.5 million plus contractual interest and any other amounts due under applicable law.  DSME challenged the validity of Cobalt Buyer's termination and, on August 18, 2015, DSME sent Cobalt Buyer a notice purporting to terminate the Cobalt Construction Contract due to Cobalt Buyer's failure to make the second milestone payment.  On August 25, 2015, DSME commenced arbitration proceedings in the United Kingdom pursuant to the arbitration provisions in the Cobalt Construction Contract.  The arbitration proceedings are confidential and are conducted in accordance with the Arbitration Act 1996 of United Kingdom and the rules of The London Maritime Arbitrators' Association.  If DSME prevails on the arbitration, it could be entitled to recover from Cobalt Buyer, among other things, any difference between the contract price for the *Cobalt Explorer* and the price for which DSME actually sells it.  If Cobalt Buyer prevails in the arbitration, Cobalt Buyer is entitled to a refund in an amount equal to the initial milestone payment, plus interest.

#### 2.   Nobu Su Litigation

##### (a)   Transactions with Nobu Su[3]

Following its initial public offering in May 2007, Vantage was in the market for offshore drilling units.  In the course of evaluating potential acquisitions, certain members of the Vantage management team were introduced to Nobu Su, a Taiwanese national who owned, operated, or controlled a variety of shipping

---

[3] Given that many of the transactions between Nobu Su and Vantage Parent were accomplished through various wholly-owned and/or controlled entities, solely for the purposes of this Section V.B.3, unless otherwise specified, references to "Vantage" and "Nobu Su" shall be deemed to include any subsidiaries or affiliates of such party.

and offshore drilling assets.  On August 30, 2007, Nobu Su, acting though F3 Capital (an entity wholly-owned and controlled by Nobu Su), and VESI entered into an agreement whereby VESI agreed to acquire all of the shares of OGIL, an entity holding contracts for the construction and delivery of four jackup drilling rigs, in exchange for (i) $56 million in cash, (ii) $275 million in VESI common stock and warrants, and (iii) the assumption by Vantage of the $517 million remaining to be paid under the construction contracts for the jackup rigs.  Additionally, the agreement provided that the seller would grant to VESI an option to call for the novation of a contract between DSME and Mandarin Drilling Company ("***Mandarin***") for the construction of a deepwater drillship.  On December 7, 2007, the agreement was amended such that F3 Capital would agree to sell the shares of OGIL to Vantage Parent and VESI agreed to merge into a wholly-owned subsidiary of Vantage Parent.  On March 24, 2008, Mandarin and OGIL (the acquisition of OGIL had not yet closed), entered into an agreement for the outright purchase by Vantage of the *Platinum Explorer*.  The purchase agreement for the *Platinum Explorer* provided for, among other things, the payment of $676 million to Mandarin and the grant of an option to Vantage for the purchase a second ultra-deepwater drillship, the *Titanium Explorer*, which was then under construction by DSME.  The purchase agreement for the shares of OGIL closed on June 12, 2008.  Upon closing, Nobu Su, through F3 Capital, became the largest shareholder of Vantage Parent, controlled three of the nine seats on the board of directors for Vantage Parent, and appointed himself to the board.

On November 18, 2008, Vantage Parent, through its wholly-owned subsidiary Vantage Deepwater, entered into a joint venture agreement with Nobu Su, through F3 Capital (the "***Mandarin JV Agreement***"), which terminated the *Platinum Explorer* purchase agreement and instead provided that Vantage Deepwater would purchase 45% of Mandarin, the entity that was party to the *Platinum Explorer* construction contract, while Nobu Su continued to own the remaining 55% of Mandarin.  Pursuant to the Mandarin JV Agreement, among other things, (i) Nobu Su acquired additional shares of, and warrants for, Vantage Ordinary Shares, (ii) Vantage agreed to apply previous payments made to Nobu Su towards the purchase of its 45% interest in Mandarin, (iii) Nobu Su agreed to fund 100% of the remaining installment payments to DSME, and (iv) each party agreed to pay its pro rata share of all remaining construction costs and the final completion payment due upon delivery of the *Platinum Explorer*.  In connection with the Mandarin JV Agreement, on December 19, 2008, Mandarin entered into an agreement with VIMCO Cayman for the latter to oversee and manage the construction of the *Platinum Explorer* (as well as two other ultra-deepwater drillships controlled by Nobu Su) and an agreement with Vantage Deepwater to market and operate the *Platinum Explorer* on behalf of Mandarin.[4]  Likewise, Nobu Su, through his affiliate Valencia Drilling Corporation ("***Valencia***"), the entity party to the contract for the construction of the *Titanium Explorer*, (i) entered into an agreement, effective January 1, 2009, for Vantage, through its affiliate Titanium Explorer Company, to manage the construction of the *Titanium Explorer*, and (ii) in March 2009, entered into an agreement with Vantage Deepwater to market and operate the *Titanium Explorer*, on behalf of Valencia.[5]  Due to Nobu Su's inability to satisfy, and defaults with respect to, his payment obligations under the Mandarin JV Agreement, and to avoid the substantial losses that would have resulted from defaulting on the construction contract for the *Platinum Explorer*, on July 30, 2010, Vantage bought out Nobu Su's 55% interest in Mandarin in exchange for consideration that included Vantage's issuance of the F3 Capital Note to the F3 Capital.  As a result of the events described above,

---

[4] Throughout the period in which Nobu Su controlled 55% of Mandarin, he failed to make the payments owed to VIMCO Cayman and Vantage Deepwater under these agreements.

[5] Similar to the management agreements relating to the *Platinum Explorer*, Nobu Su failed to satisfy his payment obligations relating to the *Titanium Explorer* management agreements.  Due to Nobu Su's failure to satisfy such payment obligations, on March 20, 2012, Vantage, through Dragonquest Holdings Company and Vantage Parent, entered into an agreement with Nobu Su, through Valencia, to acquire the rights and obligations under the construction contract for the *Titanium Explorer*.

WEIL:\95549520\1\78787.0003

among other things, Nobu Su's relationship with Vantage deteriorated and, on April 14, 2011, he resigned from Vantage Parent's board of directors.  On March 20, 2012, following further breaches of Nobu Su's payment obligations under the *Titanium Explorer* construction management agreement, and facing potentially devastating liability under the Petrobras Contract in the event the *Titanium Explorer* was not completed and delivered on time, Vantage was likewise forced to purchase the *Titanium Explorer* outright.

(b)    Overview of the Nobu Su Litigation

On August 21, 2012, Vantage Parent commenced a lawsuit styled *Vantage Drilling Company vs. Hsin-Chi Su a/k/a Nobu Su* (the "***Nobu Su Litigation***") by filing a petition (as amended, the "***Vantage Complaint***")[6] against Nobu Su.  In the Vantage Complaint, Vantage Parent states various causes of action against Nobu Su, including breaches of fiduciary duties, fraud, fraudulent inducement, negligent misrepresentation, and unjust enrichment.  Through the Nobu Su Litigation, Vantage Parent seeks, among other things, to (i) recover approximately 100 million shares of Vantage Ordinary Shares held by F3 Capital, (ii) cancel the F3 Capital Note, and (iii) recover actual and punitive damages relating to losses suffered as a result of Nobu Su's conduct.  The Nobu Su Litigation is based on Nobu Su's actions and omissions, both before, during, and after his tenure as a director of Vantage Parent, relating to his various transactions with Vantage, including the joint venture in Mandarin, the acquisition and related financing of the *Platinum Explorer*, and the management and ultimate acquisition of the *Titanium Explorer*.  Specifically, the Vantage Complaint alleges that Nobu Su (i) made multiple material misrepresentations and omissions regarding the payment terms of the construction contract for the *Platinum Explorer* and his relationship with DSME, (ii) materially misrepresented his ability to satisfy his obligations to Vantage relating to the Mandarin JV Agreement and various management agreements, (iii) continually and intentionally frustrated Vantage's efforts to raise capital from conventional sources, and (iv) threatened not to perform his obligations to Vantage unless Vantage acquiesced to his demands for loans and other cash payments from Vantage, early payment of amounts owed by Vantage in connection with the *Platinum Explorer*, and modification of various agreements between Nobu Su and Vantage.  Vantage alleges, among other things, that Nobu Su's actions (a) caused material damage to Vantage's liquidity position and ability to raise capital from conventional sources, (b) caused damage to Vantage's reputation with its lenders and the investment community, (c) forced Vantage into interested transactions with Nobu Su, and (d) forced Vantage to incur substantial amounts of actual, special, and consequential damages to mitigate the impact of Nobu Su's wrongdoing and obtain the benefit of its agreements with Nobu Su.

On June 20, 2014, nearly two years into the case and after numerous dilatory gimmicks, Nobu Su filed a counterclaim (as amended, the "***Counterclaim***") against Vantage Parent and certain of its current and former officers and directors, Paul Bragg, Chris Celano, Christopher DeClaire, and John O'Leary.  In the Counterclaim, Nobu Su asserts various causes of action including fraud, negligent misrepresentation, tortious interference with contract, breaches of fiduciary duties, and unjust enrichment.  Through the Counterclaim, Nobu Su seeks damages in excess of $2 billion—based on purported losses suffered by Nobu Su directly and indirectly through his affiliates, resulting from the decline in the price of Vantage Ordinary Shares and Vantage's alleged interference with Nobu Su's contacts with DSME—and indemnification from Vantage Parent with respect to the matters that are the basis of the Nobu Su Litigation.

The Nobu Su Litigation is currently pending before the 270th District Court of Harris County, Texas.  On January 16, 2015, Nobu Su filed a motion seeking to compel arbitration under the arbitration provision of the OGIL purchase agreement.  By Order signed February 20, 2015, the court granted Nobu Su's arbitration motion, compelling the parties to arbitration (the "***Nobu Su Arbitration***") to determine the

---

[6] The Vantage Complaint is incorporated by reference into this Disclosure Statement as if set forth fully herein.

WEIL:\95549520\1\78787.0003

"arbitrability" of Vantage Parent's claims for fraud, fraudulent inducement, misrepresentation, and breach of fiduciary duty as they relate to the OGIL purchase agreement.  In connection with the Nobu Su Arbitration, Vantage Parent incorporated the claims asserted against Nobu Su in the Nobu Su Litigation and added a claim for constructive fraud, alleging that Nobu Su engaged in a scheme to procure a drilling contract for the *Titanium Explorer* through acts of bribery and money laundering.  The Nobu Su Litigation is currently stayed pending the result of the Nobu Su Arbitration in Houston, Texas. Additional discussion of the Nobu Su Litigation can be found in the Form 10-K of Vantage Parent for the fiscal year ended December 31, 2014, filed with the SEC on March 6, 2015.

### 3.    BP Oil Spill

On April 3, 2013, Vantage Parent filed a complaint against BP Exploration & Production, Inc. ("**BP**").  In its complaint, Vantage Parent alleges that, as a result of the April 2010 Macondo well incident, BP committed various violations of the U.S. Oil Pollution Act of 1990 ("**OPA**") that harmed Vantage Parent. Through its complaint, Vantage Parent seeks an award for damages it suffered as a result of BP's actions (approximately $265,513,705).  The case is pending before the United States District Court for the Eastern District of Louisiana and is styled *Vantage Drilling Company v. BP Exploration & Production, Inc*.  This litigation is one of approximately 200 lawsuits against BP and its affiliates based upon violations of the OPA resulting from the April 2010 Macondo well incident.

### C.    Purchase of the Vantage Service Subsidiaries and Transfers of Essential Non-Debtor Contracts

To minimize operational disruption and enhance organizational efficiencies for the Reorganized Debtors, prior to the Petition Date, OGIL will purchase, at fair market value as determined by a third- party appraisal, Vantage Parent's equity interests in VIMCO Singapore and VESI (together, the "*Vantage Service Subsidiaries*").

The Vantage Service Subsidiaries provide significant operational services for the Debtors.  In particular, VESI provides administrative support, such as personnel, payroll, purchasing goods and services for the Debtors' operating entities and retention services to the Debtors, and VIMCO Singapore serves as the management company for the enterprise, retaining employees and purchasing goods and services on behalf of the Debtors' operating entities, and managing a capital spares program for the Debtors' fleet. As noted above, VIMCO Singapore is also party to the Sonangol Construction Contracts.  In exchange for the Vantage Service Subsidiaries, OGIL will issue a secured promissory note to Vantage Parent (the "*Vantage Parent Secured Promissory Note*") in an amount equal to ($61,477,000), which is equal to (i) the arms' length, fair market value of the purchased assets, as appraised by Alvarez & Marsal Valuation Services, LLC ("*A&M*") ($59,477,000) and (ii) consideration ($2,000,000) for Vantage Parent's contribution to the capital of VESI of the non-Vantage Service Subsidiary non-Debtors' claims against VESI.  The Vantage Parent Secured Promissory Note will mature one year from the date of issuance of such note and will provide that, on the Effective Date of the Plan or a substantially similar plan of reorganization, such note will be payable in the New Common Shares, using the plan value for such shares to calculate the appropriate number of shares.  If, however, the Effective Date has not occurred by the maturity date, the Vantage Parent Secured Promissory Note provides that it will be payable in cash.  The Vantage Parent Secured Promissory Note will be secured by a first-priority security interest in the Vantage Service Subsidiaries and will accrue interest at a rate of 10% per annum.

As noted above, to ensure that fair consideration was both received by Vantage Parent and paid by OGIL for the Vantage Service Subsidiaries, Vantage retained A&M to perform a going concern valuation of each of the Vantage Service Subsidiaries.  A&M concluded that VIMCO Singapore has a value of $62.655 million, including a net intercompany receivable of $27.09 million, or $35.565 million if the

receivable is excluded.  A&M concluded that VESI has a value of $0.939 million, including a net intercompany payable of $22.973 million, or $23.912 million if the payable is excluded.

The following chart shows the net intercompany payables and receivables among each of (i) VESI, (ii) VIMCO Singapore, (iii) the Debtors, and (iv) the non-Debtors other than the Vantage Service Subsidiaries (including Vantage Parent) in the company's books and records as of September 30, 2015:

| | Debtor | Non-Debtor | VESI | VIMCO |
|---|---|---|---|---|
| | **Total** | | | |
| Debtor | $ - | $ 108,346,315 | $ 3,225,346 | $ 17,827,137 |
| Non-Debtor | (108,342,530) | - | (115,666,499) | 98,731,362 |
| VESI | (3,225,346) | 115,666,499 | - | (89,468,014) |
| VIMCO | (17,827,137) | (98,731,362) | 89,468,014 | - |
| **Total** | **($129,395,013)** | **$125,281,453** | **($22,973,139)** | **$27,090,484** |

It was determined that including intercompany receivables and payables in the value of VIMCO Singapore and VESI did not reflect the true value of those companies, because some of the receivables were not collectible in full due to the insolvency of certain entities.  For example, including those intercompany amounts would have led to unworkable results:  (i) OGIL would have paid full value ($98,731,362) for VIMCO Singapore's claim against the non-Debtors that will, at best, be collectible for cents on the dollar and (ii) After OGIL pays almost $1 million for VESI, the non-Debtors would continue to be able to assert a claim for over $100 million against VESI, rendering VESI insolvent and OGIL's investment in VESI worthless.

As a result, Vantage Parent and OGIL intend to (i) have the purchase price for VIMCO Singapore and VESI reflect the value of each entity's assets over its third party liabilities and (ii) settle and/or otherwise handle the intercompany receivables/payables involving VIMCO Singapore and VESI in a manner that reflects the actual value of the intercompany claims and is fair to both Vantage Parent and OGIL.

The following charge describes the relevant receivables and the proposed treatment of the intercompany claims by Vantage Parent and OGIL in connection with the sale of the Vantage Service Subsidiaries.

| Party Holding Receivable | Party Holding Payable | Amount | Proposed Treatment | Justification |
|---|---|---|---|---|
| VIMCO Singapore | Debtors | $17,827,137 | VIMCO to transfer the receivable to Vantage Parent | General Unsecured Claims against the Debtors are unimpaired under the plan;; through this transfer, Vantage Parent will receive consideration equal to the value of that intercompany receivable |
| VESI | Debtors | $3,225,346 | VESI to transfer the receivable to Vantage Parent | Same |
| VIMCO | Non- | $98,731,362 | VIMCO waives the | Vantage Parent is not giving up any value (it's getting a benefit); OGIL is not |

| Party Holding Receivable | Party Holding Payable | Amount | Proposed Treatment | Justification |
|---|---|---|---|---|
| Singapore | Debtors | | receivable | giving up any value because it is not paying for the receivable |
| Non-Debtors | VESI | $115,666,499 | Settled for $2 million, which amount will be added to the consideration on the Vantage Parent Secured Promissory Note and otherwise contributed by Vantage Parent to the capital of VESI | VESI's assets are valued at $28.442 million, and Vantage Parent is receiving $23.912 million for those assets. Therefore, the most Vantage Parent could ever expect to receive on account of its receivable against VESI is an additional $4.530 million. Given that in a liquidation, (i) Vantage Parent would not receive the $3 million A&M attributed to the going concern value of VESI, (ii) liquidation costs would be incurred, and (iii) Vantage Parent would have to share in the value with other creditors, a settlement of $2 million is fair and appropriate. |
| VESI | VIMCO | $89,468,014 | At OGIL's election, this claim can either be waived or ride through | Both Vantage Parent and OGIL are indifferent, as both pre-sale and post-sale the equity holders of these two entities is the same. |

In addition to the transfer of the Vantage Service Subsidiaries, as part of their pre-bankruptcy planning, and to ensure the continuation of business under Reorganized OGIL, the Debtors have transferred, or prior to the Petition Date will transfer, certain significant contracts with non-Debtors to OGIL and the Vantage Service Subsidiaries, including certain insurance policies, benefit plans, credit card agreements, consulting agreements, employment agreements, and indemnification agreements. These agreements are essential to the continued business under Reorganized OGIL and do not generally provide value to Vantage Parent.

### D.      The Related Cayman Islands Proceeding

The Cayman Proceeding is expected to commence on or shortly following the Petition Date. Subject to the Cayman Court issuing the orders sought, Vantage Parent's affairs will be wound up under the control of independent official liquidators, under the supervision of the Cayman Court. Upon the conclusion of that process, once all remaining assets of Vantage Parent have been realized and/or distributed to its creditors (and, to the extent of any surplus, its shareholders), Vantage Parent will be dissolved by order of the Cayman Court.

### VI.
### SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

WEIL:\95549520\1\78787.0003

A.    **Administrative Expense and Priority Claims**

1.    **Treatment of Administrative Expense Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; provided, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

2.    **Treatment of Fee Claims**

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

3.    **Treatment of Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; provided, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities

B.    **Classification of Claims and Interests**

1.    **Classification in General**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

WEIL:\95549520\1\78787.0003

### 2.    Formation of Debtor Groups for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separately legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.    Summary of Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Yes |
| Class 4 | Secured Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 7 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 8 | Existing OGIL Interests | Impaired | Yes |
| Class 9 | Intercompany Interests | Impaired | No (Deemed to reject) |

### C.    Treatments of Claims and Interests

### 1.    Priority Non-Tax Claims – Class 1

The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.    Other Secured Claims – Class 2

The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

### 3.    Revolving Credit Facility Claims – Class 3

On the Effective Date, each holder of an Allowed Revolving Credit Facility Claim shall receive, on account of such Allowed Claim and at the option of the Debtors or Reorganized Debtors, as applicable, its Pro Rata share of (i) payment in full in Cash to the extent the Debtors elect to refinance the Revolving Credit Facility in its entirety or (ii) a new or amended and restated senior secured term loan and letter of credit facility and, in the case of the lenders under the Revolving Credit Facility Agreement (other than the issuer of a letter of credit), a payment of Seven Million Dollars ($7,000,000) in Cash.

### 4.    Secured Debt Claims – Class 4

On the Effective Date, on account of its Allowed Secured Debt Claims, each holder of an Allowed Secured Debt Claim shall receive: (i) its Pro Rata share of the New Secured Convertible PIK Notes; (ii) up to its Pro Rata share of the $75,000,000 New Second Lien Notes to be issued in the Rights Offering, to the extent it elects to exercise its Subscription Rights thereunder, which Subscription Rights will be made available to each holder of an Allowed Secured Debt Claim on a Pro Rata basis and in accordance with the Rights Offering Procedures; and (iii) its Pro Rata share of the New Common Shares, subject to dilution by New Common Shares issued upon the conversion of the New Secured Convertible PIK Notes, on account of the Vantage Parent Secured Promissory Note, and under the Management Incentive Program.  The New Secured Convertible PIK Notes will be "stapled" to (and thus only transferred with) a holder's New Common Shares.

### 5.    General Unsecured Claims – Class 5

The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

### 6.    Intercompany Claims – Class 6

On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion.  All Intercompany Claims between any Debtor and a nondebtor affiliate shall be Unimpaired under the Plan.

WEIL:\95549520\1\78787.0003

### 7.    Subordinated Claims – Class 7

Subordinated Claims are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

### 8.    Existing OGIL Interests – Class 8

On the Effective Date, on account of its Existing OGIL Interests, each holder of an Existing OGIL Interest shall receive the releases from the Debtors set forth in section 10.7(a) hereof.  All Existing OGIL Interests (together with any certificates or other instruments evidencing such Existing OGIL Interests) shall be (i) deemed consensually foreclosed upon by all parties entitled to do so; (ii) immediately upon the issuance of the New Common Shares, surrendered to OGIL; and (iii) thereafter deemed cancelled by operation of the law of the Cayman Islands.

### 9.    Intercompany Interests – Class 9

Intercompany Interests are Impaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.14 of the Plan.

### D.    Summaries of New Securities and the Amended and Restated Credit Facility

The summaries below describe the anticipated principal terms of the Amended and Restated Credit Facility, the New Second Lien Notes, the New Secured Convertible PIK Notes, and the New Common Shares; *provided*, *however*, that these summaries do not purport to represent a complete description of the terms and conditions of the new securities and the Amended and Restated Credit Facility.  Certain terms and conditions of these new securities and the Amended and Restated Credit Facility have not yet been determined, but will be finalized in connection with the negotiation of the Definitive Documents.

### 1.    Summary of the Amended and Restated Credit Facility

| | |
|---|---|
| **Borrower:** | Offshore Group Investment Limited, a Cayman Islands exempted company (the "Borrower"). |
| **Guarantors:** | All the direct and indirect subsidiaries of the Borrower, including those, if any, that will exist at closing or that are formed or acquired during the term of the Credit Facilities (hereafter defined) (the "Guarantors" and, together with the Borrower, the "Loan Parties"). |
| **Lenders:** | The revolving lenders and Royal Bank of Canada, as LC issuer, under the Existing Credit Agreement (as defined below) ("Lenders"). |
| **Administrative Agent:** | Royal Bank of Canada (the "Administrative Agent"). |
| **Collateral Agent:** | Royal Bank of Canada (the "Collateral Agent"). |
| **LC Issuer:** | Royal Bank of Canada (in such capacity, the "LC Issuer"). |
| **Credit Facilities:** | As of the consummation of a consensual financial restructuring of the capital structure of the Loan Parties that incorporates the terms and |

conditions set forth herein and the Restructuring Term Sheet to which this Term Sheet is attached (the "<u>Restructuring Term Sheet</u>") (the "<u>Restructuring</u>"), the outstanding principal balance of the revolving loans under the Existing Credit Agreement shall be replaced with, or converted into, as applicable, a $143,000,000 senior secured term loan facility (the "<u>Term Loan Facility</u>" and the loans thereunder, the "<u>Loans</u>"), and the letter of credit facility under the Existing Credit Agreement shall be replaced with, or converted into, as applicable, a $32,000,000 senior secured letter of credit facility (the "<u>Letter of Credit Facility</u>"; together with the Term Loan Facility, the "<u>Credit Facilities</u>").

**Incremental Facility:**    At any time during the term of the Term Loan Facility, the Borrower will be permitted to add one or more incremental term loan (an "<u>Incremental Term Loan Facility</u>") or revolving credit facilities (an "<u>Incremental Revolving Facility</u>", and each Incremental Term Loan Facility or Incremental Revolving Facility being referred to as an "<u>Incremental Facility</u>") up to a maximum amount not to exceed the sum of (A) $125,000,000 less (B) the aggregate principal amount of Incremental Equivalent Debt less (C) the outstanding principal amount of the New Secured Notes (as defined in the Restructuring Term Sheet), in the aggregate for all Incremental Facilities; provided that, (i) each existing Lender will be offered the opportunity to participate in any Incremental Facility but no existing Lender will be obligated to provide any portion of such Incremental Facility, (ii) no default or event of default exists or would exist after giving effect thereto, (iii) the Borrower and its subsidiaries shall be in pro forma compliance with a minimum Consolidated Interest Coverage Ratio (to be defined in a manner consistent with the Existing Credit Agreement, but in any event, shall not include PIK interest) of 2.00x, (iv) the maturity date of such Incremental Facility shall be no earlier than the maturity date of the Term Loan Facility, (v) any Incremental Term Loan Facility cannot have amortization greater than 1.0% of original principal balance of Incremental Facility per annum and any Incremental Revolving Facility shall require no scheduled amortization or mandatory commitment reduction prior to the final maturity of the Term Loan Facility, (vi) the aggregate amount of Incremental Revolving Facilities cannot exceed $25,000,000, (vii) any Incremental Term Loan Facility may only be secured on a junior lien basis to the Term Loan Facility, (viii) any Incremental Revolving Facility may be secured on a pari passu basis with the Term Loan Facility, (ix) the pricing, interest rate margins, discounts, premiums, rate floors, and fees applicable to any Incremental Facility shall be determined by the Borrower and the lenders thereunder; provided that (a) if the Effective Yield (as defined below) relating to any such Incremental Revolving Facility equals or exceeds the Effective Yield relating to the then-existing Term Loan Facility, if any, then the applicable interest rate margins relating to the then-existing Term Loan Facility, if any, shall be adjusted to the extent necessary so that the Effective Yield of the then-existing Term Loan Facility, if any, is equal to the sum of the Effective Yield of the Incremental Revolving Facility plus 50 basis points and (b) if the Effective Yield relating to any such Incremental Revolving Facility is less than the Effective Yield relating to the then-existing Term Loan Facility, if any, then the applicable interest rate margins relating to

the then-existing Term Loan Facility, if any, shall be increased by up to 50 basis points, but only if and to the extent necessary so that the Effective Yield of the then-existing Term Loan Facility, if any, is not less than the sum of the Effective Yield of the Incremental Revolving Facility plus 50 basis points (it being understood and agreed that, if the Effective Yield of the Incremental Revolving Facility is lower than the Effective Yield relating to the then-existing Term Loan Facility, if any, by 50 basis points or more, no adjustment to the applicable interest rate margin shall be made) and (x) the other terms and documentation in respect thereof, including, without limitation, any financial covenants and baskets, shall be no more favorable to the lenders thereunder than the terms of the Term Loan Facility, and to the extent that the terms of the Incremental Facility differ from the Term Loan Facility, the terms thereof shall be reasonably acceptable to the Required Lenders.

As used herein, "Effective Yield" means, as of any date of determination, the sum of (i) the higher of (A) LIBOR with a maturity of three months and (B) the LIBOR floor, if any, with respect to such class of Loans as of such date, (ii) the applicable margins as of such date and (iii) the amount of original issue discount ("OID") and/or upfront fees paid and payable (which shall be deemed to constitute like amounts of OID) by the Borrower to the Lenders in connection with such Term Loan Facility or Incremental Revolving Facility (it being understood that customary arrangement, commitment, structuring or amendment fees payable to one or more arrangers (or their respective affiliates) in connection with any Incremental Term Facility shall be excluded).

|  |  |
|---|---|
| **Existing Credit Agreement:** | Amended and Restated Credit Agreement dated as of March 28, 2013 among Vantage Drilling Company, the Borrower, the Guarantors, the lenders party thereto, and Royal Bank of Canada, as administrative agent (the defined terms of which are used herein unless otherwise defined herein). |
| **Pricing, Fees and Interest Rates:** | As outlined in _Addendum I_. |
| **Maturity Date:** | December 31, 2019 (the "Maturity Date"). |
| **Voluntary Prepayments and Commitment Reductions:** | Voluntary prepayments of loans under the Credit Facilities are permitted (subject to reimbursement of customary applicable breakage costs) in minimum amounts and with prior notice. The unutilized portion of the commitments under the Letter of Credit Facility may from time to time be permanently reduced or terminated by the Borrower in whole or in part without penalty. |
| **Mandatory Repayments:** | The Borrower shall be required to prepay Loans with 100% of net proceeds from asset sales and casualty events (except as otherwise provided below, subject to the right to reinvest in operating assets of the Borrower and its subsidiaries if such proceeds are reinvested within 365 days so long as any proceeds to be reinvested are segregated in a manner reasonably acceptable to the Collateral Agent, including depositing such |

33

proceeds into a separate deposit account designated by the Collateral Agent), and debt incurrences (other than debt permitted under the Credit Agreement); provided, that upon the occurrence of certain events of loss with respect to a vessel, the Borrower shall have not the right of reinvestment.

**Call Premium:**    None.

**Amortization:**    Quarterly amortization payments of 0.25% of original principal balance of Term Loan Facility.

**Collateral:**    Secured by a first priority lien on substantially all assets of the Loan Parties, including all assets that currently secure the Existing Credit Agreement, including, without limitation (a) deposit accounts, (b) first naval mortgages and other instruments such as deeds over the following vessels (the "Vessels") (i) the *Topaz Driller*, (ii) the *Emerald Driller*, (iii) the *Sapphire Driller*, (iv) the *Aquamarine Driller*, (v) the *Platinum Explorer* (vi) the *Titanium Explorer* and (vii) the *Tungsten Explorer*, and any other vessel hereafter acquired by the Borrower or any of its Subsidiaries, (c) earnings, (d) insurance, (e) from and after the conversion of the Vantage Parent Secured Promissory Note (as defined in the Restructuring Support Agreement) to equity in the reorganized Borrower, the Vantage Parent Assets (as defined in the Restructuring Support Agreement), and (f) all accounts, contracts, documents, equipment, general intangibles, goods, instruments, intellectual property, inventory, investment property, receivables, equity interests and all other personal property to the extent not described above, in each case subject to customary exceptions. The foregoing shall be referred to herein as the "Collateral".[7] For the avoidance of doubt, (A) any proceeds ("Specified Proceeds") received by a Loan Party as a result of any litigation, arbitration or other dispute with respect to Petrobras' termination of the drilling contract associated with the Titanium Explorer shall be Collateral and shall be required to be held in deposit accounts subject to deposit account control agreements in favor of Collateral Agent and (B) the Vantage Parent Secured Promissory Note and, prior to (but not from and after) the conversion of the Vantage Parent Secured Promissory Note to equity in the reorganized Borrower, the Vantage Parent Assets (each as defined in the Restructuring Support Agreement) shall not constitute Collateral.

The Credit Agreement (hereinafter defined) will contain a "waterfall" that will provide that the LC Issuer under the Letter of Credit Facility and any lenders under any Incremental Revolving Facility will be "first out" on a pro rata basis with respect to Collateral proceeds and other payments made to or for the benefit of the Lenders (or any agent therefor) on account of

---

[7]    **Note**: Borrower and the Lenders will determine whether the Security Documents can be amended and restated/re-executed to grant liens directly in favor of the Collateral Agent due to any local law implications regarding amendment and restatement of Security Documents with a different secured party of record and potential for 1st lien/2nd lien structure. Borrower and the Lenders to consider in good faith how to minimize the administrative burden and cost resulting from ongoing lien and perfection requirements.

WEIL:\95549520\1\78787.0003

the Credit Facilities.

**Documentation:**    The Credit Facilities shall be evidenced by definitive loan documentation (the "<u>Loan Documents</u>"), which shall include, without limitation, (i) a credit agreement, based substantially on the Existing Credit Agreement, as modified as set forth herein and as otherwise agreed by the Borrower and the Lenders (the "<u>Credit Agreement</u>").

The Credit Facilities, the Secured Convertible PIK Notes (as defined in the Restructuring Term Sheet), and the New Secured Notes (as defined in the Restructuring Term Sheet) shall be subject to an intercreditor agreement (as described herein, the "<u>Intercreditor Agreement</u>").

Pursuant to the Intercreditor Agreement:

- The (i) Credit Facilities shall be secured by a first priority lien on the Collateral, (ii) New Secured Notes shall be secured by a second priority lien on the Collateral, and (iii) Secured Convertible PIK Notes shall be secured by a third priority lien on the Collateral.

- The proceeds of Collateral shall be distributed first to the payment of the obligations under the Credit Facilities, second to the payment of the obligations under the New Secured Notes, and third to the payment of the obligations under the Secured Convertible PIK Notes. In addition, all obligations under the Secured Convertible PIK Notes shall be subordinated in right of payment to the obligations under the Credit Facilities and the New Secured Notes, and for avoidance of doubt, to the extent the collateral trustee or any other Secured Convertible PIK Notes party receives any proceeds of Collateral and any non-Collateral proceeds or payments, then, subject to the provisions in the last bullet point of this "Documentation" subsection, such collateral trustee or other Secured Convertible PIK Notes party shall forthwith turnover same to the Collateral Agent for application to the obligations under the Credit Facilities until all such obligations have been paid in full in cash.

- After a period of 120 days has elapsed since the date on which the New Secured Notes collateral trustee has delivered to the Administrative Agent written notice of the acceleration of the New Secured Notes (the "<u>Second Lien Standstill Period</u>"), the New Secured Notes collateral trustee and the other the New Secured Notes parties may enforce or exercise any rights or remedies with respect to any Collateral; <u>provided</u>, <u>however,</u> that the New Secured Notes collateral trustee or any other New Secured Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

WEIL:\95549520\1\78787.0003

- Except as set forth in the last sentence of this paragraph, after a period of 180 days has elapsed since the date on which the Secured Convertible PIK Notes collateral trustee has delivered to the Administrative Agent written notice of the acceleration of the Secured Convertible PIK Notes (the "Third Lien Standstill Period"), the Secured Convertible PIK Notes collateral trustee and the other Secured Convertible PIK Notes parties may enforce or exercise any rights or remedies with respect to any Collateral; provided, however, that the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders or the New Secured Notes collateral trustee on behalf of the New Secured Notes parties shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

- Notwithstanding anything contained herein to the contrary (including, without limitation, the Second Lien Standstill Period and the Third Lien Standstill Period), upon the acceleration of the Secured Convertible PIK Notes following the occurrence of a Judgment Default (as defined in the Restructuring Term Sheet) under the Secured Convertible PIK Notes Indenture, the Secured Convertible PIK Notes collateral trustee and the other Secured Convertible PIK Notes parties may enforce or exercise any rights or remedies with respect to any Collateral after providing two (2) business days' advance written notice to the Administrative Agent (absent exigent circumstances); provided, however, that the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders or the New Secured Notes collateral trustee on behalf of the New Secured Notes parties shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

- If (a) the New Secured Notes collateral trustee or any other New Secured Notes party and/or (b) the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party enforce or exercise any rights or remedies with respect to any Collateral that results in their obtaining control or ownership (directly or indirectly through any affiliate) of all or a substantial portion of the Collateral, then at or prior to the consummation of such enforcement action, such enforcing party or parties shall concurrently cause all obligations under the Credit Facilities to be paid in full in cash.

- Reorganization securities received by or on behalf of holders of

WEIL:\95549520\1\78787.0003

Secured Convertible PIK Notes on account of the Secured Convertible PIK Notes ("Junior Reorganization Securities") in a subsequent reorganization proceeding (a "Subsequent Reorganization") shall not be subject to turnover to the Collateral Agent, Administrative Agent or Lenders; provided, however, that if the claims of the Collateral Agent, the Administrative Agent or the Lenders under the Credit Facilities (as determined in the absence of the Subsequent Reorganization, and whether or not any portion of such claims are allowable in the Subsequent Reorganization) are not paid in full in cash upon the effective date of any plan of reorganization in the Subsequent Reorganization and instead receive, on account of all or a portion of their claims, new securities or loans with economic terms that are worse than the economic terms of their claims under the Credit Facilities (as determined in the absence of the Subsequent Reorganization, and whether or not any portion of such economic terms or claims are allowable in the Subsequent Reorganization) (e.g., new securities or loans with a lower principal amount, lower interest or lower fees than the corresponding principal amount, interest or fees in respect of the claims under the Credit Facilities), then the holders of Secured Convertible PIK Notes shall be obligated to turn over to the Collateral Agent (on behalf of itself, the Administrative Agent and the Lenders) any and all amounts received on account of such Junior Reorganization Securities, including any cash dividends or cash distributions, until the Collateral Agent, the Administrative Agent and Lenders are paid in full in cash the amounts they would have been paid on account of their claims under the Credit Facilities, (as determined in the absence of the Subsequent Reorganization, and whether or not any portion of such claims are allowable in the Subsequent Reorganization)..

The Intercreditor Agreement shall otherwise contain (a) customary terms with respect to the Credit Facilities and New Secured Notes and (b) terms that are more protective of the Credit Facilities with respect to the Secured Convertible PIK Notes, consistent with the subordinated nature of the Secured Convertible PIK Notes.

**Conditions Precedent:**    The consummation of the transactions contemplated by this Term Sheet shall be subject to conditions precedent to be determined, including, without limitation, the occurrence of the effective date of a plan of reorganization of the Loan Parties on terms and conditions acceptable to the Administrative Agent, the Collateral Agent, the Lenders and the LC Issuer.

**Representations and Warranties:**    Usual and customary for financings of this type giving due regard to the representations and warranties set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries[, provided that additional representations and warranties regarding FCPA compliance to be agreed

WEIL:\95549520\1\78787.0003

shall be included in the Credit Agreement].

| | |
|---|---|
| **Financial Covenants:** | Minimum liquidity covenant (to be defined as cash on deposit in accounts subject to perfected lien in favor of Administrative for the benefit of the Lenders *plus* any availability under any Incremental Revolving Facility) of $[75,000,000], to be tested and reported on a quarterly basis unless liquidity is less than $[100,000,000] at which point liquidity shall be tested and reported on a monthly basis until liquidity is equal to or exceeds $[100,000,000] at which point the covenant shall again be tested and reported on a quarterly basis.[8] |

**Affirmative Covenants:**    Usual and customary for financings of this type giving due regard to the affirmative covenants set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries, provided that:

- Quarterly Lender Calls shall be required

- Periodic updates as and when reasonably requested with respect to any material investigations, litigation, arbitration or other dispute except to the extent that the provision thereof would violate any obligation of confidentiality binding upon, or waive any attorney-client privilege of, the Borrower, subject to parameters to be agreed

- Reasonable access to management for all Lenders

- Additional reporting shall be required as follows subject to reasonable limitations to be agreed:

  → periodic fleet report on a quarterly basis

  → thresholds for notices of litigation and environmental liabilities to be reduced and for notices of Asset Dispositions of Vessels and Involuntary Transfers to be reduced, in each case to levels to be agreed

  → additional reporting with respect to drilling contracts

- There shall be no ability to transfer a partial interest in a Vessel other than to a Loan Party, unless the Required Lenders shall have otherwise consented

  - All earnings from Vessels shall be required to be deposited into a blocked account and all cash of the Borrower and its Restricted Subsidiaries shall be required to be held in deposit accounts subject to deposit account control agreements in favor of Collateral

---

[8] **Note**: Subject to satisfactory review of business plan and supporting documentation

WEIL:\95549520\1\78787.0003

Agent, subject to certain limited exceptions for (a) cash in foreign deposit accounts; <u>provided</u> that no foreign deposit account may have a cash balance greater than $5,000,000 at any time, and all foreign deposit accounts, collectively, may not have a cash balance greater than $25,000,000 in the aggregate at any time, in each case, for more than ten business days and any cash balances in excess of such limits shall be swept or deposited into accounts subject to deposit account control agreements in favor of Collateral Agent and (b) accounts used for funding payroll, payroll taxes and other compensation and benefits to employees.

**Negative Covenants:** Usual and customary for financings of this type giving due regard to the negative covenants set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries, provided that:

- Permitted Liens concept shall be modified as follows:

    → Exception for liens on acquired Persons or assets shall be limited to liens securing certain Capital Leases and purchase money indebtedness provided that such liens were in existence prior to the contemplation of such acquisition

    → Basket for Liens securing Capital Leases to be reduced to $25,000,000

    → Basket for junior liens securing the Incremental Facility or Incremental Equivalent Debt

    → Basket for liens securing any Client Reimbursement Debt (as defined below) so long as such liens do not encumber any property of the Loan Parties other than the equipment acquired with the proceeds of such Client Reimbursement Debt

    → Basket for second priority Liens securing the New Secured Notes so long as such Liens are subject to the Intercreditor Agreement

    → Basket for third priority Liens securing the Secured Convertible PIK Notes (as defined in the Restructuring Term Sheet) so long as such Liens are subject to the Intercreditor Agreement

    → Liens on the Vantage Parent Assets purchased by the Borrower securing the Vantage Parent Secured Promissory Note (prior to conversion to equity)

- Permitted Debt concept shall be modified as follows:

    → Additional basket for Debt incurred in lieu of an Incremental

39

Facility (the "<u>Incremental Equivalent Debt</u>") so long as (a) the conditions set forth under the heading "Incremental Facility" are satisfied and (b) such Debt is unsecured or secured on a junior lien basis

→ Exception for debt on acquired Persons or assets shall be limited to certain Capital Leases and purchase money indebtedness provided that such debt was in existence prior to the contemplation of such acquisition

→ Basket for Capital Leases to be reduced to $25,000,000

→ Additional basket for debt (the "<u>Client Reimbursement Debt</u>") in an amount equal to the aggregate amount of committed client reimbursements for equipment mobilization expenditures, but limited to $50,000,000 per drillship and $25,000,000 per jackup

→ $75.0MM New Secured Notes on terms reasonably acceptable to Required Lenders and otherwise not more restrictive in any material respect than the terms of the Credit Facilities

→ $750,000,000 mandatorily convertible third lien subordinated Debt issued to the term lenders and noteholders under the Borrower's existing debt documents at the closing of the Restructuring for so long as such Debt has not been converted to equity in accordance with its terms, on terms reasonably acceptable to Required Lenders and otherwise not more restrictive in any material respect than the terms of the Credit Facilities

- Borrower not be permitted to merge with another Person or sell all or substantially all of its assets to another Person unless the Borrower is the survivor

- Asset Sales covenant shall be modified as follows:

  → threshold for excluded transactions to be reduced to $1,000,000 individually and $5,000,000 in the aggregate during any twelve-month period

  → to permit Asset Sales, so long as:

    ▪ receive FMV

    ▪ at least 75% cash consideration (Designated Non-Cash Consideration capped at 5% of CTA)

    ▪ 100% of net proceeds are used to pay down term loan obligations, subject to reinvestment rights as described

under the heading "Mandatory Prepayments" above

  ▪ all such Asset Sales do not exceed an aggregate annual cap equal to a fixed equal to 5% of CTA, unless the Required Lenders shall have otherwise consented

  → to add a requirement that the drillships and jack-ups may not be sold other than to Loan Parties, unless the Required Lenders shall have otherwise consented

- Investments covenant shall be modified as follows:

  → To permit additional Investments made with the proceeds of qualified equity issuances so long as the acquired assets are pledged as Collateral to the extent required under the terms of the Credit Agreement

  → No Investments outside of Borrower and its Restricted Subsidiaries in existence at consummation, subject to exceptions to be agreed

  → The Vantage Parent Secured Promissory Note in an amount to be agreed

- No Restricted Payments by the Borrower shall be permitted other than

  → [Restricted Payments consistent with the Permitted Parent Payments and/or Permitted Operating Expenses and Tax Reimbursements concepts in the Existing Credit Agreement, in each case subject to reasonable limitations to be agreed][9]

  → Up to 50% of the Specified Proceeds may be used for Restricted Payments, so long as at least 50% of such Specified Proceeds are used to prepay the Loans

- Transactions with Affiliates covenant to require delivery of fairness opinion if transaction involves aggregate consideration in excess of $25,000,000

- The following additional negative covenants shall be included:

  → growth capital expenditures only permitted to the extent made with the proceeds of qualified equity issuances or made pursuant to customer contracts

---

[9] **Note**:  Subject to review of the post-restructuring corporate structure and an understanding of the goods, taxes, services, operating expenses, franchise taxes, accounting, legal and administrative expenses that may be payable by other Persons but are attributable to the Borrower post-reorganization

&rarr;      acceptable flag jurisdictions to be limited to US, Liberia, Marshall Islands, Vanuatu, Bahamas and Panama

&rarr;      requirement to maintain certain classifications for Vessels

&rarr;      requirement to maintain ratings by one credit rating agency

&rarr;    limitations on junior debt prepayments and modification of debt instruments in a manner adverse to the Lenders

| | |
|---|---|
| **Events of Default:** | Usual and customary for financings of this type giving due regard to the events of default set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, including, without limitation, a Judgment Default (as defined in the Restructuring Term Sheet) applicable to the Borrower and/or its Restricted Subsidiaries. |
| **Assignments and Participations:** | Assignments and participations shall be subject to, so long as no payment or bankruptcy Event of Default shall exist, Borrower consent (not to be unreasonably withheld or delayed). |
| **Counsel to the Administrative and Collateral Agents:** | Latham & Watkins LLP |

With the consent of the Ad Hoc Committee, under the terms of the Amended and Restated Credit Facility, the Reorganized Debtors may enter into an alternative first lien facility and use the proceeds to pay Revolving Credit Facility Claims in full in cash. The terms of any such Amended and Restated Credit Facility will be disclosed promptly after any commitment therefor is finalized.

## 2.    Summary of the New Second Lien Notes

| Term: | Description:[10] |
|---|---|
| **Issuer** | Offshore Group Investment Limited, a Cayman Islands exempted company with limited liability. |
| **Notes** | 10% Senior Secured Second Lien Notes due 2020 (the "**Notes**"). The Notes are being issued pursuant to the rights offering contemplated by the Plan. |
| **Principal Amount** | $75.0 million, plus $1.125 million, to be issued in connection with the payment of the Backstop Commitment Premium |
| **Issue Price** | 100% of the principal amount |

---

[10] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the restructuring support agreement, dated as of December 1, 2015 (as amended or otherwise modified, the "**Restructuring Support Agreement**") and the restructuring term sheet, attached thereto (as amended or otherwise modified, the "**Restructuring Term Sheet**").

WEIL:\95549520\1\78787.0003

| Term: | Description:[10] |
|---|---|
| **Maturity Date** | The Notes will mature on December 31, 2020, unless redeemed or repurchased in accordance with their terms. |
| **Interest** | The Notes will bear interest at a rate of 10% per annum, payable in cash. Interest on the Notes will be payable semiannually, in arrears. Interest on the Notes will accrue from their issue date. |
| **Minimum Denominations** | The Notes will be issued in minimum principal denominations of $1,000 and integral multiples of $1,000 in excess thereof. |
| **No Sinking Fund** | The Notes are not entitled to the benefits of, or subject to, a sinking fund. |
| **Securities Laws Matters** | The Issuer and the Subsidiary Guarantors (as defined below) will be required to qualify the indenture for the Notes (the "**Indenture**") under the Trust Indenture Act of 1939, as amended (the "**TIA**") and will have filed a Form T-3 with the SEC immediately prior to the commencement of the solicitation. |
| **Guarantees** | The Notes will be fully and unconditionally guaranteed, jointly and severally, on a senior secured second lien basis by each of the Issuer's existing and future subsidiaries who also guarantee the Credit Facility (as defined below) (the "***Subsidiary Guarantors***"). |
| **Security** | The Notes and the Guarantees thereof will be secured by a second priority lien, junior to the liens securing the Issuer's and the Subsidiary Guarantors' obligations under the Amended and Restated Credit Facility (the "***Credit Facility***") (and senior to the third priority lien securing the Secured Convertible PIK Notes and guarantees thereof), on substantially all assets of the Issuer and the Subsidiary Guarantors, consistent with the Credit Facility and consisting of all assets securing the Credit Facility. |
| **Ranking** | The Notes and the Guarantees of each Subsidiary Guarantor will:<br><br>• be the Issuer's and the Subsidiary Guarantors' senior secured obligations;<br>• rank equal in right of payment with all of the Issuer's and the Subsidiary Guarantors' existing and future senior indebtedness, subject to the provisions of the Intercreditor Agreement;<br>• rank senior in right of payment to any of the Issuer's and the Subsidiary Guarantors' existing and future indebtedness (including, for the avoidance of doubt, the Secured Convertible PIK Notes) that is expressly subordinated in right of payment to the Notes;<br>• be effectively senior to any of the Issuer's and the Subsidiary Guarantors' unsecured indebtedness and third-priority senior secured indebtedness (including, for the avoidance of doubt, the Secured Convertible PIK Notes), to the extent of the value of the collateral securing the Notes and the Guarantees; and<br>• be effectively junior to all of the Issuer's and the Subsidiary Guarantors' existing and future first-priority senior secured indebtedness (including, for the avoidance of doubt, the Credit Facility), to the extent of the collateral securing such indebtedness. |
| **Intercreditor** | The Indenture will be subject to, and the rights of creditors in respect of the Notes and security therefor will be subject to and limited by, an Intercreditor |

WEIL:\95549520\1\78787.0003

| Term: | Description:[10] |
|---|---|
| | Agreement (the "**Intercreditor Agreement**"), as contemplated by the Restructuring Term Sheet.  Decisions as to release and maintenance of collateral will be made by first lien creditors and their agents, consistent with interpretations and guidance from the SEC rendering Section 314(d) of the TIA inapplicable to released collateral in respect of the Notes. |
| **Optional Redemption** | Subject to the terms of the Intercreditor Agreement, the Notes may be redeemed, at the option of the Issuer, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption, without premium or penalty. |
| **Mandatory Redemption Upon Event of Loss of a Vessel** | Subject to the Intercreditor Agreement, upon the occurrence of certain events of loss with respect to a vessel, the Issuer will be required to redeem, on a pro rata basis, the Notes with proceeds received in respect of such loss at a redemption price for the Notes equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption. |
| **Change of Control Offer** | If the Issuer experiences a change of control, each holder of Notes will have the right to require the Issuer to repurchase all or any part of its Notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of repurchase. |
| **Asset Sale Offer** | If the Issuer or any restricted subsidiary engages in certain asset sales, within 360 days of such sale, the Issuer generally must use the net cash proceeds from such sales to repay debt, to acquire another company in its industry, to make capital expenditures or to invest in its business, or the Issuer must make an offer to purchase a principal amount of the Notes equal to the excess net cash proceeds. The purchase price of each Note so purchased will be 100% of its principal amount, plus accrued and unpaid interest to the repurchase date. |
| **Certain Covenants** | The Indenture, among other things, will limit the Issuer's and any restricted subsidiary's ability to: <br><br> • pay dividends, redeem subordinated indebtedness or make other restricted payments; <br><br> • incur or guarantee additional indebtedness or issue preferred stock; <br><br> • create or incur liens; <br><br> • incur dividends or other payment restrictions affecting restricted subsidiaries; <br><br> • consummate a merger, consolidation or sale of all or substantially all of their assets; <br><br> • enter into transactions with affiliates; <br><br> • transfer or sell assets; and <br><br> • engage in business other than their current business and reasonably related extensions thereof. <br><br> Such covenants will be subject to customary exceptions to be set forth in the Indenture and will be no more restrictive than the covenants in the Credit |

WEIL:\95549520\1\78787.0003

| Term: | Description:[10] |
|---|---|
| | Facility. |
| **Events of Default** | The Indenture will include certain Events of Default, including:<br><br>(a) Default in the payment of principal when the same becomes due and payable at maturity,<br>(b) Default for 30 days or more in the payment, when due, of interest;<br>(c) Certain customary events of bankruptcy, insolvency, etc. in respect of the Issuer or any Subsidiary Guarantor;<br>(d) the acceleration of any indebtedness of the Issuer or any Subsidiary Guarantor in an amount greater than $30 million dollars prior to its stated maturity;<br>(e) entry by a court or courts of competent jurisdiction of a final judgment or government fine or penalty (whether by agreement, consent decree, or otherwise), or entry by OGIL, any guarantor of the Notes, or any affiliate of OGIL (other than Vantage Parent) into any settlement agreement, consent decree, or similar agreement with respect to any investigations involving, or claims against, such entity, that would individually or in the aggregate exceed $50.0 million; and<br>(f) failure to comply with covenants for a period of 45 days after proper notice thereof.<br><br>For the avoidance of doubt, the Indenture shall provide that a majority in aggregate principal amount of the then outstanding Notes may waive any Event of Default other than an Event of Default relating to the payment of principal of, premium, if any, or interest on, the Notes. |
| **Acceleration** | Upon occurrence and continuance of an Event of Default (other than an Event of Default relating to certain bankruptcy and insolvency matters), either the Trustee or holders of at least 25% in aggregate principal amount of the then outstanding Notes may accelerate the Notes, in which event, the Issuer will be obligated to pay principal and all accrued and unpaid interest as of the date of such acceleration (and any other amounts due in respect of the Notes) in full in cash. However, for the avoidance of doubt, holders of a majority in aggregate principal amount of the then outstanding Notes may rescind any acceleration and its consequences, including any related payment default that resulted therefrom.<br><br>In addition, upon the occurrence of an Event of Default relating to certain bankruptcy and insolvency matters, the Notes will automatically be accelerated, in which event the Issuer will also be obligated to pay principal and all accrued and unpaid interest as of the date of acceleration on the Notes (and any other amounts due in respect of the Notes) in full in cash. |

WEIL:\95549520\1\78787.0003

| Term: | Description:[10] |
|---|---|
| **Trustee** | [_____][11] |
| **Definitive Documents and Due Diligence** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of definitive documents, which documents shall be substantially consistent with the terms of this Term Sheet.  The definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |

### 3.    Summary of the New Secured Convertible PIK Notes

| Term: | Description:[12] |
|---|---|
| **Issuer** | Offshore Group Investment Limited, a Cayman Islands exempted company with limited liability. |
| **Notes** | 1% / 12% Step-up Senior Subordinated Secured Third Lien Convertible Notes due 2030 (the "**Secured Convertible PIK Notes**") |
| **Principal Amount** | $750.0 million |
| **Issue Price** | 100% of the principal amount |
| **Maturity Date** | The Secured Convertible PIK Notes will mature on December 31, 2030, unless redeemed or repurchased in accordance with their terms. |
| **Step-up Interest** | During the first four years, 1%, payable in kind, semi-annually (in arrears) by increasing the outstanding principal amount of the Secured Convertible PIK Notes.  From and after the fifth  year from the issue date through the Maturity Date, 12%, payable in kind, semi-annually (in arrears) by increasing the outstanding principal amount of the Secured Convertible PIK Notes.  At final maturity (or an earlier acceleration), all accrued and unpaid interest will be paid together with (and in the same form of payment as) principal. |
| **Minimum Denominations** | The Secured Convertible PIK Notes will be issued in minimum principal denominations of $1.00. |
| **No Sinking Fund** | The Secured Convertible PIK Notes are not entitled to the benefits of, or subject to, a sinking fund. |
| **Securities Laws Matters** | The Secured Convertible PIK Notes (including the New Common Shares issuable upon conversion thereof):<br>(a)  will be issued pursuant to the exemption from the registration |

---

The Trustee will be determined by the Issuer and the Ad Hoc Committee.

[12] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the restructuring support agreement, dated as of December 1, 2015 (as amended or otherwise modified, the "**Restructuring Support Agreement**") and the restructuring term sheet, attached thereto (as amended or otherwise modified, the "**Restructuring Term Sheet**").

WEIL:\95549520\1\78787.0003

| Term: | Description:[12] |
|---|---|
| | requirements of the U.S. Securities Act of 1933, as amended, and applicable state securities laws provided by Section 1145 of the Bankruptcy Code, and<br>(b) will not be listed for trading on any national securities exchange.<br>The Issuer and the Subsidiary Guarantors (as defined below) will be required to qualify the indenture for the Secured Convertible PIK Notes (the "**Indenture**") under the Trust Indenture Act of 1939, as amended (the "**TIA**") and will have filed a Form T-3 with the SEC immediately prior to the commencement of the solicitation. |
| **Subordination** | Subordinated in right of payment to the Amended and Restated Credit Revolving Facility (the "**Credit Facility**") and the New Secured Notes). |
| **Guarantees** | The Secured Convertible PIK Notes will be fully and unconditionally guaranteed, jointly and severally, on a senior subordinated secured third lien basis by each of the Issuer's existing and future subsidiaries who also guarantee the Credit Facility (the "**Subsidiary Guarantors**"). |
| **Security** | The Secured Convertible Notes and the Guarantees thereof will be secured by a third priority lien, junior to the liens securing the Issuer's and the Subsidiary Guarantors' obligations under the Credit Facility and the New Secured Notes, on substantially all assets of the Issuer and the Subsidiary Guarantors, consistent with the Credit Facility and consisting of all assets securing the Credit Facility. |
| **Ranking** | The Secured Convertible PIK Notes and the Guarantees of each Subsidiary Guarantor will:<br><br>• be the Issuer's and the Subsidiary Guarantors' senior subordinated secured obligations;<br>• be subordinated in right of payment to the Credit Facility and the New Secured Notes subject to the provisions of the Intercreditor Agreement;<br>• rank equal in right of payment with all of the Issuer's and the Subsidiary Guarantors' other existing and future senior indebtedness;<br>• rank senior in right of payment to any of the Issuer's and the Subsidiary Guarantors' future indebtedness that is expressly subordinated in right of payment to the Secured Convertible PIK Notes; and<br>• be effectively senior to any of the Issuer's and the Subsidiary Guarantors' unsecured indebtedness, to the extent of the value of the collateral securing the Secured Convertible PIK Notes and the Guarantees.<br>• be effectively junior to all of the Issuer's and the Subsidiary Guarantors' existing and future first-priority and second-priority senior secured indebtedness (including, for the avoidance of doubt, the Credit Facility and the New Secured Notes), to the extent of the collateral securing such indebtedness. |
| **Intercreditor** | The Indenture will be subject to, and the rights of creditors in respect of the Secured Convertible PIK Notes and security therefor will be subject to and limited by, an Intercreditor Agreement (the "**Intercreditor Agreement**"), as contemplated by the Restructuring Term Sheet.  Decisions as to release and maintenance of collateral will be made by first lien creditors and their agents, |

47

| Term: | Description:[12] |
|---|---|
| | consistent with interpretations and guidance from the SEC rendering Section 314(d) of the TIA inapplicable to released collateral in respect of the Secured Convertible PIK Notes. |
| **New Common Shares Stapled** | The Secured Convertible PIK Notes will be "stapled" to the New Common Shares issuable to the Allowed Secured Term Loan Claim and Allowed Secured Notes Claim holders, pursuant to (and as defined in) the Plan, in units comprising [●] New Common Shares to each $1.00 principal amount of Secured Convertible PIK Notes, such that the units may not be separated and may only be traded together as single units.<br><br>The stapling of the notes and shares may take one of several different forms including, among others, the issuance of units in a trust formed for the sole purpose of holding the notes and shares. |
| **Mandatory Conversion** | The then outstanding principal amount of Secured Convertible PIK Notes, including any interest previously paid by increasing such principal amount (and any accrued and unpaid interest thereon, as of the date of conversion), may be converted into New Common Shares at the Conversion Price:<br>(a) during the first three years after the issue date,<br>    (i) upon the agreement by a majority vote of holders of the Secured Convertible PIK Notes to convert into New Common Shares or<br>    (ii) upon the full and final resolution of all potential Investigation Claims (as defined herein) against the Issuer, the Issuer's current subsidiaries, Vantage International Management Company Pte. Ltd., Vantage Energy Services, Inc., and Vantage Parent and Vantage Parent's current subsidiaries (to the extent that the Issuer or any subsidiary of the Issuer may reasonably be expected to be liable for such claim against Vantage Parent or Vantage Parent's current subsidiaries), as determined in good faith by the New Board of the Issuer (which determination shall require the affirmative vote of a supermajority of the non-management directors, which, for all purposes herein, shall mean 5 affirmative votes assuming that 6 directors are eligible to vote), and<br>(b) from and after the third anniversary of the issue date through the Maturity Date, upon the approval of the New Board of the Issuer (which approval shall require the affirmative vote of a supermajority of the non-management directors).<br><br>The Conversion Price shall be equal to $[●]/per New Common Share[13] (the "**Conversion Price**").<br><br>The Subordinated Convertible PIK Notes, if not converted in full, may only be converted, at any time or from time to time, if a minimum of $125 million aggregate principal amount of the then outstanding Secured Convertible PIK Notes is so converted. |

---

[13] Conversion Price will be set based on the valuation of the Plan.

| Term: | Description:[12] |
|---|---|
| | The Conversion Price will be subject to adjustment in certain circumstances as set forth in the Indenture (*e.g.*, share splits or other fundamental changes in the New Common Shares).<br><br>The "**Investigation Claim**" shall mean any claim held by a United States or Brazilian governmental unit and arising from or related to the procurement of that certain Agreement for the Provision of Drilling Services, dated as of February 4, 2009, by and between Petrobras Venezuela Investments & Services B.V. and Vantage Deepwater Company, as amended, modified, supplemented, or novated from time to time. |
| **Amortization** | No principal amortization will be required or permitted prior to maturity. |
| **Optional Redemption** | Subject to the terms of the Intercreditor Agreement, the Secured Convertible PIK Notes may be redeemed, at the option of the Issuer, in whole or in part, at any time and from time to time, at the amount equal to the accreted value of the Secured Convertible PIK Notes at maturity, discounted at the applicable Treasury Rate (which Treasury Rate shall match the tenor of the Secured Convertible PIK Notes at the time the make-whole premium is due and payable) + 50 basis points. |
| **Mandatory Redemption** | Subject to the terms of the Intercreditor Agreement:<br>(a) Upon the occurrence of certain events of loss with respect to a vessel, the Issuer will be required to redeem, on a pro rata basis, the Secured Convertible PIK Notes with proceeds received in respect of such loss at a redemption price for the notes equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption.<br>(b) If the Issuer or any restricted subsidiary engages in certain asset sales, within 360 days of such sale, the Issuer generally must use the net cash proceeds from such sales to repay debt, to acquire another company in its industry, to make capital expenditures or to invest in its business, or the Issuer must make an offer to purchase a principal amount of the Secured Convertible PIK Notes equal to the excess net cash proceeds. The purchase price of each Secured Convertible PIK Note so purchased will be 100% of its principal amount, plus accrued and unpaid interest to the repurchase date.<br>(c) If the Issuer experiences a change of control, each holder of Secured Convertible PIK Notes will have the right to require the Issuer to repurchase all or any part of its notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of repurchase. |
| **Events of Default** | The Indenture will include certain Events of Default, including:<br><br>(g) Default in the payment of principal when the same becomes due and payable at maturity,<br>(h) Default for 30 days or more in the payment, when due, of interest;<br>(i) Certain customary events of bankruptcy, insolvency, etc. in respect of the Issuer or any Subsidiary Guarantor;<br>(j) the acceleration of any indebtedness of the Issuer or any Subsidiary Guarantor in an amount greater than $30 million dollars prior to its stated maturity; |

| Term: | Description:[12] |
|---|---|
| | (k) entry by a court or courts of competent jurisdiction of a final judgment or government fine or penalty (whether by agreement, consent decree, or otherwise), or entry by OGIL, any guarantor of the Secured Convertible PIK Notes, or any affiliate of OGIL (other than Vantage Parent) into any settlement agreement, consent decree, or similar agreement with respect to any investigations involving, or claims against, such entity, that would individually or in the aggregate exceed $50.0 million; and <br><br>(l) failure to comply with covenants for a period of 45 days after proper notice thereof. <br><br>For the avoidance of doubt, the Indenture shall provide that a majority in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may waive any Event of Default other than an Event of Default relating to the payment of principal of, premium, if any, or interest on, the Secured Convertible PIK Notes. |
| **Acceleration** | Upon occurrence and continuance of an Event of Default (other than an Event of Default relating to certain bankruptcy and insolvency matters), either the Trustee or holders of at least 25% in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may accelerate the Secured Convertible PIK Notes, in which event, the Issuer will be obligated to pay principal and all accrued and unpaid interest as of the date of such acceleration (and any other amounts due in respect of the Secured Convertible PIK Notes) in full in cash, at the make-whole premium amount described below.  However, for the avoidance of doubt, holders of a majority in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may rescind any acceleration and its consequences, including any related payment default that resulted therefrom. <br><br>In addition, upon the occurrence of an Event of Default relating to certain bankruptcy and insolvency matters, the Secured Convertible PIK Notes will automatically be accelerated, in which event the Issuer will also be obligated to pay principal and all accrued and unpaid interest as of the date of acceleration on the Secured Convertible PIK Notes (and any other amounts due in respect of the Secured Convertible PIK Notes) in full in cash, at the make-whole premium amount described below. |
| **Make-whole premium** | The Secured Convertible PIK Notes shall be subject to a make-whole premium (on customary terms and conditions) due and payable upon the occurrence of acceleration following an Event of Default (as defined herein) in the amount equal to the accreted value of the Secured Convertible PIK Notes at maturity, discounted at the applicable Treasury Rate (which Treasury Rate shall match the tenor of the Secured Convertible PIK Notes at the time the make-whole premium is due and payable) + 50 basis points. |
| **Other Covenants** | Additional covenants as are reasonable and customary in similar issuances of convertible PIK notes, including as to payment of principal and interest, payment of taxes, maintenance of corporate existence, continuation of business in current nature and reasonably related extensions thereof, restrictions on liens (other than customary permitted liens), and similar matters, which covenants shall be no more restrictive than corresponding |

WEIL:\95549520\1\78787.0003

| Term: | Description:[12] |
|---|---|
| | covenants contained in the Credit Facility and the New Secured Notes.  For the avoidance of doubt, the Secured Convertible PIK Notes will not be subject to any maintenance covenants. |
| **Trustee** | [_____][14] |
| **Definitive Documents and Due Diligence** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of definitive documents, which documents shall be substantially consistent with the terms of this Term Sheet.  The definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |

### 4.    Summary of the New Common Shares

Pursuant to the Plan, on the Effective Date, Reorganized OGIL will issue the New Common Shares to holders of the Secured Debt Claims, Vantage Parent, and participants under the Management Incentive Program.

### E.    Means for Implementation

### 1.    Continued Corporate Existence

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Shareholders Agreement, the Amended Certificates of Incorporation, and the Amended By-Laws.  On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents and the New Secured Debt Agreements, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates of incorporation and memoranda and articles of association and amendments thereto, reincorporation,

---

[14] The Trustee will be determined by the Issuer and the Ad Hoc Committee.

WEIL:\95549520\1\78787.0003

merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law or the New Secured Debt Agreements.

## 2.    Plan Funding

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering.

## 3.    Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, and other documents evidencing any Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. Notwithstanding such cancellation and discharge, each of the 7.5% Secured Notes Indenture, the 7.125% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, the 2019 Secured Term Loan Agreement, and the Revolving Credit Agreement shall continue in effect (i) to the extent necessary to allow the Reorganized Debtors, the 7.5% Secured Notes Trustee, the 7.125% Secured Notes Trustee, the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, and the Revolving Credit Facility Agent to make distributions pursuant to the Plan on account of the 7.5% Secured Notes Claims, the 7.125% Secured Notes Claims, the 2017 Secured Term Loan Claims, the 2019 Secured Term Loan Claims, and the Revolving Credit Facility Claims, respectively; (ii) with respect to any obligations thereunder governing the relationship between and among each of the following groups of Persons (and not as between such groups or as between such groups and the Debtors): (a) the Revolving Credit Facility Agent and the other holders of Revolving Credit Facility Claims, (b) the 7.5% Secured Notes Trustee and the holders of 7.5% Secured Notes Claims, (c) the 2017 Secured Term Loan Agent and the holders of 2017 Secured Term Loan Claims, and (d) the 2019 Secured Term Loan Agent and the holders of 2019 Secured Term Loan Claims, in the case of the immediately preceding clauses (a) through (d), including but not limited to those provisions relating to rights to expense reimbursement, indemnification, and similar amounts, or that may survive termination or maturity of the Revolving Credit Agreement, 7.5% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, or the 2019 Secured Term Loan Agreement, as applicable, in accordance with the terms thereof; and (iii) to the extent necessary to allow the holders of Secured Debt Claims and Revolving Credit Facility Claims, respectively, to assert and prosecute their rights against Vantage Parent, if any.  The holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Except as provided pursuant to the Plan, each of the 7.5% Secured Notes Trustee, the 7.125% Secured Notes Trustee, the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, the Revolving Credit Facility Agent, and their respective agents, successors, and assigns shall be discharged of all of their obligations associated with the 7.5% Secured Notes Indenture, the 7.125% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, the 2019 Secured Term Loan Agreement, and the Revolving Credit Agreement, respectively.  Nothing in the Plan shall affect any party's rights against Vantage Parent under any contractual arrangement.

## 4.    Cancellation of Certain Existing Security Interests

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination

statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory liens, or lis pendens, or similar interests or documents.

### 5.    Officers and Boards of Directors

(a)    The composition of each board of directors of a Reorganized Debtor shall be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5).

(b)    Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such member will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 6.    Management Incentive Program

The holders of Secured Debt Claims party to the Restructuring Support Agreement have agreed that they shall cause the New Board to adopt the Management Incentive Plan pursuant to the Management Incentive Program. The New Common Shares issued pursuant to the Management Incentive Program shall dilute all other New Common Shares to be issued pursuant to the Plan.

### 7.    New Shareholders Agreement

On the Effective Date, Reorganized OGIL and all of the holders of New Common Shares then outstanding (other than New Common Shares received pursuant to the Management Incentive Program) shall be deemed to be parties to the New Shareholders Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than Reorganized OGIL. The New Shareholders Agreement shall be binding on Reorganized OGIL and all parties receiving, and all holders of, New Common Shares of Reorganized OGIL; provided, that regardless of whether such parties execute the New Shareholders Agreement, such parties will be deemed to have signed the New Shareholders Agreement, which shall be as binding on such parties as if they had actually signed it.

WEIL:\95549520\1\78787.0003

8.    **Authorization, Issuance, and Delivery of New Common Shares**

(a)    On the Effective Date, Reorganized OGIL is authorized to issue or cause to be issued the New Common Shares for distribution in accordance with the terms of the Plan and the New Shareholders Agreement without the need for any further corporate or shareholder action.

(b)    After the Effective Date, OGIL will file documents with the Securities and Exchange Commission as a voluntary filer under the Exchange Act but does not intend to list the New Common Shares for trading on any national securities exchange.  Distribution of New Common Shares will be made by registration of such issued New Common Shares in the register of members of the Company by the transfer agent for the New Common Shares or by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, as provided in section 6.4 of the Plan.

9.    **Amended and Restated Credit Facility**

On the Effective Date, the Debtors will enter into the Amended and Restated Credit Facility Agreement unless the Debtors elect to refinance the Revolving Credit Facility in its entirety in accordance with section 4.3 hereof; provided, that any such refinancing shall be acceptable to the Ad Hoc Committee.

10.    **New Secured Convertible PIK Notes**

On the Effective Date, OGIL shall issue seven-hundred-fifty million dollars ($750,000,000) of New Secured Convertible PIK Notes.

11.    **New Intercreditor Agreement**

On the Effective Date, the Revolving Credit Facility Agent, the New Secured Convertible PIK Notes Indenture Trustee, and the New Second Lien Notes Indenture Trustee shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.  Each other party to one or more of the New Secured Debt Agreements shall be deemed to have directed the applicable agent or indenture trustee to execute the New Intercreditor Agreement and shall be bound to the terms of the New Intercreditor Agreement from and after the Effective Date as if it were a signatory thereto.

WEIL:\95549520\1\78787.0003

## 12.    Rights Offering

(a)    <u>Terms</u>.  Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith.  On the Effective Date, the Debtors shall consummate the Rights Offering.  The Rights Offering will be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Agreement.  The right to participate in the Rights Offering may not be sold, transferred, or assigned.

(b)    <u>Purpose</u>.  On the Effective Date, the proceeds of the sale of the New Second Lien Notes shall be used: (i) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (ii) to fund Plan Distributions; and (iii) to fund administrative expenses of the Chapter 11 Cases payable on or after the Effective Date.

(c)    <u>Backstop Commitment</u>.  In accordance with the Backstop Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its Investor Percentage (as defined in the Backstop Agreement) of the Unsubscribed Notes (as defined in the Backstop Agreement).

(d)    <u>Backstop Commitment Premium</u>.  In exchange for providing the Backstop Commitment for the Rights Offering, the Backstop Parties will receive the Backstop Commitment Premium.  Upon entry of an order by the Bankruptcy Court authorizing the Debtors' performance of their obligations under the Backstop Agreement, the Backstop Commitment Premium will be immediately and automatically deemed earned and payable.

## 13.    Registration Rights

On the Effective Date, the Registration Rights Parties shall enter into a registration rights agreement in form and substance acceptable to (i) the Required Restructuring Support Parties and (ii) the Debtors or Reorganized Debtors, as applicable.  The registration rights agreement shall provide the Registration Rights Parties with certain demand registration rights and with piggyback registration rights.  The registration rights agreement shall also provide that on or before the date that is 90 days after the Effective Date, Reorganized OGIL shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Common Shares and New Secured Convertible PIK Notes held by the Registration Rights Parties.  The Registration Rights Agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

In addition, Vantage Parent shall have the right to require OGIL to file, and thereafter use its commercially reasonable efforts to cause to become effective as promptly as practicable, a registration statement on Form S-1 (or other applicable form) for the distribution of New Common Shares it receives in respect of the Vantage Parent Secured Promissory Note pursuant to Vantage Parent's official liquidation proceeding in the Cayman Islands.

## 14.    Intercompany Interests; Corporate Reorganization

On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests held by OGIL or a direct or indirect subsidiary of OGIL shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors that are subsidiaries of OGIL; provided, that

(i) shares in Vantage Driller I Co., Vantage Driller II Co., and Vantage Driller IV Co. will be transferred to OGIL in accordance with applicable share pledge agreements, and (ii) the existing shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be cancelled and new shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be distributed to OGIL in accordance with the Plan.

### 15.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 16.    Tax Matters

All parties (including the Reorganized Debtors, all holders of Allowed Secured Debt Claims who receive New Secured Convertible PIK Notes pursuant to the Plan, the New Secured Convertible PIK Notes Indenture Trustee and all other parties to the New Secured Convertible PIK Notes Indenture) shall treat the New Secured Convertible PIK Notes and the New Common Shares to which such notes shall be "stapled" (and thus only transferred) together as constituting a single instrument treated as common stock of Reorganized OGIL for U.S. federal income tax purposes (subject to definitive guidance from the U.S. Internal Revenue Service or a court of competent jurisdiction to the contrary), and the New Secured Convertible PIK Notes Indenture shall so provide.  To the extent permitted by applicable law, all parties shall report consistent therewith for U.S. state and local income tax purposes.

### 17.    Separability

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code with the consent of the Required Restructuring Support Parties and the Majority Revolving Credit Facility Claimholders (which consents shall not be unreasonably withheld).

### F.    Distributions

### 1.    Distributions Generally

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 2.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

WEIL:\95549520\1\78787.0003

### 3.    Date of Distributions

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; provided, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### 4.    Distribution Record Date

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class (other than the Secured Notes Claims), as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed Secured Notes Claims, New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares to the extent consistent with the customary practices of DTC used in connection with such distributions.  With respect to the New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares to be distributed under the Plan through the facilities of DTC, all of such New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; provided, that such New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares are permitted to be held through DTC's book-entry system; and provided, further, that to the extent the New Secured Convertible PIK Notes, New Second Lien Notes, or New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized OGIL will take all such reasonable actions as may be required to cause distributions of the New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares under the Plan.

### 5.    Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.16 of the Plan.

### 6.    Delivery of Distributions

Subject to section 6.4(b) of the Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the

books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 7.    Unclaimed Property

One year from the later of: (i) the Effective Date and (ii) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 374(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 8.    Satisfaction of Claims

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 9.    Manner of Payment Under Plan

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 10.    Fractional Shares and Notes and De Minimis Cash Distributions

No fractional New Common Shares shall be distributed. When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Common Shares to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for herein. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $50.00 in Cash. Fractional New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized OGIL. The New Secured Convertible PIK Notes and New Second Lien Notes each shall be issued in denominations of one dollar ($1) or any integral multiples thereof and any other amounts shall be rounded down.

### 11.    No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Plan).

### 12.    Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the Plan and subject to section 6.2 of the Plan, to the extent that any Allowed Secured Debt Claim or Allowed Vantage Parent Secured Promissory Note Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 13.    Exemption from Securities Laws

The issuance of and the distribution under the Plan of the New Secured Convertible PIK Notes, the Subscription Rights (including the New Second Lien Notes issued pursuant to the exercise thereof in the Rights Offering), and the New Common Shares issued to holders of Allowed Secured Debt Claims and the issuance of New Common Shares upon the conversion of the New Secured Convertible PIK Notes shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the New Second Lien Notes to the Backstop Parties under the Backstop Agreement (including the New Second Lien Notes comprising the Backstop Commitment Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under, or an available exemption from the registration requirements of, the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 14.    Setoffs and Recoupments

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or it successor or assign may possess against such holder.

### 15.    Rights and Powers of Disbursing Agent

(a)    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any

order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

              (b)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

## 16.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. The Reorganized Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

The Reorganized Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder. If the Reorganized Debtors make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## 17.    Hart-Scott-Rodino Antitrust Improvements Act

Any New Common Shares to be distributed under the Plan to an entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

## G.    Procedures for Resolving Claims

### 1.    Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under the Plan, all proofs of Claim filed in the Chapter 11 Cases shall be deemed objected to, and all such Claims Disputed, without further action by the Debtors or the Bankruptcy Court.  Upon the Effective Date, all proofs of Claim filed in the Chapter 11 Cases, regardless of the time of filing, and including proofs of Claim filed after the Effective Date, shall be deemed

automatically withdrawn, without prejudice to the rights of the holders of such Claims to assert any Cause of Action it may have in any appropriate forum as though the Chapter 11 Cases had not been commenced; provided, that the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Disputed Claims, which shall be resolved on a case-by-case basis as Claim objections (or, if necessary, as adversary proceedings) by the Reorganized Debtors and in accordance with a litigation schedule to be determined by the applicable parties and the Bankruptcy Court.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 2.    Objections to Fee Claims

Any objections to Fee Claims shall be served and filed (a) no later than thirty (30) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 3.    Estimation of Claims

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 4.    Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

### 5.    No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 6.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

WEIL:\95549520\1\78787.0003

### H.    Executory Contracts and Unexpired Leases

### 1.    General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 2.    Determination of Cure Disputes and Deemed Consent

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.  Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be Zero Dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within 15 days of the filing thereof, shall be deemed to have assented to such assumption and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 3.    Survival of the Debtors' Indemnification Obligations

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; provided, that the Reorganized Debtors shall not indemnify directors of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

4.      **Compensation and Benefit Plans**

All employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code subject to the reasonable consent of the Required Restructuring Support Parties (such consent to apply only with respect to non-material economic terms and non-economic terms).  For the avoidance of doubt, any awards granted under the Management Incentive Program will be governed by such program and will not be subject to any provisions of the foregoing assumed plans, programs, or arrangements.

5.      **Insurance Policies**

All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

6.      **Reservation of Rights**

(a)      Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)      Except as otherwise provided in the Plan, nothing in the Plan shall be deemed to waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.      **Conditions Precedent to the Occurrence of the Effective Date**

1.      **Conditions Precedent to the Effective Date**

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)      the Plan Documents are reasonably satisfactory in all respects to the Debtors, the Required Restructuring Support Parties, and, solely on Plan Documents over which the holders of Revolving Credit Facility Claims (or a subset thereof) have consent rights under the Restructuring

63

Support Agreement, also such holders of Revolving Credit Facility Claims (or subset thereof) with such consent rights;

(b) the New Shareholders Agreement has been entered into by Reorganized OGIL and shall be in full force and effect and binding on all entities that will receive New Common Shares;

(c) the Bankruptcy Court has entered the Confirmation Order;

(d) the conditions to effectiveness of the Backstop Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Agreement is in full force and effect and binding on all parties thereto;

(e) unless the Debtors refinance the Revolving Credit Facility in full in Cash  on or prior to the Effective Date in accordance with section 4.3 hereof (in which case the conditions to effectiveness of such financing agreement have been satisfied or waived in accordance with the terms thereof, and such financing agreement is in full force and effect and binding on all parties thereto), the conditions to effectiveness of the Amended and Restated Credit Facility Agreement have been satisfied or waived in accordance with the terms thereof, and the Amended and Restated Credit Facility Agreement is in full force and effect and binding on all parties thereto;

(f) the conditions to effectiveness of the New Second Lien Notes Indenture have been satisfied or waived in accordance with the terms thereof, and the New Second Lien Notes Indenture is in full force and effect and binding on all parties thereto, and shall have been qualified under section 307 of the Trust Indenture Act of 1939, as amended, as of the issuance date of such Notes;

(g) the conditions to effectiveness of the New Secured Convertible PIK Notes Indenture have been satisfied or waived in accordance with the terms thereof, and the New Secured Convertible PIK Notes Indenture is in full force and effect and binding on all parties thereto, and shall have been qualified under section 307 of the Trust Indenture Act of 1939, as amended, as of the issuance date of such Notes;

(h) the conditions to effectiveness of the New Intercreditor Agreement have been satisfied or waived in accordance with the terms thereof, and such conditions have not been amended without the consent of the Debtors and the Restructuring Support Parties, and the New Intercreditor Agreement is in full force and effect and binding on all parties thereto;

(i) all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(j) the Amended Certificate of Incorporation of Reorganized OGIL shall have been filed with the appropriate governmental authority; and

(k) all material drilling contracts in effect on or after the Petition Date are in good standing, but for any default or threatened default relating directly or indirectly to the commencement of the Chapter 11 Cases, any other insolvency-related defaults under U.S. or any other applicable laws, or any of the transactions contemplated by the Plan or the Restructuring Support Agreement.

## 2.      Waiver of Conditions Precedent

(a)      Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors together with the Required Restructuring Support Parties, subject to the consent rights set forth in the Restructuring Support Agreement.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, the wavier of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors as provided for in section 5.15 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## 3.      Effect of Failure of a Condition

If the conditions listed in sections 9.1 are not satisfied or waived in accordance with section 9.2 on or before the first Business Day that is more than 60 days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## J.      Effect of Confirmation

## 1.      Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

## 2.      Vesting of Assets

Except as otherwise provided in the Plan, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

WEIL:\95549520\1\78787.0003

3. **Discharge of Claims Against and Interests in the Debtors**

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

4. **Pre-Confirmation Injunctions and Stays**

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5. **Injunction Against Interference with Plan**

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

6. **Plan Injunction**

(a) **Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, that nothing contained**

**herein shall preclude such Persons who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.**

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this section.

7.    **Releases**

(a)    **Releases by the Debtors.**  **As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all claims, obligations, suits, judgments, damages, demands, debts rights, Causes of Action, losses, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.  Notwithstanding the foregoing, such release and discharge shall not operate as a release or discharge of any right of any holder of a Secured Debt Claim to assert and prosecute its rights against Vantage Parent, and nothing in the Plan shall affect any party's rights against Vantage Parent for any contractual obligation. Nothing in the Plan shall constitute a release of any claim by Vantage Parent or its nondebtor subsidiaries against a Debtor as set forth on the books and records of the Debtors as of the Petition Date or any defense of any Debtor to such a claim.  Nothing in the Plan shall constitute a release of any claim by a Debtor against Vantage Parent as set forth on the books and records of the Debtors as of the Petition Date.**

(b)    **Releases by Holders of Claims and Interests.**  **As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by (i) the holders of all Claims and Interests who vote to accept the Plan, (ii) holders of Claims or Interests that are Unimpaired under the Plan, (iii) holders of Claims or**

**Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, (v) Vantage Parent (to the fullest extent permitted by applicable law), (vi) the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, the 7.125% Secured Notes Indenture Trustee, the 7.5% Secured Notes Indenture Trustee, and (viii) the Revolving Credit Facility Agent, except in each case with respect to any contractual obligations, from any and all claims, obligations, suits, judgments, damages, demands, debts rights, Causes of Action, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud. Notwithstanding the foregoing, such release and discharge shall not operate as a release or discharge of (x) any right of any holder of a Secured Debt Claim to assert and prosecute its rights against Vantage Parent or (y) any contractual obligation, and nothing in the Plan shall affect any party's rights against Vantage Parent under any applicable document.**

### 8.    Exculpation

To the extent permitted by applicable law, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the New Second Lien Notes Indenture, the New Secured Convertible PIK Notes Indenture, the Amended and Restated Credit Facility Agreement, the New Shareholders Agreement, the New By-Laws, the Management Incentive Program, the Backstop Agreement, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the conducting of the Rights Offering; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Released Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

WEIL:\95549520\1\78787.0003

### 9. Injunction Related to Releases and Exculpation

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan.

### 10. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto (other than with respect to the Prepetition Intercreditor Agreement).

### 11. Retention of Causes of Action and Reservation of Rights

Subject to section 10.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12. Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor or affiliate of a Debtor shall be void and of no further force or effect with respect to any Debtor or affiliate of a Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor or affiliate of a Debtor as a result of, or gives rise to a right of any entity based on any of the following: (i) the insolvency or financial condition of a Debtor or affiliate of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring; *provided*, that the foregoing shall not operate as a release or discharge of any right of any holder of a Secured Debt Claim to assert and prosecute its rights against Vantage Parent, and nothing in the Plan shall affect any party's rights against Vantage Parent for any contractual obligation.

### 13. Indemnification and Reimbursement Obligations

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

WEIL:\95549520\1\78787.0003

### K.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising under or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine applications for the assumption of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all Fee Claims;

(j)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

WEIL:\95549520\1\78787.0003

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)    to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)    to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)    to enter a final decree closing each of the Chapter 11 Cases.

## L.    Miscellaneous Provisions

### 1.    Exemption from Certain Transfer Taxes

To the fullest extent permitted by applicable law, the issuance, transfer, or exchange of any security hereunder, as well as all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, and any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 2.    Dates of Actions to Implement the Plan

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 3.    Amendments

(a)    Plan Modifications.  The Plan may be amended, modified, or supplemented by the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or

71

Interest that the Plan has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    Certain Technical Amendments.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; provided, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Plan.

## 4.    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 5.    Severability

Subject to section 5.15 of the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

## 6.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

## 7.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

WEIL:\95549520\1\78787.0003

### 8. Successors and Assigns

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 9. Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 10. Computing Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 11. Exhibits to Plan

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

### 12. Notices

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Offshore Group Investment Limited
c/o Vantage Energy Services, Inc.
777 Post Oak Boulevard
Suite 800
Houston, Texas 77056
Attn: Paul A. Bragg
Telephone: (281) 404-4702
Facsimile: (281) 404-4749

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq.,
Daniel J. DeFrancheschi, Esq.,
and Zachary I. Shapiro, Esq.
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Attorneys for the Debtors

WEIL:\95549520\1\78787.0003

– and –

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York  10153
> Attn: Ray C. Schrock, P.C. and Ronit J. Berkovich, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
> Attorneys for the Debtors

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities much file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that have filed such renewed requests.

### 13.    Reservation of Rights

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

## VII.
## FINANCIAL INFORMATION AND PROJECTIONS

### A.    Consolidated Condensed Projected Financial Information

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (see Section XIV hereof), as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors prepared financial projections (the "***Projections***") for the balance of the 2015 calendar year, and for 2016 through 2019 (the "***Projection Period***"), as set forth below.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Projections to holders of Claims or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.  In connection with the planning and development of the Plan, the Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production in the U.S. Gulf of Mexico and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which

WEIL\95549520\1\78787.0003

the Vantage Group operates, regulatory changes, and/or a variety of other factors.  Consequently, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were last updated on December 1, 2015.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISERS.  THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE

PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

PROJECTED INCOME STATEMENT

| | FYE December 31, | | | | |
|---|---|---|---|---|---|
| *(US $ in thousands)* | **2015E** | **2016E** | **2017E** | **2018E** | **2019E** |
| **Revenue** | **$761,544** | **$238,937** | **$409,540** | **$541,709** | **$633,227** |
| Operating Costs | 373,541 | 218,338 | 281,050 | 301,350 | 300,350 |
| **Gross Margin** | **$388,003** | **$20,599** | **$128,490** | **$240,359** | **$332,877** |
| *Gross Margin* | *50.9%* | *8.6%* | *31.4%* | *44.4%* | *52.6%* |
| Depreciation | $127,282 | $50,941 | $43,699 | $43,699 | $43,699 |
| Construction Termination | 31,189 | - - | - - | - - | - - |
| Transaction Expenses | - - | 34,500 | - - | - - | - - |
| General and Administrative | 52,039 | 34,400 | 29,300 | 29,300 | 29,300 |
| **Income from Operations** | **$177,493** | **($99,242)** | **$55,491** | **$167,359** | **$259,878** |
| Interest Expense | $182,352 | $23,067 | $25,794 | $25,692 | $25,563 |
| Other (Income) Expense | (41,579) | - - | - - | - - | - - |
| **Income (Loss) Before Tax Provision** | **$36,720** | **($122,309)** | **$29,696** | **$141,668** | **$234,315** |
| Provision for Taxes | 41,056 | 15,027 | 23,216 | 29,575 | 35,412 |
| **Net income (loss)** | **($4,336)** | **($137,336)** | **$6,480** | **$112,093** | **$198,903** |
| **RECONCILIATION OF NET INCOME TO ADJUSTED EBITDA** | | | | | |
| **Net income (loss)** | **($4,336)** | **($137,336)** | **$6,480** | **$112,093** | **$198,903** |
| Depreciation | $127,282 | $50,941 | $43,699 | $43,699 | $43,699 |
| Construction Termination | 31,189 | - - | - - | - - | - - |
| Transaction Expenses and other Non-Recurring Items | 8,000 | 39,500 | -- | -- | -- |
| Interest Expense | 182,352 | 23,067 | 25,794 | 25,692 | 25,563 |
| Other (Income) Expense | (41,579) | - - | - - | - - | - - |
| Provision for Taxes | 41,056 | 15,027 | 23,216 | 29,575 | 35,412 |
| **EBITDA, Adj.** | **$343,964** | **($8,801)** | **$99,190** | **$211,059** | **$303,577** |

PROJECTED BALANCE SHEET[15]

---

[15] Pro forma long-term debt balances in this analysis assume the New Secured Convertible PIK Notes remain unconverted. The New Board will have the option to convert the $750 million New Secured Convertible PIK Notes (with accrued PIK interest) after 3 years post the Emergence Date (and may, in certain circumstances, convert the New Secured Convertible PIK Notes prior to 3 years). Secured Revolving Credit Facility (previously classified as short-term debt) assumed to be refinanced with a term loan, which is classified as long-term debt for pro forma balances.

WEIL:\95549520\1\78787.0003

| (US $ in thousands) | FYE December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015E | Feb 2016E (Pro Forma) | 2016E | 2017E | 2018E | 2019E |
| **ASSETS** | | | | | | |
| Cash | $210,442 | $242,097 | $187,100 | $234,233 | $372,036 | $457,700 |
| Accounts receivable | 63,539 | 38,854 | 32,642 | 56,101 | 74,207 | 86,743 |
| Inventory | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 | 65,270 |
| Other Current Assets | 31,344 | 28,415 | 29,782 | 28,269 | 26,755 | 25,242 |
| Total Current Assets | $370,594 | $374,636 | $314,793 | $383,872 | $538,268 | $634,955 |
| | | | | | | |
| Property and Equipment, net | $2,957,859 | $986,382 | $957,810 | $919,361 | $888,911 | $858,462 |
| Other Assets | 115,356 | 86,079 | 85,610 | 85,048 | 84,485 | 83,923 |
| **Total Assets** | **$3,443,809** | **$1,447,097** | **$1,358,213** | **$1,388,280** | **$1,511,664** | **$1,577,340** |
| | | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | |
| Accounts payable | 23,849 | 18,274 | 29,828 | 38,500 | 41,281 | 41,144 |
| Interest Payable | 83,485 | - - | 1,506 | 1,491 | 1,476 | 631 |
| Other Accrued Liabilities | 52,467 | 40,204 | 35,323 | 44,888 | 47,972 | 47,847 |
| ST Debt / Line of Credit | 150,000 | - - | - - | - - | - - | - - |
| Short-Term Debt | 78,162 | - - | - - | - - | - - | - - |
| Total Current Liabilities | $387,963 | $58,478 | $66,657 | $84,879 | $90,729 | $89,622 |
| | | | | | | |
| Long-Term Debt | 2,465,184 | 969,125 | 971,232 | 976,597 | 982,038 | 849,917 |
| Other Accrued Liabilities | 34,200 | 30,870 | 13,885 | 13,885 | 13,885 | 13,885 |
| **Total Liabilities** | **$2,887,347** | **$1,058,473** | **$1,051,774** | **$1,075,361** | **$1,086,652** | **$953,425** |
| | | | | | | |
| Shareholders' Equity | $556,462 | $388,624 | $306,440 | $312,920 | $425,013 | $623,915 |
| | | | | | | |
| **Total Liabilities and Shareholders' Equity** | **$3,443,809** | **$1,447,097** | **$1,358,213** | **$1,388,280** | **$1,511,664** | **$1,577,340** |

## PROJECTED CASH FLOW STATEMENT

| (US $ in thousands) | FYE December 31, | | | | |
|---|---|---|---|---|---|
| | 2015E | 2016E | 2017E | 2018E | 2019E |
| **OPERATING ACTIVITIES** | | | | | |
| Net Income / (Loss) | ($4,336) | ($137,336) | $6,480 | $112,093 | $198,903 |
| Depreciation & Amortization | 127,282 | 50,941 | 43,699 | 43,699 | 43,699 |
| Other | (46,993) | (14,804) | 8,144 | 8,220 | 8,297 |
| Changes in Working Capital | 112,395 | 22,009 | (3,750) | (10,768) | (12,156) |
| Total Operating Activities | $188,348 | ($79,191) | $54,574 | $153,245 | $238,743 |
| | | | | | |
| **INVESTING ACTIVITIES** | | | | | |
| JV Investment | $212 | - - | - - | - - | - - |
| Capital Expenditures | (56,740) | (9,382) | (5,250) | (13,250) | (13,250) |
| Total Investing Activities | ($56,528) | ($9,382) | ($5,250) | ($13,250) | ($13,250) |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Change in Debt | ($4,191) | $65,232 | ($2,191) | ($2,191) | ($139,829) |
| Total Financing Activities | ($4,191) | $65,232 | ($2,191) | ($2,191) | ($139,829) |
| | | | | | |
| **Total Change in Cash** | **$127,629** | **($23,341)** | **$47,132** | **$137,803** | **$85,664** |

## B.    Assumptions to the Projections

### 1.    General Assumptions

*Overview.*  The Debtors and their affiliates are an international offshore drilling contractor for the oil and gas industry, focused on operating a fleet of modern, high-specification mobile offshore drilling units ("*MODUs*").  The Debtors' operating fleet currently consists of four ultra-premium jackup rigs and three ultra-deepwater drillships. The Debtors global fleet is currently located in Southeast Asia, West Africa, India, and the U.S. Gulf of Mexico.

*Presentation.*  The Projections are presented on a consolidated basis, including estimates of operating results for Debtor and non-Debtor entities, combined.

*Methodology.*  In developing the Projections, the Debtors reviewed their fleet's current contracted status and made an assessment of whether or not these contracts were likely to continue and future speculative contracts.  The forecast was developed on an individual MODU basis and the Debtors evaluated the likelihood of each of their MODUs being utilized over the forecast period.

*Plan Consummation.*  The Projections assume that the Plan will be confirmed or consummated on or about February 29, 2016.

## 2. Assumptions With Respect to the Projected Income Statement

*Revenues.*  In the Projections, Revenues are forecasted by MODU, based on expected day rates, utilization, and efficiency for existing contracts and future speculative contracts.

*Operating Costs.*  Operating Costs are projected based on historical daily regional operating costs, adjusted for recent cost reduction efforts, and expected utilization of each MODU based on current contracts and expectations regarding future speculative contracts.

*General and Administrative.*  General and Administrative Costs ("**G&A**") are primarily comprised of labor costs, legal expenses, and other expenses associated with the Debtors' corporate overhead.  G&A is based on historical G&A costs, adjusted for recent cost reduction efforts.

*Depreciation and Amortization.*  Depreciation and Amortization reflects the anticipated depreciation and amortization of the existing fleet, based on net book values.

*Interest Expense.*  Interest expense post-emergence is forecasted based on the Debtors' proposed exit financing as more fully described in the Plan and the exhibits thereto.

*Income Tax (Expense) Benefit.*  Income tax is estimated based on the jurisdictional mix of the Debtors' projected revenue.

## 3. Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows

*Working Capital*.  Working capital assumptions are based on historical days sales and payable outstanding and other prepaid assets and other accrued liabilities.

*Pro Forma Adjustments Related to Emergence and Exit Financing*.  The February 2016 Balance Sheet included in the Projections presents a pro forma view of February 2016, assuming the effect of certain adjustments related to the Debtors' emergence from bankruptcy and obtaining related financing. These adjustments primarily relate to the conversion of the Debtors' Secured Debt into New Secured Convertible PIK Notes and New Common Shares.  Although the 2016–2019 Projections roll forward the effect of such pro forma adjustments, "fresh start" accounting principles have not been applied.

*Capital Expenditures*.  Projections for expenditures were prepared with consideration of the Debtors' current fixed assets.  Capital Expenditures primarily relate to sustaining capital needed to maintain MODUs in proper working condition and information technology-associated capital.

# VIII.
# VALUATION ANALYSIS

### A.    Estimated Reorganization Valuation of the Debtors

The Debtors have been advised by Lazard Frères & Co. LLC ("*Lazard*") with respect to the reorganization value of the Reorganized Debtors on a going concern basis.

Solely for purposes of the Plan, the estimated range of a reorganization value of the Reorganized Debtors was assumed to be approximately $1,110 million to $1,300 million (with a midpoint estimate of approximately $1,205 million) as of an assumed Effective Date of February 29, 2016.  The valuation analysis herein is based on information as of the date of the Disclosure Statement and is based on projections provided by the Debtors' management ("Financial Projections") for 2016 to 2019. For purposes of this valuation, it has been assumed that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Lazard's estimate of a range of reorganization values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF FEBRUARY 29, 2016, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF SEPTEMBER 30, 2015.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

Based upon the assumed combined range of the reorganization value of the Reorganized Debtors of between $1,110 million and $1,300 million and assumed net debt of $727 million (assuming a debt balance of $969 million and a pro forma cash balance of $242 million as of February 29, 2016), Lazard has employed an imputed estimate of the range of equity value for the Reorganized Debtors between approximately $383 million and $573 million, with a midpoint estimate of $478 million.

The assumed range of reorganization value was based on the Projections for the Projection Period, as set forth previously.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH LAZARD'S ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.  ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.  IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY LAZARD REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS.  SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY

SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the Reorganized Debtors will achieve their Financial Projections in all material respects, including revenue growth, EBITDA margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods, which is limited; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the  value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

The estimated Enterprise Value and Equity Value do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time. The estimated Enterprise Value and Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Based on the Debtors' and their tax professionals' tax analysis, the Reorganized Debtors do not expect to have significant tax attributes following the reorganization. Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' projections. Any changes to the assumptions on the availability of tax attributes or the impact of

cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Lazard's valuation analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY LAZARD REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE COMPANY, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE.

## IX.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The Solicitation is being made prior to the Petition Date only to holders of the Secured Debt Claims who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act.

The issuance of and the distribution under the Plan of the New Secured Convertible PIK Notes, the Subscription Rights (including the New Second Lien Notes issued pursuant to the exercise thereof in the Rights Offering), and the New Common Shares issued to holders of Allowed Secured Debt Claims and the issuance of New Common Shares upon the conversion of the New Secured Convertible PIK Notes shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the New Secured Convertible PIK Notes, the Subscription Rights (including the New Second Lien Notes issued pursuant to the exercise thereof in the Rights Offering), and the New Common Shares issued to holders of Allowed Secured Debt Claims and the issuance of New Common Shares upon the conversion of the New Secured Convertible PIK Notes generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The issuance and sale, as applicable, of the New Second Lien Notes to the Backstop Parties under the Backstop Agreement (including the New Second Lien Notes comprising the Backstop Commitment

WEIL:\95549520\1\78787.0003

Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under, or an available exemption from, the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

*Listing*.  Upon the Effective Date of the Plan, the New Second Lien Notes, the New Secured Convertible PIK Notes and the New Common Shares will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends*.  To the extent certificated, certificates evidencing the New Common Shares held by holders of 10% or more of the outstanding New Common Shares, including the New Second Lien Notes and New Secured Convertible PIK Notes held by such holders, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

[THIS NOTE] [THE ORDINARY SHARES] REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS OFFSHORE GROUP INVESTMENT LIMITED RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## X.
## CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    Certain U.S. Federal Income Tax Consequences of the Plan

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax ("**AMT**") or the "Medicare" tax on unearned income, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the senior secured term loans under the Amended and Restated Credit Facility Agreement, New Second Lien Notes, New Secured Convertible PIK Notes or New Common Shares in the secondary market.

This discussion assumes that the Revolving Credit Facility Claims, Secured Debt Claims, senior secured term loans under the Amended and Restated Credit Facility Agreement, Subscription Rights, New Second Lien Notes, New Secured Convertible PIK Notes and New Common Shares are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.

### 1.    Consequences to the Debtors

Only one of the Debtors, VDDI, is an entity required to file a U.S. federal income tax return. VDDI is not expected to have any material adverse U.S. federal income tax consequences as a result of the implementation of the Plan. Delaware Holdings, a Delaware limited liability company wholly-owned by OGIL, is a disregarded entity for U.S. federal income tax purposes and has no U.S. operations or assets.

### 2.    Consequences to Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to holders of Revolving Credit Facility Claims and Secured Debt Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. As used herein, the term "**U.S. Holder**" means a beneficial owner of Revolving Credit Facility Claims, Secured Debt Claims, senior secured term loans under the Amended and Restated Credit Facility Agreement, Subscription Rights, New Secured Convertible PIK Notes or New Common Shares, that is for U.S. federal income tax purposes:

83

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Revolving Credit Facility Claims, Secured Debt Claims, senior secured term loans under the Amended and Restated Credit Facility Agreement, Subscription Rights, New Secured Convertible PIK Notes or New Common Shares, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

(a)     Holders of Revolving Credit Facility Claims

Pursuant to the Plan, and in complete and final satisfaction of their respective Revolving Credit Facility Claims, holders of Revolving Credit Facility Claims will receive payment in cash or a senior secured term loan under the Amended and Restated Credit Facility Agreement, or a combination of both.

In general, a U.S. Holder of their respective Revolving Credit Facility Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) cash received in the exchange in respect of its Claim plus the issue price of the secured term loan received in the exchange in respect of its Claim (other than any consideration received in respect of a claim for accrued but unpaid interest and possibly accrued original issue discount ("*OID*")), and (ii) the holder's adjusted tax basis in the Claims exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* 4.— "Character of Gain or Loss," below.  In addition, a U.S. Holder of a Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* 3.— "Distributions in Discharge of Accrued Interest," below.

The "issue price" of the secured term loans issued under the Plan depends on whether, at any time during the 31-day period ending 15days after the Effective Date, such loans are traded on an "established market" or the Revolving Credit Facility Claims exchanged (in whole or in part) for loans are traded on an established market.  Pursuant to applicable Treasury regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of the new loans or existing claims, or if there is one or more "firm quotes" or "indicative quotes" for such notes, in each case as such terms are defined in applicable Treasury regulations.  If Reorganized OGIL determines that either the new loans or existing claims are traded on an established market, such determination will be binding on a U.S. Holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from Reorganized OGIL's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

If the secured term loans received are considered traded on an established market, their issue price for U.S. federal income tax purposes will equal their fair market value as of the Effective Date.  If the secured term loans are not considered traded on an established market but the Revolving Credit Facility Claims are so treated, the issue price of the secured term loans for U.S. federal income tax purposes will be based on the fair market value of the Revolving Credit Facility Claims. If neither instrument is treated as traded on an established market, the issue price of the secured term loans for U.S. federal income tax purposes generally will be their stated principal amount. See Section VI— *Summary of the Plan—Summaries of the New Securities and the Amended and Restated Credit Facility for a description of the material terms of the Amended and Restated Credit Facility*.

A U.S. Holder's tax basis in the secured term loan received in respect of its Claim on the Effective Date should equal its issue price on the Effective Date.  The U.S. Holder's holding period in such loan should begin on the day following the Effective Date.

As to a U.S. Holder's treatment of interest or potentially OID with respect to the secured term loans received and any payments on such loan, or any gain or loss upon a subsequent disposition of such loan, each holder is urged to consult its tax advisor (particularly given that the terms of the secured term loans will not be fully known until made available as part of the Plan Supplement).

> (b)    Holders of Secured Debt Claims

Pursuant to the Plan, and in complete and final satisfaction of their respective Secured Debt Claims, holders of Secured Debt Claims will receive New Secured Convertible PIK Notes, New Common Shares and Subscription Rights. The New Secured Convertible PIK Notes will be "stapled" to New Common Shares and thus traded as a single unit (the "***Stapled Units***").

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Secured Debt Claims depends, in part, on whether the holder's Claim constitutes a "security" of OGIL for U.S. federal income tax purposes.  This determination is made separately for each type of Claim.  If a Secured Debt Claim constitutes a security of OGIL, then the receipt of New Secured Convertible PIK Notes, New Common Shares and Subscription Rights in accordance with the Plan should be treated as part of a tax "reorganization" for U.S. federal income tax purposes, with the consequences described below in 2.b.ii.— "Reorganization Treatment."  If, on the other hand, a Secured Debt Claim does not constitute a security of OGIL, then the receipt of New Secured Convertible PIK Notes, New Common Shares and Subscription Rights in exchange therefor will be treated as a fully taxable transaction, with the consequences described below in 2.b.i.—"Fully Taxable Exchange."

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Holders of Secured Debt Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Secured Debt Claims.

As indicated, the New Secured Convertible PIK Notes will be "stapled" to (and thus only transferred with) a holder's New Common Shares, and thus intended to constitute a single instrument.  Moreover, the

85

Stapled Units are intended to be treated as "stock" for U.S. federal income tax purposes, and the Plan so provides.  *See* 7.a.—"Ownership and Disposition of Stapled Units – Status of Stapled Units as Debt or Equity."  Accordingly, unless otherwise indicated, the following discussion assumes the Stapled Units are properly treated as stock for U.S. federal income tax purposes.

Whether the Subscription Rights constitute "securities" could depend on the characterization of the Subscription Rights as options to acquire the underlying New Second Lien Notes or as transitory instruments in an integrated transaction pursuant to which the underlying New Second Lien Notes are acquired directly by holders in the exchange.  Although the discussion below generally refers to the Subscription Rights as part of the consideration received in respect of a Secured Debt Claim, it may be more appropriate to integrate the transaction and view a direct interest in the New Second Lien Notes as part of the consideration received in respect of a Secured Debt Claim.  *See* 5.a.— "Treatment of Subscription Rights – Status as Options or New Second Lien Notes," below.

(i)    Fully Taxable Exchange

In general, if the exchange of a Secured Debt Claim pursuant to the Plan is a fully taxable exchange, a U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate fair market value of Stapled Units and possibly the Subscription Rights received in the exchange in respect of its Secured Debt Claim (other than any exchange consideration received in respect of a claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in the Secured Debt Claims exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* 4.— "Character of Gain or Loss," below.  In addition, a U.S. Holder of a Secured Debt Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  See 3.— "Distributions in Discharge of Accrued Interest," below.

In the case of a taxable exchange, a U.S. Holder's tax basis in the Stapled Units and possibly the Subscription Rights received in respect of its Secured Debt Claim on the Effective Date should equal their respective fair market values on the Effective Date.  The U.S. Holder's holding period in any such Stapled Units received should begin on the day following the Effective Date.  *See* 5.—"Treatment of Subscription Rights," below.

(ii)    Reorganization Treatment

If a Secured Debt Claim constitutes a security of OGIL, the receipt of Stapled Units and Subscription Rights in exchange therefor will qualify for reorganization exchange treatment for U.S. federal income tax purposes.  The classification as a reorganization exchange generally serves to defer the recognition of any taxable gain or loss by the U.S. Holder.  However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives consideration other than stock or "securities" of the exchanging company.  Accordingly, a U.S. Holder of Secured Debt Claim generally will not recognize any loss upon the exchange, but will recognize any gain (computed as described in the preceding section) to the extent of the fair market value of the Subscription Rights received in the exchange if the Subscription Rights do not constitute "securities" of Reorganized OGIL.  In addition, even within an otherwise tax-free exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* 3.— "Distributions in Discharge of Accrued Interest," below.

In a reorganization exchange, a U.S. Holder's aggregate tax basis in the Stapled Units and Subscription Rights (if the Subscription Rights constitute "securities") received will equal such holder's aggregate adjusted tax basis in the Secured Debt Claims exchanged therefor, increased by any gain or interest

86

income recognized in the exchange and decreased by any exchange consideration that does not constitute stock or "securities" of Reorganized OGIL.  Such aggregate tax basis presumably should be allocated among the Stapled Units and Subscription Rights (if the Subscription Rights constitute "securities") received in accordance with their relative fair market values.  In a reorganization exchange, a U.S. Holder's holding period in the Stapled Units received will include its holding period in the Secured Debt Claims exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest.  If the Subscription Rights do not constitute "securities" of Reorganized OGIL, then a U.S. Holder's tax basis in the Subscription Rights received may be their fair market value. *See* 5.—"Treatment of Subscription Rights," below.

### 3.    Distributions in Discharge of Accrued Interest

In general, to the extent that any exchange consideration received pursuant to the Plan (whether cash, stock or other property) by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest.  *See* Section 6.12 of the Plan.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### 4.    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount.  Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any

deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange but, if the exchange is a reorganization exchange, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of Secured Debt Claims that qualifies as a reorganization exchange, the Tax Code indicates that any accrued market discount in respect of the Secured Debt Claims should not be currently includible in income under Treasury regulations to be issued.  Rather, such accrued market discount should carry over to any nonrecognition property received in exchange therefor (i.e., to the Stapled Units and Subscription Rights, if such Subscription Rights constitute "securities", received in the exchange).  Any gain recognized by a U.S. Holder upon a subsequent disposition of such Stapled Units or Subscription Rights would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury regulations implementing this rule have not been issued.

### 5.    Treatment of Subscription Rights

#### (a)    Status as Options or New Second Lien Notes

The characterization of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes – as simply the exercise of options to acquire the underlying New Second Lien Notes or, alternatively, as an integrated transaction pursuant to which the underlying New Second Lien Notes are acquired directly in partial satisfaction of a holder's Secured Debt Claim – is uncertain.

#### (b)    Exercise of the Subscription Rights

Regardless of the characterization of the Subscription Rights, a U.S. Holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of such Subscription Rights (beyond the gain or loss recognized in respect of its Secured Debt Claim, as described above).

A U.S. Holder's aggregate tax basis in the New Second Lien Notes received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Second Lien Notes and (ii) the holder's tax basis, if any, in the Subscription Rights or, alternatively, under an integrated transaction analysis, in any New Second Lien Notes that is treated as directly acquired in partial satisfaction of the holder's Secured Debt Claim.  A U.S. Holder's holding period in the New Second Lien Notes received upon exercise of a Subscription Right generally should commence the day following the Effective Date, unless the Subscription Right is disregarded and the holder is instead treated as receiving for its Secured Debt Claim a portion of the New Second Lien Notes acquired equal in value to the Subscription Rights.  In the latter event, the U.S. Holder could have a split holding period (part new and part carry over) if the receipt of the New Second Lien Notes was part of a "reorganization" exchange for U.S. federal income tax purposes.  In addition, if either the Subscription Rights or, under an integrated transaction analysis, the New Second Lien Notes acquired are treated as received as part of a reorganization exchange, any gain recognized upon a subsequent disposition of the New Second Lien Notes may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income (*see* 4.—Character of Gain or Loss," above).

It is uncertain whether a holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Secured Debt Claim.  If the U.S. Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the holder generally would recognize a loss to the extent of the holder's tax basis in the Subscription Right.  In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of

the Subscription Rights in partial satisfaction of a Secured Debt Claim could be part of a reorganization exchange, even if the right goes unexercised, such that the U.S. Holder may carry over the holding period in its Secured Debt Claim).

### 6.    Ownership of New Second Lien Notes

(a)    Payments of Stated Interest

Payments of stated interest on the New Second Lien Notes generally will be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U.S. Holder's regular method of tax accounting).

(b)    Original Issue Discount

The New Second Lien Notes may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. A New Second Lien Note's stated redemption price at maturity for this purpose would include all principal and interest payable over the term of the New Second Lien Notes, other than "qualified stated interest." The stated interest payable on the New Second Lien Notes will be considered qualified stated interest for this purpose.

The "issue price" of a debt instrument generally equals (i) the first price at which a substantial amount of the debt instruments in the issue are sold, in the case of debt instruments issued solely for cash, or (ii) the fair market value as of the issue date of the property for which a substantial amount of the debt instruments are issued, in the case of debt instruments issued solely for property traded on an established market.  It is unclear how the issue price of a debt instrument should be determined if it is not issued solely for property or solely for cash.  Neither the Tax Code nor the regulations thereunder address this issue.  If the receipt of the Subscription Rights and subsequent exercise is characterized as an integrated transaction pursuant to which the underlying New Second Lien Notes are acquired directly, one possible approach to determining the issue price of the New Second Lien Notes would be to aggregate (i) the amount of cash for which the New Second Lien Notes are issued in the exercise of the Subscription Rights and (ii) the fair market value of the portion of the New Secured Debt Claims for which the Subscription Rights are granted, if the New Secured Debt Claims are treated as being traded on an established market during the relevant period.  If the receipt of the Subscription Rights and subsequent exercise is not characterized as an integrated transaction, the Debtors believe that the issue price of the New Second Lien Notes would be the stated redemption price at maturity of the New Second Lien Notes.

If the New Second Lien Notes are issued with OID, a U.S. Holder will be required to include in taxable income for any particular taxable year the daily portion of the OID that accrues on the note for each day during the taxable year on which such holder holds the note, whether reporting on the cash or accrual basis of accounting for United States federal income tax purposes.  Thus, a U.S. Holder will be required to include OID in income in advance of the receipt of the cash to which such OID is attributable.  The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the note at the beginning of the accrual period multiplied by the yield to maturity of the note less the amount of any qualified stated interest allocable to such accrual period.  The "adjusted issue price" of a note at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the note in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the notes other than qualified stated interest.

In compliance with applicable Treasury regulations, the Debtors will furnish annually to the IRS information describing the amount of accrued OID, if any. The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, each holder of New Secured Debt Claims exercising or considering whether to exercise Subscription Rights is urged to consult its tax advisor regarding the determination of the issue price of the New Second Lien Notes and the possible application of the OID rules to the New Second Lien Notes.

### 7.    Ownership and Disposition of Stapled Units

(a)    Status of Stapled Units as Debt or Equity

Pursuant to case law and IRS rulings, stapled instruments are generally treated as a single instrument for U.S. federal income tax purposes where a holder does not have the right to separate the instruments and dispose of each individually. Accordingly, the Stapled Units should be analyzed as a single instrument that is treated as "debt" or "equity" for U.S. federal income tax purposes.

For an instrument with both debt-like and equity-like features to be considered "debt" for U.S. federal income tax purposes, the instrument must represent an unqualified obligation to pay a sum certain with interest regardless of the debtor's income or lack thereof. Conversely, if there is not an unqualified obligation to pay a sum certain, and the instrument represents an embarking on the corporate venture such that the holder takes the risks of loss so that it might share in the profits of success, such instrument generally will be considered "stock" for U.S. federal income tax purposes. Congress and Treasury have generally left such determination up to the courts, which have developed a multi-factored test based on facts and circumstances with no one factor determinative. Because the Stapled Units are partially composed of New Common Shares, the Stapled Units have an indefinite maturity, an unlimited participation in the corporation's growth, and the controlling ownership of the corporation, the Debtors believe that the Stapled Units are properly regarded as "stock" for U.S federal income tax purposes, and the discussion herein so assumes.

Moreover, the Plan provides (as will the governing instrument) that all parties (including the Reorganized Debtors, all holders of Allowed Secured Debt Claims who receive Stapled Units pursuant to the Plan, the New Secured Convertible PIK Notes Indenture Trustee and all other parties to the New Secured Convertible PIK Notes Indenture) must treat the Stapled Units as constituting a single instrument treated as common stock of Reorganized OGIL for U.S. federal income tax purposes (subject to definitive guidance from the U.S. Internal Revenue Service or a court of competent jurisdiction to the contrary). In addition, to the extent permitted by applicable law, all parties must report consistent therewith for U.S. state and local income tax purposes.

(b)    General Treatment

The following discussion is qualified in part by the discussion below regarding the possible treatment as a passive foreign investment company ("**PFIC**") or a controlled foreign corporation ("**CFC**"). *See* 7.c., below.

(i)    Cash Payments and other Cash Distributions on the Stapled Units.

In general, any cash distributions with respect to the Stapled Units – including any cash payments on the New Secured Convertible PIK Notes (whether denominated as interest or principal) –will be treated as a taxable dividend to the extent paid out of Reorganized OGIL's current or accumulated earnings and profits as determined under U.S. federal income tax principles ("earnings and profits"), and will be includible by the U.S. Holder as ordinary income when received. To the extent the amount of any

distribution exceeds available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the U.S. Holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the Stapled Units as to which the distribution was made, but not below zero. Any remaining excess will be treated as gain from the sale or exchange of Stapled Units, with the consequences discussed below (*see* 7.b.iv.— "Disposition of Stapled Units," below). The Debtors do not expect that Reorganized OGIL will keep record of its earnings and profits in accordance with U.S. federal income tax principles. Therefore, U.S. Holders should expect that a cash payment or distribution on Stapled Units will generally be treated as a dividend (as discussed above).

Any such taxable dividends received by a U.S. Holder will not be eligible for the "dividends received deduction" for corporate U.S. Holders and will not be eligible for reduced rates of taxation as "qualified dividend income" for non-corporate U.S. Holders.

> (ii)     Constructive Distributions; PIK Interest.

Under section 305 of the Tax Code, certain transactions that affect a shareholder's proportionate interest in the corporation's assets are treated as creating deemed distributions on stock, which distributions may be taxed as dividends, despite the absence of any actual payment of cash (or property) to the holder of such stock. Interest on the New Secured Convertible PIK Notes generally will be payable in kind (PIK Interest) by increasing the outstanding principal of the New Secured Convertible PIK Notes, which will increase the amount of New Common Shares that would be received upon conversion of the New Secured Convertible PIK Notes. In addition, there will only be anti-dilution adjustments in respect of the conversion right for certain events. Under certain circumstances, possibly including the payment of cash with respect to shares of stock or rights to acquire stock that are not part of the Stapled Units, the increase in the stock receivable upon conversion due to the PIK Interest or the presence or absence of an adjustment to the conversion price at which the New Secured Convertible PIK Notes are convertible into New Common Shares may be treated as receiving a constructive distribution for U.S. federal income tax purposes, which would be taxable similar to an ordinary distribution on stock.

U.S. Holders should consult their tax advisors as to the tax consequences of holding Stapled Units and of the possibility that the holder will be treated as receiving constructive distributions with respect to such stock.

> (iii)    Conversion of the New Secured Convertible PIK Notes into New
>          Common Shares.

A U.S. Holder generally will not recognize any gain or loss in respect of the receipt of additional New Common Shares upon the conversion of the New Secured Convertible PIK Notes. The adjusted tax basis of the New Common Shares received should be determined based on the tax basis of the Stapled Unit in respect of which the shares were received, by taking the tax basis of the Stapled Unit and allocating it among the new shares and the remaining portion of the Stapled Unit based on relative fair market value. The holding period of the New Common Shares received on conversion will generally include the holding period for the Stapled Unit.

> (iv)     Disposition of Stapled Units

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount (*see* 4.—"Character of Gain or Loss," above) and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange (other than pursuant to a conversion of the New Secured Convertible PIK Notes portion of the Stapled Units) of the Stapled Units in an amount equal to the difference between (i) the holder's adjusted tax basis in the Stapled Units held and (ii) the

sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term if the holder's holding period for its Stapled Units held is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. Holder upon a subsequent disposition of the Stapled Units (or any stock or property received for such Stapled Units in a later tax-free exchange) received in exchange for a Secured Debt Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions incurred upon exchange or previously as a result of the write-down of the Secured Debt Claim, decreased by any income (other than interest income) recognized by the holder upon exchange of the Secured Debt Claim, and (ii) with respect to a cash-basis holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Secured Debt Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

> (c)  Possible Treatment of Reorganized OGIL as a Passive Foreign Investment Company or Controlled Foreign Corporation

Reorganized OGIL or any of its subsidiaries may be classified as a PFIC for U.S. federal income tax purposes. In general, a foreign corporation will be classified as a PFIC if (i) 75% or more of its gross income in a taxable year, including its pro rata share of the gross income of any company treated as a corporation for U.S. federal income tax purposes, U.S. or foreign, in which the foreign corporation is considered to own, directly or indirectly, 25% or more of the shares by value, is passive income, or (ii) at least 50% of its assets in a taxable year, averaged quarterly over the year and ordinarily determined based on fair market value and including its pro rata share of the assets of any company treated as a corporation for U.S. federal income tax purposes, U.S. or foreign, in which the foreign corporation is considered to own, directly or indirectly, 25% or more of the shares by value, produce, or are held for the production of, passive income. Passive income for this purpose includes, among other items, interest, dividends, royalties, rents and annuities. The Debtors do not expect that, as of the Effective Date, Reorganized OGIL or any of its subsidiaries will constitute a PFIC for U.S. federal income tax purposes. There can be no assurance, however, that the IRS or a court will agree or that Reorganized OGIL or one of its subsidiaries will not be or later become a PFIC in the future. Holders are urged to consult their own tax advisors regarding whether Reorganized OGIL or any of its subsidiaries will constitute a PFIC for U.S. federal income tax purposes and, if so, the U.S. federal, state, local, and foreign tax consequences of holding Stapled Units.

Reorganized OGIL or any of its subsidiaries may be classified as a CFC for U.S. federal income tax purposes. In general, a foreign corporation will be classified as a CFC if more than 50% of the shares of the corporation, measured by reference to combined voting power or value, is owned (directly, indirectly or by attribution) by "U.S. Shareholders." A "U.S. Shareholder," for this purpose, is any U.S. person that possesses (directly, indirectly or by attribution) 10% or more of the combined voting power (generally the right to vote for directors of the corporation) of all classes of shares of a foreign corporation. The Debtors do not expect that, as of the Effective Date, Reorganized OGIL or any of its subsidiaries will constitute a CFC for U.S. federal income tax purposes. There can be no assurance, however, that Reorganized OGIL or one of its subsidiaries will not be or later become a CFC. Holders are urged to consult their own tax advisors regarding whether Reorganized OGIL or any of its subsidiaries will constitute a CFC for U.S. federal income tax purposes and, if so, the U.S. federal, state, local, and foreign tax consequences of holding Stapled Units.

(i)     Distributions on and Disposition of Stapled Units if Reorganized OGIL is a PFIC

If Reorganized OGIL is characterized as a PFIC, a U.S. Holder would be subject to a tax at the time of the sale of its Stapled Units or on the receipt of an "excess distribution" with respect to its Stapled Units, unless a "qualified electing fund" ("**QEF**") election is made with respect to such holder's Stapled Units. A U.S. Holder is treated as receiving an "excess distribution" from a PFIC if the amount of the distribution is more than 125% of the average distribution with respect to such holder's stock during the three preceding taxable years (or shorter period during which the holder held its stock).  In general, the tax is equivalent to an interest charge based on the value of the tax deferral of the taxes that are deemed due during the period the U.S. Holder owned its Stapled Units, computed by assuming that the excess distribution or gain (in the case of a sale) with respect to such Stapled Units was taxed in equal portions throughout the holder's period of ownership at the highest marginal ordinary income tax rate.  The interest charge is computed using the applicable rate imposed on underpayments of U.S. federal income tax for such period.  The entire amount of gain realized by a U.S. Holder upon the sale or other disposition of its Stapled Units will also be treated as an excess distribution and will be subject to this tax. The Debtors do not intend to make available the information necessary for holders to make a QEF election.

The rules relating to PFICs are complex.  Holders are urged to consult their own tax advisors regarding whether Reorganized OGIL will constitute a PFIC and, if so, the U.S. federal, state, local, and foreign tax consequences of holding the Stapled Units.

(ii)    Deemed Dividends and Actual Distributions on Stapled Units if Reorganized OGIL is a Controlled Foreign Corporation

If Reorganized OGIL is treated as a CFC for U.S. federal income tax purposes, a U.S. Shareholder of Reorganized OGIL would be treated, subject to certain exceptions, as receiving a deemed dividend at the end of the taxable year from Reorganized OGIL in an amount equal to that person's pro rata share of the "Subpart F income" of Reorganized OGIL to the extent of Reorganized OGIL's earnings and profits, as determined under U.S. federal income tax principles.  Such deemed dividend would be treated as income from sources within the United States for U.S. foreign tax credit limitation purposes to the extent that it is attributable to income of Reorganized OGIL from sources within the United States.  Among other items, and subject to certain exceptions, "Subpart F income" includes dividends, interest, annuities, gains from the sale or exchange of shares and securities, certain gains from commodities transactions, certain types of insurance income and income from certain transactions with related parties.  If a CFC's Subpart F income exceeds 70% of its gross income for a taxable year, the entire amount of the CFC's income for such taxable year will be treated as Subpart F income.

Any actual distributions made by Reorganized OGIL to a U.S. Holder will be taxable in the manner described above in 7.b.i—"Cash Payments and Other Distributions on the Stapled Units" to the extent that such amounts have not previously been included in income as a deemed dividend by such holder.

The rules relating to CFCs are complex.  Holders are urged to consult their own tax advisors regarding whether Reorganized OGIL will constitute a CFC and, if so, the U.S. federal, state, local, and foreign tax consequences of holding the Stapled Units.

## 8.     Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale,

retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only.  All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.

### B.    Cayman Islands Tax Considerations

OGIL and certain of the Debtors are Cayman Islands exempted companies with limited liability. Exempted companies are Cayman Islands companies whose objects are carried out mainly outside the Cayman Islands and, as such, are exempt from complying with certain provisions of the Cayman Islands Companies Law (2013 Revision).

The Cayman Islands currently have no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax.  As an exempted company, OGIL has received a tax exemption undertaking from the Cayman Islands government that , in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking (being 1 July 2008), no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to OGIL or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of OGIL's shares, debentures or other obligations or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by OGIL to its members or a payment of principal or interest or other sums due under a debenture or other obligation of OGIL.  Certain of the other Debtors have also received undertakings in similar form.

### XI.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below,

94

and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

#### 3.    Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

#### 4.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5. Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the Requisite Consenting Debtholders and the Majority Consenting Revolver Lenders the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 6. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section XIV hereof, as well as the Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

## B. Additional Factors Affecting the Value of the Reorganized Debtors

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' Projections and feasibility analysis, and the variation may be material.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

## C. Risks Relating to the Debtors' Business and Financial Condition

### 1. Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have outstanding secured indebtedness of approximately $969 million, which includes amounts under the Amended and Restated Credit Facility, the New Secured Convertible PIK Notes, and the New Second Lien Notes. Upon the conversion of the New Secured Convertible PIK Notes into New Common Shares, the Reorganized Debtors will have $219 million in outstanding secured indebtedness. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.

96

In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 2.    Risks Related to Foreign Customers and Creditors

The Debtors' customers may not be subject to the jurisdiction of U.S. courts and may attempt to terminate their contracts with the Debtors or take actions against the Debtors' assets in contravention of U.S. bankruptcy law or orders of the Bankruptcy Court.  Any such termination or renegotiation of contracts and unfavorable costs increases or loss of revenue could have a material adverse impact on the Debtors' financial condition and results of operations.

### 3.    Risks Relating to the Debtors' Relationship with F3 Capital and Nobu Su

As previously discussed in Section V.B.2, hereof, Vantage Parent has been involved in litigation with Nobu Su, a former director of Vantage Parent and the sole owner of F3 Capital, Vantage Parent's largest shareholder.  On June 20, 2014, Nobu Su filed the Counterclaim seeking damages in excess of $2 billion and indemnification with respect to the matters that are the basis for the Nobu Su Litigation.  Vantage Parent intends to vigorously pursue its claims against Nobu Su and vigorously defend against the Counterclaim, but there can be no assurance as to the outcome of these legal proceedings.

Although Nobu Su has to date only asserted claims against Vantage Parent, it is possible that Nobu Su may bring additional legal action against other entities in the Vantage Group, including various Debtor entities, upon the filing of the Chapter 11 Cases.  Further, the potential for future litigation by Nobu Su against the Debtors or Reorganized Debtors, as applicable, even if such litigation does not materialize, might adversely affect the public's perception of the Debtors or Reorganized Debtors, as applicable, the price of their securities, their relationship with other companies, and their ability to enter into new relationships in the future, which may have a material adverse effect the Debtors' business.

### D.    Factors Relating to Securities to Be Issued Under the Plan, Generally

### 1.    No Current Public Market for Securities

There is currently no market for the New Common Shares, the New Secured Convertible PIK Notes, or the New Second Lien Notes, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list any of the above securities on any national securities exchange.  Although Reorganized OGIL will enter into a registration rights agreement with the Registration Rights Parties, providing such parties with certain rights that will facilitate the registration of the New Common Shares and the New Secured Convertible PIK Notes held by them under the Securities Act to allow for the resale of such securities, such rights will be limited.

Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

WEIL:\95549520\1\78787.0003

2.      **Potential Dilution**

The ownership percentage represented by the New Common Shares distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Program, conversion of the New Secured Convertible PIK Notes, any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In particular, conversion of the New Secured Convertible PIK Notes will dilute the ownership interest of any existing shareholders.  In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Shares issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

E.      **Risks Related to an Investment in the New Secured Convertible PIK Notes**

1.      **Insufficient Cash Flow to Meet Debt Obligations**

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total secured indebtedness outstanding of approximately $969 million, which is expected to consist of $143 million under the Amended and Restated Credit Facility, $750 million under the New Secured Convertible PIK Notes, and approximately $76 million under the New Second Lien Notes.  Upon conversion of the New Secured Convertible PIK Notes into New Common Shares, the Reorganized Debtors will have $219 million of total secured indebtedness outstanding.  This high level of expected indebtedness and the funds required to service such debt could, among other things, make it more difficult for the Reorganized Debtors to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year due to the cyclical nature of the offshore drilling industry.  Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments, including the New Secured Convertible PIK Notes and the New Second Lien Notes.  Any insufficiency could negatively impact the Reorganized Debtors' business.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt, including the New Secured Convertible PIK Notes and the New Second Lien Notes.  Many of these factors, such as oil and natural gas prices, economic and financial conditions in the offshore drilling industry and the oil and gas industry, as well as the global economy or competitive initiatives of competitors, are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- Refinancing or restructuring debt;

- Selling assets;

- Reducing or delaying capital investments; or

- Seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations, including obligations under the New Secured Convertible PIK Notes and the

New Second Lien Notes, or to obtain alternative financing, could materially and adversely affect the Reorganized Debtors' ability to make payments on the New Secured Convertible PIK Notes and the New Second Lien Notes and their business, financial condition, results of operations, and prospects.

### 2.    Inability to Repurchase the New Secured Convertible PIK Notes and the New Second Lien Notes

Under the terms of the indenture governing the New Secured Convertible PIK Notes (the "*New Convertible Indenture*") and the indenture governing the New Second Lien Notes (the "*New Secured Indenture*" and, together with the New Convertible Indenture, the "*New Indentures*"), Reorganized OGIL may, at the holder's option, be required to repurchase all or a portion of the New Secured Convertible PIK Notes and the New Second Lien Notes, respectively, in the event of a change of control, as defined in the New Indentures.

In addition, under the terms of the New Convertible Indenture, the New Secured Convertible PIK Notes will become due and payable at a make-whole price specified therein upon the occurrence of any event of default provided therein.

Reorganized OGIL and the other Reorganized Debtors may not have enough funds to pay the repurchase price or the make-whole price on the repurchase date or due date thereof.

### 3.    Reorganized OGIL Will be a Holding Company

OGIL is a holding company, and as such, it conducts its operations through, most of its assets are owned by, and its operating income and cash flow are generated by, its subsidiaries.  Upon the Effective Date, Reorganized OGIL will remain a holding company.  Therefore, Reorganized OGIL will be dependent upon cash flows from its subsidiaries to meet its debt service and related obligations, including the obligation to repurchase all or a portion of the New Secured Convertible PIK Notes and the New Second Lien Notes in the event of a change of control, as defined in the New Indentures, or to pay the make-whole premium on the New Secured Convertible PIK Notes required by the New Convertible Indenture upon the occurrence of an event of default thereunder.  Contractual provisions or laws, as well as its subsidiaries' financial conditions and operating requirements, may limit Reorganized OGIL's ability to obtain, from such subsidiaries, the cash required to meet such debt service or related obligations. Applicable tax laws may also subject such payments to further taxation.  The inability to obtain cash from its subsidiaries may limit Reorganized OGIL's ability to meet its debt service and related obligations even though there may be sufficient resources on a consolidated basis to satisfy such obligations.

### 4.    Insufficiency of Proceeds from Collateral Securing New Second Lien Notes and New Secured Convertible PIK Notes

The indebtedness under the Amended and Restated Credit Facility will be secured, subject to certain exceptions and permitted liens, on a first-priority basis by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "*collateral*").  The New Second Lien Notes and the New Secured Convertible PIK Notes will be secured, subject to certain exceptions and permitted liens, on a second-priority and a third-priority basis, respectively, by security interests in substantially all of the Reorganized Debtors' assets.

In the event of a foreclosure on the collateral (or a distribution in respect thereof in a subsequent bankruptcy or insolvency proceeding), the proceeds from the collateral securing the New Second Lien Notes and the New Secured Convertible PIK Notes may not be sufficient to satisfy the obligations outstanding under such notes because the proceeds would, under the New Intercreditor Agreement, first

99

be applied to satisfy the Reorganized Debtors' obligations under the Amended and Restated Credit Facility. Only after all of the obligations under the Amended and Restated Credit Facility have been satisfied will proceeds from the collateral on which the New Second Lien Notes have a second-priority lien be applied to satisfy the Reorganized Debtors' obligations under the New Second Lien Notes, and only after such obligations have been satisfied will any remaining proceeds from the collateral on which the New Secured Convertible PIK Notes have a third-priority lien be applied to satisfy the Reorganized Debtors' obligations under the New Secured Convertible PIK Notes.

### 5. Defects in Collateral Securing the New Second Lien Notes and the New Secured Convertible PIK Notes

The collateral securing the New Second Lien Notes and the New Secured Convertible PIK Notes may be subject to exceptions, defects, encumbrances, liens, and other imperfections. Further, the Debtors have not conducted appraisals of all of their assets constituting collateral securing the New Second Lien Notes and the New Secured Convertible PIK Notes to determine if the value of the collateral upon foreclosure or liquidation equals or exceeds the amount of the New Second Lien Notes and the New Secured Convertible PIK Notes or such other obligation secured by the collateral. Accordingly, it cannot be assured that the remaining proceeds from a sale of the collateral would be sufficient to repay holders of the New Second Lien Notes and the New Secured Convertible PIK Notes all amounts owed under such notes. The fair market value of the collateral is subject to fluctuations based on factors that include, among others, the condition of the offshore drilling industry, the ability to sell collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors. The amount received upon a sale of collateral would be dependent on numerous factors, including, but not limited to, the actual fair market value of the collateral at such time, and the timing and manner of the sale. By its nature, portions of the collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the collateral will be sufficient to pay the Reorganized Debtors' obligations under the New Second Lien Notes and the New Secured Convertible PIK Notes, in full or at all, after first satisfying the obligations under the Amended and Restated Credit Facility in full or that any remaining proceeds will be sufficient to pay the Reorganized Debtors' obligations under the New Secured Convertible PIK Notes, in full or at all, after satisfying the obligations under the New Second Lien Notes, which are more senior to the New Secured Convertible PIK Notes. There can also be no assurance that the collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the New Second Lien Notes and the New Secured Convertible PIK Notes.

### 6. Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the collateral could adversely affect the collateral agent's ability to enforce its rights with respect to the collateral for the benefit of the holders of the New Second Lien Notes and the New Secured Convertible PIK Notes. In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the trustee or the collateral agent will monitor, or that Reorganized OGIL will inform the trustee or the collateral agent of, the future acquisition of property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired collateral. The trustee and the collateral agent have no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interests therein. Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

WEIL:\95549520\1\78787.0003

7.      **Limitations on Rights of Holders of New Second Lien Notes and New Secured Convertible PIK Notes with Respect to Collateral**

The rights of the holders of the New Second Lien Notes and the New Secured Convertible PIK Notes with respect to the collateral securing such notes will be substantially limited by the terms of the lien ranking agreements set forth in the New Indentures and the New Intercreditor Agreement, even during an event of default.  Under the New Indentures and the New Intercreditor Agreement, at any time that obligations that have the benefit of the higher priority liens are outstanding, any actions that may be taken with respect to (or in respect of) such collateral, including the ability to cause the commencement of enforcement proceedings against such collateral and to control the conduct of such proceedings, and the approval of amendments to, releases of such collateral from the lien of, and waivers of past defaults under, such documents relating to such collateral, will be at the direction of the holders of the obligations secured by the first-priority liens, and the holders of the New Second Lien Notes (secured by second-priority liens) and the New Secured Convertible PIK Notes (secured by third-priority liens) may be adversely affected.  Under the terms of the New Intercreditor Agreement, at any time that obligations that have the benefit of the first-priority liens on the collateral are outstanding, if the holders of such indebtedness release the collateral for any reason whatsoever (other than any such release granted following the discharge of obligations with respect to the Amended and Restated Credit Facility), the second-priority and third-priority security interests in such collateral securing the New Second Lien Notes and the New Secured Convertible PIK Notes will be automatically and simultaneously released without any consent or action by the holders of the New Second Lien Notes or the New Secured Convertible PIK Notes, subject to certain exceptions.  The collateral so released will no longer secure the Reorganized Debtors' obligations under the New Second Lien Notes or the New Secured Convertible PIK Notes and the related guarantees.  To the extent the obligations with respect to the Amended and Restated Credit Facility were to be discharged without comparable replacement in the future, the foregoing risks will apply mutatis mutandis to the relationship between the second-priority security interests of the New Second Lien Notes and the third-priority security interests of the New Secured Convertible PIK Notes, as if they were first-priority and second-priority secured interests, respectively.

8.      **Casualty Risk of Collateral**

Reorganized OGIL will be obligated under the New Indentures and collateral agreements governing the New Second Lien Notes and the New Secured Convertible PIK Notes to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities.  There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part, including windstorm insurance for drilling units operating in the Gulf of Mexico.  As a result, it is possible that the insurance proceeds will not compensate Reorganized OGIL and the other Reorganized Debtors fully for their losses.  If there is a total or partial loss of any of the pledged collateral, the insurance proceeds received may be insufficient to satisfy the secured obligations of Reorganized OGIL and the other Reorganized Debtors, including the New Second Lien Notes and the New Secured Convertible PIK Notes.

9.      **Risk of Recharacterization of New Secured Convertible PIK Notes**

Recharacterization of a debt obligation to a capital contribution is an equitable remedy a bankruptcy court may direct if it determines, upon an objection raised by a party in interest, a purported debt obligation is more properly characterized as a capital contribution.  In making such a determination, bankruptcy courts consider, among other things, whether the parties intended to create a debt obligation and the nature of the instrument evidencing the obligation.  Although the Debtors believe, and intend, the New Secured Convertible PIK Notes to be a bona fide debt obligation, there can be no assurance a bankruptcy court would agree with the Debtors' interpretation.

### 10.    The Conversion Rate Will Only be Adjusted for Stock Splits

The conversion rate of the New Secured Convertible PIK Notes is only subject to adjustment upon certain events, including, among others, stock splits, combinations, or certain other adjustments with respect to the New Common Shares.  The conversion rate will not be adjusted for any other events.

### 11.    Changes to New Common Shares Affect Holders of New Secured Convertible PIK Notes

Holders of the New Secured Convertible PIK Notes will not be entitled to any rights with respect to the New Common Shares (including, without limitation, voting rights and rights to participate in any dividends or other distributions on the New Common Shares), but holders of the New Secured Convertible PIK Notes will be subject to all changes affecting the New Common Shares.  Holders of the New Secured Convertible PIK Notes will have rights with respect to the New Common Shares only upon conversion.  For example, in the event an amendment is proposed to Reorganized OGIL's amended and restated memorandum and articles of association requiring shareholder approval and the record date for determining the shareholders of record entitled to vote on the amendment occurs prior to delivery of the New Common Shares, such holders will not be entitled to vote on the amendment, although they will, nevertheless, be subject to any changes in the powers, preferences, or rights of the New Common Shares.

### 12.    The New Second Lien Notes and the New Secured Convertible PIK Notes May Not Be Rated or May Receive a Lower Rating than Anticipated

It is not expected that Reorganized OGIL will seek a rating on the New Second Lien Notes or the New Secured Convertible PIK Notes.  If, however, one or more rating agencies rates the New Second Lien Notes and/or the New Secured Convertible PIK Notes and assigns them a rating lower than the rating expected by investors, or reduces its rating in the future, the market price of the New Second Lien Notes, the New Secured Convertible PIK Notes, and/or the New Common Shares could be reduced.

### 13.    Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors

Any future pledge of collateral in favor of the collateral agent, including pursuant to security documents delivered after the date of the New Indentures, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the New Second Lien Notes or the New Secured Convertible PIK Notes to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### 14.    Foreclosing on the Collateral May Be Difficult

Most or all of the collateral is located outside of the United States.  In particular, the *Emerald Driller*, *Sapphire Driller*, *Topaz Driller*, *Aquamarine Driller*, *Platinum Explorer*, *Titanium Explorer,* and *Tungsten Explorer* (together, the "**Vessels**") are highly mobile and are, or may be, located in international waters outside the jurisdiction of any court.  Even when such collateral is within the jurisdiction of a court, such jurisdiction may not have effective or favorable foreclosure procedures and lien priorities, particularly if such collateral is routinely in transit.  Any foreclosure proceedings could be subject to lengthy delays resulting in increased custodial costs, deterioration in the condition of the collateral, and substantial reduction of the value of such collateral.  In addition, some jurisdictions may not provide a legal remedy for the enforcement of mortgages on the collateral.

The Vessels operate worldwide and the respective laws of each jurisdiction where a Vessel is actually located at the time the collateral agent may seek to enforce the ship mortgage will govern the foreclosure proceedings and distribution of proceeds.  Such laws may vary significantly from jurisdiction to jurisdiction.  Furthermore, all or some of those laws and procedures may be less favorable to mortgagees than those in other jurisdictions and may be less favorable than those applicable in the United States.  The costs of enforcement in foreign jurisdictions, particularly if proceedings are ongoing simultaneously against the Vessels in different jurisdictions, can be high and can include fees based on the face amount of the mortgage(s) being enforced.  Foreign court proceedings can also be slow and have unexpected procedural hurdles.  Priorities accorded maritime lien claims and ship mortgages can vary in foreign jurisdictions, and some jurisdictions prefer certain local claimants (such as local suppliers of operating necessaries) to foreign claimants, such as the collateral agent or mortgagee.  Consequently there are no assurances that the collateral agent will be able to enforce any one or more of the ship mortgages covering vessels that are located outside the United States.

### 15.    Priority of Maritime Liens

The laws of the various jurisdictions in which the Vessels may operate may give rise to the existence of maritime liens, which may take priority over the ship mortgages.  Such liens may arise in support of, among other things, claims by unpaid ship repairers remaining in possession of such collateral, claims for salvage, claims for damage caused by a collision, claims for seamen's wages and other employment benefits and claims for pilotage, as well as potential claims for necessary goods and services supplied to such collateral.  This list should not be regarded as definitive or exhaustive, as the categories of claims giving rise to maritime liens, and the ranking of such liens, vary from one jurisdiction to another.  Maritime liens can attach without any court action, notice, registration, or documentation and accordingly their existence cannot necessarily be identified.

### F.    Risks Related to an Investment in the New Common Shares

#### 1.    Significant Holders

Certain holders of Allowed Secured Debt Claims are expected to acquire a significant ownership interest in the New Common Shares pursuant to the Plan.  If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Shares.

#### 2.    Equity Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares would rank below all debt claims against the Reorganized Debtors, including the New Second Lien Notes and the New Secured Convertible PIK Notes.  As a result, holders of the New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied, including payments to holders of the New Second Lien Notes and the New Secured Convertible PIK Notes.

WEIL:\95549520\1\78787.0003

3.      **Implied Valuation of New Common Shares Not Intended to Represent the Trading Value of the New Common Shares**

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities.  The actual market price of the New Common Shares is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

4.      **No Intention to Pay Dividends**

Reorganized OGIL does not anticipate paying any dividends on the New Common Shares as it expects to retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Common Shares will depend entirely upon any future appreciation in the value of the New Common Shares.  There is, however, no guarantee that the New Common Shares will appreciate in value or even maintain their initial value.

G.      **Factors Relating to the Rights Offering**

1.      **Debtors Could Modify the Rights Offering Procedures**

The Debtors may modify the procedures governing the Rights Offering, with the approval of the Requisite Investors (as defined in the Backstop Agreement), to, among other things, adopt additional detailed procedures if necessary in the Debtors' business judgment.  Such modifications may adversely affect the rights of those participating in the Rights Offering.

2.      **The Backstop Agreement Has Not Yet Been Executed**

The Backstop Parties have not yet signed the Backstop Agreement and may not be compelled to perform under the Backstop Agreement.  If the Backstop Agreement is not executed, there is no guarantee that the Rights Offering will be successfully consummated.

3.      **The Bankruptcy Court Might Not Approve the Backstop Agreement and the Rights Offering Procedures**

The Bankruptcy Court's approval of the Backstop Agreement and the Rights Offering Procedures is one of the milestones of the Restructuring Support Agreement.  Failure to meet one of the milestones in the Restructuring Support Agreement would provide grounds for terminating the Restructuring Support Agreement, and imperil the successful consummation of the Plan.

WEIL:\95549520\1\78787.0003

### 4. Debtors Could Fail to Meet all Conditions Precedent to the Rights Offering

The backstop commitment of the Backstop Parties is subject to, among other things, the conditions precedent in the Backstop Agreement.  There is no guarantee that the Debtors will be able to satisfy such conditions.  If the Debtors fail to satisfy such conditions, the Restructuring may be adversely affected.

### H. Additional Factors

### 1. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Creditor or Equity Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section X hereof.

# XII.
# VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Revolving Credit Facility Claim, a Secured Term Loan Claim, a Secured Notes Claim, or an Existing OGIL Interest as of the Record Date (an "***Eligible Holder***") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

### A.    Voting Deadline

All Eligible Holders have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote. Special procedures are set forth below for holders of securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("***Nominee***").

The Debtors have engaged Epiq Systems as their voting agent (the "***Voting Agent***") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., EASTERN TIME, ON DECEMBER 31, 2015, UNLESS EXTENDED BY THE DEBTORS**.

AN ELIGIBLE HOLDER HOLDING THE SECURED NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.

IF YOU MUST RETURN YOUR BALLOT TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN THE MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Epiq Systems**
**Telephone:  (646) 282-2500 or (866) 734-9393 (toll free)**
**E-mail:  tabulation@epiqsystems.com with " OGIL" in the subject line**

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "***Solicitation Package***") to record holders of the Revolving Credit Facility Claims, Secured Debt Claims, and Existing OGIL Interests. Record holders of Secured Notes may include Nominees. If such entities do not hold Secured Notes Claims for their own account,

they must provide copies of the Solicitation Package to their customers that are the Eligible Holders thereof as of the Record Date.  Any Eligible Holder of Secured Notes Claims who has not received a Ballot should contact his, her, or its Nominee, or the Voting Agent.

Holders of Revolving Credit Facility Claims, Secured Debt Claims, and Existing OGIL Interests should provide all of the information requested by the Ballot.  Holders of Revolving Credit Facility Claims, Secured Debt Claims, and Existing OGIL Interests should complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Voting Agent or their Nominee, as applicable.

The Record Date for determining which holders are entitled to vote on the Plan is November 20, 2015.  The applicable indenture trustee under the Secured Notes Claims will not vote on behalf of its respective holders.  Holders of the Secured Notes Claims must submit their own Ballot.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

The claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – Revolving Credit Facility Claims
- Class 4 – Secured Debt Claims
- Class 9 – Existing OGIL Interests

### 1.    Beneficial Holders

An Eligible Holder who holds Secured Notes Claims as a record holder in its own name should vote on the Plan by completing and signing a Ballot (a "**_Beneficial Holder Ballot_**") and returning it directly to the Voting Agent on or before the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

An Eligible Holder holding the Secured Notes Claims in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such Eligible Holder's Nominee):

- Complete and sign the enclosed Beneficial Holder Ballot.  Return the Beneficial Holder Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed Master Ballot to the Voting Agent by the Voting Deadline.  If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Voting Agent for instructions; or

- Complete and sign the pre-validated Beneficial Holder Ballot (as described below) provided to you by your Nominee.  Return the pre-validated Beneficial Holder Ballot to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Beneficial Holder Ballot returned to a Nominee by an Eligible Holder will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent that Beneficial Holder Ballot (properly validated) or a Master Ballot casting the vote of such Eligible Holder.

If any Eligible Holder owns the Secured Notes Claims through more than one Nominee, such Eligible Holder may receive multiple mailings containing the Beneficial Holder Ballots.  The Eligible Holder should execute a separate Beneficial Holder Ballot for each block of the Secured Notes Claims that it holds through any particular Nominee and return each Beneficial Holder Ballot to the respective Nominee in the return envelope provided therewith.  Eligible Holders who execute multiple Beneficial Holder Ballots with respect to the Secured Notes Claims in a single class held through more than one Nominee must indicate on each Beneficial Holder Ballot the names of all such other Nominees and the additional amounts of such Secured Notes Claims so held and voted, in addition to any Secured Term Loan Claims voted.

## 2.    Nominees

A Nominee that, on the Record Date, is the record holder of the Secured Notes Claims for one or more Eligible Holders can obtain the votes of the Eligible Holders of such Secured Notes Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

### (a)    Pre-Validated Ballots

The Nominee may "pre-validate" a Beneficial Holder Ballot by (i) signing the Beneficial Holder Ballot and indicating on the Beneficial Holder Ballot the name of the Nominee and DTC Participant Number, (ii) the amount and the account number of the Secured Notes Claims held by the Nominee for the Eligible Holder, and (iii) forwarding such Beneficial Holder Ballot, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded, to the Eligible Holder for voting.  The Eligible Holder must then complete the information requested in Item 2 and Item 3 of the Beneficial Holder Ballot, and return the Beneficial Holder Ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is RECEIVED by the Voting Agent on or before the Voting Deadline.  A list of the Eligible Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

(b)    Master Ballots

If the Nominee elects not to prevalidate Beneficial Holder Ballots, the Nominee may obtain the votes of Eligible Holders by forwarding to the Eligible Holders the unsigned Beneficial Holder Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded.  Each such Eligible Holder must then indicate his, her, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee.  After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent on or before the Voting Deadline.  All Beneficial Holder Ballots returned by Eligible Holders should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline.  EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

**3.    Miscellaneous**

All Ballots must be signed by the holder of record of the Revolving Credit Facility Claims, Secured Debt Claims, or Existing OGIL Interests, as applicable, or any person who has obtained a properly completed Ballot proxy from the record holder of the Revolving Credit Facility Claims or Secured Debt Claims, as applicable, on such date.  For purposes of voting to accept or reject the Plan, the Eligible Holders of the Secured Notes Claims will be deemed to be the "holders" of the claims represented by such Secured Notes.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any ballot marked to both accept and reject the Plan shall not be counted.  If you return more than one Ballot voting different Secured Debt Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  If you return more than one Ballot voting different Revolving Credit Facility Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  If you return more than one Ballot voting different Existing OGIL Interests, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Revolving Credit Facility Claims, Secured Debt Claims, and Existing OGIL Interests, as applicable, who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent or its Nominee will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 4.    Fiduciaries And Other Representatives

If a Beneficial Holder Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Beneficial Holder Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 5.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.6, 10.7, and 10.8 therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Restructuring Support Agreement or Term Sheet.

### 6.    Change of Vote

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

### D.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until

110

such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

E.     **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Revolving Credit Facility Claims, Secured Debt Claims, and Existing OGIL Interests, as applicable, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

**XIII.
RIGHTS OFFERING PROCEDURES**

A.     **Introduction**

In connection with the Plan, after approval of these procedures (the "***Rights Offering Procedures***") by the Bankruptcy Court (the "***Rights Offering Approval***"), OGIL will launch the Rights Offering, pursuant to which Eligible Offerees will be entitled to receive their pro rata share of the Subscription Rights to acquire $75 million of the New Second Lien Notes, on the terms and conditions set forth in the Plan, at a purchase price equal to 100% of the principal amount of such New Second Lien Notes so acquired. ***Participation in the Rights Offering is not being solicited at this time.***

Only Eligible Offerees (i.e., holders of Secured Debt Claims as of the Rights Offering Record Date) may participate in the Rights Offering.  The Rights Offering Procedures will govern the ability of Eligible Offerees to participate in the Rights Offering.

All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering or the requirements to participate in the Rights Offering should be directed to Epiq Systems, the subscription agent (the "***Subscription Agent***") retained by OGIL at:

**Epiq Systems
777 Third Avenue, 12th Floor
New York, New York  10017
Attention:  OGIL Processing
Tel:  (866) 734-9393 or (646) 282-2500**

***THIS DISCLOSURE STATEMENT SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING.***

B.     **Rights Offering**

To fully exercise its Subscription Rights, an Eligible Offeree must (i) complete the rights offering subscription exercise form (the "***Rights Exercise Form***"), which will be sent following the Rights Offering Approval to Eligible Offerees, entitling such holder to exercise its Subscription Rights and (ii) pay the purchase price, which is an amount equal to its pro rata share of $75 million (the "***Rights Exercise Price***"), such pro rata share to be calculated as the proportion that an Eligible Offeree's Allowed Secured Term Loan Claim or Allowed Secured Notes Claim bears to the aggregate of all Allowed Secured Term Loan Claims and Allowed Secured Notes Claims as of December 7, 2015 (the "***Rights Offering Record Date***"), rounded down to the nearest dollar.

WEIL:\95549520\1\78787.0003

Each Eligible Offeree may exercise all, some or none of such pro rata share, and the Rights Exercise Price for such Eligible Offeree will be adjusted accordingly.   The portion of New Second Lien Notes issued to an Eligible Offeree who elects to acquire such notes shall be rounded down to the nearest dollar.

The Subscription Rights shall not be transferable, assignable, or detachable.

### C.    **The Backstop**

The Backstop Parties will agree to backstop the Rights Offering, and in connection therewith, the Backstop Parties intend to execute the Backstop Agreement on or after the Petition Date.  Each of the Backstop Parties, severally and not jointly, will agree, pursuant to the Backstop Agreement, to purchase the Unsubscribed Notes on a pro rata basis in accordance with the percentages set forth in **Exhibit A** to the Backstop Agreement.  As consideration for their commitment under the Backstop Agreement, the Backstop Parties will receive the Backstop Commitment Premium set forth in the Backstop Agreement.

There will be no over-subscription privilege in the Rights Offering.  The Unsubscribed Notes will not be offered to other Eligible Offerees but will be purchased by the Backstop Parties in accordance with the Backstop Agreement.

### D.    **Commencement/Expiration of the Rights Offering**

The Rights Offering shall commence on the day upon which the Rights Exercise Form is first mailed or made available to Eligible Offerees (the "***Rights Commencement Date***"), which is expected to be no later than the first Business Day after receipt of the Rights Offering Approval.  The Rights Offering shall expire at 5:00 p.m. (prevailing Eastern Time) on the date specified in the Rights Offering Approval, which is expected to be the 16th Business Day after the Rights Commencement Date, unless extended by OGIL with the consent of the Requisite Investors (as defined in the Backstop Agreement) (such time and date, as may be amended, the "***Rights Expiration Time***").  OGIL shall promptly notify the Eligible Offerees of any extension and of the new Rights Expiration Time.

OGIL will furnish, or cause to be furnished, Rights Exercise Forms to the Eligible Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "***Subscription Nominees***").  Each Subscription Nominee will be entitled to receive sufficient copies of the Rights Exercise Form for distribution to the beneficial owners of the Secured Notes for whom such Subscription Nominee holds such Secured Notes.

### E.    **Exercise of Subscription Rights**

Each Eligible Offeree that elects to participate in the Rights Offering must affirmatively make a binding, irrevocable election to exercise its Subscription Rights (the "***Binding Rights Election***") before the Rights Expiration Time.

---

**The Binding Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn.**

---

Each Eligible Offeree is entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures, except in the case of Eligible Offerees who are Backstop Parties, who are entitled to participate in the Rights Offering to the extent also provided in Backstop Agreement.  OGIL will accept a Binding Rights Election by delivery of written notice to each participating Eligible Offeree and the Subscription Agent (the "***Acceptance Notice***").

### 1. Exercise by Eligible Offerees

To exercise the Subscription Rights, each Eligible Offeree must (i) return a duly completed Rights Exercise Form to the Subscription Agent so that the duly completed Rights Exercise Form is *actually received* by the Subscription Agent on or before the Rights Expiration Time and (ii) pay to the Subscription Agent, by wire transfer of immediately available funds, the Rights Exercise Price, so that payment of the Rights Exercise Price is *actually received* by the Subscription Agent on or before the Rights Expiration Time; *provided*, that the Backstop Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the effective date of the Plan (the "*Effective Date*"), in accordance with the Backstop Agreement.

In order to exercise its Subscription Rights, any Eligible Offeree who holds through a Subscription Nominee must return a duly completed Rights Exercise Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its instructions for the Subscription Rights (in each case in sufficient time to allow such Subscription Nominee to deliver the Rights Exercise Form to the Subscription Agent prior to the Rights Expiration Time) in accordance with procedures established by its Subscription Nominee, which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Rights Offering, Wells Fargo, in its capacity as indenture trustee for the Secured Notes, shall not constitute a Subscription Nominee and shall have no responsibility with respect to sending any Rights Offering information or collecting any Rights Exercise Forms.

### 2. Deemed Representations and Acknowledgements

Any Eligible Offeree that participates in the Rights Offering is deemed to have made the following representations and acknowledgements:

(a)     Such Eligible Offeree recognizes and understands that the Subscription Rights are not transferable (see Section B above for details) and that the benefits of the Subscription Rights are not separable from the claim or securities with respect to which the Subscription Rights have been granted.  Such Creditor represents and warrants that it is an Eligible Offeree.

(b)     Such Eligible Offeree represents and warrants that it will not accept a distribution of New Second Lien Notes, if at such time, it does not hold an Allowed Secured Term Loan Claim or an Allowed Secured Notes Claim and, by accepting a distribution of New Second Lien Notes, such Eligible Offeree will be deemed to be the holder thereof.

### 3. Failure to Exercise Subscription Rights

**Unexercised Subscription Rights will be relinquished on the Rights Expiration Time**.  If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive from an Eligible Offeree or its Subscription Nominee a duly completed Rights Exercise Form, such Eligible Offeree shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.

Any attempt to exercise Subscription Rights after the Rights Expiration Time shall be null and void and OGIL shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Rights Expiration Time regardless of when the documents relating thereto were sent.

113

The method of delivery of the Rights Exercise Form and any other required documents is at each Eligible Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent.  If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Expiration Time.

The risk of non-delivery of the Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Subscription Rights lies solely with the holders of the Allowed Secured Term Loan Claims and Allowed Secured Notes Claims, and none of the Vantage Parent, the Debtors, the Reorganized Debtors, the Backstop Parties, or any of their respective officers, directors, employees, agents or advisors, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.

### 4.    Payment for Subscription Rights

If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive on behalf of an Eligible Offeree immediately available funds by wire transfer or bank cashier's check in an amount equal to the total Rights Exercise Price for such Eligible Offeree's Subscription Rights, such Eligible Offeree shall be deemed to have relinquished and waived its Subscription Rights, subject to the next paragraph; *provided*, that the Backstop Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the Effective Date.

### 5.    Disputes, Waivers, and Extensions

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be addressed in good faith by OGIL in consultation with the Backstop Parties, the determinations of which shall be final and binding.  OGIL, with the approval of the Requisite Investors, may (i)  waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Subscription Rights for which the Rights Exercise Form and/or payment includes defects or irregularities.  Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured.  OGIL reserves the right, with the approval of the Requisite Investors, to give notice to any Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Eligible Offeree and OGIL may, with the approval of the Requisite Investors, permit such defect or irregularity to be cured; it being understood, that none of OGIL, the Subscription Agent, or the Backstop Parties (or any of their respective officers, directors, employees, agents, or advisers) shall incur any liability for failure to give such notification.

OGIL, with the approval of the Bankruptcy Court (if applicable) and the Requisite Investors, may (i) extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Subscription Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which parties constitute Eligible Offerees.

### 6.    Funds

The payments made to acquire New Second Lien Notes pursuant to the Rights Offering (the "***Rights Offering Funds***") shall be deposited when made and held by the Subscription Agent in escrow pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The

Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by OGIL on the Effective Date or as otherwise set forth in these Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate. The Subscription Agent shall not permit the Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation. No interest will be paid to participating Eligible Offerees on account of any amounts paid in connection with their exercise of Subscription Rights under any circumstances.

Notwithstanding anything to the contrary herein, each Backstop Party shall make all payments in connection with the Rights Offering directly to OGIL on the Effective Date.

### 7.    Participating Eligible Offeree Release

Upon the Effective Date of the Plan, each Eligible Offeree that participates in the Rights Offering shall be deemed, by virtue of such election, to have conclusively, absolutely, unconditionally, irrevocably and forever, waived, released, acquitted, and discharged the Debtors and the Subscription Agent to the extent as set forth in the Plan. The release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

### F.    <u>Miscellaneous</u>

### 1.    Issuance

The New Second Lien Notes to be issued pursuant to the Rights Offering are expected to be delivered to Eligible Offerees that have properly exercised their Subscription Rights on or as soon as practicable following the Effective Date. See Section G. The New Second Lien Notes will be issued in book-entry form.

### 2.    Securities Law and Related Matters

The New Second Lien Notes issued to the Eligible Offerees participating in the Rights Offering will be exempt from registration under the Securities Act, and any other applicable federal and state securities laws pursuant to Section 1145 of the Bankruptcy Code, and may be resold, without registration under the Securities Act or other applicable federal and state securities laws, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code.

There is not and there may not be a public market for the New Second Lien Notes, and OGIL does not intend to seek any listing of the New Second Lien Notes on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Second Lien Notes will ever develop or, if such a market does develop, that it will be maintained.

### G.    <u>Rights Offering Conditioned Upon Consummation of the Plan; Reservation of Subscription Rights; Return of Rights Offering Amount</u>

All exercises of Subscription Rights are subject to and conditioned upon the effectiveness of the Plan. OGIL will accept a Binding Rights Election only upon the confirmation and effectiveness of the Plan. Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, OGIL reserves the right, with the approval of the Requisite Investors, to modify these Rights Offering Procedures or adopt additional detailed procedures if necessary in OGIL's business judgment to more efficiently administer the distribution and exercise of the Subscription Rights or comply with applicable law.

WEIL:\95549520\1\78787.0003

In the event that (i) the Rights Offering is terminated, (ii) OGIL revokes or withdraws the Plan or (iii) the Effective Date of the Plan does not occur on or before April 1, 2016 (unless such date is extended in accordance with the terms of the Restructuring Support Agreement), the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Rights Offering shall automatically be terminated.

**XIV.**
**CONFIRMATION OF THE PLAN**

### A.    <u>Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    <u>Objections To Confirmation</u>

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

> (a)    ***The Debtors*** at:
> Offshore Group Investment Limited
> 777 Post Oak Boulevard, Suite 800
> Houston, Texas  77067
> Attn:    Paul A. Bragg

> (b)    ***Office of the U.S. Trustee*** at:
> Office of the U.S. Trustee for the District of Delaware
> 844 King Street, Suite 2207, Lockbox 35
> Wilmington, Delaware 19899-0035

> (c)    ***Counsel to the Debtors*** at:
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:    Ray C. Schrock, P.C.
>             Ronit J. Berkovich, Esq.

116

    (d)    ***Co-Counsel to the Debtors*** at:
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Mark D. Collins, Esq.
            Daniel J. DeFrancheschi, Esq.
            Zachary I. Shapiro, Esq.

    (e)    ***Counsel to the Ad Hoc Committee*** at:
Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005-1413
Attn:    Dennis F. Dunne, Esq.
            Evan R. Fleck, Esq.

    (f)    ***Counsel to the Administrative Agent
of the Revolving Credit Facility*** at:
Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4834
Attn:    Richard A. Levy, Esq.
            M. Catherine Ozdogan, Esq.
            Peter P. Knight, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.**    **Requirements for Confirmation of the Plan**

    **1.**    **Requirements of Section 1129(a) of the Bankruptcy Code**

    (a)    General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

    (i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

    (iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been

WEIL:\95549520\1\78787.0003

disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v) the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi) with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Equity Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi) all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

WEIL:\95549520\1\78787.0003

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Projections provided in Section VII hereof.  Based upon such Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Section XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors shall be amended as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.    Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Claims in Class 8 and Interests in Class 10 will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

### (a)    Unfair Discrimination Test

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.  Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

### (i)    Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.  The Plan provides that holders of impaired secured Claims in Class 3 shall receive, on account of such Allowed Claim and at the option of the Debtors or Reorganized Debtors, as applicable, its Pro Rata share of (i) payment in full in Cash to the extent the Debtors elect to refinance the Revolving Credit Facility in its entirety with one or more third-party lenders or (ii) a new or amended and restated senior secured term loan and letter of credit facility and, in the case of the holders of Allowed Revolving Credit Facility Claims (other than the issuer of any letter of credit under the Revolving Credit Agreement), a payment of Seven Million Dollars ($7,000,000) in Cash.  The Plan provides that holders of impaired secured Claims in Class 4 will each receive on account of its Allowed Secured Debt Claims:  (i) its Pro Rata share of the New Secured Convertible PIK Notes; (ii) up to its Pro Rata share of the $75,000,000 New Second Lien Notes to be issued in the Rights Offering, to the extent it elects to exercise its

Subscription Rights thereunder, which Subscription Rights will be made available to each holder of an Allowed Secured Debt Claim on a Pro Rata basis and in accordance with the Rights Offering Procedures; and (iii) its Pro Rata share of the New Common Shares, subject to dilution by New Common Shares issued upon the conversion of the New Secured Convertible PIK Notes, on account of the Vantage Parent Secured Promissory Note, and under the Management Incentive Program.

(ii)    Unsecured Creditors

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization. The Plan provides that the holders of Claims in Class 7 will not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged, but no holder of Existing OGIL Interests or Intercompany Interests will receive a distribution under the Plan (although the holder of Existing OGIL Interests will receive releases as set forth in the Plan). Accordingly, the Plan meets the "fair and equitable" test with respect to unsecured Claims.

(iii)   Equity Interests

With respect to a class of equity interests, either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization. Pursuant to the Plan, no holders of an Existing OGIL Interest or Intercompany Interest will receive a distribution on account of such Interests (although the holder of Existing OGIL Interests will receive releases as set forth in the Plan). Accordingly, the Plan meets the "fair and equitable" test with respect to those Interests.

XV.
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

121

**B.**     **Sale Under Section 363 of the Bankruptcy Code**

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Classes 3 and 4 would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 3 and 4 would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 3 and 4.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

**C.**     **Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

As noted in Section XV of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

**XVI.**
**CONCLUSION AND RECOMMENDATION**

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3 and 4 to vote in favor thereof.

WEIL:\95549520\1\78787.0003

Dated:  December 2, 2015

Respectfully submitted,


**OFFSHORE GROUP INVESTMENT LIMITED**
**VANTAGE DRILLING (MALAYSIA) I SDN. BHD.**
**VANTAGE DRILLING LABUAN I LTD.**
**VANTAGE DRILLING NETHERLANDS B.V.**
**DRAGONQUEST HOLDINGS COMPANY**
**EMERALD DRILLER COMPANY**
**P2020 RIG CO.**
**P2021 RIG CO.**
**SAPPHIRE DRILLER COMPANY**
**VANTAGE DEEPWATER COMPANY**
**VANTAGE DEEPWATER DRILLING, INC.**
**VANTAGE DELAWARE HOLDINGS, LLC**
**VANTAGE DRILLER I CO.**
**VANTAGE DRILLER II CO.**
**VANTAGE DRILLER III CO.**
**VANTAGE DRILLER IV CO.**
**VANTAGE DRILLER VI CO.**
**VANTAGE DRILLING AFRICA**
**VANTAGE HOLDINGS MALAYSIA I CO.**
**VANTAGE INTERNATIONAL MANAGEMENT CO.**


By:  /s/ Christopher G. DeClaire
Name:  Christopher G. DeClaire
Title:    Authorized Officer


**VANTAGE HOLDING HUNGARY KFT.**


By:  /s/ Linda J. Ibrahim
Name:  Linda J. Ibrahim
Title:  Managing Director


123

Dated:        December 1, 2015
              Singapore

**PT. VANTAGE DRILLING COMPANY INDONESIA**


By:  /s/ Guy Dawson-Smith
Name: Guy Dawson-Smith
Title: President Director


**VANTAGE DRILLER ROCO S.R.L.**
**VANTAGE HOLDINGS CYPRUS ODC LIMITED**


By:  /s/ Ronald J. Nelson
Name:  Ronald J. Nelson
Title:  Director

124