## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                                :

In re                         :        **Chapter 11**
                                  :

**OFFSHORE GROUP**        :        **Case No. 15-12422 (BLS)**
**INVESTMENT LIMITED,** *et al.*,   :
                                  :        **Joint Administration Requested**
           **Debtors.**[1]      :
                                  :
-------------------------------------------------------x

### DECLARATION OF CHRISTOPHER G. DECLAIRE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Christopher G. Declaire, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Administrative Officer and a co-founder of Vantage Drilling Company ("***Vantage Parent***"), the publicly-traded parent company of Offshore Group Investment Limited ("***OGIL***"). I am also the Chief Administrative Officer of OGIL. Each of the other above-captioned debtors (collectively with OGIL, the "***Debtors***") is a subsidiary or affiliate of OGIL.[2] I am familiar with the Debtors' day-to-day operations, books and records, and

---

[1] The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Offshore Group Investment Limited; Vantage Delaware Holdings, LLC; Dragonquest Holdings Company; Emerald Driller Company; P2020 Rig Co.; P2021 Rig Co.; PT. Vantage Drilling Company Indonesia; Sapphire Driller Company; Vantage Deepwater Company; Vantage Deepwater Drilling, Inc. (3668); Vantage Driller I Co; Vantage Driller II Co; Vantage Driller III Co; Vantage Driller IV Co.; Vantage Driller VI Co.; Vantage Driller ROCO S.R.L.; Vantage Drilling Africa; Vantage Drilling (Malaysia) I Sdn. Bhd.; Vantage Drilling Labuan I Ltd.; Vantage Drilling Netherlands B.V.; Vantage Holding Hungary Limited Liability Company; Vantage Holdings Cyprus ODC Limited; Vantage Holdings Malaysia I Co; and Vantage International Management Co. The Debtors' mailing address is 777 Post Oak Boulevard, Suite 800, Houston, Texas 77056.

[2] Vantage Parent is not a Debtor.

business and financial affairs and have served as Vice President and Secretary of Vantage Parent

since 2008.  I was also a director of Vantage Parent from its founding until December 2009.

        2.      I submit this declaration (the "*Declaration*") to assist the Court and other

parties in interest in understanding the circumstances that compelled the commencement of these

Chapter 11 Cases (the "*Chapter 11 Cases*") and in support of (i) the Debtors' voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") filed

with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*")

on the date hereof (the "*Petition Date*") and (ii) the request for related relief, in the form of

motions and applications that the Debtors have filed with the Court (the "*First Day Papers*").

        3.      The First Day Papers seek relief intended to preserve the value of the

Debtors and maintain continuity of operations by, among other things, (i) preserving the

Debtors' relationships with their customers, vendors, suppliers, and employees, many of which

are located in jurisdictions outside the United States; (ii) ensuring continued employee morale;

(iii) maintaining the Debtors' cash management systems and other business operations without

interruption; and (iv) establishing certain administrative procedures to facilitate an orderly

transition into, and uninterrupted operations throughout, these Chapter 11 Cases.  This relief is

critical to the Debtors' restructuring efforts.

        4.      Except as otherwise indicated, the facts set forth in this Declaration are

based upon my personal knowledge, my review of relevant documents, my discussion with other

members of the Debtors' senior management, information provided to me by employees working

under my supervision, or my opinion based upon experience, knowledge and information

concerning the operations of Vantage Parent and the Debtors, and the offshore drilling industry.

WEIL:\95471886\13\78787.0003

If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

## I.

## Overview

5.    The Debtors are an international offshore drilling company operating a fleet of modern, high-specification drilling units around the world. The Debtors' principal business is to contract their drilling units, related equipment, and work crews to drill underwater oil and natural gas wells for major, national, and independent oil and natural gas companies.

6.    Starting in the summer of 2014, oil prices began to decline precipitously. Over the next six months or so, the price of oil was cut in half. The rapid and unexpected decline in oil prices led to a significant decline in demand for offshore drilling services as the Debtors' customers implemented severe reductions in capital spending. The reduced demand has been compounded by an oversupply of drilling units, and deliveries of newly-built rigs continue to saturate the global fleet. The significant and sustained drop in oil prices and related contraction of demand for offshore drilling services, coupled with certain unfortunate and unforeseeable events, caused uncertainty regarding the viability of the Debtors' leveraged capital structure in the long term.

7.    The Debtors determined that their enterprise should no longer bear the weight of its capital structure and began to explore potential transactions that would allow the company to deleverage its capital structure and allow for continued growth and long-term success. In light of the highly competitive environment for offshore drilling services and the international nature of the Debtors' operations, it became apparent that, to preserve the Debtor's enterprise value, any deleveraging transaction would need to be an expeditious process to minimize re-contracting risk and prevent the wrongful termination of drilling service contracts.

3

With this imperative in mind, the Debtors engaged in discussions with certain key secured debtholders, initially through their advisers.

8.      Through extensive negotiation over the past several months, the Debtors built consensus around the terms of a comprehensive financial restructuring.  Ultimately, on December 1, 2015, the Debtors and Vantage Parent entered into a Restructuring Support Agreement (together with all exhibits and attachments thereto, the "***Restructuring Support Agreement***") with holders of (i) approximately 90% of the outstanding principal amount of the Debtors' secured revolving credit facility and (ii) approximately 59% of the outstanding principal amount of the Debtors' secured term loans and secured notes.  The Restructuring Support Agreement, attached hereto as **Exhibit 2**, sets forth the terms of the restructuring of the Debtors and Vantage Parent and is incorporated in this Declaration by reference.  Pursuant to the Restructuring Support Agreement, a majority of the Debtors' secured creditors have agreed, among other things, to support a deleveraging transaction implemented through the (i) liquidation of Vantage Parent under the laws of the Cayman Islands, its place of incorporation, pursuant an official liquidation proceeding (the "***Cayman Proceeding***") and (ii) an expedited reorganization of OGIL and the other Debtors under chapter 11 of the Bankruptcy Code pursuant to the *Joint Prepackaged Chapter 11 Plan of Offshore Group Investment Limited and Its Affiliated Debtors* (the "***Prepackaged Plan***").

WEIL:\95471886\13\78787.0003

9.    The effect of the restructuring on the Debtors' capital structure is summarized as follows:

| Current | Reorganized |
|---|---|
| $200 million 1st Lien (1st Out) Revolver and L/C Facility ($150mm drawn)+ $22.9m in undrawn letters of credit) | $143 million 1st Lien Revolver + $32 million L/C Facility (unless refinanced by an alternative facility) |
| $500 million 1st Lien Term Loan due 2017 | $76 million  2nd Lien Notes (from Rights Offering) |
| $350 million 1st Lien Term Loan due 2019 | $750 million 3rd Lien Convertible PIK Notes |
| $1.150 billion 1st Lien Notes due 2019 | Shares held by former holders of 1st Lien Term Loans and 1st Lien Notes (and a portion by Vantage Parent) |
| $775 million 1st Lien Notes due 2023 | |
| Shares held by Vantage Parent | |

10.    The Debtors' believe that, to be successful, these Chapter 11 Cases must proceed in the most expeditious manner permitted by applicable law and the Bankruptcy Court. The terms of the Restructuring Support Agreement reflect that belief.  Among the milestones contained in the Restructuring Support Agreement is a deadline for the entry of an order by the Bankruptcy Court approving the Disclosure Statement and the solicitation procedures and confirming the Prepackaged Plan within sixty (60) calendar days after the Petition Date.  To meet this deadline, the Debtors have proposed the following timetable for these Chapter 11 Cases:

| Proposed Timetable | |
|---|---|
| Commencement of Solicitation | December 2, 2015 |
| Petition Date | December 3, 2015 |
| Mailing of Combined Notice and Rights Offering Launch | December 7, 2015 |
| Plan Voting Deadline and Rights Expiration Time | December 31, 2015 |
| Objection Deadline | January 7, 2016 |
| Reply Date (if any) | January 13, 2016 |
| Combined Hearing | January 14, 2016 |

5

11.     The Debtors' proposed timeline is necessary in the present cases because the Debtors operate in numerous countries with different legal systems, including the Republic of the Congo, Gabon, India, Indonesia, Luxembourg, Malaysia, Singapore, the Republic of South Korea, Thailand, the United Arab Emirates, and the United States.  In addition, the Debtors are incorporated under the laws of numerous additional countries, including the Cayman Islands, Cyprus, Hungary, the Netherlands, and Romania, and the Debtors' key contracts are governed by the laws of still more foreign jurisdictions, such as England and France.  Notwithstanding the self-executing and global nature of sections 362, 365, 525, and 541(c) of the Bankruptcy Code, as they have been explained to me, the Debtors believe that not all parties affected or potentially affected by the commencement of the Chapter 11 Cases are aware of these statutory provisions or their significance and impact.  In a worst case scenario, improper action by such parties could lead to wrongful termination of customer contracts, resulting in substantial damage to the Debtors' business and injuring the Debtors and their respective estates and creditors.  In addition, the Debtors are party to numerous ongoing attempts to obtain further contracts around the globe. It is the Debtors' view that a protracted bankruptcy proceeding will impede our ability to gain further contracts and put the entire prepackaged restructuring in jeopardy. The marketplace is intensely competitive presently in this sector, and speed is the one true asset that will give the Debtors the ability to reorganize.  For that reason, the deal encapsulated in the Restructuring Support Agreement is subject to certain condition on timing, including the entry of an order confirming the Prepackaged Plan within 60 days after the Petition Date, and an absolute "drop dead" date of 120 days after the Petition Date.  Accordingly, the various milestones under the Restructuring Support Agreement are crucial to the Debtors' successful reorganization.

WEIL:\95471886\13\78787.0003

12.     To that end, before commencing these Chapter 11 Cases, the Debtors

commenced a solicitation of votes on the Prepackaged Plan by distributing the *Disclosure*

*Statement for Joint Chapter 11 Plan of Offshore Group Investment Limited and Its Affiliated*

*Debtors* (the "***Disclosure Statement***")[3] pursuant to sections 1125 and 1126(b) of the Bankruptcy

Code to holders of impaired claims entitled to vote in favor of the Prepackaged Plan.  I have

been advised that the Debtors have set a voting deadline of December 31, 2015, and, therefore,

intend that their solicitation of votes on the Prepackaged Plan continue after the Petition Date.  In

light of the Restructuring Support Agreement, the Debtors expect that the votes tabulated and

received from all classes entitled to vote will be sufficient to confirm the Prepackaged Plan.

13.     I understand that there are two primary creditor groups whose claims are

impaired and, therefore, whose acceptances have been solicited:  (i) claims arising out of OGIL's

secured Revolving Credit Facility (the "***Revolving Credit Facility Claims***"), and (ii) claims

arising out of OGIL's 2017 Secured Term Loan Agreement, 2019 Secured Term Loan

Agreement, 7.125% Secured Notes Indenture, and 7.5% Secured Notes Indenture (the "***Secured***

***Debt Claims***").  Notably, the Prepackaged Plan does not impair the Debtors' trade or other

creditors and the Debtors intend to continue paying General Unsecured Claims in the ordinary

course of business, subject to approval of the Bankruptcy Court.

14.     The Prepackaged Plan provides that each holder of an Allowed Revolving

Credit Facility Claims will receive, on the Effective Date, at the option of the Debtors or

Reorganized Debtors, as applicable, its pro rata share of (i) payment in full in cash to the extent

the Debtors elect to refinance the Revolving Credit Facility in its entirety with one or more third-

party lenders or (ii) a new or amended and restated senior secured term loan and letter of credit

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure
Statement or the Prepackaged Plan, as the case may be.

WEIL:\95471886\13\78787.0003

facility and, in the case of the holders of Allowed Revolving Credit Facility Claims (other than the issuer of any letter of credit under the Revolving Credit Agreement), a payment of $7 million in cash.

15.     The Prepackaged Plan further provides that each holder of an Allowed Secured Debt Claim will receive, on the Effective Date: (i) its pro rata share of $750 million in New Secured Convertible PIK Notes; (ii) up to its pro rata share of $75 million in New Second Lien Notes (defined below) to be issued in a (the "***Rights Offering***") (described in more detail below); and (iii) its pro rata share of the new common shares of reorganized OGIL (the "***New Common Shares***"), subject to dilution by New Common Shares issued to certain other parties in interest.  The New Secured Convertible PIK Notes, which are convertible by Reorganized OGIIL into New Common Shares under various circumstances, will be "stapled" to (and thus only transferred with) a holder's New Common Shares.

16.     In addition, to obtain necessary additional capital for the reorganized Debtors, OGIL will, after approval of certain rights offering procedures by the Bankruptcy Court, launch a Rights Offering with an aggregate offering amount of up to $75 million, pursuant to which the holders of Secured Debt Claims will be entitled to receive their pro rata share of subscription rights to acquire $75 million of new Senior Secured Second Lien Notes (the "***New Secured Notes***").  It is expected that, shortly after the Petition Date, OGIL will enter into a backstop agreement with certain holders of Secured Debt Claims (the "***Backstop Parties***") pursuant to which the Backstop Parties will backstop the Rights Offering to ensure the reorganized Debtors receive the benefit of the Rights Offering.

17.     The beginning of these Chapter 11 Cases marks the end of the most critical and complex task required for a successful reorganization:  the negotiation and

WEIL:\95471886\13\78787.0003

formulation of a chapter 11 plan of reorganization supported by more than $1.6 billion of critical creditor constituencies.  From here, the Debtors respectfully request to progress expeditiously toward confirmation of the Prepackaged Plan and emergence from chapter 11 as a stronger, more competitive business with genuine long-term growth prospects.

## II.

### The Debtors' Business

18.     The Debtors are an international offshore drilling company operating a fleet of modern, high-specification drilling units.  The Debtors' principal business is to contract their drilling units, related equipment, and work crews to drill underwater oil and natural gas wells in deep water for customers.  The Debtors provide these services to major, national, and independent oil and natural gas companies.  The Debtors generally perform offshore contract drilling services on a day-rate basis (i.e., based on a fixed rate per day regardless of the number of days needed to drill the well).  In addition, the Debtors also utilize their technical expertise to provide construction supervision services for drilling units being built for other companies.

19.     For the nine months ended September 30, 2015, the unaudited and consolidated financial statements of Vantage Parent and its Debtor and non-Debtor subsidiaries, (collectively, the "***Vantage Group***") reflected total revenues of approximately $638,402,000 and a net loss of $6,054,000.  As of September 30, 2015, the Vantage Group's unaudited and consolidated financial statements reflected assets totaling approximately $3,507,372,000 and liabilities totaling approximately $2,954,141,000.  Substantially all of the Vantage Group's operations are conducted by the Debtors.  As of November 23, 2015, the Debtors employed approximately 190 full-time employees worldwide.

WEIL:\95471886\13\78787.0003

**A.**    **The Debtors' Drilling Fleet and Drilling Contracts**

20.    The Debtors' drilling fleet is composed of four jackup rigs and three drillships.  A jackup rig is a mobile drilling unit equipped with legs that lower to the ocean floor to establish a foundation before elevating the drilling platform into a position above the water from which drilling and workover operations may be conducted.  The Debtors' jackups are capable of drilling in water depths of up to 375 feet.  Drillships are self-propelled, dynamically-positioned drilling units, capable of drilling in water depths of up to 12,000 feet.  Because of their mobility and large, load-carrying capacity, drillships are well suited for drilling in remote locations.

   *i.*    ***Emerald Driller***

21.    The *Emerald Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2008 by PPL Shipyard in Singapore.  It is owned by Emerald Driller Company, a Debtor.  As of the date hereof, the *Emerald Driller* is conducting drilling operations off the coast of Thailand pursuant to a drilling contract by and between Vantage Driller I Co, a Debtor, and Salamander Energy (Bualuang) Limited, which commenced on August 1, 2015, and is for the duration required to complete three firm wells of up to 72 days and up to eight additional option wells of up to 89 days.

   *ii.*    ***Sapphire Driller***

22.    The *Sapphire Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned by Vantage Driller VI Co. ("***Vantage Driller VI***"), a Debtor.  As of the date hereof, the *Sapphire Driller* is idle and being maintained in Port Gentil, Gabon.

10

### iii.        *Aquamarine Driller*

23.    The *Aquamarine Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned and operated by P2020 Rig Co., a Debtor.  As of the date hereof, the *Aquamarine Driller* is being prepared for mobilization pursuant to a letter of award dated October 16, 2015.  In accordance with the letter of award, under the drilling contract that will be executed with Olio Energy Sdn. Bhd., which acts as the Debtors' agent in Malaysia, the *Aquamarine Driller* will conduct drilling operations off the coast of Malaysia and Thailand in a joint development area.  The drilling contract will last 18 months and will expire on May 1, 2017.  In addition, there are three extension options of three months each.

### iv.        *Topaz Driller*

24.    The *Topaz Driller* is a Baker Marine Pacific Class 375 Jackup Rig, built in 2009 by PPL Shipyard in Singapore.  It is owned by P2021 Rig Co. and operated by Vantage Drilling Company Indonesia, PT ("***Vantage PT***"), both Debtors.  As of the date hereof, the *Topaz Driller* is conducting drilling operations off the coast of Indonesia pursuant to a drilling contract between Vantage PT and PC Ketapang II Ltd. ("***PC Ketapang***").  The drilling contract with PC Ketapang was set to expire on December 31, 2015; however, the contract contains an option for PC Ketapang to extend the contract for three months, which was exercised on September 1, 2015, and an additional option to extend for approximately six months by mutual agreement of the parties.

### v.        *Platinum Explorer*

25.    The *Platinum Explorer* is an ultra-deepwater drillship, built in 2010 by Daewoo Shipbuilding & Marine Engineering Co., Ltd. ("***DSME***") in the Republic of Korea.  It is owned and operated by Vantage International Management Company ("***VIMCO Cayman***"), a

11

Debtor.  As of the date hereof, the *Platinum Explorer* is conducting drilling operations off the coast of India pursuant to a drilling contract between Oil & Natural Gas Corporation Limited ("**ONGC**") and VIMCO Cayman.  The drilling contract with ONGC is set to expire shortly, but may be extended automatically under certain conditions, and negotiations are ongoing in that respect.

### vi.        *Titanium Explorer*

26.        The *Titanium Explorer* is an ultra-deepwater drillship, built in 2012 by DSME in the Republic of Korea.  It is owned by the Luxembourg branch of Vantage Driller ROCO S.R.L., a Debtor.  As of the date hereof, the *Titanium Explorer* is en route from Port Fourchon, Louisiana to Port Gentil, Gabon.  Before August 31, 2015, the *Titanium Explorer* conducted drilling operations in the U.S. Gulf of Mexico pursuant to a drilling contract (the "**Petrobras Contract**") between Petrobras Venezuela Investments & Services B.V. ("**PVIS**") and Vantage Deepwater Company ("***Vantage Deepwater***"), a Debtor, as novated, respectively, to Petrobras America Inc. ("**PAI**") and Vantage Deepwater Drilling, Inc. ("**VDDI**"), a Debtor.  As discussed in more detail in Part IV, on August 31, 2015, VDDI received a letter (the "**Petrobras Notice**") from PAI and PVIS, purporting to terminate the Petrobras Contract.  Had it not been improperly terminated, the Petrobras Contract was set to expire in December 2020, with an optional two-year extension exercisable by PVIS.

### vii.       *Tungsten Explorer*

27.        The *Tungsten Explorer* is an ultra-deepwater drillship, built in 2013 by DSME in the Republic of Korea.  It is owned by Vantage Drilling Africa, a Debtor.  As of the date hereof, the *Tungsten Explorer* is conducting drilling operations off the coast of the Republic of Congo pursuant to a drilling contract between Total E&P Congo and Vantage Drilling Africa. The drilling contract with Total E&P Congo is set to expire in the fourth quarter of 2016;

however, Total E&P Congo has the option to extend the initial term by up to four optional extension periods of six months each. Any further extensions leading to an aggregate duration of more than three months shall be subject to mutual agreement by the parties.

**III.**

**History and Organizational Structure**

28.     Vantage Energy Services, Inc. ("**VESI**"), a non-Debtor, was founded in September 2006 as a Delaware special purpose acquisition company. As a special purpose acquisition company, VESI lacked assets or operations, but conducted an initial public offering to raise capital for future acquisitions of drilling units. Vantage Parent was founded in November 2007 as a Cayman Islands exempt company for the purpose of acquiring VESI and OGIL from F3 Capital, an entity wholly-owned and controlled by Hsin-Chi Su (a/k/a Nobu Su) ("**Nobu Su**"). Vantage Parent completed the acquisition of VESI and OGIL in June 2008. The Debtors' tumultuous history with Nobu Su is described in more detail below in the Disclosure Statement. All of the Debtors are direct or indirect subsidiaries of Vantage Parent. As of the date hereof, the Debtors' drilling fleet is entirely owned and principally operated by certain subsidiaries of OGIL, which is a direct, wholly-owned subsidiary of Vantage Parent.

29.     To facilitate the Debtors' operations and accommodate the complexities arising from such operations, Vantage Parent and the Debtors have established offices in the United States, Singapore, and Dubai and have incorporated entities in a number of jurisdictions, including Brazil, the Cayman Islands, Cyprus, Hungary, Indonesia, Luxembourg, Malaysia, Mexico, the Netherlands, Romania, Singapore, and the United States. VESI, based in Houston, Texas, has always acted as the headquarters and main base of operations for Vantage Parent and the Debtors. VESI's address is 777 Post Oak Boulevard, Suite 800, Houston, Texas  77056.

WEIL:\95471886\13\78787.0003

## Capital Structure, Prepetition Indebtedness and Obligations

**B.**    **Equity Ownership**

30.    Vantage Parent is a public company and files annual reports with, and furnishes other information to, the SEC.  Before September 14, 2015, ordinary shares of Vantage Parent ("***Vantage Ordinary Shares***") were traded on NYSE MKT LLC (the "***Exchange***") under the symbol "VTG."  As of September 14, 2015, there were 129 actual holders of record of Vantage Ordinary Shares.  On September 14, 2015, Vantage Parent received a notice (the "***Suspension Notice***") from the staff of NYSE Regulation Inc. ("***NYSE Regulation***") that it had determined to commence proceedings to delist Vantage Ordinary Shares from the Exchange and that trading in Vantage Ordinary Shares had been suspended at the market open on that date.  In the Suspension Notice, the NYSE Regulation staff stated its decision was made in accordance with the NYSE MKT Company Guide (the "***NYSE Company Guide***"), and that it was necessary and appropriate to initiate delisting proceedings due to the "abnormally low" trading price of Vantage Ordinary Shares.  Since receipt of the Suspension Notice, Vantage Ordinary Shares have been trading on the over the counter markets under the trading symbol "VTGDF."  On November 4, 2015, the Exchange notified the SEC of its intention to remove the Vantage Ordinary Shares from listing and registration on the Exchange on November 16, 2015.

**B.**    **Prepetition Indebtedness**

31.    The Vantage Group's significant prepetition indebtedness includes secured financing obligations in the amount of approximately $2,642,600,000, unsecured financing obligations in the amount of approximately $87.7 million, and, as of September 30, 2015, trade debt in the amount of approximately $48.2 million.  The Debtors' secured and unsecured financing obligations are described in greater detail below.  Such description is for informational purposes only and is qualified in its entirety by reference to the documents setting

14

forth the specific terms of such obligations, and their respective related agreements.  As noted

above, substantially all of the Vantage Group's operations are conducted by the Debtors.

      *i.*      ***Secured Revolving Credit Facility***

      32.      Vantage Parent and OGIL are party to that certain Amended and Restated

Credit Agreement, dated as of March 28, 2013, by and among Vantage Parent and OGIL, as

borrowers, each of the Debtor-guarantors named therein, the various financial institutions party

thereto from time to time as lenders (the "***Revolver Lenders***"), Royal Bank of Canada ("***RBC***"),

as administrative agent, and RBC Capital Markets as sole lead arranger and sole bookrunner, as

amended, modified, or otherwise supplemented from time to time (the "***Revolving Credit***

***Agreement***").  The Revolving Credit Agreement provides for revolving credit commitments in

an aggregate principal amount of up to $168 million (the "***Revolving Credit Facility***") and letter

of credit commitments in an aggregate amount of up to $32 million.  The Revolving Credit

Agreement matures on April 25, 2017.  OGIL and Vantage Parent may prepay outstanding

advances; *provided* that, with respect to partial prepayments, such prepayment shall be in an

aggregate principal amount of not less than $1 million and in integral multiples in excess thereof.

      33.      On or about September 2, 2015, OGIL requested and received an advance

of $150 million from the Revolver Lenders.  At the time of such advance, OGIL made certain

representations to the Revolver Lenders as required under the Revolving Credit Agreement.  On

October 14, 2015, Vantage Parent received a letter from RBC on behalf of the Revolver Lenders,

pursuant to which the Revolver Lenders "request" return of the $150 million advance.  The letter

stated that if Vantage Parent and OGIL refuse to return the advance, "at minimum" they must

segregate such funds from other company funds and maintain them in the account in which such

funds were initially deposited, and provide the Revolver Lenders with information regarding

certain representations in the loan documents at the time the advance was made.  As of the date

hereof, the aggregate amount outstanding under the Revolving Credit Agreement is $150 million

in unpaid principal, plus interest, fees, and other expenses.  Additionally, as of the date hereof,

there are $22.9 million in undrawn letters of credit under the Revolving Credit Agreement.

### ii.        *2017 Secured Term Loan*

34.    OGIL and Vantage Delaware Holdings, LLC ("***Delaware Holdings***") are

party to that certain Amended and Restated Term Loan Agreement, dated as of October 25,

2012, as amended and restated as of November 22, 2013, by and among OGIL and Delaware

Holdings, as borrowers, each of the Debtor-guarantors named therein, the various financial

institutions and other persons party thereto from time to time as lenders (the "***2017 Term Loan***

***Lenders***"), Cortland Capital Markets Services LLC  ("***Cortland***"), as successor administrator

agent to Citibank, N.A. ("***Citibank***"), Wells Fargo National Association ("***Wells Fargo***"), as

collateral agent, and Citigroup Global Markets Inc. as sole lead arranger, sole bookrunning

manager, syndication agent, and documentation agent, as amended, modified, or otherwise

supplemented from time to time (the "***2017 Term Loan Agreement***"), pursuant to which OGIL

and Delaware Holdings obtained a term loan in the aggregate principal amount of $475 million

maturing on October 25, 2017 (the "***2017 Term Loan***").  As of the date hereof, the aggregate

amount outstanding under the 2017 Term Loan Agreement is $323,543,428 in unpaid principal,

plus interest, fees, and other expenses.

### iii.       *2019 Secured Term Loan*

35.    OGIL and Delaware Holdings are party to that certain Second Term Loan

Agreement, dated as of March 28, 2013, by and among OGIL and Delaware Holdings, as

borrowers, each of the Debtor-guarantors named therein, the various financial institutions and

other persons party thereto from time to time as lenders (the "***2019 Term Loan Lenders***"),

Cortland, as successor administrative agent to Citibank, Wells Fargo as collateral agent and

16

various other financial institutions as joint lead arrangers, joint bookrunning managers, co-syndication agents, and co-documentation agents, as amended, modified, or otherwise supplemented (the "*2019 Term Loan Agreement*").  Pursuant to the 2019 Term Loan Agreement, OGIL and Delaware Holdings obtained a term loan in the aggregate principal amount of $350 million maturing on March 28, 2019 (the "*2019 Term Loan*").  As of the date hereof, the aggregate amount outstanding under the 2019 Term Loan Agreement is $341,250,000 in unpaid principal, plus interest, fees, and other expenses.

### iv.       *7.5% Secured Notes*

36.       OGIL is party to that certain Indenture, dated as of October 25, 2012, by and among OGIL, as issuer, each of the Debtor-guarantors named therein, and Wells Fargo, as indenture trustee and noteholder collateral agent, as amended, modified, or otherwise supplemented, pursuant to which OGIL issued 7.5% Senior Secured First Lien Notes due 2019 in the aggregate principal amount of $1.15 billion (the "*7.5% Notes*" and the holders of such notes, the "*7.5% Noteholders*").  The 7.5% Notes were issued at par and mature on November 1, 2019.  As of the date hereof, the aggregate amount outstanding under the 7.5% Notes is $1,086,815,000 in unpaid principal, plus interest, fees, and other expenses.

### v.       *7.125% Secured Notes*

37.       OGIL is party to that certain Indenture, dated as of March 28, 2013, by and among OGIL, as issuer, each of the Debtor-guarantors named therein, and Wells Fargo, as indenture trustee and noteholder collateral agent, as amended, modified, or otherwise supplemented from time to time, pursuant to which OGIL issued 7.125% Senior Secured First Lien Notes due 2023 in the aggregate principal amount of $775 million (the "*7.125% Notes*" and the holders of such notes, the "*7.125% Noteholders*").  The 7.125% Notes were issued at par and

17

mature on April 1, 2023.  As of the date hereof, the aggregate amount outstanding under the

7.125% Notes is $727,622,000 in unpaid principal, plus interest, fees, and other expenses.

> ### vi.    *Security Agreement, Pledge Agreement, and Intercreditor Agreement*

38.    The obligations of OGIL, Delaware Holdings, and the Debtor-guarantors,

as applicable, under the Revolving Credit Agreement, the 2017 Term Loan Agreement, the 2019

Term Loan Agreement, the 7.5% Notes, and the 7.125% Notes (the "***Pari Passu Obligations***")

are secured pursuant to that certain Third Amended and Restated Pledge and Security

Agreement, dated October 25, 2012 (as amended, supplemented, amended and restated or

otherwise modified from time to time, the "***Security Agreement***").  Pursuant to the Security

Agreement and certain other local law collateral agreements, each of OGIL, Delaware Holdings,

and the Debtor-guarantors granted a first-priority pari passu lien on substantially all its personal

property, other than "***Excluded Property***," which includes, among other things, certain foreign

deposit accounts and equity interests of subsidiaries that are not guarantors of the Pari Passu

Obligations.  In addition, certain obligors under the Pari Passu Obligations executed ship

mortgages, assignments of earnings, and assignments of insurance for each of the jackups and

drillships in the Debtors' fleet.

39.    The obligations of Vantage Parent with respect to the Pari Passu

Obligations are secured pursuant to that certain Third Amended and Restated Pledge Agreement,

dated October 25, 2012 (as amended, supplemented, amended and restated or otherwise modified

from time to time, the "***Parent Pledge Agreement***").  Pursuant to the Parent Pledge Agreement,

Vantage Parent pledged the equity interests of all its direct subsidiaries that are borrowers or

guarantors under the Pari Passu Obligations.

40.    The rights of the Revolver Lenders, 2017 Term Loan Lenders, 2019 Term

Loan Lenders, 7.5% Noteholders, and 7.125% Noteholders with respect to their shared collateral

are governed by that certain Amended and Restated Intercreditor Agreement dated October 25, 2012 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "***Intercreditor Agreement***").  Pursuant to the Intercreditor Agreement, all Pari Passu Obligations are secured equally with respect to "***Common Collateral***," which expressly excludes (i) any cash, deposit accounts, or similar liquid assets to the extent on deposit or maintained with RBC or any other Revolver Lender to secure the obligations under the Revolving Credit Agreement (the "***Pari Passu Excluded Collateral***") and (ii) any compensation, damages, or other payments (including insurance proceeds) received in respect of  an event of loss related to a vessel (the "***Credit Agreement Excluded Collateral***").  Only the obligations under the Revolving Credit Agreement are secured by the Pari Passu Excluded Collateral.  In addition, under the payment priority waterfall established by the Intercreditor Agreement, the Revolving Credit Facility is entitled to receive any proceeds of Common Collateral until repaid in full, at which point all other Pari Passu Obligations are paid equally; provided that the proceeds of any Credit Agreement Excluded Collateral shall be applied first to any Pari Passu Obligations (other than the Revolving Credit Facility), to the extent such proceeds are subject to a mandatory redemption in favor of such other Pari Passu Obligations, until repaid in full.

    ***vii.***      ***Trade Payables***

       41.     In the ordinary course of business, the Debtors incur various fixed, liquidated, and undisputed payment obligations (the "***Trade Payables***") to various third-party providers of goods and services that facilitate the Debtors' business operations (the "***Trade Creditors***").  As of the date hereof, the Debtors estimate that the aggregate amount of Trade Payables outstanding is approximately $27.7 million.

WEIL:\95471886\13\78787.0003

### viii.        *Intercompany Claims*

42.        Certain non-Debtors, including the Vantage Service Subsidiaries as (defined herein), which are subsidiaries of the Debtors, and Vantage Parent, hold Claims against the Debtors resulting from, among other things, the provision of intercompany services by the non-Debtors to the Debtors, including, without limitation, providing administrative support services, such as personnel, payroll, and retention services, acting as the primary contracting entity for insurance covering the rigs, and managing a capital spares program.  Other intercompany claims arise from the sale or transfer of rigs from non-Debtors to Debtors, as well as costs in connection with the development and construction of the Debtors' fleet.  As of September 30, 2015, the Debtors owed approximately $21 million in intercompany claims to the Vantage Service Subsidiaries and $108 million in intercompany claims to the other non-Debtors, in each case, net of setoffs.

## Events Leading to Chapter 11

### A.        Collapse in Oil Prices

43.        As is common throughout the oilfield services industry, the demand for offshore drilling services is largely driven by actual or anticipated changes in oil and natural gas prices and, with it, capital spending by companies exploring for, and producing, oil and natural gas.  Consequently, the offshore drilling industry has historically been cyclical, with periods of high demand, limited rig supply, and high dayrates when the price of oil is high, alternating with periods of low demand, excess rig supply, and low dayrates when the price of oil is low.  Periods of low demand and excess rig supply intensify competition in the industry and often result in drilling rigs—particularly older, less efficient rigs—becoming idle for longer periods of time.

44.    Starting in the summer of 2014, oil prices began to decline precipitously. Over the next six months or so, the price of oil was cut in half.  The rapid and unexpected decline in oil prices led to a significant decline in demand for offshore drilling services as major, national, and independent oil and natural gas companies—the Debtors' customers—implemented severe reductions in capital spending.  The reduced demand is compounded by an oversupply of drilling units, as existing rigs compete for the limited, or almost non-existent, tendering activity for jackups and drillships, and deliveries of newly-built rigs continue to saturate the global fleet. As a result, the market for offshore drilling services is severely depressed.  The Debtors expect these adverse market conditions to continue for the duration of 2015, into 2016, and possibly beyond.

45.    Against this backdrop, the Debtors, like many of their competitors, have suffered as a result of the collapse in oil prices.  Although the Debtors do not face any maturities on their secured debt until 2017, the severity and duration of the market downturn increased the risk that existing customer contracts, some of which are due to expire in the near term, would not be renewed or would be renewed at materially reduced prices.  This made the Debtors increasingly reliant on revenue from longer-term contracts, such as the drilling services contract with an affiliate of Petroleo Brasiliero S.A. (the "***Petrobras Contract***"), to service debt.

**B.    Operation Carwash**

46.    As of December 31, 2014, the Petrobras Contract accounted for approximately $1.4 billion of the Debtors' contract backlog of approximately $2.1 billion. Petróleo Brasileiro S.A. and its affiliates (collectively, "***Petrobras***"), however, became embroiled in an ongoing investigation by Brazilian authorities into corrupt practices.  Dubbed Operation Carwash (*Operação Lava Jato*), the investigation by Brazilian authorities began by identifying a group of "black market money exchange dealers" operating in Brazil and thereafter revealed a

21

web of corruption involving Petrobras executives and high-ranking officials in the Brazilian government.  Among other things, the Brazilian federal authorities allege that Petrobras executives received bribes in exchange for awarding contracts at above-market prices.

47.    As part of Operation Carwash, the Brazilian Federal Police scrutinized interactions between Petrobras and Hamylton Pinheiro Padilha Junior, who acted as an agent for numerous international offshore drilling companies seeking to do business in Brazil.  After being identified as a person of interest, Mr. Padilha cooperated with Brazilian authorities and ultimately entered into a plea agreement with the Brazilian Federal Prosecutor's Office (the "***Brazilian Prosecutor's Office***") in which he admitted he participated in the bribery of certain Petrobras executives.

48.    Mr. Padilha was the Brazilian agent utilized by Vantage Parent during the contracting of the *Titanium Explorer* drillship with Petrobras Venezuela Investements & Services B.V. ("***PVIS***"), an affiliate of Petróleo Brasileiro S.A.  In his written plea agreement, Mr. Padilha stated under oath that he arranged with Nobu Su, then the owner of the *Titanium Explorer*, to carry out a bribery scheme with Petrobras executives.  Nobu Su, who at the time of the alleged bribery payments was a director and significant shareholder of Vantage Parent, was not involved in any of the negotiations between Vantage Parent management and Petrobras representatives relating to the *Titanium Explorer* and never discussed his illegal conduct with any member of Vantage Parent's management.  Mr. Padilha further indicated that Vantage Parent's management did not know about the alleged bribery scheme and that he would not have attempted to undertake such a scheme with any member of Vantage Parent's management because of the company's Foreign Corrupt Practices Act compliance program.

22

49.    On July 30, 2015, the Brazilian media reported on the statements made in Mr. Padilha's plea agreement.  On the same date, Vantage Parent issued a press release disclosing that it was unable to confirm Mr. Padilha's statements and, to the extent Mr. Padilha committed any illegal acts, he was not acting on behalf of, or upon any instructions from, Vantage Parent or any of its subsidiaries.

50.    On August 5, 2015, after reviewing case records, documents gathered in connection with the investigation, and a report issued by the Brazilian Federal Police, the Brazilian Prosecutor's Office indicted several individuals for the alleged bribery of certain Petrobras executives and political officials in connection with the Petrobras Contract. Mr. Padilha and Mr. Su were among those indicted on evidence that they had committed crimes of corruption and money laundering at the time of the negotiation of the Petrobras Contract. Neither Paul Bragg nor any other director or officer of Vantage Parent or its subsidiaries has been indicted by the Brazilian Prosecutor's Office.  On August 10, 2015, the 13th Federal Division of the Court of Law of Curitiba/PR accepted the indictment submitted by the Brazilian Prosecutor's Office and initiated a criminal lawsuit against Mr. Padilha and Mr. Su, among others.

51.    Vantage Parent's audit committee, with the assistance of Weil, Gothsal & Manges LLP, is conducting an internal investigation regarding the Brazilian authorities' allegations of wrongdoing by Mr. Padilha and Mr. Su.  In connection with this investigation, Vantage Parent also is investigating all current and former directors and officers.  Whether the investigation is continued by the joint official liquidators in the Cayman Proceeding or by OGIL, the investigation is currently expected to be completed in the first half of 2016.  In addition, Vantage Parent contacted the United States Department of Justice ("*DOJ*") and the SEC when it

23

was first advised that Mr. Padilha and Mr. Su were indicted in early August 2015. Vantage

Parent provided periodic progress reports to the DOJ and SEC, cooperated with all DOJ and SEC

requests related to this matter, and currently plans to report the conclusions of the company's

audit committee investigation by way of "self-report" to the DOJ and SEC in the first half of

2016. Vantage Parent has neither been contacted by, nor engaged in discussions with, any other

governmental unit for the United States or any other country with respect to these matters. It has

been explained to me that claims held by a governmental unit of the United States arising from

or related the foregoing will not be affected by the Debtors' chapter 11 cases.

**C.    Wrongful Termination of the Petrobras Contract**

52.    On August 31, 2015, Vantage Deepwater Drilling, Inc. ("**VDDI**") received

a letter (the "**Petrobras Notice**"), in which Petrobras America Inc. and PVIS purported to

terminate the Petrobras Contract. The Petrobras Notice cites to provisions in the Petrobras

Contract that permit PAI and PVIS to terminate the agreement in the event of a material breach,

repeated failure to provide services in accordance with good oil and gas field practices, or if any

representations and warranties are false in any material respect.

53.    Vantage Parent, Vantage Deepwater Company, and VDDI strongly

disagree with the allegations of contractual breaches made by PAI and PVIS in the Petrobras

Notice and believe the company is in compliance with all of its obligations under the Petrobras

Contract. On the same date, VDDI filed for arbitration to challenge the assertions made in the

Petrobras Notice and to assert the Petrobras Notice is a wrongful attempt to terminate the

Petrobras Contract that entitles VDDI to compensatory damages plus attorneys' fees. As of the

date hereof, the arbitration with PVIS and PAI is ongoing. In accordance with the terms of that

certain Third Novation and Amendment Agreement to the Agreement for the Provision of

Drilling Services governing the Petrobras Contract, (i) disputes are subject to arbitration in

Houston, Texas, under the Commercial Arbitration Rules of the International Center for Dispute Resolution of the American Arbitration Associations, and (ii) the governing law is general maritime law of the United States or, if such law is inapplicable, the laws of the state of Texas. The Debtors intend to stipulate to lifting the automatic stay so that the arbitration can continue.

**D.**    **Delisting of Vantage Ordinary Shares from New York Stock Exchange**

54.    On September 14, 2015, Vantage Parent received the Suspension Notice from the staff of NYSE Regulation that it had determined to commence proceedings to delist Vantage Ordinary Shares from the Exchange and that trading in Vantage Ordinary Shares had been suspended at the market open on that date.  In the Suspension Notice, the NYSE Regulation staff stated its decision was made in accordance with the NYSE Company Guide, and that it was necessary and appropriate to initiate delisting proceedings due to the "abnormally low" trading price of Vantage Ordinary Shares.  Vantage Parent exercised its right under the NYSE Company Guide to appeal the delisting determination and requested an oral hearing, which was set for November 5, 2015.  Since receipt of the Suspension Notice, Vantage Ordinary Shares have been trading on the over the counter markets under the trading symbol "VTGDF."  On November 4, 2015, the Exchange notified the SEC of its intention to remove the Vantage Ordinary Shares from listing and registration on the Exchange on November 16, 2015.

55.    The supplemental indentures for the 7.875% Convertible Notes due 2042 (the "*7.875% Convertible Notes*") and the 5.5% Convertible Notes due 2043 (the "*5.5% Convertible Notes*") provide that, if Vantage Ordinary Shares are delisted, holders of those notes may require Vantage Parent to repurchase the notes at a price equal to 100% of the principal amount of such notes, plus accrued and unpaid interest.  On November 25, 2015, Vantage Parent provided a fundamental change notice (the "***Fundamental Change Notice***") to the holders of the 5.5% Convertible Notes, as a result of the effectiveness of the delisting on November 16, 2015

25

(the "***Fundamental Change***").  The Fundamental Change Notice notified the holders of their

right to repurchase the 5.5% Convertible Notes on January 15, 2016, which must be exercised on

or before January 12, 2016.  In addition, the Fundamental Change Notice disclosed that Vantage

Parent currently has no plans to repurchase any notes in respect of the Fundamental Change.

E.     **Reduction in Workforce**

56.     In accordance with the Worker Adjustment and Retraining Notification

Act, by letter dated October 21, 2015, Vantage Deepwater notified the Texas Workforce

Commission of its intention to reduce the headcount associated with its Gulf of Mexico

operations by approximately 135 employees.  This reduction in headcount is the result, in part, of

the unexpected termination of drilling operations associated with the Petrobras Contract.

F.     **Non-Payment of Interest and the Restructuring Support Agreement**

57.     Through diligent and thoughtful management, the Debtors have

historically been able to maintain revenues at a better than breakeven level, including debt

service.  However, the significant and sustained drop in oil prices and related contraction of

demand for offshore drilling services, coupled with loss of the Petrobras Contract, have caused

uncertainty regarding the viability of the Debtors' capital structure in the long term.

Accordingly, the Debtors retained restructuring advisers to work closely with the Debtors'

management to explore deleveraging options, and to engage key secured debtholders and their

advisers in extensive arms' length and good faith negotiations regarding a potential restructuring

transaction.  In connection with these negotiations, on November 2, 2015, with the Debtors

elected not to make the $40.8 million interest payment then due on the 7.5% Notes, instead

choosing to utilize the grace period under such notes, which expired on December 2, 2015.

58.     On December 1, 2015, with an interest payment default only a day away,

the Debtors executed the Restructuring Support Agreement with certain Revolver Lenders,

26

Secured Term Loan Lenders, and Secured Noteholders holding, in the aggregate, approximately 90% of the outstanding principal amount of the Revolving Credit Facility Claims and approximately 59% of the outstanding principal amount of the Secured Debt Claims regarding the terms of a restructuring.

59.     Under the Restructuring Support Agreement, each of the Consenting Debtholders agreed to, among other things:  (i) vote any claim it holds against the Debtors to accept the Prepackaged Plan and not (a) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Prepackaged Plan, (b) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Prepackaged Plan, or (c) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization of the Debtors other than the Prepackaged Plan; (ii) forbear from exercising, directly or indirectly, its rights under the applicable finance documents with respect to its loans or notes resulting from certain specified events; and (iii) subject to certain exceptions, limit its ability to transfer the indebtedness it holds.

60.     Under the Restructuring Support Agreement, the Debtors agreed to, among other things, (i) commence the Chapter 11 Cases on or before the 10th calendar day after the commencement of the Solicitation, (ii) file the Prepackaged Plan and this Disclosure Statement on the Petition Date, and (iii) file a motion seeking approval of the procedures relating to the Rights Offering and the Backstop Agreement on the Petition Date.  The deal encapsulated in the Restructuring Support Agreement is subject to certain condition on timing, including the entry of an order confirming the Prepackaged Plan within 60 days after the Petition Date and an absolute "drop dead" date of 120 days after the Petition Date.

WEIL:\95471886\13\78787.0003

61.     The Restructuring Support Agreement also provides for various termination events relating to the Majority Consenting Debtholders (as defined in the Restructuring Support Agreement), the Requisite Consenting Revolver Lenders, and the Debtors and Vantage Parent.  The Restructuring Support Agreement could be terminated automatically upon the occurrence of any of the following events:

(a)     an order denying confirmation of the Prepackaged Plan is entered;

(b)     an order confirming the Prepackaged Plan is reversed or vacated;

(c)     any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring the Restructuring Support Agreement to be unenforceable; or

(d)     the occurrence of the Effective Date.

62.     The Restructuring Support Agreement and the obligations of all parties thereto may be terminated by mutual agreement among the parties.  In addition, the Majority Consenting Debtholders may terminate the Restructuring Support Agreement upon termination thereof by the Requisite Consenting Revolver Lenders and vice versa.

## G.     The Related Cayman Islands Proceeding

63.     It is expected that the Cayman Proceeding will be commenced shortly after the Petition Date.  Subject to the Cayman Court issuing the orders sought, Vantage Parent's affairs will be wound up under the control of independent official liquidators, under the supervision of the Cayman Court.  Upon the conclusion of that process, once all remaining assets of Vantage Parent have been realized and/or distributed to its creditors (and, to the extent of any surplus, its shareholders), Vantage Parent will be dissolved by order of the Cayman Court.

64.     Vantage Parent and the Debtors have elected to proceed with this structure, among other reasons, to facilitate the Debtors' need to reorganize and emerge from chapter 11 quickly.  The Prepackaged Plan is premised on the notion that the Secured Debt

WEIL:\95471886\13\78787.0003

Claims are significantly undersecured.  Because the Secured Debt Claims are guaranteed by

Vantage Parent, the holders of Secured Debt Claims have a large deficiency claim against

Vantage Parent.  That deficiency claim is believed to be much larger than any other unsecured

claims against Vantage Parent.  Thus, the same secured creditor constituency that would become

the new equity holders under the Prepackaged Plan also will be the largest creditor constituency

in the Cayman Proceeding and will ultimately receive their pro rata distribution of the remaining

value of Vantage Parent upon its eventual liquidation.  The Debtors are confident that this

structure provides the most expeditious and fair way to reorganize the Debtors' enterprise.

**H.**     **Purchase of the Vantage Service Subsidiaries and Transfers of Essential Non-Debtor Contracts**

65.     To minimize operational disruption and enhance organizational

efficiencies for the Reorganized Debtors, and especially in light of Vantage Parent's Cayman

Proceeding, prior to the Petition Date, OGIL purchased, at fair market value as determined by a

third- party appraisal, Vantage Parent's equity interests in Vantage International Management

Company Pte. Ltd. ("***VIMCO Singapore***") and VESI (together, the "***Vantage Service

Subsidiaries***") and agreed to certain settlements and contributions of intercompany claims by

and among, each of the Vantage Service Subsidiaries, the Debtors, and the non-Debtors.

66.     The Vantage Service Subsidiaries provide significant operational services

to the Debtors.  In particular, VESI provides administrative support, such as personnel, payroll,

and retention services to the Debtors, and VIMCO Singapore serves as the management

company for the enterprise, retaining employees and purchasing goods and services on behalf of

the Debtors' operating entities, and managing a capital spares program for the Debtors' fleet.

VIMCO Singapore is also party to two contracts to supervise and manage the construction of two

ultra-deepwater drillships by DSME.  In exchange for the Vantage Service Subsidiaries, OGIL

WEIL:\95471886\13\78787.0003

issued a secured promissory note to Vantage Parent (the "***Vantage Parent Secured Promissory Note***") in an amount equal to $61,477,000, which is equal to (i) the arms' length, fair market value of the purchased assets, as appraised by Alvarez & Marsal Valuation Services, LLC ("***A&M***") ($59,477,000) and (ii) consideration ($2,000,000) for Vantage Parent's contribution to the capital of VESI of the non-Vantage Service Subsidiary non-Debtors' claims against VESI. The Vantage Parent Secured Promissory Note is secured by a first priority security interest in the Vantage Service Subsidiaries and accrues interest at a rate of 10% per annum. Under the Prepackaged Plan, on account of the Vantage Parent Secured Promissory Notes, Vantage Parent is receiving New Common Shares equal to the value of such note, which is expressly permitted and contemplated by the note.

67.    As part of their pre-bankruptcy planning, and to ensure the continuation of business under reorganized OGIL given that Vantage Parent will be liquidated in a proceeding in the Cayman Islands, the Debtors have transferred certain significant contracts with non-Debtors to OGIL and the Vantage Service Subsidiaries, including certain insurance policies, benefit plans, credit card agreements, consulting agreements, employment agreements, and indemnification agreements. These agreements are essential to the continued business under Reorganized OGIL and do not generally provide value to Vantage Parent.

**IV.**

**Summary of First Day Papers**[4]

68.     On the Petition Date, the Debtors intend to file multiple motions seeking

various relief from the Bankruptcy Court and authorizing the Debtors to maintain their

operations in the ordinary course.  Such relief is designed to ensure a seamless transition between

the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization

through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The

following is a brief overview of the relief the Debtors intend to seek on the Petition Date to

maintain their operations in the ordinary course.

**A.     Joint Admin**

69.     By this motion (the "***Joint Administration Motion***"), the Debtors request,

pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015–1 of the Local Rules, the

Debtors request entry of an order directing consolidation of their chapter 11 cases for procedural

purposes only.

70.     I believe that joint administration of these cases will save the Debtors and

their estates substantial time and expense because it will remove the need to prepare, replicate,

file, and serve duplicative notices, applications, and orders.  Further, I believe that joint

administration will relieve the Court of entering duplicative orders and maintaining duplicative

files and dockets.  The United States Trustee for the District of Delaware (the "***U.S. Trustee***")

and other parties in interest will similarly benefit from joint administration of these chapter 11

cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

---

[4] NTD: significant additions required re: evidence.

71.     I believe that joint administration will not adversely affect creditors' rights because this Motion requests only the administrative consolidation of the estates, and does not seek substantive consolidation.  As such, each creditor will continue to hold its claim against a particular Debtor's estate after this Motion is approved.  Accordingly, I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B.     Cash Management System**

72.     Prior to the Petition Date and in the ordinary course of business, the Debtors employed a cash management system to collect funds generated by their operations and disburse those funds to satisfy the obligations required to operate their business (the "***Cash Management System***").  Because of the multinational nature of the Debtors' business and the different types of revenue models the Debtors utilize, the Debtors do not have a single, centralized cash management process.  Rather, the Debtors have a decentralized cash management system that comprises three cash management processes to facilitate the Debtors' different revenue models: (i) payments under back-to-back bareboat charters[5] (the "***Bareboat Charter Process***"); (ii) payments under a split contract (the "***Split Contract Process***"); and (iii) payments to rig owner-operators (the "***Owner-Operator Process***").

73.     The Debtors utilize one of the three cash management processes for each of their seven rigs.  The rigs are aligned to the cash management processes as follows:

| **Cash Management Process** | **Rig** |
| --- | --- |
| **Bareboat Charter Process** | Emerald Driller |
| | Aquamarine Driller |

---

[5] A bareboat charter is a charter of a bare rig (*i.e.,* without crew or supplies).

| Cash Management Process | Rig |
|---|---|
| | Titanium Explorer |
| **Split Contract Process** | Topaz Driller |
| **Owner-Operator Process** | Platinum Explorer |
| | Tungsten Explorer |
| | Sapphire Driller |

These decentralized cash management processes permit the Debtors to comply with local laws and achieve operational efficiency while operating in multiple countries and with different revenue models.

74.    Although the administration of the Cash Management System is ultimately subject to the control of the management of OGIL, OGIL's subsidiaries generally maintain their own control over the administration of their own deposit accounts (each, a "***Bank Account***"), which are located at various banks (each, a "***Bank***") around the world.  A list of the Debtors' Bank Accounts is annexed as **Schedule 1** to each of the Proposed Interim Order and the Proposed Final Order.

75.    The Cash Management System utilizes a total of 19 domestic Bank Accounts maintained at JPMorgan Chase & Co. ("***JPM***") and 45 foreign Bank Accounts maintained at 12 different foreign Banks.  It enables the Debtors to meet their operating needs, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.  In addition to these benefits, the Cash Management System further provides the Debtors with the ability to create, on an expedited basis, status reports on the locations and amounts of funds, thereby allowing management to

33

track and control such funds.  Control over the Debtors' funds is crucial to the operation of the

Debtors' business because the Debtors' business generates revenue and expenses both within the

United States and abroad.

76.     In addition, in the ordinary course of business, the Debtors rely heavily on

the services provided and goods procured by the Vantage Service Subsidiaries.  The Vantage

Service Subsidiaries are wholly-owned by Debtor OGIL, provide necessary services to the

Debtors, and, as discussed below, are generally reimbursed by the Debtors for such services.

77.     Each of three structures within the Cash Management System has been

organized to integrate the Debtors' cash receipts into the Cash Management System in an

operationally efficient manner.  These structures, the Debtors that participate in them, their

relationships with the Vantage Service Subsidiaries, and the other aspects of the Cash

Management System are depicted in the diagrams annexed as **Exhibit C** to the cash management

motion and are described in further detail below.

### Structure I: Payments Under Back-to-Back Bareboat Charters

78.     The Bareboat Charter Process incorporates revenues received under back-

to-back bareboat charters of the jackups Emerald Driller and Aquamarine Driller into the Cash

Management System in an operationally efficient manner (the "***Bareboat Charter Process***").

The Bareboat Charter Process for each of those two rigs is explained below.

79.     Emerald Driller Bareboat Charter Process.  The Bareboat Charter Process

for the Emerald Driller operates as follows:

- The Emerald Driller is owned by Emerald Driller Company, a Cayman Islands company
  with a Bank Account ending in 7188 (the "***7188 Account***") denominated in United States
  dollars and maintained at JPM in the United States.

- Emerald Driller Company charters the Emerald Driller to Vantage Drilling Netherlands
  B.V., a Netherlands company with Bank Accounts ending in 4538 (the "***4538 Account***")

34

and 9120 (the "*9120 Account*") and denominated in United States dollars and Euros, respectively, maintained at ING Bank N.V. ("*ING*") in The Netherlands.

- Vantage Drilling Netherlands B.V. subcharters the Emerald Driller to Vantage Driller I Co., a Cayman Islands company with two Bank Accounts maintained at JPM in the United States and two Bank Accounts maintained at JPM in Thailand. Vantage Driller I Co.'s Bank Accounts in the United States end in 4798 (the "*4798 Account*") and 8902 (the "*8902 Account*") and are both denominated in United States dollars. Its Bank Accounts in Thailand end in 5828 (the "*5828 Account*") and 8674 (the "*8674 Account*") and are denominated in United States dollars and Thai bahts, respectively. The 8674 Account is a payroll account.

- Vantage Driller I Co., which operates in Thailand, ultimately utilizes the Emerald Driller to perform offshore drilling services for third-party clients to produce revenue.

80.     Clients pay Vantage Driller I Co. in United States dollars for the offshore drilling services. Those payments are received in the 4798 Account. Vantage Driller I Co. transfers funds to its 8902 Account and its 5828 Account and uses those funds to cover its operating expenses and local taxes. Vantage Driller I Co.'s operating expenses include reimbursements to the Vantage Service Subsidiaries for goods procured and employee services provided. To fund local payroll, Vantage Driller I Co. transfers funds from the 5828 Account to the 8674 Account routinely as needed.

81.     To pay its charter obligations to Vantage Drilling Netherlands B.V., Vantage Driller I Co. transfers funds from the 4798 Account to Vantage Drilling Netherlands B.V.'s 4538 Account. From the 4538 Account, Vantage Drilling Netherlands B.V. makes two types of disbursements: (i) small deposits to its 9120 Account to cover local operating costs (such as the costs of maintaining its legal presence in The Netherlands) and (ii) disbursements to Emerald Driller Company's 7188 Account as payment under its charter of the Emerald Driller. In the ordinary course, Emerald Driller Company makes disbursements from the 7188 Account to the Vantage Service Subsidiaries and certain Debtors. Those disbursements are principally on account of capital expenditures (to maintain the Emerald Driller) and to fund intercompany

35

settlements of costs, such as insurance, that are paid by one entity on behalf of all of OGIL and its Debtor affiliates.

82.    <u>Aquamarine Driller Bareboat Charter Process</u>.  The Bareboat Charter Process for the Aquamarine Driller is currently being established to incorporate revenues from a new December 2015 charter.  This process will be similar to that of the Emerald Driller and will operate substantially as follows:

- The Aquamarine Driller is owned by P2020 Rig Co., a Cayman Islands company with a Bank Account ending in 6163 (the "***6163 Account***") that is denominated in U.S. dollars and maintained at JPM in the United States.

- P2020 Rig Co. charters the Aquamarine Driller to Vantage Drilling Labuan I Ltd., a Malaysian company with two Bank Accounts: (i) one ending in 3116 (the "***3116 Account***") that is denominated in United States dollars and maintained at JPM in Malaysia and (ii) one ending in 3115 (the "***3115 Account***") that is denominated in Malaysian ringgits and maintained at JPM in Malaysia..

- Vantage Drilling Labuan I Ltd. subcharters the Aquamarine Driller to Vantage Drilling (Malaysia) I Sdn. Bhd., a Malaysian company with two Bank Accounts: (i) one ending in 3114 (the "***3114 Account***"), denominated in United States dollars, and maintained at JPM in Malaysia, and (ii) one ending in 3113 (the "***3113 Account***"), denominated in Malaysian ringgits, and maintained at JPM in Malaysia.  The 3113 Account is used to make payroll.

- Vantage Drilling (Malaysia) I Sdn. Bhd., which operates in Malaysia, ultimately utilizes the Aquamarine Driller to provide offshore drilling services to third-party clients to produce revenue.

83.    Clients pay Vantage Drilling (Malaysia) I Sdn. Bhd. in United States dollars for the offshore drilling services.  Those payments are received in the 3114 Account. Vantage Drilling (Malaysia) I Sdn. Bhd. transfers part of its funds to its 3113 Account routinely as needed and uses those funds to cover its payroll, operating expenses, and local taxes, including reimbursements to the Vantage Service Subsidiaries for operational goods and services.

WEIL:\95471886\13\78787.0003

84.     To pay its charter obligations to Vantage Drilling Labuan I Ltd., Vantage Drilling (Malaysia) I Sdn. Bhd. transfers funds from its 3114 Account to Vantage Drilling Labuan I Ltd.'s 3116 Account.  From the 3116 Account, Vantage Drilling Labuan I Ltd. makes (i) small disbursements to cover local expenses associated principally with maintaining its legal presence in Malaysia and (ii) disbursements to P2020 Rig Co.'s 6163 Account as payment under its charter of the Aquamarine Driller.  In the ordinary course, P2020 Rig Co. makes disbursements from its 6163 Account to the Vantage Service Subsidiaries and certain Debtors. Those disbursements are principally on account of capital expenditures and to fund intercompany settlements of costs, such as rig insurance, that are paid by one entity on behalf of all of OGIL and its Debtor affiliates.

85.     _Titanium Explorer Bareboat Charter Process_.  The Debtors' revenues from the Titanium Explorer are also obtained in accordance with the Bareboat Charter Process as follows:

- The Titanium Explorer is owned by the Luxembourg branch of Vantage Driller ROCO S.R.L., a Romanian company with Bank Accounts in several countries:

    o _In Romania_: (i) one ending in 4010 (the "**_4010 Account_**") that is denominated in United States dollars and maintained at ING and (ii) one ending in 8910 (the "**_8910 Account_**") that is denominated in Romanian new leu and maintained at ING;

    o _In Switzerland_: one ending in 0291 (the "**_0291 Account_**") that is denominated in United States dollars and maintained at JPM;

    o _In Luxembourg_: (i) one ending in 3010 (the "**_3010 Account_**") that is denominated in United States dollars and maintained at ING and (ii) one ending in 0000 (the "**_0000 Account_**") that is denominated in Euros and maintained at ING.[6]

---

[6] Vantage Driller ROCO S.R.L. has historically maintained three Bank Accounts at Bank Zachodni in Poland.  These three Bank Accounts collectively hold only a nominal amount of cash, have virtually no involvement in the Cash Management System, and are in the process of being closed.  Accordingly, these three Polish Bank Accounts are mentioned here in the interest of full disclosure but are not otherwise discussed in this Motion.

- Vantage Driller ROCO S.R.L. Luxembourg Branch charters the Titanium Explorer to Vantage Deepwater Drilling Inc., a United States-based company ("*VDDI*") with two Bank Accounts: (i) one ending in 2739 (the "*2739 Account*") that is denominated in United States dollars and maintained at JPM in the United States and (ii) one ending in 6638 (the "*6638 Account*") that is also denominated in United States dollars and maintained at JPM in the United States.  The 6638 Account is a zero-balance account that is used to make payroll.

- VDDI ultimately utilizes the Titanium Explorer to provide offshore drilling services to third-party clients to produce revenue.  The Titanium Explorer is not currently under drilling contract but for a period of time will continue to receive revenues under a recently terminated drilling contract.

- To achieve operational efficiency, the offshore drilling third-party contract is novated to subsidiaries of OGIL to operate the Titanium Explorer in various jurisdictions.

86.     VDDI receives its payments under its drilling contract in its 2739 Account.  VDDI also receives payments in its 2739 Account from rig-owning and rig-operating Debtors as reimbursement of certain rig-related services it provides to other Debtors, such as procurement of goods, provision of employees, and operational support functions.  Specifically, VDDI provides non-payroll-related services to all rig-owning Debtors and employs the employees who work on the Titanium Explorer.  VDDI disburses funds regularly as needed from its 2739 Account to its 6638 Account to fund its payroll obligations.  It also makes disbursements from its 2739 Account to the Vantage Service Subsidiaries and third parties primarily for the procurement of rig-related supplies.

87.     To pay its charter obligations to Vantage Driller ROCO S.R.L. Luxembourg Branch, VDDI transfers funds from its 2739 Account to Vantage Driller ROCO S.R.L.'s 3010 Account.  From the 3010 Account, Vantage Driller ROCO S.R.L. makes two types of disbursements: (i) small deposits into its 0000 Account to cover local expenses associated principally with maintaining its legal presence in Luxembourg and (ii) disbursements of most of its remaining funds to its 4010 Account and 8910 Account.  From its 4010 Account and 8910 Account, Vantage Driller ROCO S.R.L. makes disbursements to the Vantage Service

38

Subsidiaries and third parties to fund capital expenditures for the Titanium Explorer, as well as its own operating costs. Vantage Driller ROCO S.R.L. also from time to time makes disbursements to its 0291 Account to cover local expenses associated principally with maintaining its legal presence in Switzerland.

### Structure II: Payments Under the Topaz Driller Split Contract

88.     The Debtors generate revenue from the operations of the Topaz Driller based on a "split contract" arrangement as follows. The Topaz Driller is owned by P2021 Rig Co., a Cayman Islands company with five Bank Accounts: (i) one ending in 0580 (the "*0580 Account*") that is denominated in United States dollars and maintained at Bank Mandiri in Indonesia; (ii) one ending in 1966 (the "*1966 Account*") that is denominated in United States dollars and maintained at JPM in Indonesia; (iii) one ending in 0606 (the "*0606 Account*") that is denominated in Indonesian rupiah and maintained at Bank Mandiri in Indonesia; (iv) one ending in 1974 (the "*1974 Account*") that is denominated in Indonesian rupiah and maintained at JPM in Indonesia; and (v) one ending in 2127 (the "*2127 Account*") that is denominated in United States dollars and maintained at JPM in the United States.

89.     Under the Topaz Driller's drilling contract, the Topaz Driller's operations are split between those of its owner, P2021 Rig Co., and those of Debtor affiliate PT. Vantage Drilling Company Indonesia ("*Vantage Indonesia*"). Vantage Indonesia is an Indonesian company with four Bank Accounts situated in Indonesia: (i) one ending in 1628 (the "*1628 Account*") that is denominated in United States dollars and maintained at Bank Mandiri; (ii) one ending in 1602 (the "*1602 Account*") that is denominated in Indonesian rupiah and maintained at Bank Mandiri; (iii) one ending in 1933 (the "*1933 Account*") denominated in United States dollars and maintained at JPM; and (iv) one ending in 1941 (the "*1941 Account*") denominated in Indonesian rupiah and maintained at JPM.

39

90.    The use of two operators for the Topaz Driller permits the Debtors to achieve operational efficiency with respect to the cash receipts under the contract.  Vantage Indonesia generally receives a small amount of cash receipts from the counterparty relative to the receipts of P2021 Rig Co. from the counterparty.  Vantage Indonesia receives payments under the contract in its 1628 Account.  It disburses funds as needed from its 1628 Account to its other three Bank Accounts primarily to fund its operating costs and the costs of doing business and maintaining a legal presence in Indonesia.  P2021 Rig Co. receives its payments under the drilling contract in its 0580 Account.  Similarly to Vantage Indonesia, P2021 Rig Co. makes disbursements from its 0580 Account to its other three Indonesian Bank Accounts to fund its operating costs and the costs of doing business and maintaining a legal presence in Indonesia.  Its largest transfers of funds go to its 2127 Account, from which they are used to fund capital expenditures associated with owning the Topaz Driller, to reimburse the Vantage Service Subsidiaries for their services, and to settle intercompany claims of other Debtors arising from, among other things, insurance costs that are funded by one entity but are incurred for the benefit of all entities in the Debtors' corporate structure.

### Structure III: Payments to Rig Owner-Operators

91.    The Debtors' third ordinary-course cash management process involves cash revenues generated by Debtors that both own and operate rigs.  These Debtors and rigs are as follows:

| Debtor Owner-Operator | Rig |
| --- | --- |
| Vantage International Management Co. ("*VIMCO Cayman*") | Platinum Explorer |
| Vantage Drilling Africa | Tungsten Explorer |
| Vantage Driller VI Co. | Sapphire Driller |

WEIL:\95471886\13\78787.0003

92.    <u>VIMCO Cayman</u>.  VIMCO Cayman owns and operates the Platinum Explorer through its India Project Office.  VIMCO Cayman has two Bank Accounts: (i) one ending in 4650 (the "*4650 Account*") denominated in United States dollars and maintained at JPM in the United States and (ii) one ending in 1076 (the "*1076 Account*") denominated in Indian rupees and maintained at JPM in India.  Receipts related to the Platinum Explorer are received in the 4650 Account and are disbursed to, among others, the Vantage Service Subsidiaries and third-party vendors to fund VIMCO Cayman's operations.  In addition, disbursements are made from the 4650 Account to the 1076 Account to fund operational expenses in India and meet local payroll obligations.

93.    <u>Vantage Drilling Africa</u>.  Vantage Drilling Africa is a Cayman Islands company that owns and operates the Tungsten Explorer through its Congolese branch.  Vantage Drilling Africa has two Bank Accounts:  (i) one ending in 8338 (the "*8338 Account*") that is denominated in United States dollars and maintained at JPM in the United States and (ii) one ending in 0858 (the "*0858 Account*") that is denominated in Central African CFA Francs and maintained at Credit du Congo in Congo.  Vantage Drilling Africa receives cash receipts based on Tungsten Explorer drilling contracts in its 8338 Account.  It makes disbursements of its cash in two ways.  First, small amounts are transferred to the 0858 Account to fund local operating expenses and the costs associated with maintaining Vantage Drilling Africa's legal presence in Congo.  Second, funds from the 8338 Account are used to fund the capital expenditures necessary to maintain the Tungsten Explorer and the costs of Vantage Drilling Africa's operations, including by reimbursing the Vantage Service Subsidiaries for necessary operational goods and services.

WEIL:\95471886\13\78787.0003

94.    <u>Vantage Driller VI Co.</u>  Vantage Driller VI Co. is a Cayman Islands company that owns and operates the Sapphire Driller through its Gabonese branch.  Vantage Driller VI Co. has four Bank Accounts:  (i) one ending in 3983 (the "***3983 Account***") that is denominated in United States dollars and maintained at JPM in the United States; (ii) one account ending in 2580 (the "***2580 Account***") that is denominated in United States dollars and maintained at JPM in the United States; (iii) one account ending in 0987 (the "***0987 Account***") that is denominated in Central African CFA Francs and maintained at Banque International pour le Commerce et l'Industrie du Gabon in Gabon; and (iv) one account ending in 0106 (the "***0106 Account***") that is denominated in Guinean Francs and maintained at Societe Generale de Banques en Guinee Equatoriale in Guinea.  Vantage Driller VI Co. receives cash revenues from the operation of the Sapphire Driller in its 3983 Account.  To provide available funding for local payroll, operating costs, and capital expenditures], it transfers funds to its 2580 Account and 0987 Account routinely as needed.  Disbursements are made from the 2580 Account and the 0987 Account principally to VESI, VIMCO Singapore, third-party vendors, and taxing and other governmental authorities in furtherance of the operations of Vantage Driller VI Co.  Although Vantage Driller VI Co. has historically made transfers to its 0106 Account for various corporate purposes, it is in the process of closing the 0106 Account.  The 0106 Account no longer participates in the Cash Management System.

**Central Banker Processes**

95.    From time to time and in the ordinary course of business, the Debtors have historically transferred cash within their corporate structure on an as-needed basis in management's discretion.  Such transfers have typically been made through dividends, intercompany loans, or equity infusions into subsidiaries; however, postpetition, the Debtors will make all such intercompany transfers via intercompany loans.  Although the Debtors do not have

42

a centralized cash management system, the ability to exercise "central banker" powers from time to time is essential to maintaining necessary liquidity throughout their corporate structure.

96.     Prior to commencing these chapter 11 cases, for example, the Debtors prefunded the Vantage Service Subsidiaries to ensure that those entities would have sufficient cash to withstand any impact of the Debtors' restructuring on their ability to continue providing necessary goods and services.  For example, the Debtors sought to ensure that in the event that VIMCO Singapore's foreign vendors stopped offering trade terms upon learning of these chapter 11 cases, VIMCO Singapore could pay those vendors with available cash on hand so that it could continue procuring goods for the Debtors' business.  Likewise, the prefunding of VESI was prudent to provide employees employed by VESI with the peace of mind that there would be no interruption in their payroll schedule notwithstanding the Debtors' restructuring.

97.     OGIL itself does not serve as a traditional "central banker" for the Debtors; its involvement in the Cash Management System is generally limited.  OGIL has two Bank Accounts, both denominated in United States dollars and maintained by JPM in the United States.  One account ends in 4747 (the "*4747 Account*") and the other ends in 0813 (the "*0813 Account*").  OGIL's 4747 Account is its primary operating account; the 0813 Account was established for the purpose of segregating adequate assurance deposits for utility providers during these chapter 11 cases.  OGIL's 4747 Account obtains receipts both when OGIL draws on its revolving credit facility, which it did in the months leading up to these chapter 11 cases, and when it is paid under intercompany settlements of enterprise-wide costs such as premiums due under employee health and welfare benefits plans.  OGIL makes disbursements out of its 4747 Account mainly to cover costs such as those and to make payments on its long-term debt.

43

98.     Finally, certain of the Debtors maintain Bank Accounts with immaterial account activity and only small balances.  These Debtors include Sapphire Driller Company, Vantage Holdings Cyprus ODC Limited, DragonQuest Holdings Company; and Vantage Holding Hungary Kft.  They maintain certain accounts in the ordinary course of business either because (i) the account is needed to conduct business efficiently in the country or (ii) to maintain a more substantial legal presence in a country where the Debtors do business or may in the future do business.  Because they accounts have only immaterial balances, these accounts are generally funded in the Debtors' discretion as is necessary to maintain them.[7]

### Effect of the Debtors' Corporate Reorganization

99.     Shortly following the commencement of these chapter 11 cases, nondebtor Vantage Parent is expected to be subject to an official liquidation proceeding in the Cayman Islands.  The Debtors anticipate that Vantage Parent will fall under the legal control of a Cayman Islands official liquidator and will no longer be controlled by the Debtors' prepetition directors and management.  Accordingly, prior to commencing these chapter 11 cases, the Debtors began a corporate reorganization with the goal of migrating the operational and administrative functions of Vantage Parent to OGIL.  These functions include, among other things, being the named insured under the Debtors' insurance policies; serving as the accountholder on the Debtors' corporate credit cards (the "*Credit Card Program*"); paying the regulatory and other necessary filing fees associated to which the Debtors are subject; being a contract counterparty to certain agreements with key executives; and maintaining the Debtors' health and welfare policies

---

[7] The Debtors have included in Exhibit C hereto Vantage Luxembourg I, S.a.r.l. ("*Vantage Luxembourg*"), a nondebtor subsidiary of Debtor Vantage Holding Hungary Kft. ("*Vantage Hungary*"). In the ordinary course of its business, Vantage Hungary from time to time funds Vantage Luxembourg in small amounts as needed to fund Vantage Luxembourg's costs of maintaining a legal presence in Luxembourg.  These transfers are immaterial to the business and occur within management's discretion.

WEIL:\95471886\13\78787.0003

on behalf of the Debtors' corporate enterprise.  The corporate reorganization process is still underway.  Accordingly, by this Motion, the Debtors request authority to implement such changes to the Cash Management System as are required to move all such operations into the Debtors.

### Transitional Credit Card Program

100.    Of particular significance to the Debtors is the need to transition their prepetition Credit Card Program from a system involving Vantage Parent as the accountholder to one in which OGIL is the accountholder and Vantage Parent has no involvement.  The Credit Card Program has been critical to the Debtors' business operations—and to their employees in particular—insofar as it has been the primary mechanism by which employees' expenses incurred in the ordinary-course discharge of their employment duties have been paid without requiring the employees themselves to advance funds on the Debtors' behalf.  The international nature of the Debtors' business makes their Credit Card Program especially important, as frequent international travel to far-away places is required for crew changes and other business reasons.  Crew changes of rig personnel represent the most significant cost under the Credit Card Program and are a critical part of the Debtors' operations.

101.    The Credit Card Program consists of two card accounts: one with JPM and one with American Express ("***Amex***"; together with JPM, the "***Credit Card Providers***").  Prepetition, JPM issued MasterCard credit cards to the non-management employees of Vantage Parent and its direct and indirect subsidiaries.  Likewise, Amex issued Amex cards to the management-level employees of Vantage Parent and its direct and indirect subsidiaries.  Vantage Parent has historically paid all balances on both the JPM MasterCard cards and the Amex cards without any need for employees to advance funds or seek reimbursement in connection with the

45

Credit Card Program.  Affiliates of Vantage Parent have reimbursed Vantage Parent for charged

incurred under the Credit Card Program on their behalf.

102.    As discussed above, however, the Debtors anticipate that Vantage Parent

will imminently commence an official liquidation proceeding in the Cayman Islands.  The

Debtors are advised by their counsel that upon the commencement of such proceeding, Vantage

Parent will, as a general matter, be prohibited from disposing of its assets or incurring additional

risk to its creditors without the prior approval of the Cayman Islands court overseeing its

liquidation.  Because none of the Debtors is a party to the agreements governing the Credit Card

Program and because no Debtor maintains any separate employee credit card program, the

Debtors are at immediate and urgent risk of an inability of their employees to incur expenses in

the course of their employment.  Such a disruption would have an extremely detrimental impact

on the Debtors' business because the Debtors operate globally and require, among other things,

significant work-related travel by their employees.  A sudden loss of ability to pay for

employees' work-related expenses risks shutting down large swaths of the Debtors' business or

subjecting the Debtors' already weary workforce to large personal liabilities.

103.    Despite their diligent efforts, the Debtors were unable to open new credit

card accounts or transition the Credit Card Program from Vantage Parent to a Debtor prior to

commencing these chapter 11 cases.  As a result, the Debtors hereby seek to establish a

transitional credit card program (the "***Transitional Credit Card Program***") to minimize the risk

of a disruption to their business by the loss of the prepetition Credit Card Program.  Under the

Debtors' proposed Transitional Credit Card Program, the Debtors would implement a payment

arrangement with Vantage Parent and/or the Credit Card Providers that would be cost-neutral

and risk-free to Vantage Parent while maintaining it as the accountholder until the Debtors are

46

able to establish their own program; would provide assurances to the Credit Card Providers that the obligations under the Credit Card Program would continue to be satisfied; and would permit the Debtors' continued use of the JPM MasterCard and Amex cards.  In exchange for the ability to continue to utilize their corporate credit cards, the Debtors would (as is appropriate) assume the liability on the JPM MasterCard account (the "***JPM MasterCard Account***") and Amex account (the "***Amex Account***").

104.    Under the Transitional Credit Card Program, Vantage Parent would continue to function essentially as a pass-through entity.  The Debtors and Nondebtor Service Entity employees would use their corporate credit cards in the ordinary course of business and although a balance may technically accrue on Vantage Parent's account, it would be paid by the Debtors.  The Debtors propose to provide the following protections to Vantage Parent, JPM, Amex, and their employees to ensure the protection of those counterparties and employees during the Transitional Credit Card Program:

- The Debtors would be authorized to pay any outstanding prepetition balance on each of the JPM MasterCard Account and the Amex Account up to a combined cap of $200,000 (which is the amount the Debtors believe is outstanding under such accounts, plus a small amount of cushion) and may pay postpetition balances on such accounts in the ordinary course of business (but subject to the other terms of the Proposed Order).

- The Debtors would be authorized and directed to pay JPM and Amex directly on Vantage Parent's behalf and the Order would authorize JPM and Amex to accept such payments.

- The Debtors would pre-fund their obligations to Vantage Parent under the Transitional Credit Card Program in an amount each billing period equal approximately to the average historical balance during one billing period for each of the JPM MasterCard Account and the Amex Account for the 12 months preceding the entry of an order granting this Motion (prorated for the present length of the applicable billing period).

- Prepetition, Debtor Vantage Driller I Co. posted approximately $400,000 of cash collateral to the JPM MasterCard Account.  Based on their historical practices and the present state of their business, the Debtors believe that such cash collateral is

WEIL:\95471886\13\78787.0003

approximately equal to four weeks' worth of obligations accrued on the JPM MasterCard Account. This cash collateral would remain in place on behalf of (and for the benefit of all of) the Debtors to provide assurance both that JPM will be paid in full on each balance and that Vantage Parent will not be at risk of incurring its own liabilities for any balance, as the cash collateral posted to the account provides approximately four times the amount of any balance that would accrue in a week. Further by Order of this Court, JPM would be permitted to offset any balance due on the JPM MasterCard Account against such cash collateral, regardless of which Debtor or Nondebtor Service Entity is technically liable for the amounts due on the account.

- The Debtors would be authorized to post $300,000 to Amex as cash collateral for the use of the Amex Account. Based on their historical practices and the present state of their business, the Debtors believe that such cash collateral is greater than four weeks' worth of obligations accrued on the Amex Account. This cash collateral would remain in place on behalf of (and for the benefit of all of) the Debtors to provide assurance both that Amex will be paid in full on each balance and that Vantage Parent will not be at risk of incurring its own liabilities for any balance. Moreover, because Amex has historically been paid by a monthly check from Vantage Parent, the cash collateral posted to the account would provide approximately the full amount of any balance that would accrue over the course of a month. Further by Order of this Court, Amex would be permitted to offset any balance due on the Amex Account against such cash collateral, regardless of which Debtor or Nondebtor Service Entity is technically liable for the amounts due on the account.

- The Debtors would indemnify Vantage Parent solely to the extent of any liabilities Vantage Parent may occur for balances (including any related fees or expenses) due under each of the JPM MasterCard Account and the Amex Account.

- Vantage Parent would be granted an administrative priority claim against each of the Debtors in these chapter 11 cases for any amounts it must actually pay to JPM or Amex on account of corporate credit card balances (including any related fees or expenses), although under the other terms of the proposed Transitional Credit Card Program, it is not likely that Vantage Parent will be a creditor of the Debtors.

- The Debtors would be authorized by the Court to take all and further actions necessary or appropriate to implement the Transitional Credit Card Program in a way that is cost-neutral and minimizes risk to Vantage Parent.

- All payments received by JPM and Amex would be deemed to have been for fair value given to the Debtors in good faith. No payments made to JPM or Amex in accordance with the Transitional Credit Card Program would be subject to clawbacks, fraudulent transfer or preference liability, or any other avoidance or turnover powers.

- To ensure the Court and other parties in interest that the exposure under the Credit Card Program is not unlimited, the aggregate amount outstanding at any one time under both the JPM MasterCard Account and the Amex Account, collectively, may not exceed $650,000.

WEIL:\95471886\13\78787.0003

- In the event that notwithstanding these protections, the Debtors or Vantage Service Subsidiaries were not able to access either the JPM Account or Amex Account, the Debtors would be authorized to reimburse any employee (or provide funding to the Vantage Service Subsidiaries to reimburse any employee) as soon as reasonably practical after the employee incurred an expense on her or his own credit card or out of his or her own pocket due to the lack of access to the JPM Account or Amex Account.

105.    The foregoing protections that the Debtors seek permission to implement in connection with the Transitional Credit Card Program are not intended to be utilized all at one time.  Rather, the Debtors are seeking to have the flexibility they need to ensure that they can provide the necessary level of comfort to Vantage Parent, JPM, and Amex that those parties need to continue the Credit Card Program under the present circumstances.

### Transactions with the Vantage Service Subsidiaries

106.    As described above, the Vantage Service Subsidiaries, which are not obligors or guarantors under the Debtors' long-term debt obligations and therefore have not commenced their own chapter 11 cases, provide significant operational services for the Debtors, including the employment of two-thirds of the workforce utilized by the Debtors and the procurement of goods supplied to the Debtors.  In particular, VESI provides administrative support, such as personnel, payroll, purchasing goods and services for the Debtors' operating entities and retention services to the Debtors, and VIMCO Singapore serves as the management company for the enterprise, retaining employees and purchasing goods and services on behalf of the Debtors' operating entities, and managing a capital spares program for the Debtors' fleet. VIMCO Singapore is also party to certain valuable contracts. The Vantage Service Subsidiaries are thus critical components of the Debtors' business.

107.    Similarly, the Vantage Service Subsidiaries rely on their continued funding from the Debtors to continue serving the Debtors.  The relationship is one of mutual dependency.  The Vantage Service Subsidiaries send invoices to the Debtors monthly and are

49

generally reimbursed by the Debtors (at cost for goods procured and with a small premium for employee services provided), generally within 30 days after sending the invoice.  As of the Petition Date, the Debtors estimate that they owe approximately $3 million to VESI and approximately $10 million to VIMCO Singapore on account of goods and services provided to the Debtors prepetition.

108.    The Debtors maintain records of all of their intercompany transactions, including those with VESI and VIMCO Singapore and, therefore, can ascertain, trace, and account for their transactions with VESI and VIMCO Singapore.  Discontinuation of any intercompany transactions with VESI and VIMCO Singapore would hinder the provision of business-critical employees and/or goods to certain entities.  Simply put, without funding from the Debtors, VESI and VIMCO Singapore are unable to meet any of their obligations.  Given the critical importance of VESI's and VIMCO Singapore's creditors, primarily employees and third party goods and services providers, the failure to make the payments could disrupt the Debtors' everyday business operations.  Moreover, because VESI and VIMCO Singapore are wholly-owned subsidiaries of the Debtors, continuing to keep those entities financially secure inures to the benefit of the Debtors and their creditors.  Accordingly, the Debtors seek to pay prepetition amounts owed to VESI and VIMCO Singapore and to continue to fund the Vantage Service Subsidiaries.

**Bank Fees**

109.    In the ordinary course of their business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain service charges and other fees, costs, and expenses charged by the Banks (collectively, the "***Bank Fees***").  As a result of the Debtors' extensive need to use non-U.S. Bank Accounts in the ordinary course of their business, the Bank Fees currently average approximately $25,000 per month to the Debtors'

50

Banks.  To the extent the balance in the applicable Bank Account decreases below a threshold amount established by the applicable Bank, the Debtors may incur fees for sending and receiving wire transfers, clearing checks, automated clearinghouse transfers, and other transactions.

**The Relief Requested in the Cash Management Motion Is Necessary**

110.    The Debtors' business could not function if the Cash Management System were disrupted.  Accordingly, the Debtors seek authority to continue using the Cash Management System; implement ordinary-course changes to it as they may determine are beneficial to their estates; and implement changes to the Cash Management System that are required to move all such operations into the Debtors.

111.    The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors, including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, and reduce borrowing costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  The use of the Cash Management System has historically reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner.  Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtors' value.

112.    The Debtors will maintain all records of receipts, disbursements, and transfers within the Cash Management System, including postpetition intercompany transactions and any intercompany balances that existed as of the commencement of these Cases.  All transfers and transactions will be properly documented, and accurate intercompany balances will be maintained.

WEIL:\95471886\13\78787.0003

113.    In furtherance of the foregoing, the Debtors request that all Banks at which the Bank Accounts are maintained be authorized and directed to continue to administer such accounts as they were maintained prepetition, without interruption, and in the ordinary course of business.  The Banks in which Disbursement Accounts exist also should be authorized and directed to pay any and all drafts, wires, and ACH transfers issued on the Bank Accounts for payment of any claims arising on or after the Petition Date, or prior to the Petition Date to the extent such claims were approved by order of the Bankruptcy Court, in each case so long as sufficient funds are in these accounts.

114.    Establishment of the Transitional Credit Card Program is also necessary and appropriate.  The Debtors' workforce spans the world and works mainly offshore.  The Debtors cannot operate their business without funding the international travel and other work-related expenses of their employees.  Without even the ability to seek to use corporate credit cards, the Debtors' business would be significantly hampered during these Chapter 11 Cases.  Moreover, employees' use of corporate credit cards has historically fallen squarely within the Debtors' ordinary-course operations.  Establishing a program to transition such use in light of the Debtors' corporate reorganization would minimize the risk of business disruption and be a step toward restoring the Debtors to their ordinary-course business operations.  The requested provisions of the Transition Credit Card Program are designed to give the Debtors flexibility to agree to structures that are acceptable to both Vantage Parent and the credit card banks.  Moreover, the relief requested is limited in dollar amount to provide assurances to parties in interest that the Debtors will be judicious with their use of their credit cards, consistent with past practice.

115.    Moreover, continuation of the Transitional Credit Card Program is not very different from the Debtors incurring trade credit in the ordinary course. Even without the Credit Card Program, the Debtors are permitted to purchase the items purchased with the credit cards and incur trade credit to do so. As I am advised, the incurrence of such trade debt is permitted without court order. Here, the Debtors are simply using the credit cards to incur such trade debt out of administrative convenience. The relief they are seeking is simply to provide certain protections for other parties in light of the Debtors' corporate structure changes. No parties are prejudiced as a result and, in fact, stake holders are benefitted from minimizing the disruption to the Debtors' business.

116.    In these Chapter 11 Cases, strict enforcement of the U.S. Trustee's Operating Guidelines, as I understand them, with respect to the Cash Management System would severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. For example, if the Debtors were required to open new debtor-in-possession accounts and modify the Cash Management System accordingly, the Debtors would be forced to reconstruct the Cash Management System in its entirety. This simply would not be possible in an enterprise like the Debtors' business that requires multiple Bank Accounts all over the world. The Debtors' finance department, including accounting and bookkeeping employees, would need to focus their efforts on immediately opening new bank accounts and working to establish proper controls for cash to flow properly, thereby diverting them from their daily responsibilities during this critical juncture of the Debtors' Chapter 11 Cases. Many accounts could not be replaced in time to effectively continue the Debtors' business; even if they could, the opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash

management procedures, and instructing customers to redirect payments would negatively

impact the Debtors' ability to operate their business while establishing these new arrangements.

This would further exacerbate the risk to the Debtors' business caused by these Chapter 11 Cases

given their foreign customers and foreign suppliers who are unfamiliar with chapter 11 and may

not feel bound by the automatic stay and this Court's orders.[8]

117.    The Debtors should also be permitted to maintain their business forms.

The Debtors issue manual checks from time to time and use a variety of business forms in the

ordinary course of their business.  Changing this practice would increase the Debtors' expenses

and would risk unnecessarily confusing the Debtors' customers, suppliers, and employees.

Accordingly, the Debtors believe it is appropriate to continue to use all correspondence and other

business forms (including letterhead, purchase orders, invoices, and all other business forms) as

such forms were in existence prior to the commencement of these Chapter 11 Cases.  Further, in

light of the expense and delay attendant in ordering entirely new business forms, the Debtors

believe it is appropriate to use their existing correspondence and other business forms without

any reference to the Debtors' current status as debtors in possession.

118.    The Debtors believe that they do not require the Court's approval to

continue entering into and performing under the intercompany transactions.  The Debtors enter

into and perform under the intercompany transactions in the ordinary course of business.  The

intercompany transactions are not just a matter of routine in the Debtors' business: they are the

sorts of transactions that are common among many business enterprises that operate through

multiple affiliates.  Yet, precisely because of their routine nature, the intercompany transactions,

---

[8] This is further described in the *Motion of Debtors for an Order Enforcing the Protections of Sections 362, 365, 525, and 541(c) of the Bankruptcy Code Pursuant to Section 105 of the Bankruptcy Code*.

WEIL:\95471886\13\78787.0003

including the ability to fund the Nondebtor Service Entities that provide valuable goods and services (including employees) to the Debtors, are integral to the Debtors' ability to operate their business and successfully emerge from chapter 11.  Accordingly, out of an abundance of caution, the Debtors request express authority to engage in such transactions postpetition.

119.    In addition, the Debtors request a waiver of the requirements of section 345(b) of the Bankruptcy Code.  All or nearly all of the Debtors' banks holding significant balances are highly rated, nationally chartered banks subject to supervision by national banking regulators; the Debtors retain the right to close accounts with the Banks and establish new bank accounts as needed; the cost associated with satisfying the requirements of section 345(b) is needlessly burdensome to the Debtors and their estates; and the process of satisfying such requirements would lead to needless inefficiencies in the management of the Debtors' business. Furthermore, the unique international nature of the Debtors' business requires bank accounts in multiple exotic jurisdictions.  The benefits of an interim waiver would far outweigh any potential harm to the estates from noncompliance with section 345(b).  Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such a bond could be obtained at all).  Finally, the fact that these are prepackaged Chapter 11 Cases filed with the support of the Debtors' primary creditor groups further weighs in favor of granting the relief. The Debtors intend to be in chapter 11 only a short period of time, and the costs of disruption to the business by having to close dozens of accounts far outweighs the risks of the Debtors continuing to maintain their historic bank accounts for the short period of time they remain in chapter 11.  Accordingly, the Court should waive the requirements of section 345(b) in these Chapter 11 Cases.

WEIL:\95471886\13\78787.0003

**C.**     **Payment of General Unsecured Claims in the Ordinary Course**

120.     By this motion (the "***All Trade Motion***"), pursuant to sections 105(a), 362(d), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request interim and final authority to pay, in the ordinary course of business, allowed prepetition claims (collectively, the "***Trade Claims***") of general unsecured creditors that provide goods or services related to the Debtors' operations (collectively, the "***Trade Creditors***"), many of which are located in jurisdictions outside the United States (collectively, the "***Foreign Creditors***").  On an interim basis, the Debtors seek authorization to pay prepetition amounts owed to the Trade Creditors on account of the Trade Claims in an aggregate amount not to exceed $20,809,496. Contemporaneously with the filing of this Motion, the Debtors have filed certain other "first day" motions seeking authority to satisfy certain prepetition obligations to parties including, among others, employees, insurance providers, taxing authorities, and affiliates.  The relief requested in this Motion is not duplicative of the relief sought in such motions.

The Trade Creditors

121.     The Debtors are an international offshore drilling company operating a fleet of modern, high-specification drilling units.  The Debtors' principal business is to contract their drilling units, related equipment, and work crews to drill underwater oil and natural gas wells for customers.  The Debtors provide these services to major, national, and independent oil and natural gas companies, with a primary focus on international markets

122.     The Debtors' business is truly global: they operate in various different countries including the Republic of the Congo, Gabon, India, Indonesia, Luxembourg, Malaysia, Singapore, the Republic of South Korea, Thailand, the United Arab Emirates, and the United States; they are incorporated under the laws of numerous additional countries, including the

56

Cayman Islands, Cyprus, Hungary, the Netherlands, and Romania; and their key contracts are governed by the laws of still more foreign jurisdictions, such as England and France. The Debtors' global operations require the support of various suppliers of goods and services located in more than 50 different countries including those listed above.

123.    In the course of providing offshore drilling services, the Debtors operate and maintain highly-complex drilling units that conduct precise underwater operations in remote locations. The Trade Creditors provide the Debtors with the goods and services that facilitate those operations, such as parts, equipment, rig-to-shore transportation of personnel and supplies, shipping, warehousing, communications, catering, maintenance and repair services, financial and legal services, human resources, and safety inspections.

<u>The Trade Claims</u>

124.    The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business. For the 12 months prior to the Petition Date, the Debtors' average monthly payment to Trade Creditors was approximately $19 million, including $7.2 million per month in obligations to Foreign Creditors.

125.    The Debtors estimate that, as of the Petition Date, they owe a total of approximately $27.7 million on account of undisputed Trade Claims. The following table summarizes the types of Trade Claims held by the Trade Creditors and provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date, including estimates for the portion of such total coming due (i) within 21 days of the Petition Date and (ii) before a hearing granting relief on an final basis.[9]

---

[9] For the purpose of this calculation, the Debtors assume the final hearing on the Motion will be held January 8, 2015.

57

| Category | Description of Services Provided | Estimated Total Amount Outstanding as of Petition Date | Estimated Amount Due Within 21 Days | Estimated Amount Due Before Final Hearing |
|---|---|---|---|---|
| Operational | Includes domestic suppliers, service providers, and other vendors utilized in connection with the operation of the Debtors' drilling fleet and provision of related services. | $13,200,556 | $7,260,306 | $9,900,417 |
| Corporate G&A[10] | Includes domestic providers of support services for corporate and administrative functions such as information technology, human resources, legal, and accounting. | $1,792,122 | $985,667 | $1,344,092 |
| Foreign Creditors | Includes Trade Creditors located in jurisdictions outside the United States. | $10,011,975 | $5,506,586 | $7,508,981 |
| Freight and Customs | Includes domestic shippers, warehouseman, customs agents, and providers of similar services. | $2,741,341 | $1,507,738 | $2,056,006 |
| **Total:** | | $27,745,994 | $15,260,297 | $20,809,496 |

126.    The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business.  As of the Petition Date, the Debtors have over $150 million in cash on hand.  The Debtors' cash on hand and the cash generated by the Debtors' business will provide ample liquidity for payment of the Trade Claims and continued operation in the ordinary course during the administration of these chapter 11 cases.

127.    The goal of these prepackaged chapter 11 cases is to deleverage the Debtors' balance sheet with minimal interruption of their business operations.  Disruption of the Debtors' necessary goods and services could negatively impact the Debtors' performance of

---

[10] The Debtors intend to file a motion seeking authority to employ certain professionals (who are included herein as Trade Creditors) that provide ongoing administrative services in the ordinary course of business under section 327 of the Bankruptcy Code.  The relief requested in this Motion pertains solely to amounts owed to such professionals on account of services rendered before the Petition Date.

WEIL:\95471886\13\78787.0003

drilling services, which would harm their business by damaging market reputation and possibly leading to termination of customer contracts.  Accordingly, it is imperative that the Debtors maintain positive relationships with the suppliers of the goods and services essential to their business operations throughout the course of these chapter 11 cases.  The Debtors negotiated the terms of the Prepackaged Plan with this goal in mind:  under the Prepackaged Plan, the legal, equitable, and contractual rights of holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (each as defined in the Prepackaged Plan), which includes the Trade Claims, will be unaltered. Moreover, as more fully described in the DeClaire Declaration, the Prepackaged Plan is supported by a majority of creditors in the only creditor classes that are impaired under the Prepackaged Plan.  Accordingly, the relief requested in this Motion furthers the Debtors' overarching restructuring goals without prejudice to the Debtors' stakeholders.

Treatment of Trade Claims Under the Prepackaged Plan

128.     The goal of these prepackaged chapter 11 cases is to deleverage the Debtors' balance sheet with minimal interruption of their business operations.  Disruption of the Debtors' necessary goods and services could negatively impact the Debtors' performance of drilling services, which would harm their business by damaging market reputation and possibly leading to termination of customer contracts.  Accordingly, it is imperative that the Debtors maintain positive relationships with the suppliers of the goods and services essential to their business operations throughout the course of these chapter 11 cases.  The Debtors negotiated the terms of the Prepackaged Plan with this goal in mind:  under the Prepackaged Plan, the legal, equitable, and contractual rights of holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims (each as defined in the Prepackaged Plan), which includes the Trade Claims, will be unaltered.

59

Moreover, as more fully described in the DeClaire Declaration, the Prepackaged Plan is supported by a majority of creditors in the only creditor classes that are impaired under the Prepackaged Plan.  Accordingly, the relief requested in this Motion furthers the Debtors' overarching restructuring goals without prejudice to the Debtors' stakeholders.

<u>Payment of Trade Claims Warranted Under 363 of the Bankruptcy Code</u>

129.    I believe it is a sound exercise of the Debtors' business judgment to pay the Trade Claims as they become due in the ordinary course of business because doing so will avoid value-destructive business interruption.  The goods and services provided by Trade Creditors are necessary for the continued operation of the Debtors' business.  The Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in the Trade Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.  A Trade Creditor's nonperformance could materially disrupt the Debtors' own performance of drilling services under customer contracts and jeopardizes the continued viability of the Debtors' business, and these chapter 11 cases, ultimately to the detriment of the Debtors' stakeholders.

130.    In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs based on years of the Debtors' building relationships with such vendors, they are in the best position to provide goods and services on commercially reasonable terms.  Also, due to the international and highly-specialized nature of the Debtors' operations, certain Trade Creditors may be the only or preferred source from which the Debtors can procure essential goods and services.  Therefore, even if it were possible to obtain replacement goods and services, doing so would likely cause substantial delay and significant costs.  Further, the laws of the jurisdictions in which the Debtors operate often require certain

WEIL:\95471886\13\78787.0003

goods and services be provided by local vendors, further limiting the Debtors' options for obtaining essential goods and services.

131.    Delaying payments to the Trade Creditors could prevent the Debtors from obtaining goods and services that are essential to their continued performance under customer contracts.  In a worst case scenario, nonperformance may lead to termination of customer contracts, resulting in substantial damage to the Debtors' business and injuring the Debtors and their respective estates and creditors.  The relief requested in this Motion is necessary immediately, on an interim basis, to avoid irreparable harm to the Debtors, their estates, and their creditors.

132.    Authority to pay the Trade Claims as they come due will assist the smooth transition into and out of these chapter 11 cases and will ensure the Debtors' continued operation during the intervening period.  Moreover, no party in interest will be prejudiced by the relief requested herein because the Trade Claims are unimpaired under the Prepackaged Plan and will be paid in full upon the effective date of the Prepackaged Plan.  Thus, the relief requested herein seeks to alter only the timing, not the amount or priority, of such payments.

133.    Accordingly, I believe that paying the relatively modest amount of Trade Claims—roughly one percent (1%) of the total debt to be restructured in these chapter 11 cases—in the ordinary course is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' business were to be interrupted and, therefore, it is a sound exercise of the Debtors' business judgment.

### Certain Trade Claims Are Owed to Foreign Creditors

134.    The Debtors rely on parties located outside the United States for essential goods and services.  As a result, an aggregate amount of approximately $10 million, roughly

36%, of the Trade Claims are owed to Foreign Creditors that may lack minimum contacts with the United States and, therefore, may not be subject to the jurisdiction of this Court or provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations. Based on the Debtors' experience in the offshore drilling industry and their familiarity with the Foreign Creditors, the Debtors believe there is a significant risk that Foreign Creditors may consider themselves to be beyond the jurisdiction of this Court, disregard the automatic stay, and engage in conduct that is harmful to the Debtors' business operations unless paid in the ordinary course.  Further, such conduct would inevitably lead to litigation in foreign courts, resulting in additional and unnecessary expenses to the detriment of the Debtors, their estates, and their creditors.  These harms would be immediate and irreparable.  As discussed above, permitting the Debtors to pay the Trade Claims of Foreign Creditors as they become due will only alter the timing, not the amount or priority, of such payments, and will help preserve the value of the Debtors' estates by minimizing disruptions to their business operations.  Accordingly, payment of the Trade Claims of Foreign Creditors is a sound exercise of the Debtors' business judgment, is necessary to avoid irreparable harm to the Debtors' estates, is in the best interests of the Debtors and their respective estates and creditors, and is warranted under the circumstance.

Certain Trade Claims Are Pass-Through Costs

135.    Approximately $3.9 million of the Trade Claims owed to a particular Foreign Creditor ultimately pass through to (i.e., are reimbursed by) one of the Debtors' customers (the "***Pass-Through Trade Claims***").  In certain circumstances, the Debtors procure goods and services on behalf of their customers, and manage the logistics related to such goods and services; for example, performing the necessary diligence on the vendor, setting up appropriate service agreements with the vendor, and ensuring the vendor satisfies the

62

requirements for providing offshore drilling goods and services to the customer.  Instead of

billing the customer directly for such services, the vendor invoices the Debtors, who in turn pass

the cost on to their customer.

136.    The Pass-Through Trade Claims subject to this Motion were incurred in

connection with sourcing a vendor to install an intervention workover supply system at the

request of one of the Debtors' key customers.  Given the nature of the Pass-Through Trade

Claims, the amounts disbursed by the Debtors will be offset by associated receivables and, thus,

are not true liabilities of the Debtors' estate.  Accordingly, the Court should authorize the

Debtors to pay the Pass-Through Trade Claims in the ordinary course of business.

### *Certain Trade Claims Are Administrative Expenses*

137.    An aggregate amount of approximately $5.1 million, roughly 18%, of the

Trade Claims are entitled to the statutory priority for goods delivered to the Debtors in the

ordinary course of business within 20 days before the Petition Date.  It has been explained to me

that section 503(b)(9) of the Bankruptcy Code provides that such claims are administrative

expense claims against the applicable Debtor's estate.  It has been explained to me that, the

Debtors, therefore, are required to pay such claims in full to confirm a plan of reorganization.

Instead of paying such Trade Claims on the effective date of the Prepackaged Plan, the Debtors

seek authority to pay the Trade Claims during the pendency of these chapter 11 cases as they

become due.

138.    The Bankruptcy Code requires, and the Prepackaged Plan provides for,

payment in full of administrative expense claims on the effective date of the Prepackaged Plan,

or as soon as practicable thereafter.  Thus, payment of Trade Claims entitled to priority under

section 503(b)(9) under the Proposed Orders will effect only a change in the timing of such

WEIL:\95471886\13\78787.0003

payments, not the amounts or priority thereof.  Finally, authorizing the Debtors to pay Trade

Claims pursuant to the terms set forth herein should eliminate the burden on this Court and the

Debtors arising from numerous individual motions requesting payment on account of 503(b)(9)

claims.  Accordingly, I believe that payment of the Trade Claims as provided herein, is a sound

exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable

harm to the Debtors' estates, is in the best interests of the Debtors' and their respective estates

and creditors, and is warranted under the circumstances.

### Certain Trade Claims May Be Secured by Liens

139.    Certain Trade Claims are held by Trade Creditors that (i) provide

shipping, warehousing, and logistics services and supplies; (ii) repair and maintain the Debtors'

equipment and facilities; and/or (iii) lease facilities or equipment to the Debtors.  It has been

explained to me that such Trade Creditors may be entitled to assert liens against certain of the

Debtors' assets under various state, federal, international, or maritime laws.  These issues are

particularly acute in the context of international maritime operations like those of the Debtors.  It

has been explained to me that, under maritime law, if a Trade Creditor were owed for the

provision of "necessaries," it could potentially assert maritime liens against the Debtors' drilling

units and seek to attach and arrest these assets.  And once a vessel is arrested, it will be held in

custody until the order for attachment and arrest is vacated or security is posted from which the

maritime claim may be satisfied.  The arrest of one the Debtors' drilling units would cause a

substantial disruption in the Debtors' business operations and cause the Debtors' estates to incur

additional costs and expenses associated with maritime proceedings to release the vessel.

Moreover, it has been explained to me that, under section 363(e) of the Bankruptcy Code, Trade

Creditors with liens may be entitled to adequate protection of their liens, which may impose

additional costs on the Debtors' estates.

WEIL:\95471886\13\78787.0003

140.    Furthermore, under the Prepackaged Plan, Trade Claims supported by liens are "Other Secured Claim" that are unimpaired and will be paid in full on the effective date of the Prepackaged Plan.  Accordingly, I believe that payment of the Trade Claims as provided herein, is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, is in the best interests of the Debtors' and their respective estates and creditors, and is warranted under the circumstances.

**D.      Taxes**

141.    By this Motion (the "***Tax Motion***"), pursuant to sections 105(a), 363(b), 507(a)(8), and 541(d) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request (i) authority, but not direction, to satisfy all Taxes (as defined below) due and owing to various local, state, and foreign taxing authorities (collectively, the "***Taxing Authorities***")[11] that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) that the Court authorize and direct applicable banks and financial institutions (collectively, the "***Banks***") to receive, honor, process, and pay all checks issued or to be issued and electronic fund transfers requested or to be requested relating to the above.

**The Debtors' Prepetition Taxes**

**A.      State Income Taxes**

142.    In the ordinary course of business, the Debtors incur state income taxes as a result of their operations within the United States (the "***State Income Taxes***").  The Debtors

---

[11] I understand that the definition of "Taxing Authorities" includes, but is not limited to, those parties set forth on the Taxing Authority List (as defined herein).  The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

65

estimate that they will owe approximately $528,320 in State Income Taxes relating to periods prior to the Petition Date.  The Debtors do not request authority to pay any prepetition State Income Taxes under the Proposed Interim Order.

### B.    Franchise Taxes

143.    The Debtors are required to pay certain taxes assessed for the privilege of doing business within a particular jurisdiction (the "*Franchise Taxes*").  The Franchise Taxes are typically paid annually, in May, June, or July, to the applicable Taxing Authorities.  The Debtors estimate they will owe approximately $67,000 in prepetition Franchise Taxes.  The Debtors do not request authority to pay any prepetition Franchise Taxes under the Proposed Interim Order.

### C.    Property Taxes

144.    The Debtors own certain personal property in Harris County, Texas; Galveston County, Texas; Houma, Louisiana; and Jefferson Parish, Louisiana that are subject to local property taxes (the "*Property Taxes*").  The Property Taxes are assessed in estimated amounts at the beginning of the year, and the Debtors remit payments on such estimated amounts to (i) the Harris County Appraisal District and the Galveston County on an annual basis in January for the previous year and (ii) the Jefferson Parish and the Terrebonne Parish Sales Tax Fund on an annual basis in December for the previous year.  The Debtors estimate that they will owe approximately $105,600 in Property Taxes for calendar year 2015.  The Debtors do not request authority to pay any prepetition Property Taxes under the Proposed Interim Order.

### D.    Foreign Taxes

145.    All of the Debtors, other than Delaware Holdings and VDDI, are organized in jurisdictions outside of the United States (the "*Non-U.S. Debtors*") and withhold and incur certain business income taxes and value-added taxes (the "*Foreign Taxes*").  The Non-

U.S. Debtors are obligated to timely collect, withhold, incur, and remit the Foreign Taxes to

Taxing Authorities.  The Non-U.S. Debtors estimate that they will owe approximately

$11,503,735 in Foreign Taxes relating to periods prior to the Petition Date.  The Debtors request

authority to pay prepetition Foreign Taxes under the Proposed Interim Order in an amount not

exceeding $3,098,730.

### E.    Regulatory Assessments and Other Miscellaneous Taxes

146.    The Debtors incur, in the ordinary course of business, certain regulatory

assessments, permitting fees, licensing fees, levies, and other miscellaneous Taxes (collectively,

the "***Regulatory Assessments,*** and collectively with the State Income Taxes, the Franchise

Taxes, the Property Taxes, and the Foreign Taxes, the "***Taxes***").  The continued payment of

these Regulatory Assessments, including any such Taxes due and owing on account of

prepetition Regulatory Assessments, are crucial to the continued operation of the Debtors'

business.  The Debtors estimate that they will owe approximately $470,000 in Regulatory

Assessments relating to the periods prior to the Petition Date.  The Debtors do not request

authority to pay any prepetition Property Taxes under the Proposed Interim Order.

### F.    Taxes Amounts

147.    In summary, as of the Petition Date, the Debtors estimate that

approximately $528,320 in State Income Taxes, $67,000 in Franchise Taxes, $105,600 in

Property Taxes, $11,503,735 in Foreign Taxes, and $470,000 in Regulatory Assessments relating

to periods prior to the Petition Date will become due and owing to the Taxing Authorities after

the Petition Date.

148.    The amounts of the Taxes listed above are good faith estimates based on

the Debtors' books and records and remain subject to potential audits and other adjustments.  As

WEIL:\95471886\13\78787.0003

such, the Debtors also seek authorization to pay any prepetition Taxes due and owing following audit and review.

149.    Ample reasons exist to authorize the payment of the prepetition Taxes, including, among other things, that (i) the failure to pay the prepetition Taxes may interfere with the Debtors' continued operations and successful reorganization efforts, (ii) certain of the prepetition Taxes may not be property of the Debtors' estates, (iii) the failure to pay prepetition Property Taxes may increase the scope of secured and priority claims held by the applicable Taxing Authorities against the Debtors' estates, (iv) the payment of prepetition Taxes affects only the timing of payments as most, if not all, of the Taxes are afforded priority status under the Bankruptcy Code and even those Taxes that are not afforded such status will be paid in full pursuant to the terms of the Prepackaged Plan, and (v) payment of the prepetition Taxes is an exercise of the Debtors' sound business judgment.

### A.    Failure to Pay the Prepetition Taxes May Interfere with the Debtors' Continued Operations and Successful Reorganization Efforts

150.    The Debtors seek to pay the prepetition Taxes to, among other things, discourage the Taxing Authorities from taking actions that may interfere with the Debtors' continued business operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, asserting liens or seeking to lift the automatic stay, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.  Failure to satisfy the prepetition Taxes may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.

151.    I have been informed that, to the extent that any prepetition Taxes remain unpaid by the Debtors, the Debtors' officers and directors may be subject to lawsuits or criminal

WEIL:\95471886\13\78787.0003

prosecution during the pendency of these chapter 11 cases.  The dedicated and active

participation of the Debtors' directors, officers, and other employees is not only integral to the

Debtors' continued, uninterrupted operations, but also essential to the orderly administration of

these chapter 11 cases.  The threat of a lawsuit or criminal prosecution, and any ensuing liability,

would distract the Debtors and their personnel from important tasks, to the detriment of all

parties in interest.

152.    Further, with respect to the Foreign Taxes, foreign governmental

authorities may consider themselves to be beyond the jurisdiction of this Court or disregard the

automatic stay imposed pursuant to section 362 of the Bankruptcy Code, as it has been explained

to me.  Foreign governmental authorities that believe the automatic stay does not govern their

actions may exercise self-help (if permitted under local law), which may include, among other

things, taking control of the Debtors' businesses to sell them at auction.  Accordingly, the

proposed relief is in the best interests of the Debtors' estates.

**B.      Certain of the Prepetition Taxes May Not Be Property of the Debtors' Estates**

153.    Some of the prepetition Taxes, such as certain value-added taxes

comprising the Foreign Taxes, may constitute "trust fund" taxes, which the Debtors are required

to collect and/or hold in trust for payment to the Taxing Authorities.

**C.      Failure to Pay Prepetition Property Taxes May Increase the Scope of Secured and Priority Claims Held by the Taxing Authorities**

154.    Payment of prepetition Property Taxes is necessary for several reasons.

The Debtors' failure to pay the prepetition Property Taxes may increase the amount of secured

claims held by the Taxing Authorities against the Debtors' estates.  State and local taxing

authorities may assert liens against any personal property for which the prepetition Property

Taxes are due and owing.

WEIL:\95471886\13\78787.0003

**D.** **Paying the Prepetition Taxes Will Affect Only the Timing of Payments**

155.    As described above, the Debtors have solicited from certain of their creditors acceptance of the Prepackaged Plan prior to the Petition Date.  Under the Prepackaged Plan, the Taxes will be paid in full.  Moreover, I have been informed that most, if not all, of the Taxes described herein are afforded priority status pursuant to section 507(a)(8) of the Bankruptcy Code and such prepetition Taxes must be paid in full under any chapter 11 plan before any general unsecured obligations of the Debtors may be satisfied.  Accordingly, the proposed relief will affect only the timing of payment of the prepetition Taxes and will not prejudice the rights of any general unsecured creditor or other party in interest.  Therefore, the Court should grant the Debtors authority to pay the prepetition Taxes in the ordinary course.

**E.** **Payment of the Prepetition Taxes is an Exercise of the Debtors' Sound Business Judgment**

156.    I believe that payment of the prepetition Taxes is an exercise of sound business judgment and necessary to permit a successful reorganization, as the Debtors' satisfaction of the prepetition Taxes is necessary to avoid the obstacles to a smooth transition through these chapter 11 cases.  Significant disruptions of the Debtors' operations of the types described above threaten to irreparably impair the Debtors' ability to conduct a successful reorganization process and thereby maximize the value of the Debtors' estates for the benefit of creditors.

**E.** **Utilities**

157.    By this motion (the "**Utilities Motion**"), the Debtors request, pursuant to sections 105(a) and 366 of the Bankruptcy Code and Rules 6003 and 6004 of the Bankruptcy Rules, entry of interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment for postpetition Utility Services (as hereinafter defined); (ii) establishing

70

procedures for resolving objections by Utility Companies (as hereinafter defined) relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these chapter 11 cases or that a debt owed by the Debtors for Utility Services rendered before the Petition Date (as hereinafter defined) was not paid when due.

158.    To operate their business and manage their properties, the Debtors obtain telecommunications, waste disposal, water, gas, electricity, and other utility services (collectively, the "*Utility Services*") from a number of utility companies (collectively, the "*Utility Companies*").  A nonexclusive list of Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached as an exhibit to the proposed interim and final orders attached to the Utilities Motion.[12]

159.    Historically, the Debtors have a good payment record with the Utility Companies.  To the best of my knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.  Based on their monthly average for the twelve (12) months prior to the Petition Date, the Debtors estimate that their cost of Utility Services for the next thirty (30) days will be approximately $492,034.00.

160.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations and, therefore, the success of the Debtors' reorganization.  Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted.  The Debtors coordinate their complex global business through their

---

[12] The inclusion of any entity in, or omission of any entity from, the Utility Services List is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights and defenses with respect thereto.

headquarters in Houston, their office in Singapore, and their operations in numerous other countries.  Interruption of the Utility Services provided at these locations would disrupt the Debtors' ability to communicate with, and provide the necessary support to, their employees, vendors, customers, and various regulatory authorities.  Such interruption would negatively impact the Debtors' reorganization efforts and all parties in interest.

161.    I have been informed that the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner and I believe that the Debtors have sufficient funds to do so.  Nevertheless, to provide the Utility Companies with adequate assurance pursuant to sections 366(b) and 366(c) of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to two (2) weeks' payment for Utility Services, calculated using the historical average for such payments during the past twelve (12) months (the "***Adequate Assurance Deposit***") into a newly created segregated account for the benefit of the Utility Companies (the "***Utility Deposit Account***").  The Adequate Assurance Deposit may be adjusted by the Debtors if the Debtors terminate any of the Utility Services provided by a Utility Company, make other arrangements with certain Utility Companies for adequate assurance of payment, determine that an entity listed on the Utility Services List is not a utility company as defined by section 366 of the Bankruptcy Code, or supplement the Utility Services List to include additional Utility Companies.

162.    I have been informed that the Adequate Assurance Deposit will be placed into the Utility Deposit Account within twenty (20) days after the Petition Date.  Based on the foregoing, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $246,016.  The Adequate Assurance Deposit will be held by the Debtors in the Utility Deposit Account for the benefit of the Utility Companies on the Utility Services List

WEIL:\95471886\13\78787.0003

during the pendency of these chapter 11 cases; a Utility Company will be eligible to receive

payment from the Adequate Assurance Deposit in an amount equal to two (2) weeks of its Utility

Services.

163.    I believe that the relief requested will ensure the continuation of the

Debtors' business at this critical juncture as the Debtors transition into chapter 11.  I believe that

the relief requested also provides the Utility Companies with a fair and orderly procedure for

determining requests for additional adequate assurance, without which the Debtors could be

forced to address multiple requests by Utility Companies in a disorganized manner at a critical

period in these chapter 11 cases when the Debtors' efforts should be more productively focused

on restructuring their business for the benefit of all parties in interest.  I believe that a disruption

in the Debtors' Utility Services during this critical time will cause irreparable harm to the

Debtors' estates.  Consequently, I believe that granting the relief requested in the Utilities

Motion is in the best interests of the Debtors and their respective estates and creditors, and is

warranted under the circumstance.

## F.    **Insurance**

164.    By this motion (the "***Insurance Motion***"), the Debtors request, pursuant to

sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code: (i) authority to amend

certain Insurance Policies (as defined below); (ii) authority to continue all Insurance Programs

(as defined below) in accordance with the applicable Insurance Policies, including those to be

amended, and authority to perform with respect thereto; (iii) modification of the automatic stay

to the extent necessary to permit the Debtors' employees to proceed with any claims they may

have under the Workers' Compensation Program (as defined below); and (iv) related relief.  To

the best of my knowledge, the Debtors do not owe any prepetition amounts on account of any

Insurance Program.

### The Debtors' Insurance Programs in General

165.     In the ordinary course of their business, the Debtors participate in various insurance programs (each, an "**Insurance Program**") in accordance with their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**"), including: (i) a general coverage of workers' compensation and employer liability (the "**Workers' Compensation Program**"); (ii) a general coverage of the Debtors' jackups and drillships (the "**Rig Program**"); (iii) a coverage of the Debtors' general liability (the "**General Liability Program**"); (iv) a coverage of accelerated construction costs and war costs that exceed coverage under other Insurance Programs (the "**ACOC and Excess War Program**"); (v) a general coverage of commercial liability for Debtors' business operations in the United States, (the "**Business Owner Program**"); (vi) a coverage of excess war risks for the Tungsten Explorer (the "**Tungsten Reinsurance Program**"); (vii) a coverage of aviation-related liability (the "**Non-Owned Aviation Program**"); (viii) a coverage of general commercial liability for the Debtors' operations outside the United States (the "**Foreign Program**"); (ix) a general coverage of director and officer liability and indemnification (the "**D&O Program**"); (x) a coverage of director and officer liability and indemnification for liability in excess of the coverage provided under the D&O Program (the "**Allied Excess D&O Program**"); (xi) an additional coverage of director and officer liability and indemnification for non-U.S. subsidiaries in excess of the coverage provided under any other Insurance Program (the "**XL Excess D&O Program**"); and (xii) and other insurance relevant to their business.  A complete list of the Insurance Programs is attached hereto as **Exhibit C**.  The Debtors also retain an insurance broker.  The Insurance Programs and the role of the insurance broker are discussed in further detail below.

WEIL:\95471886\13\78787.0003

**Workers' Compensation Program**

166.    Under the laws of the U.S. states in which the Debtors operate, the Debtors must maintain workers' compensation insurance for their employees for claims arising from or related to employment by the Debtors.  The Insurance Carrier for the Workers' Compensation Program is Travelers Casualty & Surety Company ("***Travelers***").  The named insured under the Workers' Compensation Program is Vantage Energy Services, Inc.  The Workers' Compensation Program covers, with respect to the Debtors' U.S. operations and in accordance with applicable state law, (i) workers' compensation and (ii) employer liability for accident and disease.  The estimated annual premium for the Workers' Compensation Program is determined according to Travelers' manual of rules, classifications, rates, and rating plans. Travelers is entitled to conduct an audit following each coverage period to determine the final premium.  For the coverage period ending on November 5, 2016, the Debtors' annual premium for the Workers' Compensation Program is approximately $20,969, which has been paid in full for the current coverage period.  Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Workers' Compensation Program as of the Petition Date. However, under applicable workers' compensation laws, the Debtors may be obligated to pay all or part of a workers' compensation claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Although unlikely, it is possible that an event giving rise to an obligation of the Debtors to make such payment—for example, injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge.  Thus, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Workers' Compensation Program as of the Petition Date.  If the Debtors become aware of any such prepetition obligation, they will promptly notify this Court.

75

## The Rig Program

167.    The Insurance Carrier for the Rig Program is Lloyd's of London and

London Companies ("***Lloyd's***").  The named insured under the Rig Program is Vantage Drilling

Company, the ultimate parent of the Debtors ("***Vantage Parent***"), and the Debtors are additional

insureds.  The Rig Program covers: (i) physical damage to offshore drilling units, including hulls

and machinery, cargo, and other rig-related materials and supplies; (ii) builder's risks, as may be

agreed upon between the contract leader and agreement parties; (iii) war risks; (iv) loss of hire of

jackups and drillships due to casualties; (v) legal liability as drilling contractor for control of

wells, redrilling, restoration, seepage, and pollution costs; and (vi) liabilities in excess of the

amounts listed in the schedule of underlying assets.  The coverage period under the Rig Program

is November 5, 2015 through November 5, 2016.  The annual premium for the Rig Program is

approximately $6,162,578 paid in advance in quarterly installments—the most recent of which

was paid on November 9, 2015 in the amount of $1,540,644.46.  The next payment is due on

January 3, 2016.  Accordingly, to the best of the Debtors' knowledge, they do not owe any

amounts on account of the Rig Program as of the Petition Date.

## The General Liability Program

168.    The Insurance Carrier for the General Liability Program is

Assuranceforeningen SKULD (Gjensidig) and SKULD Mutual Protection & Indemnity

Association (Bermuda) Ltd. (together, "***SKULD***").  The named insured under the General

Liability Program is Vantage Parent, and the Debtors are additional insureds.  The General

Liability Program covers: (i) general protection and indemnity for liabilities, losses, costs, and

expenses; (ii) war and nuclear risks; and (iii) liabilities, losses, costs, and expenses in respect of

seepage, pollution, cleanup, and contamination.  The coverage period under the General Liability

Program is November 5, 2015 through November 5, 2016.  The annual premium for the General

76

Liability Program is approximately $1,447,427 paid in advance in three installments, the most

recent of which was paid on November 9, 2015 in the amount of $414,210.19.  The next

payment is due on February 28, 2016.  Accordingly, to the best of the Debtors' knowledge, they

do not owe any amounts on account of the General Liability Program as of the Petition Date.

### The ACOC and Excess War Program

169.    The Insurance Carrier for the ACOC and Excess War Program is Lloyd's.

The named insured under the ACOC and Excess War Program is Vantage Parent, and the

Debtors are additional insureds.  The ACOC and Excess War Program covers (i) accelerated cost

of construction for the jackups and the *Platinum*, *Titanium*, and *Tungsten Explorer* and

(ii) excess war costs for the jackups and the *Platinum*, *Titanium*, and *Tungsten Explorer*.  The

coverage period under the ACOC and Excess War Program is November 5, 2015 through

November 5, 2016.  The annual premium for the ACOC and Excess War Program is

approximately $552,252 paid in advance in quarterly installments, the most recent of which was

paid on November 9, 2015 in the amount of $138,813.18.  The next payment is due on January 3,

2016.  Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on

account of the ACOC and Excess War Program as of the Petition Date.

### The Business Owner Program

170.    The Insurance Carrier for the Business Owner Program is St. Paul Fire &

Marine Insurance Company through Travelers.  The named insured under the Business Owner

Program is Vantage Parent, and the Debtors are additional insureds.  The Business Owner

Program covers: (i) general damage to two properties located in Houston, Texas,[13] including

wind and hail damage; (ii) damage to contractor equipment; (iii) commercial general liability,

---

[13] The addresses of these properties are: (i) 777 Post Oak Boulevard, Suite 800, Houston, TX 77056 and (ii) 777 Post Oak Boulevard, Suite 730, Houston, TX 77056.

including products and completed work, personal injury, advertising injury, premises damage, and medical expenses; (iv) employee benefits; (v) umbrella excess liability, including products and completed work, personal injury, and advertising injury; and (vi) automobile liability and collisions, including hired and non-owned automobiles. The coverage period under the Business Owner Program is November 5, 2015 through November 5, 2016. The annual premium for the Business Owner Program is approximately $25,164, which has been paid in full for the current coverage period. Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Business Owner Program as of the Petition Date.

### The Tungsten Reinsurance Program

171.    The Insurance Carrier for the Tungsten Reinsurance Program is Assurances ET Reassurances Du Congo (A.R.C.) ("**ARC**"). The named insureds under the Tungsten Reinsurance Program are Vantage Parent and Vantage Drilling Africa. The Tungsten Reinsurance Program covers war risks in excess of the U.S. dollar equivalent to the proper value of the Tungsten Explorer, or the amount recoverable from the Tungsten Explorer's war risk underwriters, whichever is greater. The coverage period under the Tungsten Reinsurance Program is November 5, 2015 through November 5, 2016. The annual premium for the Tungsten Reinsurance Program is approximately $5,156, which has been paid in full for the current coverage period. Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Tungsten Reinsurance Program as of the Petition Date.

### The Non-Owned Aviation Program

172.    The Insurance Carrier for the Non-Owned Aviation Program is StarNet Insurance Company through Berkley Aviation, LLC. The named insureds under the Non-Owned Aviation Program are Vantage Energy Services, Inc. and Vantage Parent, and the Debtors are additional insureds. The Non-Owned Aviation Program covers: (i) medical payments;

(ii) personal effects liability; (iii) aviation premises liability; (iv) personal injury liability; and (v) Terrorism Risk Insurance Act liability.  The coverage period for the Non-Owned Aviation Program is February 20, 2015 through February 20, 2016.  The annual premium for the Non-Owned Aviation Program is approximately $5,848, which has been paid in full for the current coverage period.  Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Non-Owned Aviation Program as of the Petition Date.

## The Foreign Program

173.    The Insurance Carrier for the Foreign Program is ACE American Insurance Company ("**ACE**").  The named insured under the Foreign Program is Vantage Parent. It covers: (i) general commercial liability, including products and completed operations, personal and advertising injury, damage to rented premises, and medical expenses; (ii) contingent automobile liability; (iii) employee benefit liability; (iv) medical assistance services; (v) employer liability and maritime employer liability for bodily injury due to accident or disease; and (vi) benefits for voluntary compensation of an employee by the employer.  It applies worldwide except in the United States and its territories and possessions, Puerto Rico, Canada, and any country or jurisdiction which is the subject of trade or economic sanctions imposed by the laws or regulations of the United States.  The coverage period under the Foreign Program is April 4, 2015 through April 1, 2016.  The annual premium for the Foreign Program is approximately $136,014, which has been paid in full for the current coverage period. Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the Foreign Program as of the Petition Date.

## The D&O Program

174.    The D&O Program is insured by the Chubb Group of Insurance Companies ("**Chubb**") through Federal Insurance Company.  The named insured is Vantage

WEIL:\95471886\13\78787.0003

Parent, and the Debtors are additional insureds.  The D&O Program covers: (i) general liability

and indemnification for executives, (ii) securities claims for Vantage entities, and

(iii) investigative costs resulting from securityholder derivative demands.  The coverage period

under the D&O Program is June 26, 2014 through July 26, 2016.  The annual premium for the

D&O Program is approximately $650,000, which has been paid in full for the current coverage

period.  Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on

account of the D&O Program as of the Petition Date.

### The Allied Excess D&O Program

175.    The Allied Excess D&O Program is insured by Allied World National

Assurance Company ("*Allied*").  The named insured under the Allied Excess D&O Program is

Vantage Parent, and the Debtors are additional insureds.  The Allied Excess D&O Program

covers losses to directors and officers after exhaustion by payments of all applicable underlying

limits under the D&O Program.  The coverage period under the Allied Excess D&O Program is

June 26, 2014 to July 26, 2016.  The annual premium for the Allied Excess D&O Program is

approximately $150,000, which has been paid in full for the current coverage period.

Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of

the Allied Excess D&O Program as of the Petition Date.

### The XL Excess D&O Program

176.    The XL Excess D&O Program is insured by XL Specialty Insurance

Company ("*XL*").  The named insured under the XL Excess D&O Program is Vantage Parent,

and all Debtors that operate or are incorporated outside the United States are additional insureds.

The XL Excess D&O Program covers losses to directors and officers after exhaustion by

payment of all other of the applicable Debtors' Insurance Programs.  The coverage period under

the XL Excess D&O Program is June 26, 2014 through July 26, 2016.  The annual premium for

the XL Excess D&O Program is approximately $155,000, which has been paid in full for the current coverage period.  Accordingly, to the best of the Debtors' knowledge, they do not owe any amounts on account of the XL Excess D&O Program as of the Petition Date.

### Insurance Broker Services

177.    Lockton Companies LLC ("***Lockton***" or the "***Broker***") acts as insurance broker to the Debtors under all of their Insurance Programs.  As Broker, Lockton reviews policies and advises the Debtors with respect to the procurement and maintenance of their Insurance Programs.  The premiums remitted by Vantage Parent are inclusive of Broker's compensation; Lockton does not receive any separate fees on account of its broker services.

### Amendment and Performance of Certain Insurance Obligations

178.    As part of the Vantage enterprise's overall restructuring strategy, Vantage Parent expects to commence an official liquidation proceeding in the Cayman Islands.  I have been informed that the Debtors expect that, in accordance with Cayman law, an official liquidator will take control of Vantage Parent and oversee the winding up and eventual dissolution of Vantage Parent under court supervision.

179.    Vantage Parent is a named insured under all of the Debtors' Insurance Programs except the Workers' Compensation Program.  Some of the Insurance Policies for these Insurance Programs do not name the Debtors as additional insureds, but instead contain provisions stating that subsidiaries of the named insureds are additional insureds under the applicable Insurance Policy.  I have been informed that once the Debtors emerge from chapter 11, the Debtors will no longer be subsidiaries of Vantage Parent and therefore may not be covered under such Insurance Policies.

180.    Vantage Parent currently remits the premiums for all of the Debtors' Insurance Programs and engages the Broker with respect to these Insurance Programs.  Because

WEIL:\95471886\13\78787.0003

Vantage Parent is expected to be liquidated and dissolved, it will likely no longer be able to remit premiums for or engage the Broker with respect to the Insurance Programs.

181.    Thus, to ensure that all Debtors maintain uninterrupted insurance coverage under all of their Insurance Programs, the Debtors request authority to amend each Insurance Policy under which Vantage Parent is a named insured such that Offshore Group Investment Limited ("*OGIL*") will be added as a named insured under each such Insurance Policy. Importantly, they do not seek termination of coverage for any insured, including Vantage Parent, nor do they seek modification to the substance of any such Insurance Policy. Because they expect all insureds to retain all their existing benefits under the Insurance Programs, there will be no prejudice to any party in interest.

182.    As a result of these proposed amendments to the Insurance Policies, OGIL will be directly responsible for all obligations as provided under each Insurance Policy. Therefore, the Debtors further request that they be permitted to remit premiums in connection with all of the Debtors' Insurance Programs and take any other action necessary to perform thereunder.

183.    The proposed amendments to the Insurance Policies are supported by sound business reasons. If the proposed amendments to the Insurance Policies are not executed, the liquidation and dissolution of Vantage Parent in the Cayman Islands may cause coverage of the Debtors under the Insurance Policies to terminate. The nature of the Debtors' business makes it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under just one of the Insurance Programs could result in one or more of the Insurance Carriers terminating the Debtors' existing policies, declining to renew such policies, or refusing to enter into new

WEIL:\95471886\13\78787.0003

insurance agreements with the Debtors in the future.  If the Insurance Programs were allowed to

lapse or terminate, the Debtors could be exposed to significant liability for damages resulting to

persons and property of the Debtors and others, which exposure could have a materially adverse

impact on the Debtors' ability to successfully administer these chapter 11 cases.  Moreover, the

Debtors would be required to obtain replacement policies on an expedited basis at what likely

would be a significantly higher cost.

184.    For these reasons, the Debtors have determined, in their sound business

judgment, that amending the Insurance Programs is necessary for continued business operations

and is in the best interests of the Debtors and their respective estates and creditors.  Furthermore,

such amendments will not prejudice any party in interest, including Vantage Parent, because the

policies will continue to cover Vantage Parent until they expire.

185.    I have been informed that the Debtors' participation in the Insurance

Programs constitutes an ordinary-course business practice of the Debtors.  Moreover, I have been

informed that the Debtors are unaware of any prepetition amounts due under the Insurance

Programs.  However, there may be prepetition workers' compensation claims of which the

Debtors are currently unaware.  I have been informed that, out of an abundance of caution, the

Debtors seek authority pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code to

continue their Insurance Programs and honor any obligations with respect thereto, including

payment of valid prepetition workers' compensation claims.

186.    The Insurance Programs are also vital to the Debtors' continued

operations.  I have been informed that applicable state law mandates that certain Debtors

maintain workers' compensation coverage for their employees.  I am also informed that the

Debtors' failure to pay their obligations under the Workers' Compensation Program could

WEIL:\95471886\13\78787.0003

jeopardize their coverage and expose the Debtors to significant liability in fines by state workers'

compensation boards.  In addition, the risk that eligible workers' compensation claimants will

not receive timely payments for prepetition employment-related injuries could have a devastating

effect on the financial well-being and morale of not only those claimants, but also the Debtors'

active employees.  This could result in employee departures, causing a significant disruption in

the Debtors' business with a materially adverse impact on the Debtors' operations, the value of

their estates, and the interests of all parties in these chapter 11 cases.  Accordingly, I believe that

it is necessary and in all parties' interest for the Debtors to pay all obligations on account of their

Insurance Programs.

187.    As part of their cash management system, the Debtors maintain

disbursement accounts (collectively, the "***Disbursement Accounts***") at various banks and other

financial institutions (collectively, the "***Banks***").  In the ordinary course of business, the Debtors

draw upon funds in the Disbursement Accounts to satisfy their obligations under the Insurance

Programs (collectively, the "***Insurance Obligations***").  The Debtors request that the Court direct

the Banks to receive, process, honor, and pay, to the extent of funds on deposit, any and all

checks issued or to be issued and electronic funds transfers requested or to be requested by the

Debtors relating to the Insurance Obligations.  The Debtors also seek authority, but not direction,

to issue new postpetition checks or effect new postpetition electronic funds transfers in

replacement of any checks or transfer requests on account of the Insurance Obligations

dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

188.    As described herein and in the DeClaire Declaration, the Debtors are

legally and contractually required to maintain many of their Insurance Programs.  Continuation

of the Insurance Programs is vital to the preservation of the value of the Debtors' businesses,

properties, and assets.  In addition, the termination or nonrenewal of any of the Insurance

Programs as a result of the Debtors' failure to pay any Insurance Obligations could subject the

Debtors to substantial liability as well as a possible cessation of operations, to the detriment of

all parties in interest.  Furthermore, for the reasons described above, the relief requested in the

Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors.

Accordingly, I submit that payment of the Insurance Obligations is in the best interests of the

estates.

## G.    Employee Wages and Benefits

189.    By this motion (the "***Employee Wages and Benefits Motion***"), pursuant to

sections 105(a), 363(b), 503(c)(1), and 507 of title 11 of the Bankruptcy Code and Bankruptcy

Rules 6003 and 6004, the Debtors request authority to: (a) pay, in their sole discretion, all

obligations incurred, directly or indirectly, under or relating to the Debtors' Compensation

Obligations and Employee Benefit Plans (each as defined below), all related expenses, and all

fees and costs incident to the foregoing, including amounts owed to third-party administrators;

(b) maintain and continue to honor and pay, in their sole discretion, all amounts with respect to

the Debtors' business practices, programs, and policies for their employees as such were in effect

as of the commencement of these chapter 11 cases and as such may be modified or supplemented

from time to time in the ordinary course of business; and (c) pay, in their sole discretion, the

Debtors' Temporary Employees for their services.  The Debtors further request that the Court

direct financial institutions to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests related to such obligations.

### Overview of Employment and Compensation

190.    In the ordinary course of business, the Debtors rely on the services of

employed personnel (each, an "***Employee***") to conduct the operations of their business and incur

WEIL:\95471886\13\78787.0003

obligations to or on account of such Employees (collectively, "**Employee Obligations**").  There are approximately 580 Employees in the Debtors' corporate enterprise: approximately 190 Employees are employed by Debtor entities, and approximately 390 Employees are employed by two non-Debtor affiliates, Vantage International Management Company Pte. Ltd., a Singapore private company limited by shares ("**VIMCO Singapore**") and Vantage Energy Services, Inc., a Delaware corporation ("**VESI**" and together with VIMCO Singapore, the "**Nondebtor Service Entities**" and collectively, with the Debtors, the "**OGIL Employer Entities**").

191.    The Nondebtor Service Entities are wholly-owned by Debtor OGIL.  They are not obligors or guarantors under the Debtors' long-term debt obligations and therefore have not commenced their own chapter 11 cases.  Yet both Nondebtor Service Entities provide essential operational services to the Debtors—most notably, the employment of approximately two-thirds of the Debtors' workforce.  They are reimbursed by the Debtors on an arms' length basis for their costs of doing so.  Substantially all of the Nondebtor Service Entities' Employees provide services exclusively to the Debtors, and without continued reimbursement by the Debtors, the Nondebtor Service Entities do not have the funds to pay the Employees.  The obligations of the Nondebtor Service Entities to their Employees are, therefore, indirect obligations of the Debtors.  Further detail on the reimbursement arrangements between the Debtors and the Nondebtor Service Entities is set forth in the Debtors' cash management motion,[14] filed concurrently herewith (the "**Cash Management Motion**").  To be clear, it is the Cash Management Motion that seeks authority for all reimbursements to the Nondebtor Service

---

[14] *Motion of Debtors for (I) Interim  and Final Authority to (A) Continue Existing Cash Management System, (B) Maintain Business Forms and Existing Bank Accounts, and (C) Continue Intercompany Arrangements; (II) Waiver of the Requirements of Section 345(b) of the Bankruptcy Code Pursuant to Sections 105(a), 345(b), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004; and (III) Related Relief.*

WEIL:\95471886\13\78787.0003

Entities.  Such authority is not being sought pursuant to this Motion.  Nevertheless, information

on employee-related obligations of the Nondebtor Service Entities is included in this Motion for

informational purposes because it is integral to understanding the Debtors' employee-related

obligations. This information also provides additional support for the relief requested in the Cash

Management Motion.  This Motion generally identifies which obligations described herein relate

to the Debtors, as distinguished from the Nondebtor Service Entities.  Because the employee-

related obligations of the Debtors and the Nondebtor Service Entities are so intertwined,

however, the Debtors do not have deconsolidated numbers for Debtor and Nondebtor Service

Entities with respect to all obligations discussed herein, particularly the Employee Benefit plans.

192.     The vast majority of Employees provide operational services on the

Debtors' offshore jackups and drillships or air transportation to and from those locations.  The

remaining Employees provide a variety of management, administrative, and other support

services in Houston and Singapore.  The Employees work in international waters and on shore in

ten different countries, including the Republic of the Congo, Gabon, India, Indonesia,

Luxembourg, Malaysia, Singapore, South Korea, Thailand, the United Arab Emirates, and the

United States.  The Employees' skills and knowledge of the Debtors' business, infrastructure,

and operations are essential to the continued operation of the Debtors' business.  Without the

Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not

be possible.

193.     All of the Employees are employed on a full-time basis.  Of the 580

Employees, 515 are paid salaries (each, a "***Salaried Employee***"), another 51 Employees are paid

hourly wages (each, an "***Hourly Employee***"), and the remaining 14 Employees are paid on a

"day-rate" basis (each, a "***Day-Rate Employee***") such that they are paid only for the days on

which they actually work.  In addition to their standard hourly wage, Hourly Employees are entitled to overtime compensation, which varies based on the type of position held by the Employee.  The Nondebtor Service Entities maintain an annual summer intern program but presently do not employ any interns.

194.    Salaried Employees perform a wide variety of services for the Debtors, including drilling and other rig operations, mechanical and electrical repairs and maintenance, electronic technical services, accounting, marketing, safety training, engineering, logistics, tax and governmental compliance, and company management and administration.  Hourly Employees perform a similarly wide variety of services, including many of the same types of jobs as Salaried Employees.  The 14 Day-Rate Employees all perform project-specialist services in South Korea.

195.    The Debtors estimate that, as of the Petition Date, Employees are owed an aggregate of approximately $1,676,000 on account of Employee Obligations incurred prior to the Debtors' commencement of these chapter 11 cases, including $1,201,000 owed by the Debtors and $475,000 owed by the Nondebtor Service Entities.  Through the Proposed Interim Order, the Debtors are seeking authority to pay all of the Employee Obligations owed by the Debtors, as all such amounts will come due prior to the hearing on such order.  The specific types of Employee Obligations are described in further detail below.

A.    **Salaries, Wages, and Expense Reimbursements**

196.    In the ordinary course of business, the OGIL Employer Entities incur and pay obligations relating to Employees' salaries and wages, and for certain eligible Employees, coefficients, car allowances, travel allowances, market-related bonuses and other allowances such as overseas allowances (the "***Base Compensation Obligations***") and, for certain eligible Employees, annual performance bonuses (the "***Performance Bonus Obligations***" and

88

collectively with the Base Compensation Obligations and the Annual Wage Supplement (defined below), the "***Compensation Obligations***").  Base Compensation Obligations are paid on one of four different schedules: every two weeks; monthly; weekly on Tuesday; or weekly on Thursday.[15]  Depending on where they work, Employees are paid in United States dollars, United Arab Emirates dirhams, Indonesian rupiah, Indian rupees, Malaysian ringgits, Singapore dollars, Thai bahts, or Central African CFA francs.[16]  The Debtors estimate that, as of the Petition Date, Employees are owed approximately $210,000 by the Debtors and $405,000 by the Nondebtor Service Entities on account of Base Compensation Obligations.

197.    In the ordinary course of business, two Debtor OGIL Employer Entities based in Thailand and Malaysia are required by local law to pay all employees an Annual Wage Supplement (the "***Annual Wage Supplement***") in December, as part of the regular payroll.  The payment is not based on any performance metrics and only requires that the employee be employed at the time the payment is made.  The Debtor amount for 2015 is estimated to be $6,500, which the Debtors intend to pay in the ordinary course pursuant to applicable law.

198.    Employees of the OGIL Employer Entities are awarded a 5 year service award for achieving 5 full years of service with the Company.  No additional costs relating to this program are anticipated to become due and owing during these chapter 11 cases.

199.    The OGIL Employer Entities also pay Performance Bonus Obligations. Historically, these annual bonuses have been paid to all Employees in March of the following year, based on certain criteria described below, as long as the eligible employee was employed

---

[15] When Compensation Obligations are otherwise scheduled to be paid on a weekend or bank holiday, the Debtors pay such Compensation Obligations on the preceding business day.

[16] For purposes of this Motion, all amounts denominated in currencies other than United States dollars have been stated in their United States dollar equivalents.

WEIL:\95471886\13\78787.0003

by the OGIL Employer Entity at the time of the bonus payment and certain criteria are met.

Such bonus payments are governed by the Company's bonus policy, which reflects standard

industry practice.  Employees of the OGIL Employer Entities earn performance bonuses based

on the following criteria: (i) company financial performance, which incorporates metrics such as

earnings per share, EBITDA, and debt-to-equity ratio; (ii) safety performance, which

incorporates the applicable Total Recordable Injury Rate; (iii) strategic performance, which is

based on meeting specified Vantage goals; (iv) personal performance, which is based on meeting

specified individual goals, and (v) incentive rewards, which rewards Employees who bring

forward new initiatives that will help contribute to the growth and success of the Company.

          200.     This year, the Company has determined that it is prudent to pay such the

Performance Bonus Obligations to the Employees in the second half of December.  Employee

morale has been low since the drop in oil price has depressed the industry, causing a decreased

demand for the Debtors' drillships and necessitating some reductions of force.  There is a

concern that the chapter 11 filing will further negatively affect morale, at a time when it is

particularly important that Employees perform optimally.  Moreover, the amount of the

Performance Bonus Obligations per Employee will be less than prior years due to the Company's

poor financial performance based on industry conditions.  This payment is currently $1,786,268

million in Performance Bonus Obligations to 100 Employees (the "***Bonus Payments***") have

received internal approval to be paid.  Notably, however, substantially all of those Bonus

Payments relate to Employees the Nondebtor Service Entities ($1.68 million to 92 Employees).

The Nondebtor Service Entities intend to use cash in their own non-Debtor accounts to pay such

amounts and are not seeking reimbursement from the Debtors for such amounts.  The Debtors

are intending to pay 8 Employees total Performance Bonus Obligations of $105,758.

WEIL:\95471886\13\78787.0003

Importantly, neither the Debtors nor the Nondebtor Service Entities are proposing to pay bonuses in December to any insider of the Company.

201.    Finally, the OGIL Employer Entities have generally paid Employees long-term incentive compensation in the form of restricted stock in their ultimate parent, nondebtor Vantage Drilling Company ("***Vantage Parent***").  In light of the anticipated liquidation of Vantage Parent and the restructuring transactions contemplated in these chapter 11 cases, the Debtors have ceased their payment of long-term incentive compensation until further notice.

202.    The Debtors estimate that no Employee—whether employed by a Debtor or a Nondebtor Service Entity—is owed more than $12,475 on account of Compensation Obligations.  Accordingly, the full amount of the Compensation Obligations is entitled to priority under section 507(a)(4) of the Bankruptcy Code.

203.    To facilitate payment of certain of their Employee Obligations (including Compensation Obligations, Performance Bonus Obligations, Payroll Taxes, and certain other obligations), the Nondebtor Service Entities and Debtor Vantage Deepwater Drilling, Inc. ("***VDDI***") advance funds to affiliates of ADP, LLC ("***ADP***") as needed prior to each scheduled Employee payment (each, an "***ADP Advance***").  ADP then makes payments to Employees, Taxing Authorities (as defined below), and certain Employee benefits providers on behalf of the Debtors.  The Debtors pay ADP fees of approximately $3,500 per month in exchange for ADP's services (the "***ADP Service Fees***").  VIMCO Singapore does its own in-house payroll processing.

204.    In addition to the Compensation Obligations, Employees are entitled to the prepayment or reimbursement of certain expenses, such as travel and meal expenses, that they incur in performing their employment duties (collectively, the "***Expenses***").  Because Employees

91

have historically generally used either a corporate credit card or charge expenses directly to the

company's travel and logistics firm, Expense reimbursement is used relatively infrequently.

Although it is difficult to estimate a gross monthly average cost of Expense reimbursements, the

Debtors estimate, based on the last twelve months of payroll, that Expense reimbursements

average approximately $35,000 per month for the Debtors and $250,000 for the Nondebtor

Service Entities.  Because of the irregular nature of requests for Expense reimbursements (and

the fact that the Debtors do not have visibility into how much in Expenses has been incurred

until a request for reimbursement is submitted), it is very difficult for the Debtors to determine

the amount of unpaid Expenses at any given time.  Moreover due to the international nature of

the Debtors businesses, reimbursement amounts can vary dramatically.  Out of an abundance of

caution, the Debtors estimate roughly that as of the Petition Date, Employees are owed

approximately $100,000, or roughly three months unpaid Expenses, by the Debtors that the

Debtors intend to pay pursuant to the Proposed Interim Order.  Entities on account of Expenses

incurred prior to the Debtors' commencement of these chapter 11 cases (including Expenses for

which Employees have not yet requested reimbursement).[17]

### B.      Obligations Related to Payroll Taxes

205.    The OGIL Employer Entities are required by law to withhold from

Employees' salaries and wages certain amounts related to federal, state, and local income taxes,

social security taxes, Medicare taxes, and taxes imposed by the law (each, a "***Withholding Tax***")

and to remit any such withheld amounts to the appropriate taxing authorities (each, a "***Taxing***

***Authority***") according to schedules that the Taxing Authorities have established.  The OGIL

---

[17] As discussed in more detail in the Cash Management Motion, if the Debtors' corporate credit card program is no longer available to them, they may have to ask Employees to fund their own expenses and reimburse such Employees – at least until they are able to find a replacement program.  Request for such contingency planning is sought in the Cash Management Motion, not in this Motion.

WEIL:\95471886\13\78787.0003

Employer Entities have similar withholding obligations under the laws of the various foreign nations in which they operate.  In the ordinary course of their business, the OGIL Employer Entities comply with their obligations related to Withholding Taxes.  The OGIL Employer Entities are also required to make certain additional payments from their own funds in connection with the Withholding Taxes.  In the United States, these payments include matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance (collectively, the "***Contribution Taxes***"; together with the Withholding Taxes, the "***Payroll Taxes***").  The OGIL Employer Entities remit federal Contribution Taxes each payroll period and state Contribution Taxes at frequencies determined by the laws of Washington, D.C. and Texas.  The OGIL Employer Entities also have similar obligations under the laws of the foreign nations in which they operate.  The Debtors estimate that, on account of the Payroll Taxes, the OGIL Employer Entities withhold approximately $935,000 per month.

### C.    Garnishments

206.    In the ordinary course of processing payroll checks for the Employees, the Debtors and Nondebtor Service Entities may be required by law to withhold from certain Employees' wages amounts for garnishments including tax levies, child support, and court-ordered garnishments (collectively, "***Garnishments***").  The OGIL Employer Entities remit amounts withheld on account of Garnishments to the appropriate state, federal, or non-U.S. authorities.  On average, approximately $900 per month is withheld by the Debtors from Employees' salaries and wages on account of Garnishments.  The Debtors estimate that, as of the Petition Date, the Nondebtor Service Entities do not owe any amount on account of unremitted prepetition Garnishments.

93

## Overview of Employee Benefit Plans

207.    In the ordinary course of business, the OGIL Employer Entities make various benefit plans available to their Employees.  These benefit plans fall within the following categories: (i) paid time off, including sick days, vacation days, short-term disability pay, bereavement leave, jury duty leave, maternity and paternity leave, and military leave (together, the "***Employee Leave Benefits***"); (ii) medical, dental, vision, and Flexible Spending Accounts (as defined below) (together, the "***Health and Welfare Benefits***"); (iii) 401(k) plan benefits; (iv) severance benefits; and (v) relocation and certain other transportation benefits (each of (i)– (v), an "***Employee Benefit***").  Although the OGIL Employer Entities maintain certain of the Employee Benefit plans themselves, other Employee Benefit plans, such as the Health and Welfare Benefits, are maintained by third parties.  Because of the diversity of the Employees' nations of employment, nations of residence, compensation arrangements, and services performed, only certain Employees are eligible for and participate in each Employee Benefit plan.  The Employee Benefits are described in further detail below.

### A.    Employee Leave Benefits

208.    The Employee Leave Benefits are provided and administered by the OGIL Employer Entities.  Under the Employee Leave Benefits, eligible Employees accrue paid time off and related benefits as described below.

209.    <u>Vacation Days</u>.  Each eligible Employee receives a certain number of paid vacation days each calendar year based upon his or her position, nation of residence, and nation of employment.  Employees may use vacation days at their discretion.  Unused vacation days may be carried over from one year to the first quarter of the following year.  In the event an Employee is terminated, that Employee is reimbursed for accrued but unused vacation days at the Employee's base compensation rate, or as is legally required in the employment jurisdiction.

WEIL:\95471886\13\78787.0003

Similarly, an Employee who is terminated and who has used more vacation days than the Employee has accrued is obligated to reimburse the OGIL Employer Entity for such used but unaccrued vacation days at the Employee's base compensation rate, or as is legally required in the employment jurisdiction.

210. <u>Sick Days</u>. Eligible Employees are entitled to take up to three consecutive days off on uncertified paid leave on account of sickness ("***Sick Days***").  Employees who require more than three consecutive Sick Days per case must produce a medical certificate for each day of absence thereafter and are covered by the OGIL Employer Entities' Short-Term Disability plan (as defined below).

211. <u>Short-Term Disability</u>.  The OGIL Employer Entities also maintain two types of short-term disability policy for certain eligible Employees, Type 1 and Type 2.  Type 1 is for onshore office personnel.  These Employees will continue to be paid their full compensation and bonuses up to 182 days in any fifty-two week period ("***Short-Term Disability***").  This type of Leave may run concurrently with an Employee's Family and Medical Leave Act leave, and is intended to compensate Employees absent from work because of a temporary medical disability, which is defined to include extended leave for pregnancy and childbirth.  Type 2 Employees are not eligible for Sick Days.  These Employees are placed onto zero pay for the first fourteen days of absence then they are placed back on full compensation for the remainder of the Short Term Disability period.  Both Type 1 and Type 2 Short-Term Disability cover Base Compensation Obligations and Performance Bonus Obligations, for up to six months of absence.  If an Employee participates in any of the Health and Welfare Plans, the Employee's Short-Term Disability will have no effect on such participation.

95

212.     <u>Maternity and Paternity Leave</u>.  The OGIL Employer Entities provide twelve weeks of paid maternity leave beginning no later than four weeks after the birth of a child or adoption of a newborn child (unless legally required to provide more based on the jurisdiction of employment).  The OGIL Employer Entities provide five days of paid paternity leave within thirty days of such birth or adoption (unless legally required to pay more based on the jurisdiction of employment).

213.     <u>Compassionate Leave</u>.  The OGIL Employer Entities provide Employees with reasonable paid bereavement time in the event of a death within the Employee's immediate family.  Paid bereavement time is typically up to ten days but may be increased on an unpaid basis with employer approval.  Certain Employees are entitled to one flight home per bereavement.  Employees are also entitled to one day of paid leave to attend the funeral of anyone who is not an immediate family member; however, the OGIL Employer Entities do not provide travel arrangements for such situations.

214.     <u>Jury Duty Leave</u>.  Employees are entitled to paid leave for jury duty or responses to subpoenas.

215.     <u>Military Leave</u>.  Finally, the OGIL Employer Entities grant leaves of absence as required by law for Employees who serve in military forces.  The Debtors and Nondebtor Service Entities pay the difference between Employees' regular wages and military wages in accordance with legislative jurisdictions.  Additional military leave pay is generally handled on a case-by-case basis.

**B.     Employee Leave Benefits**

216.     The OGIL Employer Entities sponsor several Health and Welfare Benefits plans to provide benefits to eligible Employees.  The Health and Welfare Benefits include: medical, vision, and dental plans; flexible spending accounts; life insurance and accidental death

96

and dismemberment ("**AD&D**") insurance; and long-term disability benefits.  The Health and

Welfare Benefits are provided by third-party insurers—except for Debtor VD Malaysia, which is

self-insured—and operate as described below

217.    <u>Medical, Vision, and Dental Benefits</u>.  The OGIL Employer Entities

administer the following health benefits plans through various insurers to eligible Employees and

their families, including, among other things: medical, vision, and dental benefits:

| **Eligible Employees** | **Type of Benefits** | **Benefits Provider** |
|---|---|---|
| Certain Employees Who Live and Work in the United States | Medical | Blue Cross Blue Shield |
| | Dental | |
| | Vision | VSP |
| Certain Employees Who Live in the United States and Work Abroad | Vision | Aetna |
| Certain Employees Who Live in the United States and Work Abroad | Medical | Aetna |
| | Dental | |
| Certain Employees Who Live and Work Abroad | Medical | Bupa |
| | Dental | |
| | Vision | |
| Certain Employees Who Live in Singapore | Medical | AXA (VIMCO Singapore only) |
| Certain Employees Who Live and Work in India | Medical | Bajaj Allianz |
| Certain Employees Who Live and Work in the Republic of the Congo | Medical | Lscoma Sante |
| | Dental | |

WEIL:\95471886\13\78787.0003

218.    Several of the main benefits providers listed above (each, a "***Health Benefits Provider***") are preferred provider organizations (each, a "***PPO***") under which improved benefits are available when using a doctor, dentist, or other healthcare provider that is within the network of preferred providers.  Under most contracts between the OGIL Employer Entities and the Health Benefits Providers, the OGIL Employer Entities are required to pay an annual premium in exchange for the benefits provided to Employees who subscribe to the Health Benefits Provider.  Such premiums for Employee Health Benefits Provider coverage are funded entirely by the OGIL Employer Entities; no amounts are deducted from Employees' salaries or wages to fund Health Benefits Provider premiums.  However, the OGIL Employer Entities do not pay the full premiums for Employee dependents, which are instead partly subsidized by Employee contributions withheld from paychecks.  In the ordinary course of business, each Health Benefits Provider premium may vary as the number of Employees enrolled in the Health Benefits Provider plans changes and as the Health Benefits Provider administrators change their prices.

219.    Historically, Vantage Parent has always been the entity that has participated in plans with the Health Benefits Providers on behalf of its entire corporate enterprise.  As a result of the Debtors' corporate reorganization that began prepetition and remains ongoing, however, OGIL is replacing Vantage Parent in its former role, including with respect to the Health Benefits Providers.   To participate in plans with the Health Benefits Providers, Vantage Parent was required to pay annual premiums of approximately $9.3 million in aggregate on its own behalf and on behalf of its directly or indirectly owned subsidiaries, including the OGIL Employer Entities.  Of these total premiums, Vantage Parent has historically paid equal monthly installments of, on average, approximately $650,000 to most of the Health

98

Benefits Providers.  Vantage Parent historically paid quarterly installments of approximately $370,000 for one of the Health Benefit Providers and annual installments of approximately $50,000 for the remaining Health Benefits Providers.  All premiums to Health Benefit Providers are paid in advance.  The OGIL Employer Entities then reimburse Vantage Parent for their respective allocations of the costs of such premiums.  Because Vantage Parent will be liquidating, its arrangements with Health Benefits Providers are now being transferred to OGIL.  Because the obligations to their Health Benefit Providers are prepaid, the Debtors estimate that, as of the Petition Date, they do not owe any prepetition amounts on account of Health Benefit Providers premiums.  As described below, however, certain other obligations to Health Benefits Providers are paid in arrears or withheld from Employee paychecks.

220.    Flexible Spending Accounts.  The OGIL Employer Entities provide a Flexible Spending Account to eligible Employees through a program called Pay Flex.  Employees who subscribe to this plan may pay for eligible expenses, including health insurance premium contributions, out-of-pocket healthcare expenses, and dependent care expenses, using pretax dollars deducted from their paychecks (the "*Flexible Spending Account*").  The Flexible Spending Account allows Employee participants to contribute up to $2,550 per year of their pretax income through regular paycheck deductions ("*Employee Deductions*") in equal installments during the plan year.  Employee participants may claim reimbursement from such contributed amounts for their own eligible expenses or those of their dependent family members, and they may use up to an additional $5,000 per year for dependent care.  Employee participants may seek reimbursement of the entire amount of the agreed-upon annual contribution to the Flexible Spending Account at any time after the commencement of the plan year.  Employee participants forfeit any unused contributions after the expiration of the plan year (following a

99

short grace period).  Upon the termination of an Employee participant's employment, such

Employee may no longer obtain reimbursement from contributed amounts and forfeits any

unused contributed amount; however, if the reimbursed amount exceeds the amount then

contributed, the Employee has no obligation to contribute the balance to the Flexible Spending

Account.  Neither the Debtors nor the Nondebtor Service Entities have payment obligations

under the Flexible Spending Account; thus, the Debtors estimate that they do not owe any

amounts on account of the Flexible Spending Account as of the Petition Date.

221.  <u>COBRA</u>.  Under the Consolidated Omnibus Budget Reconciliation Act

("***COBRA***"), U.S. workers and their families who are terminated have the right to continue their

health benefits from their employer for a limited period of time and under certain circumstances.

COBRA benefits are provided to exiting U.S.-based Employees as required by law.  The cost is

borne by the exiting employee except for an administration charge of approximately $200 per

month, which has historically been remitted by Vantage Parent.

222.  <u>Life Insurance, AD&D Insurance, and Long-Term Disability</u>.  The OGIL

Employer Entities administer life insurance (the "***Life Insurance Plans***"), AD&D insurance (the

"***AD&D Insurance Plans***"), and long-term disability benefits (the "***Long-Term Disability

Plan***")[18]  to eligible Employees.  In each case, the OGIL Employer Entities fund 100% of the

plan's basic coverage costs.  Employees of the U.S. OGIL Employer Entities can elect

supplemental coverage for the Employee and/or family members under the Life Insurance and

AD&D Insurance Plans at their own expense.

**C.    401(k) Plan**

---

[18] This plan is in addition to the Debtors' and Nondebtor Service Entities' provision of Short-Term
Disability pay described above.

223.    The OGIL Employer Entities participate in a 401(k) plan for the benefit of certain eligible Employees (the "***401(k) Plan***").  The 401(k) Plan is provided and administered by Fidelity Investments with the assistance of the OGIL Employer Entities.  Each Employee participant may elect to contribute up to 100% of his or her salary and bonus to the 401(k) Plan, subject to limitations under applicable law.  The OGIL Employer Entities do not automatically withhold any wages as contributions to participating Employees' 401(k) Plans; contributions are entirely within the participating Employee's discretion (such discretionary contribution, a "***401(k) Contribution***").  The OGIL Employer Entities match up to $15,900 of each participating Employee's annual 401(k) Contributions for the Employee's benefit (collectively, "***Matching Contributions***").  Matching Contributions for VDDI and VESI Employees only are capped at 6% of the Employee's earnings.

224.    The Debtors estimate that Matching Contributions total approximately $30,000 each month for the Debtors and $26,000 each month for the Nondebtor Service Entities. Because all 401(k) Contributions made by participating Employees immediately vest each pay period, the Debtors estimate that they currently do not hold any amount in Matching Contributions.  Fidelity Investments directly charges the 401(k) Plan a monthly fee for the administrative services it performs, such as recordkeeping, accounting, trusteeship, reporting, and other similar services.  Neither the Debtors nor the Nondebtor Service Entities incur expenses for the administration of the 401(k) Plan.  All 401(k) Contributions and Matching Contributions, including the November 30, 2015 matching payment, have been fully funded. Accordingly, the Debtors estimate that, as of the Petition Date, neither they nor the Nondebtor Service Entities will owe any amounts on account of the 401(k) Plan.

WEIL:\95471886\13\78787.0003

D.      **Severance Plan**

225.    In the ordinary course of their business, the Debtors maintain an internally
administered severance plan for all Employees (the "***Severance Plan***").  In general, an Employee
is eligible for benefits under the Severance Plan if the Employee is terminated by an OGIL
Employer Entity as a result of a reduction in workforce or an elimination of the Employee's
position.  For most non-executive Employees, the amount of severance is generally one to three
months' notice or payment in lieu of notice, plus one additional month for each full year of
service but only to the extent that such calculation would provide additional months of severance
beyond the notice period.  For non-U.S. Employees, the entitlement to one to three months'
severance is generally a contractual obligation set forth in the offer of employment or subsequent
promotion letter if promoted after original hiring date.  For the U.S. non-executive Employees,
this obligation is generally not contractual, but is part of a generally understood corporate policy.
Under the Severance Plan, upon the occurrence of a qualifying termination event, the OGIL
Employer Entities, in their discretion, either provide notice of termination to the Employee while
the Employee works during the notice period or pay severance benefits in a lump sum, according
to the regular payroll schedule.  The Debtors expect that, as of the Petition Date, no Employees
terminated prepetition have any remaining unpaid severance benefits.  However, in light of
market conditions, the Debtors can provide no assurances that they will not have to undertake
further reductions in force.  As a result, the OGIL Employer Entities intend to continue the
existing Severance Plan postpetition.

E.      **Expat Benefits, Employee Relocation and Certain Transportation Benefits**

226.    The OGIL Employer Entities provide certain eligible Employees with
annual flights home (or an allowance to cover such travel), relocation benefits, moving services,
or moving stipends in accordance with company policy subject to change from time to time.  The

102

OGIL Employer Entities also provide rental property, hotel accommodations, or property allowances to certain eligible Employees.  Finally, the OGIL Employer Entities provide transportation allowances to certain eligible Employees.  The Debtors estimate that these relocation and transportation benefits cost in aggregate approximately $2.1 million per year for the Debtors.  The OGIL Employer Entities pay these expenses as they arise in the ordinary course of business and, as a result, believe that no amounts are owed on account of prepetition relocation or transportation benefits.

Temporary Employee Obligations

227.    In the ordinary course of business, and in addition to their Employees, the Debtors and the Nondebtor Service Entities presently rely on the services of approximately five individuals as temporary employment agency employees (each, a "***Temporary Employee***") to conduct their business operations.  OGIL Employer Entity Services contract with external employment agencies to hire Temporary Employees when it is efficient or cost-effective to do so.  The Temporary Employees are mostly highly specialized offshore drilling rig workers and are therefore an integral component of the Debtors' business.  There is also a small number of onshore support staff hired through such agencies from time to time as necessary.  The Debtors and Nondebtor Service Entities historically reimburse Vantage Parent and the Nondebtor Service Entities for the cost of paying these Temporary Employees in the ordinary course of business (the "***Temporary Employee Obligations***").  The Debtors estimate that, as of the Petition Date, they owe approximately $25,000 in Temporary Employee Obligations.

**Payment of the Employee Obligations and Temporary Employee
Obligations Is Essential to the Debtors' Successful Reorganization**

228.    The Employees and Temporary Employees are the most important part of the Debtors' business.  The Debtors cannot operate without them.  The value of the Debtors'

103

other assets would materially decline without the continued support of the Employees and

Temporary Employees.  Any delay in paying or failure to pay any of the Employee Obligations

or Temporary Employee Obligations could irreparably impair the morale of the Debtors'

workforce at the time when Employees' and Temporary Employees' dedication, confidence,

retention, and cooperation are most crucial.  It could also inflict a significant financial hardship

on Employees, Temporary Employees, and their families.  The Debtors cannot risk such a

substantial disruption to their business operations, and it is inequitable to put Employees and

Temporary Employees at risk of such hardship.

229.    Payment of the Employee Obligations and Temporary Employee

Obligations in the ordinary course of business would enable the Debtors to focus on completing

a successful reorganization, which would benefit all parties in interest.  Without this relief,

otherwise-loyal Employees and Temporary Employees may seek other work opportunities,

thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of

the Employee Obligations and Temporary Employee Obligations will enable the Debtors to

continue to operate their business in an economic and efficient manner without disruption.  The

total amount sought to be paid by this Motion is modest compared to the magnitude of the

Debtors' overall business and the importance of the Employees and Temporary Employees to the

value of the Debtors' estates.

230.    Reimbursement of Expenses is necessary because any other treatment of

Employees would be highly inequitable.  Employees who have incurred Expenses should not be

forced personally to bear the cost of the Expenses, especially because the Employees incurred

the Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and

with the understanding that they would be reimbursed for doing so.

WEIL:\95471886\13\78787.0003

231.    It has been explained to me that payment of Payroll Taxes would not prejudice other creditors because Payroll Taxes generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  In any event, Payroll Taxes that the Debtors withhold are held in trust for the Taxing Authorities.  The withheld funds are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

232.    Payment of administrative fees to the administrators of the Employee Benefit Plans is also necessary.  Without the continued service of these administrators, the Debtors will be unable to continue to honor their obligations to Employees under the Employee Benefit Plans in an efficient and cost-effective manner.  The Debtors do not seek to alter any of the Employee Benefit Plans.  This Motion requests only permission for the Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code and (ii) continue to honor practices, programs, and policies with respect to Employees as such were in effect before the Petition Date.

233.    I understand that, in these chapter 11 cases, all of the prepetition Employee Obligations constitute priority claims under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.  As of the Petition Date, the Debtors do not owe any single Employee or Temporary Employee an amount in excess of $12,475 or an amount that falls outside of the statutory priorities granted in sections 507(a)(4) and (a)(5), as they have been explained to me. As priority claims, the Employee Obligations must be paid in full before the Debtors may make distributions on account of their general unsecured obligations.  Moreover, because the Debtors intend to consummate the Plan, which pays all general unsecured creditors in full, the relief

WEIL:\95471886\13\78787.0003

requested herein will not prejudice the rights of general unsecured creditors or other parties in interest

234.    To the extent that any Employee or Temporary Employee is in fact owed any amount that either exceeds the statutory threshold or otherwise is not covered by sections 507(a)(4) or (a)(5), the payment of such amount is both necessary and appropriate to administer the Debtors' estates and may be authorized under section 363(b) of the Bankruptcy Code and section 105(a) of the Bankruptcy Code pursuant to the doctrine of necessity, as each of those has been explained to me.  The Debtors cannot operate their business without their Employees and Temporary Employees.  Failure to pay any amounts owed to Employees or Temporary Employees for work they have already performed would have be strongly detrimental to the morale of the Debtors' workforce and could cause a crisis of confidence among Employees and Temporary Employees.  The Debtors cannot be put at risk of such avoidable instability in their business—particularly where the Plan provides that all such claims will be paid in full.  Accordingly, the Court should authorize the Debtors to pay all amounts currently owed to their Employees and Temporary Employees.

235.    As part of their cash management system, the Debtors and Nondebtor Service Entities maintain disbursement accounts (collectively, the "***Disbursement Accounts***") at various banks and other financial institutions (collectively, the "***Banks***").  In the ordinary course of business, the Debtors and Nondebtor Service Entities draw upon funds in the Disbursement Accounts to satisfy Employee Obligations and Temporary Employee Obligations, to make ADP Advances, and to pay ADP Service Fees.  The Debtors request that the Court authorize and direct the Banks and any other applicable financial institutions to receive, process, honor, and pay all checks and electronic funds transfers ("***EFTs***") used to pay the Employee Obligations,

Temporary Employee Obligations, and ADP Service Fees and to make the ADP Advances,

whether requested or presented prior to, on, or after the Petition Date.  The Debtors also seek

authority to issue new postpetition checks and effect new postpetition EFTs on account of the

Employee Obligations, Temporary Employee Obligations, ADP Service Fees, and ADP

Advances to replace any prepetition checks or EFTs that may be dishonored or rejected as a

result of the commencement of these chapter 11 cases.  The Debtors have sufficient liquidity to

pay such amounts as they come due in the ordinary course of the Debtors' business.

## H.    Automatic Stay Enforcement

236.    By this motion (the "***Automatic Stay Motion***"), pursuant to section 105(a)

of title 11 of the Bankruptcy Code, the Debtors request entry of an order enforcing the

protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code to aid in the

administration of their chapter 11 cases and to alleviate any confusion regarding the effects of

these chapter 11 cases on the Debtors' business operations.  The Debtors' business is truly global

and their extensive dealings with foreign creditors and governmental authorities, many of which

are unfamiliar with the protections of the automatic stay imposed by section 362 of the

Bankruptcy Code, the invalidation of ipso facto clauses under section 365(e)(1) of the

Bankruptcy Code, the ipso facto conditions under section 541(c) of the Bankruptcy Code, and

the protections against discriminatory treatment contained in section 525 of the Bankruptcy

Code.

237.    I have been informed that the protections afforded by sections 362, 365,

525, and 541(c) of the Bankruptcy Code are self-executing and global; however, I believe that

not all parties affected or potentially affected by the commencement of a chapter 11 case are

aware of these statutory provisions or their significance and impact.  Consequently, I believe that

it is prudent to obtain an order of the bankruptcy court that confirms and reinforces the relevant

provisions of each section so the Debtors may advise such parties of the existence and effect of sections 362, 365, 525, and 541(c) of the Bankruptcy Code.

238.    I believe that the requested relief is particularly appropriate in the present cases because the Debtors operate in numerous countries with different legal systems, including the Republic of the Congo, Gabon, India, Indonesia, Luxembourg, Malaysia, Singapore, the Republic of South Korea, Thailand, the United Arab Emirates, and the United States.  In addition, the Debtors are incorporated under the laws of numerous additional countries, including the Cayman Islands, Cyprus, Hungary, the Netherlands, and Romania, and the Debtors' key contracts are governed by the laws of still more foreign jurisdictions, such as England and France.

239.    I believe that granting the requested relief, which the Debtors will be able to transmit to affected parties, will give effect to the protections under sections 362, 365, and 525 of the Bankruptcy Code by proactively confirming and clarifying the applicability and effect of these provisions in the form of an order that bears the imprimatur of a federal court and may be transmitted to third parties as necessary.

## I.    **Confirmation Hearing**

240.    Contemporaneously with the filing of the Petition, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith and (ii) confirmation of the Prepackaged Plan.  The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 3, 2015
        Houston, Texas

  _/s/ *Christopher G. DeClaire*_____
Christopher G. DeClaire

WEIL:\95471886\13\78787.0003

## Exhibit 1

## Corporate Structure



**<u>Exhibit 2</u>**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "***Agreement***"), dated as of December 1, 2015, is made by and among:

(i)    Vantage Drilling Company, a Cayman Islands exempted company ("***Vantage Parent***"), and each of its subsidiaries set forth in **Schedule A** hereto (each such subsidiary, a "***Vantage Debtor***" and, collectively with Vantage Parent, the "***Company***" or the "***Company Parties***"), including, without limitation, Offshore Group Investment Limited, a Cayman Islands exempted company ("***OGIL***") and Vantage Delaware Holdings, LLC, a Delaware limited liability company ("***Delaware Holdings***");

(ii)    The undersigned beneficial holders of loans under that certain Amended and Restated Term Loan Agreement, dated as of October 25, 2012 and amended and restated as of November 22, 2013, by and among OGIL and Delaware Holdings, as borrowers, each of the guarantors named therein, and the lenders party thereto (the "***2017 Term Loan***"), together with their respective successors and permitted assigns and any lender under the 2017 Term Loan that subsequently becomes party hereto in accordance with the terms hereof (collectively, the "***Consenting 2017 Term Loan Lenders***");

(iii)    The undersigned beneficial holders of loans under that certain Second Term Loan Agreement, dated as of March 28, 2013, by and among OGIL and Delaware Holdings, as borrowers, each of the guarantors named therein, and the lenders party thereto (the "***2019 Term Loan,***" together with the 2017 Term Loan, the "***Secured Term Loans***"), together with their respective successors and permitted assigns and any lender under the 2019 Term Loan that subsequently becomes party hereto in accordance with the terms hereof (collectively, the "***Consenting 2019 Term Loan Lenders***");

(iv)    The undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders, of the 7.5% Senior Secured First Lien Notes due 2019 issued by OGIL (the "***7.5% Secured Notes***"), together with their respective successors and permitted assigns and any holder of 7.5% Senior Secured Notes that subsequently becomes party hereto in accordance with the terms hereof (collectively, the "***Consenting 7.5% Noteholders***"); and

(v)    The undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders, of the 7.125% Senior Secured First Lien Notes due 2023 issued by OGIL (the "***7.125% Secured Notes***" and, together with the 7.5% Secured Notes, the "***Secured Notes***"), together with their respective successors and permitted assigns and any holder of 7.125% Secured Notes that becomes party hereto in accordance with the terms hereof (collectively, the "***Consenting 7.125% Noteholders***");

(vi)   Royal Bank of Canada, as administrative agent (the "***Revolver Agent***") under that certain Amended and Restated Credit Agreement, dated as of March 28, 2013, by and among OGIL and Vantage Parent, as borrowers, each of the guarantors party thereto, and the lenders party thereto (the "***Revolving Credit Facility***"); and

(vii)  The undersigned parties to whom obligations under the Revolving Credit Facility (including Letter of Credit Obligations) are owed, together with their respective successors and permitted assigns and any lender under the Revolving Credit Facility that subsequently becomes party hereto in accordance with the terms hereof (together with the Revolver Agent, the "***Consenting Revolver Lenders***").

The Consenting 2017 Term Loan Lenders, Consenting 2019 Term Loan Lenders, Consenting 7.5% Noteholders, and Consenting 7.125% Noteholders are collectively referred to herein as the "***Consenting Debtholders***." Each of the Company, the Consenting Debtholders, the Consenting Revolver Lenders and any subsequent person or entity ("***Person***") that becomes a party hereto in accordance with the terms hereof is referred to herein as a "***Party***" and collectively as the "***Parties***." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet annexed hereto as **Exhibit A** (including all exhibits thereto, the "***Term Sheet***").

For purposes of this Agreement, (i) the term "***Majority Consenting Debtholders***" means, as of any date of determination, those Consenting Debtholders holding a majority of the aggregate outstanding principal amount of the Secured Term Loans and Secured Notes held by all Consenting Debtholders, (ii) the term "***Majority Consenting Revolver Lenders***" means, as of any date of determination, those Consenting Revolver Lenders holding a majority of the aggregate outstanding obligations under the Revolving Credit Facility (including Letter of Credit Obligations), and (iii) the term "***Requisite Consenting Revolver Lenders***" means, as of any date of determination, Consenting Revolver Lenders that collectively constitute more than one-half of all lenders under the Revolving Credit Facility in number and collectively hold at least two-thirds of the aggregate outstanding obligations under the Revolving Credit Facility (including Letter of Credit Obligations).

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to undertake a financial restructuring of existing debt of the Company, to be implemented by (i) the Vantage Debtors commencing cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") to pursue a pre-packaged chapter 11 plan of reorganization (the "***Plan***") and (ii) Vantage Parent commencing an official liquidation proceeding under the laws of the Cayman Islands (the "***Cayman Proceeding***"), all in accordance with the terms set forth in this Agreement, the Term Sheet, and the Definitive Documents (as defined below) (the "***Restructuring***"); and

**WHEREAS**, in connection with the Restructuring, it is expected that certain of the Consenting Debtholders (the "***Backstop Parties***") will agree to backstop a rights offering for

2

$75,000,000 of new Senior Secured Second Lien Notes (the "***Rights Offering***") in accordance with the terms and conditions specified in this Agreement, the Term Sheet, and a backstop commitment agreement (the "***Backstop Agreement***") substantially in the form attached hereto as **Exhibit B**;

        **WHEREAS,** prior to the commencement of the Chapter 11 Cases, OGIL shall purchase at fair market value Vantage Parent's equity interests in Vantage International Management Company Pte. Ltd. and Vantage Energy Services, Inc. (collectively, the "***Vantage Service Subsidiaries***"). In exchange for the Vantage Service Subsidiaries, OGIL will issue a promissory note to Vantage Parent in an amount equal to the arm's length, fair market value of the Vantage Service Subsidiaries, as appraised by an independent third party that is acceptable to both Vantage Parent and OGIL (the "***Vantage Parent Secured Promissory Note***"). The Vantage Parent Secured Promissory Note will mature one year from the date of issuance of the note and will provide that, upon the effective date of the Plan (or a substantially similar plan of reorganization) (the "***Effective Date***"), such note will be paid in common shares of reorganized OGIL, using the plan value, as established by and set forth in the disclosure statement accompanying the Plan, of such shares to calculate the appropriate number of shares. If the Effective Date has not occurred by the maturity date, the Vantage Parent Secured Promissory Note will be payable in cash, subject to the Bankruptcy Code and without prejudice to the rights of the Consenting Debtholders and Consenting Revolver Lenders to object to such payment being made during the pendency of the Chapter 11 Cases. The Vantage Parent Secured Promissory Note will be secured by a first priority security interest in the Vantage Service Subsidiaries and will earn interest at a rate of 10% per annum. For purposes of this Agreement, the term "***Vantage Parent Transaction***" means the foregoing transaction.

        **WHEREAS**, the Company has obtained the agreement for the consensual use of "cash collateral" pursuant to the terms and conditions of an interim and final order to be entered by the Bankruptcy Court (each, a "***Cash Collateral Order***") substantially in the form of order attached hereto as **Exhibit C** (the "***Form of Cash Collateral Order***") or otherwise in form and substance mutually acceptable to the Company, the Majority Consenting Debtholders, and the Majority Consenting Revolver Lenders; and

        **WHEREAS**, the Company has requested that each Consenting Debtholder and each Consenting Revolver Lender sign this Agreement to support the Restructuring in the interests of all Parties.

        **NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company, each Consenting Debtholder and each Consenting Revolver Lender, on a several but not joint basis, agree as follows:

### AGREEMENT

        **Section 1.**    **Incorporation of the Exhibits**. The Term Sheet, the Backstop Agreement, and the Form of Cash Collateral Order (collectively, the "***Exhibits***") are expressly incorporated herein and made part of this Agreement. The general terms and conditions of the Restructuring are set forth in the Term Sheet; <u>provided</u> that the Term Sheet is supplemented by the terms and

3

conditions of this Agreement.  In the event of a conflict between any term or provision contained herein and a term or provision of the Exhibits, the applicable terms and provisions of this Agreement will govern and prevail.

Section 2.    **Definitive Documents**.  All (i) documents implementing, achieving, and relating to the Restructuring, including, without limitation, the Plan, a disclosure statement describing the Plan (the "***Disclosure Statement***"), the plan supplement and its exhibits, solicitation procedures, commitment agreements, exit financing agreements, collateral or other related documents, the Backstop Agreement, procedures related to the Rights Offering, organizational documents (including, without limitation, the organizational and governance documents for the reorganized Vantage Debtors), shareholder and member related agreements, the Vantage Secured Promissory Note and related security agreement and share purchase agreement, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Term Sheet and the exhibits thereto), (ii) motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Disclosure Statement, confirm the Plan, ratify the solicitation procedures, and schedule a joint hearing, and (iii) orders approving the Vantage Debtors' use of cash collateral, the Disclosure Statement, the solicitation procedures, the Plan, and scheduling of a joint hearing (items (i)–(iii), collectively, as amended, modified, or supplemented in accordance with this Agreement, the "***Definitive Documents***"), shall be consistent with this Agreement, the Term Sheet and the Form of Cash Collateral Order in all respects unless otherwise agreed in writing by Majority Consenting Debtholders and the Requisite Consenting Revolver Lenders, and with respect to the Definitive Documents described in items (i) and (iii) above, shall otherwise be in form and substance reasonably acceptable to the Majority Consenting Debtholders and Majority Consenting Revolver Lenders; provided that with respect to all corporate organizational Definitive Documents (including, without limitation, the organizational and governance documents for the reorganized Vantage Debtors), all Definitive Documents relating to the New Common Shares (including the Backstop Agreement and all other Rights Offering documents and shareholder and member related agreements), and all Definitive Documents related to the Vantage Secured Promissory Note (including any related security agreement and share purchase agreement), the Majority Consenting Revolver Lenders shall only have such consent right to terms (other than terms set forth in the term sheet describing the Amended and Restated Credit Facility attached as Exhibit 1 to the Term Sheet, the "***Amended and Restated Credit Facility Term Sheet***") that materially and adversely affect the Revolver Agent and/or Consenting Revolver Lenders.  The Consenting Debtholders and the Revolver Agent shall each have a right to review and consult with the Company with respect to those motions and pleadings described in item (ii) of the foregoing sentence.

Section 3.    **Restructuring and Related Support**.

3.01.    The Vantage Debtors' and Vantage Parent's Obligations.  For so long as this Agreement has not been validly terminated pursuant to the terms hereof, each Vantage Debtor covenants and agrees and, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent covenants and agrees:

(i)    to support and use commercially reasonable efforts to (a) pursue and complete the Restructuring and all transactions contemplated under this Agreement, including,

4

without limitation, those described in the Term Sheet (and, once filed, the Plan) in accordance with the deadlines specified in the milestones set forth in <u>Section 4</u> (collectively, as the same may be modified in accordance with the terms of this Agreement, the "***Milestones***"), (b) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet (and, once filed, the Plan), and (c) obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring;

   (ii)  to take no action, directly or indirectly, that is inconsistent with this Agreement, the Term Sheet, or the Plan, or that would unreasonably delay approvals of the Disclosure Statement, the Cash Collateral Order, the solicitation procedures, or confirmation or consummation of the Plan, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Restructuring (an "***Alternative Transaction***");

   (iii)  to not directly or indirectly (a) join in or support any Alternative Transaction, including, without limitation, express support in writing of, or enter into any form of restructuring support agreement with respect to, any Alternative Transaction, or (b) take any action to alter, delay, or impede approval of the Disclosure Statement and confirmation and consummation of the Plan and any related documents;

   (iv)  to take no action, directly or indirectly, or make any filing or commence any action directly or indirectly challenging the amount, scope, extent, validity, enforceability, perfection, priority of, or seeking avoidance of, the claims under the Revolving Credit Facility, Secured Term Loans and Secured Notes, or the liens securing such claims, or otherwise seeking to restrict the rights of lenders under, or holders of, as applicable, the Revolving Credit Facility, Secured Term Loans and Secured Notes;

   (v)  to the extent any legal, financial, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

   (vi)  to provide counsel for the Ad Hoc Committee (as defined herein) and counsel to the Revolver Agent with draft copies of all material pleadings, motions, or other documents to be filed by the Company in the Chapter 11 Cases and, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, in the Cayman Proceeding, including all "first day" motions, if reasonably practicable, at least two (2) calendar days prior to the date when the Company intends to file any such pleading, motion, or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and to consult in good faith with such counsel with respect to each such pleading, motion, or other document;

   (vii)  to provide counsel for the Ad Hoc Committee and counsel to the Revolver Agent with updates, as reasonably requested by such counsel, regarding any governmental, regulatory, or third party complaints, litigations, arbitrations, investigations, and

5

hearings; <u>provided</u>, however, that nothing herein shall require the Company to waive any privilege, including, without limitation, the attorney-client privilege, or confidentiality obligations;

(viii)    to notify counsel for the Ad Hoc Committee and counsel to the Revolver Agent of any discovery or determination made in accordance with <u>Section 7.02(g)</u> (including the facts thereof) within one (1) Business Day after the Company's knowledge of such discovery or determination; <u>provided</u>, however, that nothing herein shall require the Company to waive any privilege, including, without limitation, the attorney-client privilege, or confidentiality obligations;

(ix)    to pay all the reasonable and documented fees and expenses of (a) Milbank, Tweed, Hadley & McCloy LLP, as counsel to an *ad hoc* committee of holders of the Secured Term Loans and Secured Notes (the "***Ad Hoc Committee***"), (b) PJT Partners LP, as financial advisors to the Ad Hoc Committee, (c) Kobre & Kim LLP, as Cayman counsel to the Ad Hoc Committee, (d) Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel to the Ad Hoc Committee, and (e) any local, maritime, or foreign counsel to the Ad Hoc Committee; <u>provided</u> that the Company Parties shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; <u>provided</u>, <u>further</u>, that neither Vantage Parent, nor any Vantage Debtor, shall be responsible for any fees or expenses of any professional for the Ad Hoc Committee incurred pursuant to the last sentence of Section 9.02;

(x)    to pay all the reasonable and documented fees and expenses of (a) Latham & Watkins LLP, as counsel to the Revolver Agent, (b) any financial advisor(s) retained by or on behalf of the Revolver Agent, (c) Young Conaway Stargatt & Taylor, LLP, as Delaware counsel to the Revolver Agent, and (d) any local, maritime, or foreign counsel to the Revolver Agent; <u>provided</u> that the Company Parties shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; <u>provided</u>, <u>further</u>, that neither Vantage Parent, nor any Vantage Debtor, shall be responsible for any fees or expenses of any professional for the Revolver Agent incurred pursuant to the last sentence of Section 9.02, except to the extent required in the Revolving Credit Facility; and

(xi)    to not, nor encourage any other Person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring.

3.02.    <u>The Consenting Debtholders' and Consenting Revolver Lenders' Obligations</u>.  For so long as this Agreement has not been validly terminated pursuant to the terms hereof, each Consenting Debtholder and Consenting Revolver Lender (severally and not jointly) covenants and agrees to perform and comply with the following obligations:

(i)    each Consenting Debtholder and each Consenting Revolver Lender shall use commercially reasonable efforts to support the Plan and take any and all other actions in

6

connection with the Restructuring as reasonably requested by the Company to consummate or otherwise give effect to the Restructuring;

(ii)     each Consenting Debtholder and each Consenting Revolver Lender shall, subject to its receipt of the Disclosure Statement and any other solicitation materials with respect to the Plan, vote any claim it holds against the Company to accept the Plan by delivering a duly executed and completed ballot accepting the Plan on a timely basis during the solicitation of votes for the Plan;

(iii)     each Consenting Debtholder and each Consenting Revolver Lender shall not (a) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, (b) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or (c) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for the Company other than the Plan;

(iv)     each Consenting Debtholder and each Consenting Revolver Lender shall not, and shall not encourage any other Person to, take any action, directly or indirectly, that would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other action, directly or indirectly, that would, or would reasonably be expected to, interfere with the acceptance or implementation of the Restructuring;

(v)     each Consenting Debtholder and each Consenting Revolver Lender shall negotiate in good faith appropriate additional or alternative provisions to address any legal, financial, or structural impediment that may arise that would prevent, hinder, or delay the consummation of the Restructuring; and

(vi)     each Consenting Debtholder and each Consenting Revolver Lender hereby consents to the Vantage Debtors' use of cash collateral pursuant to the Cash Collateral Order.

3.03.    <u>Consent to Certain Actions</u>.    Each Consenting Debtholder and each Consenting Revolver Lender hereby consents to the purchase by OGIL of the Vantage Parent Assets, the issuance by OGIL of the Vantage Parent Secured Promissory Note and the granting by OGIL of first priority liens on and security interests in the Vantage Parent Assets to secure its obligations under the Vantage Parent Secured Promissory Note, in each case together with any related actions taken in the furtherance thereof.  In addition, (a) each Consenting Debtholder and each Consenting Revolver Lender hereby waives any requirement under or with respect to the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes for any liens on or security interests in the Vantage Parent Assets to be granted to secure the obligations, and hereby agrees that such assets shall not constitute collateral for any purpose, under the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes, respectively and (b) with respect to any Person that becomes a subsidiary of OGIL as a result of the purchase of the Vantage Parent Assets, each Consenting Debtholder and each Consenting Revolver Lender hereby waives any requirement under or with respect to the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes for such subsidiary to provide a guaranty or grant liens or security interests to secure the

7

obligations under the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes, respectively.  Notwithstanding anything to the contrary in any document governing the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes, the Consenting Debtholders and the Consenting Revolver Lenders hereby agree that none of the foregoing transactions and other actions, or the failure to provide such guaranty or grant such liens, shall for any purpose constitute a default, event of default, breach or other violation under or with respect to the Revolving Credit Facility, the Secured Term Loans, or the Secured Notes.  The Consenting Debtholders and the Consenting Revolver Lenders hereby agree to provide any further consent or take such other action as shall be reasonably necessary to effectuate the consents and agreements set forth in this Section 3.03.  The Consenting Debtholders and the Consenting Revolver Lenders agree that this Section 3.03 constitutes a direction to the applicable agents and/or trustees for the Revolving Credit Facility, the Secured Notes, and the Secured Term Loans, respectively, to take actions consistent with the foregoing or to refrain from taking actions inconsistent with the foregoing, including, if applicable, to rescind any acceleration of indebtedness (and the consequences thereof) inconsistent herewith.

3.04.    Forbearance.  As long as this Agreement has not been validly terminated pursuant to the terms hereof, each Consenting Debtholder and each Consenting Revolver Lender agrees to forbear from exercising, and not to enforce, directly or indirectly its rights or remedies (whether by accelerating, commencing legal action, foreclosing or realizing on collateral or otherwise) available under applicable law or under the applicable credit agreement, indenture, or any related documents with respect to their loans and notes resulting or arising from the matters and events listed on **Schedule B** hereto (including as a result of any failure to deliver notices or take other actions under the applicable credit agreement, indenture, or any related documents with respect to such matters and events and including any cross default arising with respect to any of the foregoing); provided, that the fact that a matter or event is listed on **Schedule B** shall in no way be deemed to be an acknowledgment that such matter or event is a default or an event of default under such applicable credit agreement, indenture, or any related documents.  Notwithstanding the foregoing, the Revolver Agent shall be permitted to charge and collect default interest to the extent set forth in the Cash Collateral Order.  The Consenting Debtholders and the Consenting Revolver Lenders agree that this Section 3.04 constitutes a direction to the applicable agents and/or trustees for the Revolving Credit Facility, the Secured Notes, and the Secured Term Loans, respectively, to refrain from exercising or enforcing any such right or remedy available or other power conferred to such agent or trustee under applicable law or under the applicable credit agreement, indenture, or any related documents and to rescind any acceleration of indebtedness (and the consequences thereof) inconsistent herewith.  For the avoidance of doubt, the forbearance set forth in this Section 3.04 shall not constitute a waiver with respect to any defaults or any events of default under the applicable credit agreement, indenture, or any related documents with respect to the Consenting Debtholders' and the Consenting Revolver Lenders' loans and notes, respectively.  Notwithstanding the terms of this Section 3.04, following the commencement of the Chapter 11 Cases, any or all of the Consenting Debtholders may, with the prior written consent of Vantage Parent, take any action that Vantage Parent and such Consenting Debtholders may deem to be necessary to cause the commencement of an official liquidation proceeding in the Cayman Islands for Vantage Parent.

3.05.    Transfer of Interests and Securities.  Except as expressly provided herein, for a period commencing as of the date any Consenting Debtholder or Consenting Revolver Lender

8

executes this Agreement until the valid termination of this Agreement pursuant to the terms hereof, each such Consenting Debtholder and Consenting Revolver Lender shall not directly or indirectly, encumber, sell, assign, grant an option with respect to, transfer, or otherwise dispose of (any of the foregoing, a "***Transfer***") any indebtedness or other claim under the Revolving Credit Facility, Secured Term Loans or Secured Notes, and any purported Transfer of any indebtedness or other claim under the Revolving Credit Facility, such Secured Term Loans or Secured Notes shall be void and without effect; provided, however, that such Transfer may be made if it otherwise complies with the requirements in the documents evidencing the Revolving Credit Facility, such Term Loan or Secured Note and either (a) the transferee is another Consenting Debtholder or Consenting Revolver Lender or (b) if the transferee is not another Consenting Debtholder or Consenting Revolver Lender, the transferee delivers to the Company, on or before the time of the proposed Transfer, a written agreement containing, among other things, the transferor, the amount and type of indebtedness or other claim transferred by the transferor and the principal amount and type of indebtedness or other claim held by such transferee (consistent with the signature pages hereto) and the following statement (the "***Transferee Acknowledgement***"):

> The undersigned ("***Transferee***") hereby acknowledges that it has received and reviewed a complete copy of the Restructuring Support Agreement, dated as of [•], 2015 (the "***Agreement***"), by and among the Company (as defined in the Agreement), Transferring Consenting Debtholder or Consenting Revolver Lender ("***Transferor***"), and certain other parties thereto, and agrees that, upon execution of this Joinder, it shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall have all the rights of, and be deemed, and is hereby admitted as, a "***Consenting Debtholder***" or a "***Consenting Revolver Lender***", as applicable, and "***Party***" for all purposes thereof, with all related rights and privileges.

This Agreement shall in no way be construed to preclude the Consenting Debtholders or the Consenting Revolver Lenders from acquiring additional indebtedness under the Revolving Credit Facility, Term Loans or Secured Notes; provided that (i) any Consenting Debtholder or Consenting Revolver Lender that acquires additional indebtedness under the Revolving Credit Facility, Term Loans or Secured Notes after executing this Agreement shall notify the Company of such acquisition within five (5) Business Days after the closing of such trade (which notice shall identify the seller and if such seller is a Consenting Debtholder or Consenting Revolver Lender) and (ii) any such acquired indebtedness under the Revolving Credit Facility, Term Loans or Secured Notes shall automatically and immediately upon acquisition by a Consenting Debtholder or Consenting Revolver Lender be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company of such acquisition.

Notwithstanding the foregoing, (i) a Consenting Debtholder or Consenting Revolver Lender may Transfer any claim to an entity that is acting in its capacity as a Qualified Marketmaker (as defined herein) (a "***Qualified Transfer***") without the requirement that the Qualified Marketmaker be or become a Consenting Debtholder or Consenting Revolver Lender, as applicable, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers such claim to a transferee that is a Consenting Debtholder or Consenting Revolver Lender (or becomes a Consenting Debtholder or Consenting Revolver Lender at the time of the Transfer pursuant to a

9

Transferee Acknowledgment) either (a) prior to the voting record date for the Plan (the "***Voting Record Date***"), if the Qualified Transfer is made prior to the Voting Record Date, or (b) after the Voting Record Date, if the Qualified Transfer is made after the Voting Record Date, and (ii) if a Consenting Debtholder or Consenting Revolver Lender, acting in its capacity as a Qualified Marketmaker, acquires a claim from a holder of claims that is not a Consenting Debtholder or Consenting Revolver Lender, as applicable, it may Transfer such claim without the requirement that the transferee be or become a Consenting Debtholder or Consenting Revolver Lender, as applicable. For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims and (b) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

### Section 4.    Milestones.

4.01.    The Vantage Debtors and, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent, will comply with the following Milestones within the periods specified herein, unless otherwise agreed in writing with the Majority Consenting Debtholders and, with respect to (a), (c), (f) and (g) below, Majority Consenting Revolver Lenders:

(a)    solicitation of the lenders under the 2017 Term Loan, the lenders under the 2019 Term Loan, the lenders under the Revolving Credit Facility, the holders of the 7.5% Secured Notes, and the holders of the 7.125% Secured Notes (such date, the "***Solicitation Commencement Date***") regarding the Plan shall begin on or before December 4, 2015;

(b)    the Vantage Parent Transaction shall be completed on or before the Petition Date (as defined herein);

(c)    each of the Vantage Debtors shall commence the Chapter 11 Cases by filing a voluntary petition in the Bankruptcy Court on or before ten (10) calendar days after the Solicitation Commencement Date (the "***Petition Date***");

(d)    the Vantage Debtors shall on the Petition Date file with the Bankruptcy Court the Plan and Disclosure Statement;

(e)    the Vantage Debtors shall on the Petition Date or within one (1) Business Day after the Petition Date file a motion with the Bankruptcy Court seeking interim and final approval of the Cash Collateral Order;

(f)    Vantage Parent and OGIL shall execute the Backstop Agreement within one (1) Business Day after the Petition Date; and

WEIL:\95456194\31\78787.0003

(g)     the Vantage Debtors shall file with the Bankruptcy Court a motion seeking approval of the Backstop Agreement and the procedures related to the Rights Offering within one (1) Business Day after the execution of the Backstop Agreement.

4.02.     The Vantage Debtors and, prior to the to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent, will use commercially reasonable efforts to cause the following Milestones to be met within the periods specified herein, unless otherwise agreed in writing with the Majority Consenting Debtholders:

(a)     the Cash Collateral Order shall have been entered by the Bankruptcy Court (i) on an interim basis no later than five (5) calendar days after the Petition Date, and (ii) on a final basis no later than sixty (60) calendar days after the Petition Date;

(b)     the order approving the Backstop Agreement and procedures with respect to the Rights Offering shall be entered by the Bankruptcy Court within thirty (30) calendar days after the Petition Date;

(c)     the order approving the Disclosure Statement and the solicitation procedures shall be shall be entered by the Bankruptcy Court within sixty (60) calendar days after the Petition Date;

(d)     the order confirming the Plan shall be entered by the Bankruptcy Court within sixty (60) calendar days after the Petition Date; and

(e)     the Effective Date shall occur within fifteen (15) calendar days after entry of the order confirming the Plan.

### Section 5.     **Representations and Warranties.**

5.01.     **The Company's Representations and Warranties**.  In order to induce the Consenting Debtholders and the Consenting Revolver Lenders to enter into and perform their obligations under this Agreement, the Company hereby represents, warrants, and acknowledges as follows:

(a)     *Authority*.  (i) The Company is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by the Company under this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of the Company and no other proceedings on the part of the Company is necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)     *Validity*.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding agreement of the Company, enforceable against the Company in accordance with its terms.

11

(c)    *No Conflict*.   The execution, delivery, and performance by the Company (when such performance is due) of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its charter, certificate of incorporation, bylaws, or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under its certificate of incorporation or by-laws (or other organizational documents) or any material contractual obligation to which it is a party; provided, however, that the filing of the Chapter 11 Cases and the commencement of negotiations with the Consenting Debtholders for the Restructuring may constitute a default under certain material contractual obligations of Vantage Parent and certain of its subsidiaries.

(d)    *Authorization of Governmental Authorities*.   No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Company of this Agreement; provided that the Restructuring shall be subject to approval by the Bankruptcy Court in the Chapter 11 Cases.

(e)    *No Reliance*.   The Company  (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any other party and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the Consenting Debtholders' and Consenting Revolver Lenders' express representations, warranties, and covenants in this Agreement, and has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

5.02.   The Consenting Debtholders' and Consenting Revolver Lenders' Representations and Warranties.   In order to induce the Company to enter into and perform their obligations under this Agreement, each Consenting Debtholder and each Consenting Revolver Lender, severally but not jointly, hereby represents, warrants, and acknowledges as follows:

(a)    *Authority*.   (i) The Consenting Debtholder or Consenting Revolver Lender, as applicable, is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all the requisite corporate, partnership, or other power and authority to execute, deliver, and perform its obligations under this Agreement, and to consummate the transactions contemplated herein; and (ii) the execution, delivery, and performance by the Consenting Debtholder or Consenting Revolver Lender, as applicable, of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action (corporate, partnership, or otherwise) on the part of the Consenting Debtholder or Consenting Revolver Lender, as applicable, and no other proceedings on the part of the Consenting Debtholder or Consenting Revolver Lender, as applicable, is necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    *Validity*.   This Agreement has been duly executed and delivered by the Consenting Debtholder or Consenting Revolver Lender, as applicable, and constitutes the legal, valid, and binding agreement of the Consenting Debtholder or Consenting Revolver Lender, as

applicable, enforceable against the Consenting Debtholder or Consenting Revolver Lender, as applicable, in accordance with its terms.

(c)     *No Conflict*.  The execution, delivery, and performance by the Consenting Debtholder or Consenting Revolver Lender, as applicable (when such performance is due), of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or bylaws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(d)     *Authorization of Governmental Authorities*.  No action by (including any authorization, consent, or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery, and performance by the Consenting Debtholder or Consenting Revolver Lender, as applicable, pursuant to this Agreement.

(e)     *Accredited Investor*.  The Consenting Debtholder or Consenting Revolver Lender, as applicable, and any holder for which any such person acts as investment adviser or manager, is an Accredited Investor (as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act).

(f)     *No Reliance*.  The Consenting Debtholder or Consenting Revolver Lender, as applicable,  (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon the Company or any officer, employee, agent, or representative thereof, and based on such information as the Consenting Debtholder or Consenting Revolver Lender, as applicable, has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Consenting Debtholder or Consenting Revolver Lender, as applicable, has relied upon the Company's express representations, warranties, and covenants in this Agreement, and the Consenting Debtholder or Consenting Revolver Lender, as applicable, acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

(g)     *Relevant Securities.*  The Consenting Debtholder or Consenting Revolver Lender, as applicable, is the beneficial owner and/or the investment adviser or manager of discretionary accounts for the holders or beneficial owners of, or otherwise has the power to control or has investment authority over, the aggregate principal amount of the Secured Notes, Secured Term Loans, or the Revolving Credit Facility, as the case may be, set forth on its signature page hereto (the "***Relevant Securities***"), with the power to vote and dispose of all of the aggregate principal amount of the Relevant Securities on behalf of such holders or beneficial owners.

(h)     *Not Public Securities.*  The Consenting Debtholder or Consenting Revolver Lender, as applicable, acknowledge that they are hereby advised by the Vantage Debtors that (i) the offer and sale of the New Securities has not been, and will not be, registered under the Securities Act; and (ii) the offering and issuance of the New Securities is intended to be exempt from

13

registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

        5.03.    <u>Further Assurances</u>.  From and after the date hereof, each of the Parties agrees to execute and deliver all such agreements, instruments, and documents and to take all such further actions as the Parties may reasonably deem necessary from time to time to carry out the intent and purpose of this Agreement and the Restructuring, and to consummate the transactions contemplated thereby.  The Consenting Debtholders and the Consenting Revolver Lenders agree that the agreements set forth herein, including in this <u>Section 5.03,</u> constitute a direction to the applicable agents and/or trustees for the Revolving Credit Facility, the Secured Notes, and the Secured Term Loans, respectively, to take necessary or appropriate actions to carry out the intent and purpose of this Agreement and the Restructuring, and to consummate the transactions contemplated thereby.

        **Section 6.**    <u>**No Waiver of Participation and Reservation of Rights and Ratification of Liability**</u>.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Debtholder or Consenting Revolver Lender or the ability of each Consenting Debtholder and Consenting Revolver Lender to protect and preserve its rights, remedies, and interests, including its claims against the Company, or its full participation in the Chapter 11 Cases or the Cayman Proceeding, including with respect to any matters covered by this Agreement.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason (other than pursuant to <u>Section 7.01(d)</u>), each Party fully reserves each and all of its rights.

        **Section 7.**    <u>**Termination**</u>.

        7.01.    <u>Automatic Termination</u>.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of any of the following events (each such event in this <u>Section 7.01</u>, along with the events described in <u>Section 7.02</u>, <u>Section 7.03</u>, and <u>Section 7.04</u>, each a "***Termination Event***"):

        (a)    an order denying confirmation of the Plan is entered;

        (b)    an order confirming the Plan is reversed or vacated;

        (c)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

        (d)    the occurrence of the Effective Date.

        7.02.    <u>Consenting Debtholder and Consenting Revolver Lender Termination Events</u>.  The Majority Consenting Debtholders may terminate this Agreement on five (5) calendar days' prior written notice (the "<u>Notice Period</u>"), delivered in accordance with <u>Section 9.12</u>, upon the occurrence and during the continuance of any of the events enumerated in this <u>Section 7.02</u>. The Requisite Consenting Revolver Lenders may terminate this Agreement in accordance with the Notice Period, delivered in accordance with <u>Section 9.12</u>, (i) upon the occurrence and during the continuance of any of the events enumerated in <u>Sections 7.02(b)-(d), (f), (j), (p), (q), (r)</u> (solely with

14

respect to cash collateral, the Plan and the Disclosure Statement), <u>(u), and (x)-(y)</u>, or (ii) upon the occurrence and during the continuance of any of the events enumerated in any of the other subparagraphs of this <u>Section 7.02</u>, solely in the event, in the case of this sub-clause (ii), that such event or events materially and adversely affect the Consenting Revolver Lenders.

(a)    the breach in any material respect by the Company of any of the obligations, undertakings, representations, warranties, or covenants of the Company set forth in this Agreement which remains uncured during the Notice Period;

(b)    if the Definitive Documents and any amendments, modifications, or supplements thereto (other than Section 10.7(b) of the Plan) do not comply with <u>Section 2</u> or <u>Section 8</u> of this Agreement, as applicable, provided that such Definitive Documents or amendments, modifications or supplements thereto were not modified to be consistent with <u>Section 2</u> or <u>Section 8</u>, as applicable, or withdrawn during the Notice Period;

(c)    if the Vantage Debtors or, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent have (i) withdrawn the Plan, (ii) publicly announced their intention not to support the Plan or the Restructuring, (iii) filed a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction, or (iv) agreed (including, for the avoidance of doubt, as evidenced by a term sheet, letter of intent, or similar document) or publicly announced its intent to pursue an Alternative Transaction;

(d)    if, prior to the Effective Date, any of the Vantage Debtors seeks to sell any material assets without the consent of the Majority Consenting Debtholders and Majority Consenting Revolver Lenders;

(e)    if, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent seeks to sell any material assets without the consent of the Majority Consenting Debtholders;

(f)    if the Vantage Debtors or, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent, fails to meet a Milestone, which has not been waived or extended consistent with <u>Section 4</u> hereof, except to the extent such failure was caused by a default of a Consenting Debtholder of its obligations hereunder; <u>provided</u>, <u>however</u>, that the Requisite Consenting Revolver Lenders may not terminate this Agreement pursuant to this subsection for the failure to meet the Milestones in <u>Section 4.01(b), (f) and (g)</u> or <u>Section 4.02</u>;

(g)    if, prior to the Effective Date, (i) the Company or any governmental authority (which, for the avoidance of doubt, includes the Department of Justice and the Securities and Exchange Commission) determines that the Company has violated any laws in connection with the contracting for the Titanium Explorer, (ii) the Company or any governmental authority determines that Hamylton Padilha, Hsin-Chi Su (a/k/a Nobu Su), or any other individual was acting on behalf of or upon the instruction from the Company in connection with the alleged bribes paid in connection with the contracting for the Titanium Explorer, or (iii) the Company or any

15

governmental authority discovers any evidence of wrongdoing by the Company's employees, officers, or directors in connection with the contracting for the Titanium Explorer;

(h)    if, prior to the Effective Date, any of the Vantage Debtors enters into any material contractual obligations or any material settlements without the consent of the Majority Consenting Debtholders;

(i)    if, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent enters into any material contractual obligations or any material settlements without the consent of the Majority Consenting Debtholders;

(j)    if, prior to the Effective Date, any material contract of a Vantage Debtor (i) is validly terminated for reasons other than the insolvency of Vantage Parent or any Vantage Debtor or the commencement of the Cayman Proceeding or any case under chapter 11 of the Bankruptcy Code, (ii) there is material non-performance by any Vantage Debtor, (iii) there is a breach of any such contract by any Vantage Debtor (other than as a result of the commencement of the Chapter 11 Cases or the Cayman Proceeding), (iv) the Bankruptcy Court enters an order rejecting any such contract, or (v) a court or arbitration panel determines by final order or adjudication that a non-Vantage Debtor counterparty no longer has any obligation to perform or otherwise pay damages under any material contract;

(k)    upon the filing by the Vantage Debtors of any motion or other request for relief seeking to (i) voluntarily dismiss any of the Chapter 11 Cases, (ii) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appoint a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(l)    if, prior to the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding, Vantage Parent files a motion to dismiss or otherwise withdraw the Cayman Proceeding without the consent of the Majority Consenting Debtholders;

(m)    upon the entry of an order by the Bankruptcy Court, which order is not subject to a stay of its effectiveness pending appeal, appointing a trustee or examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(n)    if any Vantage Debtor loses the exclusive right to file and/or solicit acceptance of a chapter 11 plan;

(o)    if the Backstop Agreement is terminated in accordance with its terms;

(p)    upon the entry of an order by the Bankruptcy Court, which order is not subject to a stay of its effectiveness pending appeal, (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (c) the effect of which would render the Plan incapable of consummation on the terms set forth herein;

16

(q)     upon an Event of Default or Termination Event under the Cash Collateral Order;

(r)     if any of the orders approving the use of cash collateral, the Backstop Agreement, the Rights Offering procedures, the Plan, or the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Majority Consenting Debtholders and Majority Consenting Revolver Lenders;

(s)     if the Vantage Debtors file any motion, application, or adversary proceeding challenging the amount, scope, extent, validity, enforceability, perfection, priority of, or seeking avoidance of, the claims under the Revolving Credit Facility, Secured Term Loans and Secured Notes, or the liens securing such claims or any other cause of action against and/or seeking to restrict the rights of the holders of the Secured Term Loans, Secured Notes or Revolving Credit Facility in their capacity as such, either directly or through the respective agents or indenture trustees (or if the Vantage Debtors support any such motion, application, or adversary proceeding commenced by any third party or consent to the standing of any such third party);

(t)     if any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, setting aside, declaring void, unwinding, making illegal, or otherwise preventing or prohibiting the Restructuring, the Vantage Parent Transaction, the consummation of the transactions contemplated in the Term Sheet, or any of the Definitive Documents;

(u)     if the Bankruptcy Court shall have issued an order, which order is not subject to a stay of its effectiveness pending appeal, setting aside, declaring void, unwinding, making illegal, or otherwise preventing or prohibiting the Restructuring;

(v)     if the Vantage Parent Secured Promissory Note is transferred, assigned, amended, or modified without the consent of the Majority Consenting Debtholders;

(w)     if there is an Event of Default under the Vantage Parent Secured Promissory Note;

(x)     the Vantage Debtors make any payment under the Vantage Parent Secured Promissory Note other than a payment of the "Share Consideration"; or

(y)     in the event that the Effective Date shall not have occurred within one hundred twenty (120) days after the Petition Date.

Notwithstanding anything to the contrary herein, the Consenting Debtholders shall not have any termination rights based on any action or inaction by Vantage Parent after the making of a winding up order and the appointment of official liquidators in the Cayman Proceeding.

7.03.    Company Termination Events.  The Company may terminate this Agreement on five (5) calendar days' prior written notice, delivered in accordance with Section 9.12, upon the occurrence of the following events:

17

(a)    a breach by any Consenting Debtholder or Consenting Revolver Lender of any of its obligations under this Agreement that would reasonably be expected to have a material adverse impact on confirmation or consummation of the Restructuring, provided that such breach may be cured during the five-day notice period;

(b)    the Board of Directors of Vantage Parent or OGIL (on behalf of the Company and each of its respective boards or members or managers) determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law;

(c)    if the Backstop Parties have not executed the Backstop Agreement within one (1) Business Day after the Petition Date;

(d)    if the Backstop Agreement is terminated in accordance with its terms (except to the extent such termination was caused by a default of Vantage Parent or OGIL of its obligations thereunder);

(e)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order enjoining or otherwise prohibiting the consummation of the Restructuring; or

(f)    one hundred twenty (120) days after the Petition Date (provided that the failure of the occurrence of the Effective Date was not based on any action or inaction by any Vantage Debtor).

provided, that upon a termination of this Agreement pursuant to Section 7.03(b) all obligations of each Consenting Debtholder hereunder shall immediately terminate without further action or notice by such Consenting Debtholder.

Notwithstanding anything to the contrary herein, the Company shall not have any termination rights based on any action or inaction by Vantage Parent after commencement of the Cayman Proceeding or a liquidator appointed in the Cayman Proceeding or any event or occurrence or order of the court in the Cayman Proceeding.

For the avoidance of doubt, and notwithstanding any provisions to the contrary herein but subject to the remainder of this paragraph, in order to fulfill the Company Parties' fiduciary obligations, the Vantage Debtors and, prior to the confirmation of the Plan, Vantage Parent, may receive (but not directly or indirectly solicit) proposals or offers for Alternative Transactions from other parties and negotiate, provide due diligence, discuss, and/or analyze such Alternative Transactions received without breaching or terminating this Agreement; provided that the Company shall provide a copy (subject to redaction with respect to the identity of such other party, to the extent required in writing by the proponent of such offer) of any written offer or proposal (and notice of any oral offer or proposal) for an Alternative Transaction received to the legal counsel and the financial advisors for the Ad Hoc Committee and counsel to the Revolver Agent within two (2) Business Days after the Company Parties' or their advisors' receipt of such offer or proposal.

18

7.04.   Mutual Termination.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual agreement among the Company, the Majority Consenting Debtholders and the Requisite Consenting Revolver Lenders.  Majority Consenting Debtholders may terminate this Agreement, effective immediately upon sending notice thereof to the other parties hereto, upon the termination of this Agreement in accordance with Section 7.02 by the Requisite Consenting Revolver Lenders. Requisite Consenting Revolver Lenders may terminate this Agreement, effective immediately upon sending notice thereof to the other parties hereto, upon the termination of this Agreement in accordance with Section 7.02 by the Majority Consenting Debtholders.

7.05.   Effect of Termination.  Subject to Section 9.08, upon termination of this Agreement other than pursuant to Section 7.01(d), each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement and any and all consents and ballots tendered by the Consenting Debtholders and Consenting Revolver Lenders prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise, and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission), and the Company shall not oppose any such change or resubmission; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.  Notwithstanding the foregoing, upon termination of this Agreement by only either the Majority Consenting Debtholders or the Requisite Consenting Revolver Lenders (but not both) in accordance with Section 7.02, then this Agreement shall remain in full force and effect between the Company and the non-terminating group until termination in accordance with its terms.

7.06.   Automatic Stay.  The Parties acknowledge that after the Petition Date it shall not be a violation of the automatic stay provisions set forth in section 362 of the Bankruptcy Code, to the extent applicable, to deliver a notice of termination of this Agreement pursuant to its terms; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 8.    Effectiveness; Amendments**.  This Agreement shall become effective and binding upon each Party that has executed and delivered counterpart signature pages hereto; provided that signature pages executed by Consenting Debtholders and Consenting Revolver Lenders shall be delivered to (i) other Consenting Debtholders and Consenting Revolver Lenders in a redacted form that removes such Consenting Debtholders' holdings of the Secured Term Loans and/or Secured Notes and such Consenting Revolver Lenders' holdings of the Revolving Credit Facility and (ii) the Company, the advisers to the Company, and advisers to the Consenting Debtholders and Consenting Revolver Lenders in an unredacted form; provided, further, that the Company, the advisers to the Company, and the advisers to the Consenting Debtholders and Consenting Revolver Lenders shall not disclose the unredacted signature pages and shall keep such unredacted signature pages in strict confidence, except as may be required by law. If such disclosure is required by law, the Company shall provide each Consenting Debtholder and Consenting Revolver Lender with advanced notice of the intent to disclose and shall afford each Consenting Debtholder and Consenting Revolver Lender a reasonable opportunity to (i) seek a

19

protective order or other appropriate remedy or (ii) review and comment upon any such disclosure prior to the Company making such disclosure.

Once effective, this Agreement, including the Term Sheet, may only be modified, amended, or supplemented (except as expressly provided herein or therein) as follows: (A) any modification, amendment, or change to the definition of Majority Consenting Debtholders shall require the written approval of the Company and each of the Consenting Debtholders, (B) any modification, amendment, or change to the definitions of Requisite Consenting Revolver Lenders and/or Majority Consenting Revolver Lenders shall require the written approval of the Company and Requisite Consenting Revolver Lenders, (C) any waiver, change, modification, or amendment to this Agreement that affects the Consenting Debtholders shall require the written approval of the Company and the Majority Consenting Debtholders, (D) any waiver, change, modification, or amendment to this Agreement that adversely affects the Consenting Revolver Lenders shall require the written approval of the Company and the Majority Consenting Revolver Lenders; provided that any waiver, change, modification or amendment to the Amended and Restated Credit Facility Term Sheet shall require the written approval of the Company and the Requisite Consenting Revolver Lenders, and (E) without limitation of sub-sections (A), (B), (C), and (D), any other waiver, change, modification, or amendment to this Agreement not expressly enumerated in sub-sections (A), (B), (C), or (D) shall require the written approval of the Company and the Majority Consenting Debtholders. To the extent that a signatory to this Agreement holds, as of the date hereof or thereafter, multiple claims against the Company, such Party shall be deemed to have executed this Agreement in its capacity as a holder of all such claims, and this Agreement shall apply severally to such Party with respect to each such claim held by such Party; provided, however, that the foregoing provision shall not apply to the Consenting Revolver Lenders.

**Section 9.**     **Miscellaneous**.

9.01.    Specific Performance. This Agreement is intended as a binding commitment enforceable in accordance with its terms. Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach would result in damages that would be difficult to determine with certainty. It is understood and agreed that money damages would not be a sufficient remedy for any such breach of this Agreement, and that any non-breaching Party shall be entitled to obtain specific performance and injunctive relief as remedies for any such breach, and each Party further agrees to waive, and to cause each of their representatives to waive, any requirement for the securing or posting of any bond in connection with requesting such remedy. Such remedies shall not be deemed to be the exclusive remedies for the breach of this Agreement by any Party or its representatives. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

9.02.    Confidentiality.     The Parties understand and acknowledge that this Agreement and the Term Sheet will be disclosed as an exhibit to the Disclosure Statement and will also be filed with the Bankruptcy Court, provided that in such disclosure the executed signature pages to this Agreement shall be redacted and no individual holdings information shall be included,

20

except as may be required by law.  The Company shall not disclose to any Person the amount or percentage of claims held by any individual Consenting Debtholder, except as may be required by law.  If in either case such disclosure is required by law, the Company shall provide each Consenting Debtholder and Consenting Revolver Lender with advanced notice of the intent to disclose and shall afford each Consenting Debtholder and Consenting Revolver Lender a reasonable opportunity to (i) seek a protective order or other appropriate remedy or (ii) review and comment upon any such disclosure prior to the Company making such disclosure.

   9.03. <u>Complete Agreement</u>.  This Agreement (including exhibits) and the other documents and instruments referenced herein constitute the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the Parties with respect to the subject matter of this Agreement, other than for any confidentiality agreement.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party on the date hereof or thereafter.  Notwithstanding the foregoing, any confidentiality agreement executed by a Consenting Debtholder and the Company, and any reimbursement agreement or fee letter between counsel to any Consenting Debtholder or Consenting Revolver Lender and the Company, shall survive this Agreement and shall remain in full force and effect in accordance with its terms.

   9.04. <u>Parties</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other Person except as provided in <u>Section 3.05</u>.  Nothing in this Agreement, express or implied, shall give to any Person, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third party beneficiary hereof.

   9.05. <u>Governing Law; Submission to Jurisdiction; Selection of Forum; WAIVER OF TRIAL BY JURY</u>.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution, termination, performance, or nonperformance of this Agreement (including exhibits), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without giving effect to any applicable conflict of laws principles to the extent that the application of the laws of another jurisdiction would be required thereby.  Each Party agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this Agreement, any provision hereof or the Restructuring described herein, in the United States District Court for the Southern District of New York, any New York State court sitting in the Borough of Manhattan of New York City, or, to the extent the Company commences the Chapter 11 Cases, the Bankruptcy Court (the "***Chosen Courts***") and, solely in connection with claims arising under this Agreement or the Restructuring that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party; <u>provided</u> that, upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court.  Each Party agrees that a judgment in any

21

such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR THE RESTRUCTURING DESCRIBED HEREIN.

9.06.    Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, e-mail, or otherwise) in any number of counterparts, each of which, when executed and delivered in accordance with Section 8, shall be deemed an original, and all of which together shall constitute the same agreement.  Each Party represents and warrants that each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

9.07.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.  The agreements, representations, and obligations of the Consenting Debtholders and Consenting Revolver Lenders, respectively, under this Agreement are, in all respects, several and not joint.

9.08.    Survival.    Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in this Section 9.08, Section 3.03, Section 6, Section 7.06, Section 8, and Sections 9.01 to 9.15 shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

9.09.    Creditors' Committee.  Each Consenting Debtholder agrees not to request that the United States Trustee appoint an official committee of creditors in the Chapter 11 Cases. Notwithstanding anything herein to the contrary, if any Consenting Debtholder is appointed to and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Debtholder's exercise of its fiduciary duties to any Person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided, that nothing in this Agreement shall be construed as requiring any Consenting Debtholder to serve on any official committee in any such chapter 11 case.

9.10.    Relationship Among Parties.  (a) It is understood and agreed that no Consenting Debtholder has any duty of trust or confidence in any form with any other Consenting Debtholder, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Consenting Debtholder may trade in the Secured Term Loans, Secured Notes, or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Consenting Debtholder, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; provided, further, that neither any Consenting Debtholder nor the Company shall have any responsibility for any such trading by any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Debtholders shall in any way affect or negate this understanding and agreement.

22

(b)    It is understood and agreed that no Consenting Revolver Lender has any duty of trust or confidence in any form with any other Consenting Revolver Lender, and, except as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them.  In this regard, it is understood and agreed that any Consenting Revolver Lender may trade in the obligations under the Revolving Credit Facility, Secured Term Loans, Secured Notes, or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Consenting Revolver Lender, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; provided, however, that neither any Consenting Revolver Lender nor the Company shall have any responsibility for any such trading by any other Person by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between the Consenting Revolver Lender shall in any way affect or negate this understanding and agreement.

9.11.    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by facsimile, (c) one (1) Business Day following the day sent by overnight courier, or (d) when sent by electronic mail, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

(a)    If to the Company, to:

Vantage Drilling Company
777 Post Oak Boulevard, Suite 800
Houston, Texas 77056
Attention:    Paul A. Bragg
Facsimile:    (281) 404-4749
Email:        paul.bragg@vantagedrilling.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:    Ray C. Schrock, P.C.
              Ronit J. Berkovich, Esq.
Facsimile:    (212) 310-8007
Email:        ray.schrock@weil.com
              ronit.berkovich@weil.com

(b)    If to a Consenting Debtholder, a Consenting Revolver Lender or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Debtholder's or Consenting Revolver Lender's signature (or as directed by any transferee thereof), as the case may be, (or at such other addresses or facsimile numbers as shall be specified by like notice) with a copy to:

WEIL:\95456194\31\78787.0003

In the case of the Consenting Debtholders:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attention:     Dennis F. Dunne, Esq.
               Evan R. Fleck, Esq.
Facsimile:     (212) 822-5567
Email:         ddunne@milbank.com
               efleck@milbank.com

In the case of the Consenting Revolver Lenders:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention:     Richard A. Levy, Esq.
               M. Catherine Ozdogan, Esq.
               Peter P. Knight, Esq.
Facsimile:     (312) 993-9767
Email:         richard.levy@lw.com
               catherine.ozdogan@lw.com
               peter.knight@lw.com

9.12.    <u>No Solicitation</u>.  This Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.  The votes of the holders of claims against the Company shall not be solicited until such holders who are entitled to vote on the Plan have received the Plan, the Disclosure Statement, and any other required solicitation materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any Person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

9.13.    <u>Other Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "***herein***," "***hereinafter***," "***hereof***," and "***hereunder***" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "***including***" or any variation thereof means "***including, without limitation***" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions

24

and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any "**_Section_**" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "**_Business Day_**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)    The Company, the Consenting Debtholders and the Consenting Revolver Lenders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

25

# EXHIBIT A

VANTAGE TERM SHEET

# VANTAGE DRILLING COMPANY
# RESTRUCTURING TERM SHEET

## DECEMBER 1, 2015

This term sheet (the "**Term Sheet**") sets forth the principal terms of a proposed financial restructuring (the "**Restructuring**") of the existing debt and other obligations of Vantage Drilling Company ("**Vantage Parent**") and its subsidiaries, including Offshore Group Investment Limited ("**OGIL**").  Subject in all respects to the terms of the Restructuring Support Agreement to which this Term Sheet will be attached (the "**Restructuring Support Agreement**"), the Restructuring will be implemented by (i) OGIL and certain other subsidiaries of Vantage Parent (as listed herein, the "**Vantage Debtors**") commencing cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to pursue a pre-packaged chapter 11 plan of reorganization (the "**Plan**") containing the terms set forth herein, and (ii) Vantage Parent filing a petition commencing an official liquidation proceeding under the laws of the Cayman Islands (the "**Cayman Proceeding**").  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement or the Plan, as applicable.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.  THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE VANTAGE DEBTORS.

| Transaction Overview | | |
|---|---|---|
| **Vantage Debtors:** | • OGIL;<br>• Vantage Delaware Holdings, LLC;<br>• Dragonquest Holdings Company;<br>• Emerald Driller Company;<br>• P2020 Rig Co.;<br>• P2021 Rig Co.;<br>• PT. Vantage Drilling Company Indonesia;<br>• Sapphire Driller Company;<br>• Vantage Deepwater Company;<br>• Vantage Deepwater Drilling, Inc.;<br>• Vantage Driller I Co;<br>• Vantage Driller II Co; | • Vantage Driller III Co;<br>• Vantage Driller IV Co.;<br>• Vantage Driller VI Co.;<br>• Vantage Driller ROCO S.R.L.;<br>• Vantage Drilling Africa;<br>• Vantage Drilling (Malaysia) I Sdn. Bhd.;<br>• Vantage Drilling Labuan I Ltd.;<br>• Vantage Drilling Netherlands B.V.;<br>• Vantage Holding Hungary Limited Liability Company;<br>• Vantage Holdings Cyprus ODC Limited;<br>• Vantage Holdings Malaysia I Co.; and<br>• Vantage International Management Co. |
| **Current Capital Structure:** | **Secured** <br><u>Revolving Credit Facility Claims</u>: consisting of One Hundred Fifty Million Dollars ($150,000,000) in unpaid principal and Twenty-Two Million Nine Hundred Thousand Dollars ($22,900,000) of undrawn letters of credit, plus interest, fees and other expenses arising under or in connection with that certain Amended and Restated Credit Agreement, dated as of March 28, 2013, by and among OGIL and Vantage Parent, as borrowers, each of the guarantors named therein, the lenders party thereto (the "***Revolver Lenders***"), and Royal Bank of Canada, as administrative agent, as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "***Revolving Credit Facility***");<br><br><u>2017 Term Loan Claims</u>: consisting of Three Hundred Twenty-Three Million Five Hundred Forty-Three Thousand Four Hundred Twenty-Nine Dollars ($323,543,429) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with that certain Amended and Restated Term Loan Agreement, dated as of October 25, 2012 and amended and restated as of November 22, 2013, by and among OGIL and Vantage Delaware Holdings, LLC, as borrowers, each of the guarantors named therein, the lenders party thereto (the "***2017 Term Loan Lenders***"), and Cortland Capital Market Services LLC, as successor administrative agent to Citibank, N.A., as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "***2017 Term Loan***");<br><br><u>2019 Term Loan Claims</u>:  consisting of Three Hundred Forty-One Million Two Hundred Fifty Thousand Dollars ($341,250,000) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with that certain Second Term Loan Agreement, dated as of March 28, 2013, by and | |

among OGIL and Vantage Delaware Holdings, LLC, as borrowers, each of the guarantors named therein, the lenders party thereto (the "**2019 Term Loan Lenders**"), and Cortland Capital Market Services LLC, as successor administrative agent to Citibank, N.A., as amended, modified, or otherwise supplemented from time to time prior to the date hereof, (the "**2019 Term Loan**").  The 2017 Term Loan and the 2019 Term Loan are referred to together as the "**Secured Term Loans**" and the 2017 Term Loan Lenders and the 2019 Term Loan Lenders are referred to together as the "**Secured Term Loan Lenders**";

7.5% Notes Claims:  consisting of One Billion Eighty-Six Million Eight Hundred Fifteen Thousand Dollars ($1,086,815,000) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with the 7.5% Senior Secured First Lien Notes due 2019 or that certain Indenture, dated as of October 25, 2012, by and among OGIL, as issuer, each of the guarantors named therein, and Wells Fargo Bank, National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "**7.5% Notes**" and the respective holders, the "**7.5% Noteholders**"); and

7.125% Notes Claims:  consisting of Seven Hundred Twenty-Seven Million Six Hundred Twenty-Two Thousand Dollars ($727,622,000) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with the 7.125% Senior Secured First Lien Notes due 2023 or that certain Indenture, dated as of March 28, 2013, by and among OGIL, as issuer, each of the guarantors named therein, and Wells Fargo Bank, National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "**7.125% Notes**" and the respective holders, the "**7.125% Noteholders**").  The 7.5% Notes and the 7.125% Notes are referred to together as the "**Secured Notes**" and the 7.5% Noteholders and the 7.125% Noteholders are referred to together as the "**Secured Noteholders**."

## Unsecured

7.875% Convertible Notes Claims:  consisting of Nineteen Thousand Dollars ($19,000) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with the 7.875% Senior Convertible Notes due 2042 or that certain Indenture and First Supplemental Indenture, each dated as of August 21, 2012, by and among Vantage Parent, as issuer, and Wells Fargo Bank, National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "**7.875% Convertible Notes**" and the respective holders, the "**7.875% Convertible Noteholders**");

5.5% Convertible Notes Claims:  consisting of Twenty-Four Million Nine Hundred Seventy-Three Thousand Dollars ($24,973,000) in unpaid principal, plus interest, fees and other expenses, arising under or in connection with the 5.5% Convertible Senior Notes due 2043 or that certain Indenture and First Supplemental Indenture, each dated as of July 16, 2013, by and among Vantage Parent, as issuer, and Wells Fargo Bank, National Association, as

WEIL:\95416592\43\78787.0003

indenture trustee, as amended, modified, or otherwise supplemented from time to time prior to the date hereof (the "**5.5% Convertible Notes**" and the respective holders, the "**5.5% Convertible Noteholders**"). The 7.875% Convertible Notes and the 5.5% Convertible Notes are referred to together as the "**Convertible Notes**" and 7.875% Convertible Noteholders and the 5.5% Convertible Noteholders are referred to together as the "**Convertible Noteholders**";

F3 Capital Note Claim: consisting of Seventy Million Seven Hundred Thirty-Two Thousand Seven Hundred Twenty-Eight Dollars ($70,732,728) in unpaid principal and payable balance, plus interest, fees and other expenses, arising under or in connection with that certain Promissory Note, dated July 30, 2010, by and between Vantage Parent, as borrower, and F3 Capital, as lender. Vantage Parent disputes its liability with respect to the F3 Capital Note Claim;

Vantage Parent General Unsecured Claims: consisting of any claim against Vantage Parent that is neither secured nor entitled to priority under the applicable law governing such claim, including, without limitation, the 7.875% Convertible Notes Claims, the 5.5% Convertible Notes Claims, the F3 Capital Note Claim, any litigation claims against Vantage Parent, and any unsecured portion of the Secured Term Loan Claims and Secured Notes Claims against Vantage Parent; and

Vantage Debtor General Unsecured Claims: consisting of any claim against a Vantage Debtor that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

### Equity Interests

Vantage Parent Interests: consisting of any equity interests in Vantage Parent, including common shares, preferred shares, and any options, warrants, or rights to acquire such equity interests;

OGIL Interests: consisting of any equity interests in OGIL, including common shares, preferred shares, and any options, warrants, or rights to acquire such equity interests; and

Intercompany Interests: consisting of any equity interests in Vantage Driller I Co, Vantage Driller II Co, Vantage Driller IV Co., Vantage Holding Hungary Limited Liability Company, Vantage Drilling Netherlands B.V., and any subsidiary of OGIL, including common shares, preferred shares, and any options, warrants, or rights to acquire such equity interests.

| | |
|---|---|
| **Restructuring Summary:** | The Restructuring will be implemented through the Plan and the Cayman Proceeding. The Vantage Debtors will enter into a Restructuring Support Agreement with certain Revolver Lenders, Secured Term Loan Lenders, and Secured Noteholders. No later than December 4, 2015, the Vantage Debtors will commence the solicitation of votes for the Plan from Secured Term Loan Lenders and Secured Noteholders that are Eligible Holders and from all Revolver Lenders (the "**Solicitation**"). The "**Effective Date**" shall refer to |

WEIL:\95416592\43\78787.0003

the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Plan has been consummated.

Prior to the commencement of the cases under chapter 11 of the Bankruptcy Code by the Vantage Debtors (collectively, the "**Chapter 11 Cases**"), OGIL shall purchase at fair market value Vantage Parent's equity interests in Vantage International Management Company Pte. Ltd. and Vantage Energy Services, Inc. (collectively, the "**Vantage Service Subsidiaries**").    In exchange for the Vantage Service Subsidiaries, OGIL will issue a promissory note to Vantage Parent in an amount equal to the arm's length, fair market value of the Vantage Service Subsidiaries, as appraised by an independent third party that is acceptable to both Vantage Parent and OGIL (the "**Vantage Parent Secured Promissory Note**").    The Vantage Parent Secured Promissory Note will mature one year from the date of issuance of the note and will provide that, upon the Effective Date of the Plan or a substantially similar plan of reorganization, such note will be paid in common shares of reorganized OGIL ("**New Common Shares**") using the plan value, as established by Lazard Frères & Co. LLC and set forth in the disclosure statement accompanying the Plan, of such shares to calculate the appropriate number of shares.    If the Effective Date has not occurred by the maturity date, the Vantage Parent Secured Promissory Note will be payable in cash, subject to the Bankruptcy Code and without prejudice to the rights of the Consenting Debtholders and Consenting Revolver Lenders to object to such payment being made during the pendency of the Chapter 11 Cases.    The Vantage Parent Secured Promissory Note will be secured by a first priority security interest in the Vantage Service Subsidiaries and will earn interest at a rate of 10% per annum.    Vantage Parent shall have the right to require OGIL to file, and thereafter use its commercially reasonable efforts to cause to become effective as promptly as practicable, a registration statement on Form S-1 (or other applicable form) for the distribution of any New Common Shares it receives in respect of the Vantage Secured Promissory Note pursuant to the Cayman Proceeding.    The "**Vantage Parent Secured Promissory Note Claims**" shall refer to claims arising under the Vantage Parent Secured Promissory Note.

Following the commencement of the Chapter 11 Cases, the Vantage Debtors intend to cause an official liquidation proceeding in the Cayman Islands to be commenced for Vantage Parent.    The Vantage Parent General Unsecured Claims and Vantage Parent Interests shall be compromised and administered through the Cayman Proceeding.

After commencement of the Chapter 11 Cases, OGIL also will launch a rights offering    (the "**Rights Offering**") for Seventy Five Million Dollars ($75,000,000) of new Senior Secured Second Lien Notes (the "**New Secured Notes**"), which shall accrue interest at a rate of 10% per annum, payable in cash.    The Rights Offering is intended to be backstopped by Alliance Bernstein L.P., certain funds managed by Anchorage Capital Group, L.L.C., GoldenTree Asset Management LP, Knighthead Capital Management, LLC, Renegade Swish, LLC, Wingspan Investment Management, LP, and York Capital Management Global Advisors, LLC (collectively, the "**Backstop**

WEIL:\95416592\43\78787.0003

*Parties*") pursuant to, and subject to the terms and conditions of a backstop agreement substantially in the form attached to the Restructuring Support Agreement (the "*Backstop Agreement*").  In exchange for providing the backstop commitment for the Rights Offering, the Backstop Parties will receive on the Effective Date a backstop commitment premium in an amount equal to Two Million Two Hundred Fifty Thousand Dollars ($2,250,000), one-half of which will be paid in cash and one-half in New Secured Notes (the "*Backstop Commitment Premium*"); provided, however, that the Backstop Commitment Premium shall be paid entirely in cash to the extent so provided in the Backstop Agreement.  A term sheet for the New Secured Notes is attached hereto as **Exhibit 2**.

On the Effective Date, OGIL will issue Seven Hundred and Fifty Million Dollars ($750,000,000) of new Senior Subordinated Secured Third Lien Convertible Notes (the "*Secured Convertible PIK Notes*"), which shall (i) accrue interest at a rate of 1% per annum, payable in kind, during the first four years, (ii) accrue interest at a rate of 12% per annum, payable in kind, from and after the fifth year through the maturity date, and (iii) mature in 2030.  The Secured Convertible PIK Notes shall be subject to a make-whole premium due and payable upon acceleration of the notes following the occurrence of an event of default under the governing indenture in the amount equal to accreted value of the Secured Convertible PIK Notes at maturity, discounted at the applicable Treasury Rate (which Treasury Rate shall match the tenor of the Secured Convertible PIK Notes at the time the make-whole premium is due and payable) + 50 bps.  The indenture for the Secured Convertible PIK Notes shall include customary events of default, including, without limitation, (a) the commencement of cases under the Bankruptcy Code by OGIL or any guarantor of the Secured Convertible PIK Notes, (b) the acceleration of any indebtedness of OGIL or any guarantor of the Secured Convertible PIK Notes in an amount greater than Thirty Million Dollars ($30,000,000) prior to its stated maturity, and (c) entry by a court or courts of competent jurisdiction of a final judgment or government fine or penalty (whether by agreement, consent decree, or otherwise), or entry by OGIL, any guarantor of the Secured Convertible PIK Notes, or any affiliate of OGIL (other than Vantage Parent) into any settlement agreement, consent decree, or similar agreement with respect to any investigations involving, or claims against, such entity, that would individually or in the aggregate exceed Fifty Million Dollars ($50,000,000) ("*Judgment Default*").   For the avoidance of doubt, a majority of the holders of the Secured Convertible PIK Notes may waive any such event of default.  The Secured Convertible PIK Notes will be "stapled" to New Common Shares and will be subject to conversion (either in whole or in part) into New Common Shares at plan value (i) during the first three years, (a) upon the agreement by a majority vote of holders of the Secured Convertible PIK Notes to convert into New Common Shares or (b) upon the full and final resolution of all potential Investigation Claims (as defined herein) against OGIL, OGIL's current subsidiaries, Vantage International Management Company Pte. Ltd., Vantage Energy Services, Inc., and Vantage Parent and Vantage Parent's current subsidiaries (to the extent that OGIL or any subsidiary of OGIL may reasonably be expected to be liable for such claim against Vantage Parent or Vantage Parent's current subsidiaries), as determined in

WEIL:\95416592\43\78787.0003

|  | good faith by the New Board of OGIL (which determination shall require the affirmative vote of a supermajority of the non-management directors, which, for all purposes herein, shall mean 5 affirmative votes assuming that 6 directors are eligible to vote), and (ii) after the first three years, upon the approval of the New Board of OGIL (which approval shall require the affirmative vote of a supermajority of the non-management directors). OGIL will file documents with the Securities and Exchange Commission after the Effective Date as a voluntary filer under the Securities Exchange Act of 1934, as amended, but will not be required to list the New Common Shares for trading on any national securities exchange. The "***Investigation Claim***" shall mean any claim held by a United States or Brazilian governmental unit and arising from or related to the procurement of that certain Agreement for the Provision of Drilling Services, dated as of February 4, 2009, by and between Petrobras Venezuela Investments & Services B.V. and Vantage Deepwater Company, as amended, modified, supplemented, or novated from time to time. A term sheet for the Secured Convertible PIK Notes is attached hereto as **Exhibit 3**.<br><br>The Amended and Restated Credit Facility (as defined herein), the Secured Convertible PIK Notes, and the New Secured Notes shall be subject to an intercreditor agreement as described in **Exhibit 1** hereto (the "***Intercreditor Agreement***").<br><br>The Vantage Debtors will use proceeds from the Rights Offering plus cash on hand to (i) provide additional liquidity for working capital and general corporate purposes, (ii) pay all reasonable and documented fees and expenses incurred by the Vantage Debtors in connection with the Restructuring, including the fees (including transaction fees) and expenses of their and their creditors' legal and financial advisors, (iii) fund distributions under the Plan, and (iv) fund the administration of the Chapter 11 Cases. |
|---|---|
| **Classification and Treatment of Claims and Interests Under the Plan** | |
| **Administrative Expense, Priority Tax, and Other Priority Claims:** | On or as soon as practicable after the Effective Date, each holder of an Allowed (as defined herein) administrative expense, priority tax, and other priority claim shall receive from its respective Vantage Debtor (i) payment in full in cash or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Secured Revolving Credit Facility Claims:** | On the Effective Date, each holder of an Allowed Secured Revolving Credit Facility Claim shall receive, at the option of the Vantage Debtors, its pro rata share of (i) payment in full in cash to the extent the Vantage Debtors elect to refinance the Revolving Credit Facility in its entirety or (ii) an amended and restated senior secured term loan and letter of credit facility and, in the case of the Revolver Lenders (other than the letter of credit issuer) a cash payment of Seven Million Dollars $7,000,000, all on terms and conditions more specifically set forth in the term sheet attached as **Exhibit 1** hereto and as are otherwise acceptable to more than one-half in number and at least two-thirds in amount of Allowed Secured Revolving Credit Facility Claims |

WEIL:\95416592\43\78787.0003

| | (the "***Amended and Restated Credit Facility***"). |
|---|---|
| **Secured Term Loan Claims and Secured Notes Claims:** | On the Effective Date, each holder of an Allowed Secured Term Loan Claim or an Allowed Secured Notes Claim shall receive (i) its pro rata share of 100% of the Secured Convertible PIK Notes, (ii) its pro rata share of 100% of the New Common Shares, which shares shall be subject to dilution by New Common Shares issued on account of Vantage Parent Secured Promissory Note Claims, upon the conversion of the Secured Convertible PIK Notes, and under the Management Incentive Program, and (iii) up to its pro rata share of the $75,000,000 New Secured Notes to be issued in the Rights Offering, to the extent it elects to exercise its subscription rights thereunder, which subscription rights will be made available to each such holder on a pro rata basis. |
| **Other Secured Claims:** | On the Effective Date, each holder of an Allowed secured claim against a Vantage Debtor that is not an administrative expense claim, priority tax claim, Secured Revolving Credit Facility Claim, Secured Term Loan Claim, or Secured Notes Claim ("***Other Secured Claims***") shall receive, at the option of the Vantage Debtors, (i) payment in full in cash, (ii) reinstatement or such other treatment sufficient to be unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such secured claim. For the avoidance of doubt, the Vantage Parent Secured Promissory Note Claims shall be Allowed Other Secured Claims and, pursuant to the Plan, on the Effective Date, Vantage Parent shall receive, on account of the Vantage Parent Secured Promissory Note Claims, the number of New Common Shares equal to the value of the Vantage Service Subsidiaries plus accrued interest as of the Effective Date. |
| **Vantage Debtor General Unsecured Claims:** | On the Effective Date, each holder of an Allowed General Unsecured Claim against a Vantage Debtor shall be unimpaired under the Plan and shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, payment in full in cash in the ordinary course of business as and when due and payable. |
| **Vantage Debtor Intercompany Claims:** | All intercompany claims among the Vantage Debtors will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated to the extent determined to be appropriate by the Vantage Debtors with the prior written consent of the Majority Consenting Debtholders (such consent not to be unreasonably withheld).  All intercompany claims between any Vantage Debtor and a non-Debtor affiliate shall be unimpaired under the Plan. |
| **OGIL Interests:** | On the Effective Date, the OGIL Interests shall be extinguished such that Vantage Parent's existing equity interest in OGIL will be eliminated. |
| **Intercompany Interests:** | On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests held by OGIL or a direct or indirect subsidiary of OGIL shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of |

8

| | |
|---|---|
| | the Debtors that are subsidiaries of OGIL; provided, that (i) shares in Vantage Driller I Co., Vantage Driller II Co., and Vantage Driller IV Co. will be transferred to OGIL in accordance with applicable share pledge agreements, and (ii) the existing shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be cancelled and new shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be distributed to OGIL in accordance with this Plan. |
| **Other Provisions** | |
| **"Allowed"** | Means, with reference to any claim or interest, (i) any claim or interest arising before the Effective Date as to which (a) no objection to allowance, priority, or secured status, and no request for estimation or other challenge, has been interposed within the time period set forth in the Plan or (b) all such objections have been determined by a final order of the Bankruptcy Court to the extent such objections are determined in favor of the applicable holder, (ii) any claim or interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Vantage Debtors in a final order of the Bankruptcy Court, or (iii) any claim or interest expressly allowed under the Plan; provided, however, that notwithstanding the foregoing, the reorganized Vantage Debtors shall retain all claims and defenses with respect to Allowed claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| **"Eligible Holders"** | A holder of an Allowed Secured Term Loan Claim or Secured Notes Claim that, as of a date certain, is an "Accredited Investor" (as defined in Rule 501 of the Securities Act of 1933, as amended) and certifies to that effect or that the Vantage Debtors reasonably believe to be an Accredited Investor. |
| **Executory Contracts and Unexpired Leases:** | The Vantage Debtors reserve the right to reject executory contracts and unexpired leases in their sole discretion; provided that the Vantage Debtors shall not reject any material drilling contract without the prior written consent of the Majority Consenting Debtholders and more than one-half in number and at least two-thirds in amount of Allowed Secured Revolving Credit Facility Claims.  All executory contracts and unexpired leases not expressly rejected shall be deemed assumed pursuant to the Plan.   The existing employment agreements for the Vantage Parent management team may be assigned to OGIL prior to the commencement of the Chapter 11 Cases and assumed by reorganized OGIL upon terms reasonably acceptable to the Majority Consenting Debtholders (such consent to apply only with respect to non-material economic terms and non-economic terms).   In the alternative, Vantage Parent management team may execute new employment agreements with OGIL on terms consistent with their current employment agreements, provided that such new employment agreements contain terms reasonably acceptable to the Majority Consenting Debtholders (such consent to apply only with respect to non-material economic terms and non-economic terms). For the avoidance of doubt, any awards granted under the Management Incentive Program will be governed by such program and will not be subject to any provisions of the employment agreements. |

WEIL:\95416592\43\78787.0003

| | |
|---|---|
| **Management Incentive Program:** | Management Incentive Program contained in term sheet attached hereto as **Exhibit 4**. |
| **Board of Directors:** | The board of directors for reorganized OGIL (the "***New Board***") shall be composed of seven members, all of whom shall be designated by the Ad Hoc Committee; provided, however, that one of the board members designated by the Ad Hoc Committee shall be Paul Bragg, as CEO of the Vantage Debtors. The composition of the boards of directors for each Vantage Debtor shall be disclosed prior to the entry of the order confirming the Plan except that the New Board may select the board members for each other Vantage Debtor. |
| **Releases:** | The Plan shall include standard / customary mutual release and third party releases from holders of claims or interests to the extent permitted by law. |
| **Corporate Governance:** | The Vantage Debtors' existing articles and bylaws will be subject to customary amendments and modifications and will require the respective boards of directors to authorize in advance any Vantage Debtor's entry into a settlement agreement, consent decree, or similar agreement with respect to any material investigations involving, or claims against, such Vantage Debtor. <br><br> The terms and conditions of the corporate governance documents of the reorganized Vantage Debtors (including, without limitation, the charter and bylaws) shall be reasonably acceptable to the Majority Consenting Debtholders.  At the election of the Majority Consenting Debtholders, reorganized OGIL shall enter into a shareholders agreement on terms reasonably acceptable to the Majority Consenting Debtholders. |
| **Drilling Contracts:** | A condition precedent to the Effective Date of the Plan shall be that all material drilling contracts are in good standing, but for any default or threatened default relating to the insolvency of Vantage Parent or any Vantage Debtor or the commencement of the Cayman Proceeding or any case under chapter 11 of the Bankruptcy Code. |
| **Registration Rights:** | On the Effective Date, reorganized OGIL, any Backstop Party (or affiliate or related fund thereof that receives New Common Shares or Secured Convertible PIK Notes under the Plan), and any recipient of "stapled" New Common Shares and Secured Convertible PIK Notes who (together with its affiliates and related funds) receives 10% or more of the "stapled" New Common Shares and/or Secured Convertible PIK Notes issued under the Plan (such stockholders executing the agreement, the "***Registration Rights Parties***") will enter into a registration rights agreement, which agreement shall be in form and substance acceptable to the Majority Consenting Debtholders and the Vantage Debtors.  The registration rights agreement shall provide the Registration Rights Parties with certain demand registration rights and with piggyback registration rights.   The registration rights agreement will also provide that on or before the date that is 90 days after the Effective Date, reorganized OGIL shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Common Shares and Secured |

10

|  | Convertible PIK Notes held by the Registration Rights Parties. The registration rights agreement shall contain customary terms and conditions, including, but not limited to, provisions with respect to blackout periods. |
|---|---|
| **Definitive Documents and Due Diligence:** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of definitive documents, which documents shall be substantially consistent with the terms of this Term Sheet.  The definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |

WEIL:\95416592\43\78787.0003

**SUMMARY OF INDICATIVE TERMS AND CONDITIONS**
**OFFSHORE GROUP INVESTMENT LIMITED**

**$143,000,000[1] Senior Secured Term Loan Facility**
**$32,000,000 Senior Secured Letter of Credit Facility**

*THIS DRAFT IS BEING PROVIDED FOR DISCUSSION PURPOSES ONLY, IS NOT A COMMITMENT TO LEND, AND REMAINS SUBJECT TO THE REVIEW AND APPROVAL OF THE LENDERS' INTERNAL COMMITTEES, LEGAL DEPARTMENTS AND DUE DILIGENCE. THIS DRAFT IS NOT BINDING ON ANY PARTY AND THE PARTIES DO NOT INTEND TO BE BOUND UNLESS AND UNTIL THEY ENTER INTO DEFINITIVE DOCUMENTATION REGARDING THE SUBJECT MATTER HEREOF. THIS DRAFT IS NOT AN OFFER OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. THIS DRAFT SHALL NOT BE CONSIDERED TO BE EXHAUSTIVE AS TO THE FINAL TERMS AND CONDITIONS OF THE CREDIT FACILITIES. TERMS AND CONDITIONS HEREIN MAY BE SUBJECT TO CHANGE. THIS SUMMARY IS FOR THE CONFIDENTIAL USE OF THE BORROWER AND LENDERS AND IS NOT TO BE DISCLOSED TO ANY OTHER THIRD PARTY. THIS DRAFT IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE.*

| | |
|---|---|
| **Borrower:** | Offshore Group Investment Limited, a Cayman Islands exempted company (the "Borrower"). |
| **Guarantors:** | All the direct and indirect subsidiaries of the Borrower, including those, if any, that will exist at closing or that are formed or acquired during the term of the Credit Facilities (hereafter defined) (the "Guarantors" and, together with the Borrower, the "Loan Parties"). |
| **Lenders:** | The revolving lenders and Royal Bank of Canada, as LC issuer, under the Existing Credit Agreement (as defined below) ("Lenders"). |
| **Administrative Agent:** | Royal Bank of Canada (the "Administrative Agent"). |
| **Collateral Agent:** | Royal Bank of Canada (the "Collateral Agent"). |
| **LC Issuer:** | Royal Bank of Canada (in such capacity, the "LC Issuer"). |
| **Credit Facilities:** | As of the consummation of a consensual financial restructuring of the capital structure of the Loan Parties that incorporates the terms and conditions set forth herein and the Restructuring Term Sheet to which this Term Sheet is attached (the "Restructuring Term Sheet") |

---

[1]     **Note**: Shall equal outstanding obligations owed under revolving portion of Credit Agreement at consummation (the company shall make no further revolver draws), including default interest accrued during the bankruptcy, less a $7 million cash payment at consummation.

(the "Restructuring"), the outstanding principal balance of the revolving loans under the Existing Credit Agreement shall be replaced with, or converted into, as applicable, a $143,000,000 senior secured term loan facility (the "Term Loan Facility" and the loans thereunder, the "Loans"), and the letter of credit facility under the Existing Credit Agreement shall be replaced with, or converted into, as applicable, a $32,000,000 senior secured letter of credit facility (the "Letter of Credit Facility"; together with the Term Loan Facility, the "Credit Facilities").

**Incremental Facility:**   At any time during the term of the Term Loan Facility, the Borrower will be permitted to add one or more incremental term loan (an "Incremental Term Loan Facility") or revolving credit facilities (an "Incremental Revolving Facility", and each Incremental Term Loan Facility or Incremental Revolving Facility being referred to as an "Incremental Facility") up to a maximum amount not to exceed the sum of (A) $125,000,000 less (B) the aggregate principal amount of Incremental Equivalent Debt less (C) the outstanding principal amount of the New Secured Notes (as defined in the Restructuring Term Sheet), in the aggregate for all Incremental Facilities; provided that, (i) each existing Lender will be offered the opportunity to participate in any Incremental Facility but no existing Lender will be obligated to provide any portion of such Incremental Facility, (ii) no default or event of default exists or would exist after giving effect thereto, (iii) the Borrower and its subsidiaries shall be in pro forma compliance with a minimum Consolidated Interest Coverage Ratio (to be defined in a manner consistent with the Existing Credit Agreement, but in any event, shall not include PIK interest) of 2.00x, (iv) the maturity date of such Incremental Facility shall be no earlier than the maturity date of the Term Loan Facility, (v) any Incremental Term Loan Facility cannot have amortization greater than 1.0% of original principal balance of Incremental Facility per annum and any Incremental Revolving Facility shall require no scheduled amortization or mandatory commitment reduction prior to the final maturity of the Term Loan Facility, (vi) the aggregate amount of Incremental Revolving Facilities cannot exceed $25,000,000, (vii) any Incremental Term Loan Facility may only be secured on a junior lien basis to the Term Loan Facility, (viii) any Incremental Revolving Facility may be secured on a pari passu basis with the Term Loan Facility, (ix) the pricing, interest rate margins, discounts, premiums, rate floors, and fees applicable to any Incremental Facility shall be determined by the Borrower and the lenders thereunder; provided that (a) if the Effective Yield (as defined below) relating to any such Incremental Revolving Facility equals or exceeds the Effective Yield relating to the then-existing Term Loan Facility, if any, then the applicable interest rate margins relating to the then-existing Term Loan Facility, if any, shall be

2

adjusted to the extent necessary so that the Effective Yield of the then-existing Term Loan Facility, if any, is equal to the sum of the Effective Yield of the Incremental Revolving Facility plus 50 basis points and (b) if the Effective Yield relating to any such Incremental Revolving Facility is less than the Effective Yield relating to the then-existing Term Loan Facility, if any, then the applicable interest rate margins relating to the then-existing Term Loan Facility, if any, shall be increased by up to 50 basis points, but only if and to the extent necessary so that the Effective Yield of the then-existing Term Loan Facility, if any, is not less than the sum of the Effective Yield of the Incremental Revolving Facility plus 50 basis points (it being understood and agreed that, if  the Effective Yield of the Incremental Revolving Facility is lower than the Effective Yield relating to the then-existing Term Loan Facility, if any, by 50 basis points or more, no adjustment to the applicable interest rate margin shall be made) and (x) the other terms and documentation in respect thereof, including, without limitation, any financial covenants and baskets, shall be no more favorable to the lenders thereunder than the terms of the Term Loan Facility, and to the extent that the terms of the Incremental Facility differ from the Term Loan Facility, the terms thereof shall be reasonably acceptable to the Required Lenders.

As used herein, "Effective Yield" means, as of any date of determination, the sum of (i) the higher of (A) LIBOR with a maturity of three months and (B) the LIBOR floor, if any, with respect to such class of Loans as of such date, (ii) the applicable margins as of such date and (iii) the amount of original issue discount ("OID") and/or upfront fees paid and payable (which shall be deemed to constitute like amounts of OID) by the Borrower to the Lenders in connection with such Term Loan Facility or Incremental Revolving Facility (it being understood that customary arrangement, commitment, structuring or amendment fees payable to one or more arrangers (or their respective affiliates) in connection with any Incremental Term Facility shall be excluded).

| | |
|---|---|
| **Existing Credit Agreement:** | Amended and Restated Credit Agreement dated as of March 28, 2013 among Vantage Drilling Company, the Borrower, the Guarantors, the lenders party thereto, and Royal Bank of Canada, as administrative agent (the defined terms of which are used herein unless otherwise defined herein). |
| **Pricing, Fees and Interest Rates:** | As outlined in _Addendum I_. |
| **Maturity Date:** | December 31, 2019 (the "Maturity Date"). |

3

| | |
|---|---|
| **Voluntary Prepayments and Commitment Reductions:** | Voluntary prepayments of loans under the Credit Facilities are permitted (subject to reimbursement of customary applicable breakage costs) in minimum amounts and with prior notice. The unutilized portion of the commitments under the Letter of Credit Facility may from time to time be permanently reduced or terminated by the Borrower in whole or in part without penalty. |
| **Mandatory Repayments:** | The Borrower shall be required to prepay Loans with 100% of net proceeds from asset sales and casualty events (except as otherwise provided below, subject to the right to reinvest in operating assets of the Borrower and its subsidiaries if such proceeds are reinvested within 365 days so long as any proceeds to be reinvested are segregated in a manner reasonably acceptable to the Collateral Agent, including depositing such proceeds into a separate deposit account designated by the Collateral Agent), and debt incurrences (other than debt permitted under the Credit Agreement); provided, that upon the occurrence of certain events of loss with respect to a vessel, the Borrower shall have not the right of reinvestment. |
| **Call Premium:** | None. |
| **Amortization:** | Quarterly amortization payments of 0.25% of original principal balance of Term Loan Facility. |
| **Collateral:** | Secured by a first priority lien on substantially all assets of the Loan Parties, including all assets that currently secure the Existing Credit Agreement, including, without limitation (a) deposit accounts, (b) first naval mortgages and other instruments such as deeds over the following vessels (the "Vessels") (i) the *Topaz Driller*, (ii) the *Emerald Driller*, (iii) the *Sapphire Driller*, (iv) the *Aquamarine Driller*, (v) the *Platinum Explorer* (vi) the *Titanium Explorer* and (vii) the *Tungsten Explorer*, and any other vessel hereafter acquired by the Borrower or any of its Subsidiaries, (c) earnings, (d) insurance, (e) from and after the conversion of the Vantage Parent Secured Promissory Note (as defined in the Restructuring Support Agreement) to equity in the reorganized Borrower, the Vantage Parent Assets (as defined in the Restructuring Support Agreement), and (f) all accounts, contracts, documents, equipment, general intangibles, goods, instruments, intellectual property, inventory, investment property, receivables,  equity interests and all other personal property to the extent not described above, in each case subject to customary exceptions. The foregoing shall be referred to herein as the "Collateral".[2] For the avoidance of doubt, (A) any |

---

[2]     **Note**: Borrower and the Lenders will determine whether the Security Documents can be amended and restated/re-executed to grant liens directly in favor of the Collateral Agent due to any local law implications regarding amendment and restatement of Security Documents with a different secured party of record and potential

proceeds ("<u>Specified Proceeds</u>") received by a Loan Party as a result of any litigation, arbitration or other dispute with respect to Petrobras' termination of the drilling contract associated with the Titanium Explorer shall be Collateral and shall be required to be held in deposit accounts subject to deposit account control agreements in favor of Collateral Agent and (B) the Vantage Parent Secured Promissory Note and, prior to (but not from and after) the conversion of the Vantage Parent Secured Promissory Note to equity in the reorganized Borrower, the Vantage Parent Assets (each as defined in the Restructuring Support Agreement) shall not constitute Collateral.

The Credit Agreement (hereinafter defined) will contain a "waterfall" that will provide that the LC Issuer under the Letter of Credit Facility and any lenders under any Incremental Revolving Facility will be "first out" on a pro rata basis with respect to Collateral proceeds and other payments made to or for the benefit of the Lenders (or any agent therefor) on account of the Credit Facilities.

**Documentation:**

The Credit Facilities shall be evidenced by definitive loan documentation (the "<u>Loan Documents</u>"), which shall include, without limitation, (i) a credit agreement, based substantially on the Existing Credit Agreement, as modified as set forth herein and as otherwise agreed by the Borrower and the Lenders (the "<u>Credit Agreement</u>").

The Credit Facilities, the Secured Convertible PIK Notes (as defined in the Restructuring Term Sheet), and the New Secured Notes (as defined in the Restructuring Term Sheet) shall be subject to an intercreditor agreement (as described herein, the "<u>Intercreditor Agreement</u>").

Pursuant to the Intercreditor Agreement:

- The (i) Credit Facilities shall be secured by a first priority lien on the Collateral, (ii)  New Secured Notes shall be secured by a second priority lien on the Collateral, and (iii) Secured Convertible PIK Notes shall be secured by a third priority lien on the Collateral.

- The proceeds of Collateral shall be distributed first to the payment of the obligations under the Credit Facilities, second to the payment of the obligations under the New Secured

---

for 1st lien/2nd lien structure.  Borrower and the Lenders to consider in good faith how to minimize the administrative burden and cost resulting from ongoing lien and perfection requirements.

HN\1359573.7WEIL:\95496340\14\78787.0003

Notes, and third to the payment of the obligations under the Secured Convertible PIK Notes.  In addition, all obligations under the Secured Convertible PIK Notes shall be subordinated in right of payment to the obligations under the Credit Facilities and the New Secured Notes, and for avoidance of doubt, to the extent the collateral trustee or any other Secured Convertible PIK Notes party receives any proceeds of Collateral and any non-Collateral proceeds or payments, then, subject to the provisions in the last bullet point of this "Documentation" subsection, such collateral trustee or other Secured Convertible PIK Notes party shall forthwith turnover same to the Collateral Agent for application to the obligations under the Credit Facilities until all such obligations have been paid in full in cash.

- After a period of 120 days has elapsed since the date on which the New Secured Notes collateral trustee has delivered to the Administrative Agent written notice of the acceleration of the New Secured Notes (the "Second Lien Standstill Period"), the New Secured Notes collateral trustee and the other New Secured Notes parties may enforce or exercise any rights or remedies with respect to any Collateral; provided, however, that the New Secured Notes collateral trustee or any other New Secured Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

- Except as set forth in the last sentence of this paragraph, after a period of 180 days has elapsed since the date on which the Secured Convertible PIK Notes collateral trustee has delivered to the Administrative Agent written notice of the acceleration of the Secured Convertible PIK Notes (the "Third Lien Standstill Period"), the Secured Convertible PIK Notes collateral trustee and the other Secured Convertible PIK Notes parties may enforce or exercise any rights or remedies with respect to any Collateral; provided, however, that the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders or the New Secured Notes collateral trustee on behalf of the New Secured Notes parties

6

shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

- Notwithstanding anything contained herein to the contrary (including, without limitation, the Second Lien Standstill Period and the Third Lien Standstill Period), upon the acceleration of the Secured Convertible PIK Notes following the occurrence of a Judgment Default (as defined in the Restructuring Term Sheet) under the Secured Convertible PIK Notes Indenture, the Secured Convertible PIK Notes collateral trustee and the other Secured Convertible PIK Notes parties may enforce or exercise any rights or remedies with respect to any Collateral after providing two (2) business days' advance written notice to the Administrative Agent (absent exigent circumstances); provided, however, that the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party may not enforce or exercise any rights or remedies with respect to any Collateral (and shall discontinue any such enforcement or exercise) if the Collateral Agent on behalf of the Lenders or the New Secured Notes collateral trustee on behalf of the New Secured Notes parties shall have commenced, and shall be diligently pursuing, the enforcement or exercise of any rights or remedies with respect to all or a material portion of the Collateral.

- If (a) the New Secured Notes collateral trustee or any other New Secured Notes party and/or (b) the Secured Convertible PIK Notes collateral trustee or any other Secured Convertible PIK Notes party enforce or exercise any rights or remedies with respect to any Collateral that results in their obtaining control or ownership (directly or indirectly through any affiliate) of all or a substantial portion of the Collateral, then at or prior to the consummation of such enforcement action, such enforcing party or parties shall concurrently cause all obligations under the Credit Facilities to be paid in full in cash.

- Reorganization securities received by or on behalf of holders of Secured Convertible PIK Notes on account of the Secured Convertible PIK Notes ("Junior Reorganization Securities") in a subsequent reorganization proceeding (a "Subsequent Reorganization") shall not be subject to turnover to the Collateral Agent, Administrative Agent or Lenders; provided, however, that if the claims of the Collateral Agent, the Administrative Agent or the Lenders under the Credit Facilities (as determined in the absence of the Subsequent

Reorganization, and whether or not any portion of such claims are allowable in the Subsequent Reorganization) are not paid in full in cash upon the effective date of any plan of reorganization in the Subsequent Reorganization and instead receive, on account of all or a portion of their claims, new securities or loans with economic terms that are worse than the economic terms of their claims under the Credit Facilities (as determined in the absence of the Subsequent Reorganization, and whether or not any portion of such economic terms or claims are allowable in the Subsequent Reorganization) (e.g., new securities or loans with a lower principal amount, lower interest or lower fees than the corresponding principal amount, interest or fees in respect of the claims under the Credit Facilities), then the holders of Secured Convertible PIK Notes shall be obligated to turn over to the Collateral Agent (on behalf of itself, the Administrative Agent and the Lenders) any and all amounts received on account of such Junior Reorganization Securities, including any cash dividends or cash distributions, until the Collateral Agent, the Administrative Agent and Lenders are paid in full in cash the amounts they would have been paid on account of their claims under the Credit Facilities, (as determined in the absence of the Subsequent Reorganization, and whether or not any portion of such claims are allowable in the Subsequent Reorganization)..

The Intercreditor Agreement shall otherwise contain (a) customary terms with respect to the Credit Facilities and New Secured Notes and (b) terms that are more protective of the Credit Facilities with respect to the Secured Convertible PIK Notes, consistent with the subordinated nature of the Secured Convertible PIK Notes.

**Conditions Precedent:**    The consummation of the transactions contemplated by this Term Sheet shall be subject to conditions precedent to be determined, including, without limitation, the occurrence of the effective date of a plan of reorganization of the Loan Parties on terms and conditions acceptable to the Administrative Agent, the Collateral Agent, the Lenders and the LC Issuer.

**Representations and Warranties:**    Usual and customary for financings of this type giving due regard to the representations and warranties set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries[, provided that additional representations and warranties regarding FCPA compliance to be agreed shall be

8

included in the Credit Agreement].

**Financial Covenants:**    Minimum liquidity covenant (to be defined as cash on deposit in accounts subject to perfected lien in favor of Administrative for the benefit of the Lenders *plus* any availability under any Incremental Revolving Facility) of $[75,000,000], to be tested and reported on a quarterly basis unless liquidity is less than $[100,000,000] at which point liquidity shall be tested and reported on a monthly basis until liquidity is equal to or exceeds $[100,000,000] at which point the covenant shall again be tested and reported on a quarterly basis.[3]

**Affirmative Covenants:**    Usual and customary for financings of this type giving due regard to the affirmative covenants set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries, provided that:

- Quarterly Lender Calls shall be required

- Periodic updates as and when reasonably requested with respect to any material investigations, litigation, arbitration or other dispute except to the extent that the provision thereof would violate any obligation of confidentiality binding upon, or waive any attorney-client privilege of, the Borrower, subject to parameters to be agreed

- Reasonable access to management for all Lenders

- Additional reporting shall be required as follows subject to reasonable limitations to be agreed:

  → periodic fleet report on a quarterly basis

  → thresholds for notices of litigation and environmental liabilities to be reduced and for notices of Asset Dispositions of Vessels and Involuntary Transfers to be reduced, in each case to levels to be agreed

  → additional reporting with respect to drilling contracts

- There shall be no ability to transfer a partial interest in a Vessel other than to a Loan Party, unless the Required Lenders shall have otherwise consented

  - All earnings from Vessels shall be required to be deposited

---

[3]    **Note**: Subject to satisfactory review of business plan and supporting documentation

9

into a blocked account and all cash of the Borrower and its Restricted Subsidiaries shall be required to held in deposit accounts subject to deposit account control agreements in favor of Collateral Agent, subject to certain limited exceptions for (a) cash in foreign deposit accounts; <u>provided</u> that no foreign deposit account may have a cash balance greater than $5,000,000 at any time, and all foreign deposit accounts, collectively, may not have a cash balance greater than $25,000,000 in the aggregate at any time, in each case, for more than ten business days and any cash balances in excess of such limits shall be swept or deposited into accounts subject to deposit account control agreements in favor of Collateral Agent and (b) accounts used for funding payroll, payroll taxes and other compensation and benefits to employees.

**Negative Covenants:**       Usual and customary for financings of this type giving due regard to the negative covenants set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, applicable to the Borrower and its Restricted Subsidiaries, provided that:

- Permitted Liens concept shall be modified as follows:

  → Exception for liens on acquired Persons or assets shall be limited to liens securing certain Capital Leases and purchase money indebtedness provided that such liens were in existence prior to the contemplation of such acquisition

  → Basket for Liens securing Capital Leases to be reduced to $25,000,000

  → Basket for junior liens securing the Incremental Facility or Incremental Equivalent Debt

  → Basket for liens securing any Client Reimbursement Debt (as defined below) so long as such liens do not encumber any property of the Loan Parties other than the equipment acquired with the proceeds of such Client Reimbursement Debt

  → Basket for second priority Liens securing the New Secured Notes so long as such Liens are subject to the Intercreditor Agreement

  → Basket for third priority Liens securing the Secured

10

Convertible PIK Notes (as defined in the Restructuring Term Sheet) so long as such Liens are subject to the Intercreditor Agreement

→ Liens on the Vantage Parent Assets purchased by the Borrower securing the Vantage Parent Secured Promissory Note (prior to conversion to equity)

- Permitted Debt concept shall be modified as follows:

  → Additional basket for Debt incurred in lieu of an Incremental Facility (the "<u>Incremental Equivalent Debt</u>") so long as (a) the conditions set forth under the heading "Incremental Facility" are satisfied and (b) such Debt is unsecured or secured on a junior lien basis

  → Exception for debt on acquired Persons or assets shall be limited to certain Capital Leases and purchase money indebtedness provided that such debt was in existence prior to the contemplation of such acquisition

  → Basket for Capital Leases to be reduced to $25,000,000

  → Additional basket for debt (the "<u>Client Reimbursement Debt</u>") in an amount equal to the aggregate amount of committed client reimbursements for equipment mobilization expenditures, but limited to $50,000,000 per drillship and $25,000,000 per jackup

  → $75.0MM New Secured Notes on terms reasonably acceptable to Required Lenders and otherwise not more restrictive in any material respect than the terms of the Credit Facilities

  → $750,000,000 mandatorily convertible third lien subordinated Debt issued to the term lenders and noteholders under the Borrower's existing debt documents at the closing of the Restructuring for so long as such Debt has not been converted to equity in accordance with its terms, on terms reasonably acceptable to Required Lenders and otherwise not more restrictive in any material respect than the terms of the Credit Facilities

- Borrower not be permitted to merge with another Person or sell all or substantially all of its assets to another Person

11

unless the Borrower is the survivor

- Asset Sales covenant shall be modified as follows:

  → threshold for excluded transactions to be reduced to $1,000,000 individually and $5,000,000 in the aggregate during any twelve-month period

  → to permit Asset Sales, so long as:

    ▪ receive FMV

    ▪ at least 75% cash consideration (Designated Non-Cash Consideration capped at 5% of CTA)

    ▪ 100% of net proceeds are used to pay down term loan obligations, subject to reinvestment rights as described under the heading "Mandatory Prepayments" above

    ▪ all such Asset Sales do not exceed an aggregate annual cap equal to a fixed equal to 5% of CTA, unless the Required Lenders shall have otherwise consented

    → to add a requirement that the drillships and jack-ups may not be sold other than to Loan Parties, unless the Required Lenders shall have otherwise consented

- Investments covenant shall be modified as follows:

  → To permit additional Investments made with the proceeds of qualified equity issuances so long as the acquired assets are pledged as Collateral to the extent required under the terms of the Credit Agreement

  → No Investments outside of Borrower and its Restricted Subsidiaries in existence at consummation, subject to exceptions to be agreed

  → The Vantage Parent Secured Promissory Note in an amount to be agreed

- No Restricted Payments by the Borrower shall be permitted other than

  → [Restricted Payments consistent with the Permitted Parent Payments and/or Permitted Operating Expenses

12

and Tax Reimbursements concepts in the Existing Credit Agreement, in each case subject to reasonable limitations to be agreed][4]

→ Up to 50% of the Specified Proceeds may be used for Restricted Payments, so long as at least 50% of such Specified Proceeds are used to prepay the Loans

- Transactions with Affiliates covenant to require delivery of fairness opinion if transaction involves aggregate consideration in excess of $25,000,000

- The following additional negative covenants shall be included:

  → growth capital expenditures only permitted to the extent made with the proceeds of qualified equity issuances or made pursuant to customer contracts

  → acceptable flag jurisdictions to be limited to US, Liberia, Marshall Islands, Vanuatu, Bahamas and Panama

  → requirement to maintain certain classifications for Vessels

  → requirement to maintain ratings by one credit rating agency

    → limitations on junior debt prepayments and modification of debt instruments in a manner adverse to the Lenders

**Events of Default:** Usual and customary for financings of this type giving due regard to the events of default set forth in the Existing Credit Agreement, the New Secured Notes and the Secured Convertible PIK Notes, including, without limitation, a Judgment Default (as defined in the Restructuring Term Sheet) applicable to the Borrower and/or its Restricted Subsidiaries.

**Assignments and Participations:** Assignments and participations shall be subject to, so long as no payment or bankruptcy Event of Default shall exist, Borrower

---

[4]     **Note**: Subject to review of the post-restructuring corporate structure and an understanding of the goods, taxes, services, operating expenses, franchise taxes, accounting, legal and administrative expenses that may be payable by other Persons but are attributable to the Borrower post-reorganization

consent (not to be unreasonably withheld or delayed).

**Counsel to the Administrative and Collateral Agents:**    Latham & Watkins LLP

14

## <u>*Addendum I - Pricing, Fees and Interest Rates*</u>

| | |
|---|---|
| **Interest Rates with respect to Advances:** | L + 650 bps (50bps floor). |
| **Letter of Credit Fees:** | L + 550 bps (50bps floor). |
| **Commitment Fees:** | The Borrower agrees to pay a commitment fee, which shall accrue at 0.50% on the average daily unused amount of the commitment of the LC Issuer during the period from and including the Closing Date to but excluding the Maturity Date.  Accrued commitment fees shall be payable quarterly in arrears and on the Maturity Date.  All commitment fees shall be calculated for actual days elapsed on the basis of a 360-day year, unless such calculation would exceed the highest lawful rate, in which case interest shall be calculated for actual days elapsed on the basis of a 365, or when appropriate 366, day year. |
| **Letter of Credit Fees:** | Letter of Credit fees are due quarterly in arrears and on the Maturity Date to the LC Issuer.  In addition, the Borrower shall pay the Administrative Agent for the account of the LC Issuer a fronting fee equal to the greater of (a) $500.00 and (b) 0.25% per annum per Letter of Credit.  Letter of Credit fees will be calculated on the amount available for drawing of each Letter of Credit for the duration thereof. |
| **Agency Fees:** | TBD |

**TERMS OF 10% SENIOR SECURED SECOND LIEN NOTES DUE 2020**

| Term: | Description:[1] |
|---|---|
| **Issuer** | Offshore Group Investment Limited, a Cayman Islands exempted company with limited liability. |
| **Notes** | 10% Senior Secured Second Lien Notes due 2020 (the "**Notes**"). The Notes are being issued pursuant to the rights offering contemplated by the Plan. |
| **Principal Amount** | $75.0 million, plus $1.125 million, to be issued in connection with the payment of the Backstop Commitment Premium |
| **Issue Price** | 100% of the principal amount |
| **Maturity Date** | The Notes will mature on December 31, 2020, unless redeemed or repurchased in accordance with their terms. |
| **Interest** | The Notes will bear interest at a rate of 10% per annum, payable in cash. Interest on the Notes will be payable semiannually, in arrears. Interest on the Notes will accrue from their issue date. |
| **Minimum Denominations** | The Notes will be issued in minimum principal denominations of $1,000 and integral multiples of $1,000 in excess thereof. |
| **No Sinking Fund** | The Notes are not entitled to the benefits of, or subject to, a sinking fund. |
| **Securities Laws Matters** | The Issuer and the Subsidiary Guarantors (as defined below) will be required to qualify the indenture for the Notes (the "**Indenture**") under the Trust Indenture Act of 1939, as amended (the "**TIA**") and will have filed a Form T-3 with the SEC immediately prior to the commencement of the solicitation. |
| **Guarantees** | The Notes will be fully and unconditionally guaranteed, jointly and severally, on a senior secured second lien basis by each of the Issuer's existing and future subsidiaries who also guarantee the Credit Facility (as defined below) (the "***Subsidiary Guarantors***"). |
| **Security** | The Notes and the Guarantees thereof will be secured by a second priority lien, junior to the liens securing the Issuer's and the Subsidiary Guarantors' obligations under the Amended and Restated Credit Facility (the "***Credit Facility***") (and senior to the third priority lien securing the Secured Convertible PIK Notes and guarantees thereof), on substantially all assets of the Issuer and the Subsidiary Guarantors, consistent with the Credit Facility and consisting of all assets securing the Credit Facility. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the restructuring support agreement, dated as of December 1, 2015 (as amended or otherwise modified, the "**Restructuring Support Agreement**") and the restructuring term sheet, attached thereto (as amended or otherwise modified, the "**Restructuring Term Sheet**").

| Term: | Description:[1] |
|---|---|
| **Ranking** | The Notes and the Guarantees of each Subsidiary Guarantor will:<br><br>• be the Issuer's and the Subsidiary Guarantors' senior secured obligations;<br>• rank equal in right of payment with all of the Issuer's and the Subsidiary Guarantors' existing and future senior indebtedness, subject to the provisions of the Intercreditor Agreement;<br>• rank senior in right of payment to any of the Issuer's and the Subsidiary Guarantors' existing and future indebtedness (including, for the avoidance of doubt, the Secured Convertible PIK Notes) that is expressly subordinated in right of payment to the Notes;<br>• be effectively senior to any of the Issuer's and the Subsidiary Guarantors' unsecured indebtedness and third-priority senior secured indebtedness (including, for the avoidance of doubt, the Secured Convertible PIK Notes), to the extent of the value of the collateral securing the Notes and the Guarantees; and<br>• be effectively junior to all of the Issuer's and the Subsidiary Guarantors' existing and future first-priority senior secured indebtedness (including, for the avoidance of doubt, the Credit Facility), to the extent of the collateral securing such indebtedness. |
| **Intercreditor** | The Indenture will be subject to, and the rights of creditors in respect of the Notes and security therefor will be subject to and limited by, an Intercreditor Agreement (the "**Intercreditor Agreement**"), as contemplated by the Restructuring Term Sheet.  Decisions as to release and maintenance of collateral will be made by first lien creditors and their agents, consistent with interpretations and guidance from the SEC rendering Section 314(d) of the TIA inapplicable to released collateral in respect of the Notes. |
| **Optional Redemption** | Subject to the terms of the Intercreditor Agreement, the Notes may be redeemed, at the option of the Issuer, in whole or in part, at any time and from time to time, at a redemption price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption, without premium or penalty. |
| **Mandatory Redemption Upon Event of Loss of a Vessel** | Subject to the Intercreditor Agreement, upon the occurrence of certain events of loss with respect to a vessel, the Issuer will be required to redeem, on a pro rata basis, the Notes with proceeds received in respect of such loss at a redemption price for the Notes equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption. |
| **Change of Control Offer** | If the Issuer experiences a change of control, each holder of Notes will have the right to require the Issuer to repurchase all or any part of its Notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of repurchase. |
| **Asset Sale Offer** | If the Issuer or any restricted subsidiary engages in certain asset sales, within 360 days of such sale, the Issuer generally must use the net cash proceeds from such sales to repay debt, to acquire another company in its industry, to make capital expenditures or to invest in its business, or the Issuer must make an offer to purchase a principal amount of the Notes equal to the excess net cash |

WEIL:\95544964\9\78787.0003

| **Term:** | **Description:**[1] |
|---|---|
| | proceeds. The purchase price of each Note so purchased will be 100% of its principal amount, plus accrued and unpaid interest to the repurchase date. |
| **Certain Covenants** | The Indenture, among other things, will limit the Issuer's and any restricted subsidiary's ability to:<br><br>• pay dividends, redeem subordinated indebtedness or make other restricted payments;<br><br>• incur or guarantee additional indebtedness or issue preferred stock;<br><br>• create or incur liens;<br><br>• incur dividends or other payment restrictions affecting restricted subsidiaries;<br><br>• consummate a merger, consolidation or sale of all or substantially all of their assets;<br><br>• enter into transactions with affiliates;<br><br>• transfer or sell assets; and<br><br>• engage in business other than their current business and reasonably related extensions thereof.<br><br>Such covenants will be subject to customary exceptions to be set forth in the Indenture and will be no more restrictive than the covenants in the Credit Facility. |
| **Events of Default** | The Indenture will include certain Events of Default, including:<br><br>(a) Default in the payment of principal when the same becomes due and payable at maturity,<br>(b) Default for 30 days or more in the payment, when due, of interest;<br>(c) Certain customary events of bankruptcy, insolvency, etc. in respect of the Issuer or any Subsidiary Guarantor;<br>(d) the acceleration of any indebtedness of the Issuer or any Subsidiary Guarantor in an amount greater than $30 million dollars prior to its stated maturity;<br>(e) entry by a court or courts of competent jurisdiction of a final judgment or government fine or penalty (whether by agreement, consent decree, or otherwise), or entry by OGIL, any guarantor of the Notes, or any affiliate of OGIL (other than Vantage Parent) into any settlement agreement, consent decree, or similar agreement with respect to any investigations involving, or claims against, such entity, that would individually or in the aggregate exceed $50.0 million; and<br>(f) failure to comply with covenants for a period of 45 days after proper notice thereof.<br><br>For the avoidance of doubt, the Indenture shall provide that a majority in aggregate principal amount of the then outstanding Notes may waive any Event of Default other than an Event of Default relating to the payment of principal |

WEIL:\95544964\9\78787.0003

| **Term:** | **Description:**[1] |
|---|---|
| | of, premium, if any, or interest on, the Notes. |
| **Acceleration** | Upon occurrence and continuance of an Event of Default (other than an Event of Default relating to certain bankruptcy and insolvency matters), either the Trustee or holders of at least 25% in aggregate principal amount of the then outstanding Notes may accelerate the Notes, in which event the Issuer will be obligated to pay principal and all accrued and unpaid interest as of the date of such acceleration (and any other amounts due in respect of the Notes) in full in cash. However, for the avoidance of doubt, holders of a majority in aggregate principal amount of the then outstanding Notes may rescind any acceleration and its consequences, including any related payment default that resulted therefrom. <br><br> In addition, upon the occurrence of an Event of Default relating to certain bankruptcy and insolvency matters, the Notes will automatically be accelerated, in which event the Issuer will also be obligated to pay principal and all accrued and unpaid interest as of the date of acceleration on the Notes (and any other amounts due in respect of the Notes) in full in cash. |
| **Trustee** | [_____][2] |
| **Definitive Documents and Due Diligence** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of definitive documents, which documents shall be substantially consistent with the terms of this Term Sheet.  The definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |

---

The Trustee will be determined by the Issuer and the Ad Hoc Committee.

WEIL:\95544964\9\78787.0003

## TERMS OF STEP-UP SENIOR SUBORDINATED SECURED
## THIRD LIEN CONVERTIBLE NOTES DUE 2030

| Term: | Description:[1] |
|---|---|
| **Issuer** | Offshore Group Investment Limited, a Cayman Islands exempted company with limited liability. |
| **Notes** | 1% / 12% Step-up Senior Subordinated Secured Third Lien Convertible Notes due 2030 (the "**Secured Convertible PIK Notes**") |
| **Principal Amount** | $750.0 million |
| **Issue Price** | 100% of the principal amount |
| **Maturity Date** | The Secured Convertible PIK Notes will mature on December 31, 2030, unless redeemed or repurchased in accordance with their terms. |
| **Step-up Interest** | During the first four years, 1%, payable in kind, semi-annually (in arrears) by increasing the outstanding principal amount of the Secured Convertible PIK Notes.  From and after the fifth  year from the issue date through the Maturity Date, 12%, payable in kind, semi-annually (in arrears) by increasing the outstanding principal amount of the Secured Convertible PIK Notes.   At final maturity (or an earlier acceleration), all accrued and unpaid interest will be paid together with (and in the same form of payment as) principal. |
| **Minimum Denominations** | The Secured Convertible PIK Notes will be issued in minimum principal denominations of $1.00. |
| **No Sinking Fund** | The Secured Convertible PIK Notes are not entitled to the benefits of, or subject to, a sinking fund. |
| **Securities Laws Matters** | The Secured Convertible PIK Notes (including the New Common Shares issuable upon conversion thereof): <br>(a) will be issued pursuant to the exemption from the registration requirements of the U.S. Securities Act of 1933, as amended, and applicable state securities laws provided by Section 1145 of the Bankruptcy Code, and <br>(b) will not be listed for trading on any national securities exchange. <br><br>The Issuer and the Subsidiary Guarantors (as defined below) will be required to qualify the indenture for the Secured Convertible PIK Notes (the "**Indenture**") under the Trust Indenture Act of 1939, as amended (the "**TIA**") and will have filed a Form T-3 with the SEC |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the restructuring support agreement, dated as of December 1, 2015 (as amended or otherwise modified, the "**Restructuring Support Agreement**") and the restructuring term sheet, attached thereto (as amended or otherwise modified, the "**Restructuring Term Sheet**").

| Term: | Description:[1] |
|---|---|
| | immediately prior to the commencement of the solicitation. |
| **Subordination** | Subordinated in right of payment to the Amended and Restated Credit Revolving Facility (the "**Credit Facility**") and the New Secured Notes). |
| **Guarantees** | The Secured Convertible PIK Notes will be fully and unconditionally guaranteed, jointly and severally, on a senior subordinated secured third lien basis by each of the Issuer's existing and future subsidiaries who also guarantee the Credit Facility (the "**Subsidiary Guarantors**"). |
| **Security** | The Secured Convertible Notes and the Guarantees thereof will be secured by a third priority lien, junior to the liens securing the Issuer's and the Subsidiary Guarantors' obligations under the Credit Facility and the New Secured Notes, on substantially all assets of the Issuer and the Subsidiary Guarantors, consistent with the Credit Facility and consisting of all assets securing the Credit Facility. |
| **Ranking** | The Secured Convertible PIK Notes and the Guarantees of each Subsidiary Guarantor will:<br><br>• be the Issuer's and the Subsidiary Guarantors' senior subordinated secured obligations;<br>• be subordinated in right of payment to the Credit Facility and the New Secured Notes subject to the provisions of the Intercreditor Agreement;<br>• rank equal in right of payment with all of the Issuer's and the Subsidiary Guarantors' other existing and future senior indebtedness;<br>• rank senior in right of payment to any of the Issuer's and the Subsidiary Guarantors' future indebtedness that is expressly subordinated in right of payment to the Secured Convertible PIK Notes; and<br>• be effectively senior to any of the Issuer's and the Subsidiary Guarantors' unsecured indebtedness, to the extent of the value of the collateral securing the Secured Convertible PIK Notes and the Guarantees.<br>• be effectively junior to all of the Issuer's and the Subsidiary Guarantors' existing and future first-priority and second-priority senior secured indebtedness (including, for the avoidance of doubt, the Credit Facility and the New Secured Notes), to the extent of the collateral securing such indebtedness. |
| **Intercreditor** | The Indenture will be subject to, and the rights of creditors in respect of the Secured Convertible PIK Notes and security therefor will be subject to and limited by, an Intercreditor Agreement (the "**Intercreditor Agreement**"), as contemplated by the Restructuring Term Sheet.  Decisions as to release and maintenance of collateral will |

| **Term:** | **Description:**[1] |
|---|---|
| | be made by first lien creditors and their agents, consistent with interpretations and guidance from the SEC rendering Section 314(d) of the TIA inapplicable to released collateral in respect of the Secured Convertible PIK Notes. |
| **New Common Shares Stapled** | The Secured Convertible PIK Notes will be "stapled" to the New Common Shares issuable to the Allowed Secured Term Loan Claim and Allowed Secured Notes Claim holders, pursuant to (and as defined in) the Plan, in units comprising [●] New Common Shares to each $1.00 principal amount of Secured Convertible PIK Notes, such that the units may not be separated and may only be traded together as single units.<br><br>The stapling of the notes and shares may take one of several different forms including, among others, the issuance of units in a trust formed for the sole purpose of holding the notes and shares. |
| **Mandatory Conversion** | The then outstanding principal amount of Secured Convertible PIK Notes, including any interest previously paid by increasing such principal amount (and any accrued and unpaid interest thereon, as of the date of conversion), may be converted into New Common Shares at the Conversion Price:<br>(a) during the first three years after the issue date,<br>   (i) upon the agreement by a majority vote of holders of the Secured Convertible PIK Notes to convert into New Common Shares or<br>   (ii) upon the full and final resolution of all potential Investigation Claims (as defined herein) against the Issuer, the Issuer's current subsidiaries, Vantage International Management Company Pte. Ltd., Vantage Energy Services, Inc., and Vantage Parent and Vantage Parent's current subsidiaries (to the extent that the Issuer or any subsidiary of the Issuer may reasonably be expected to be liable for such claim against Vantage Parent or Vantage Parent's current subsidiaries), as determined in good faith by the New Board of the Issuer (which determination shall require the affirmative vote of a supermajority of the non-management directors, which, for all purposes herein, shall mean 5 affirmative votes assuming that 6 directors are eligible to vote), and<br>(b) from and after the third anniversary of the issue date through the Maturity Date, upon the approval of the New Board of the Issuer (which approval shall require the affirmative vote of a supermajority of the non-management directors). |

| Term: | Description:[1] |
|---|---|
| | The Conversion Price shall be equal to \$[●]/per New Common Share[2] (the "Conversion Price").<br><br>The Subordinated Convertible PIK Notes, if not converted in full, may only be converted, at any time or from time to time, if a minimum of \$125 million aggregate principal amount of the then outstanding Secured Convertible PIK Notes is so converted.<br><br>The Conversion Price will be subject to adjustment in certain circumstances as set forth in the Indenture (*e.g.*, share splits or other fundamental changes in the New Common Shares).<br><br>The "**Investigation Claim**" shall mean any claim held by a United States or Brazilian governmental unit and arising from or related to the procurement of that certain Agreement for the Provision of Drilling Services, dated as of February 4, 2009, by and between Petrobras Venezuela Investments & Services B.V. and Vantage Deepwater Company, as amended, modified, supplemented, or novated from time to time. |
| **Amortization** | No principal amortization will be required or permitted prior to maturity. |
| **Optional Redemption** | Subject to the terms of the Intercreditor Agreement, the Secured Convertible PIK Notes may be redeemed, at the option of the Issuer, in whole or in part, at any time and from time to time, at the amount equal to the accreted value of the Secured Convertible PIK Notes at maturity, discounted at the applicable Treasury Rate (which Treasury Rate shall match the tenor of the Secured Convertible PIK Notes at the time the make-whole premium is due and payable) + 50 basis points. |
| **Mandatory Redemption** | Subject to the terms of the Intercreditor Agreement:<br>(a) Upon the occurrence of certain events of loss with respect to a vessel, the Issuer will be required to redeem, on a pro rata basis, the Secured Convertible PIK Notes with proceeds received in respect of such loss at a redemption price for the notes equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the date of redemption.<br>(b) If the Issuer or any restricted subsidiary engages in certain asset sales, within 360 days of such sale, the Issuer generally must use the net cash proceeds from such sales to repay debt, to acquire another company in its industry, to make capital expenditures or to |

---

[2] Conversion Price will be set based on the valuation of the Plan.

| Term: | Description:[1] |
|---|---|
| | invest in its business, or the Issuer must make an offer to purchase a principal amount of the Secured Convertible PIK Notes equal to the excess net cash proceeds.  The purchase price of each Secured Convertible PIK Note so purchased will be 100% of its principal amount, plus accrued and unpaid interest to the repurchase date.<br>(c) If the Issuer experiences a change of control, each holder of Secured Convertible PIK Notes will have the right to require the Issuer to repurchase all or any part of its notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of repurchase. |
| **Events of Default** | The Indenture will include certain Events of Default, including:<br><br>(a) Default in the payment of principal when the same becomes due and payable at maturity,<br>(b) Default for 30 days or more in the payment, when due, of interest;<br>(c) Certain customary events of bankruptcy, insolvency, etc. in respect of the Issuer or any Subsidiary Guarantor;<br>(d) the acceleration of any indebtedness of the Issuer or any Subsidiary Guarantor in an amount greater than $30 million dollars prior to its stated maturity;<br>(e) entry by a court or courts of competent jurisdiction of a final judgment or government fine or penalty (whether by agreement, consent decree, or otherwise), or entry by OGIL, any guarantor of the Secured Convertible PIK Notes, or any affiliate of OGIL (other than Vantage Parent) into any settlement agreement, consent decree, or similar agreement with respect to any investigations involving, or claims against, such entity, that would individually or in the aggregate exceed $50.0 million; and<br>(f) failure to comply with covenants for a period of 45 days after proper notice thereof.<br><br>For the avoidance of doubt, the Indenture shall provide that a majority in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may waive any Event of Default other than an Event of Default relating to the payment of principal of, premium, if any, or interest on, the Secured Convertible PIK Notes. |
| **Acceleration** | Upon occurrence and continuance of an Event of Default (other than an Event of Default relating to certain bankruptcy and insolvency matters), either the Trustee or holders of at least 25% in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may accelerate the Secured Convertible PIK Notes, in which event, the Issuer will be obligated to pay principal and all accrued and unpaid interest as of the date of such acceleration (and any other amounts due in respect of the Secured Convertible PIK Notes) in full |

| Term: | Description:[1] |
|---|---|
| | in cash, at the make-whole premium amount described below. However, for the avoidance of doubt, holders of a majority in aggregate principal amount of the then outstanding Secured Convertible PIK Notes may rescind any acceleration and its consequences, including any related payment default that resulted therefrom.<br><br>In addition, upon the occurrence of an Event of Default relating to certain bankruptcy and insolvency matters, the Secured Convertible PIK Notes will automatically be accelerated, in which event the Issuer will also be obligated to pay principal and all accrued and unpaid interest as of the date of acceleration on the Secured Convertible PIK Notes (and any other amounts due in respect of the Secured Convertible PIK Notes) in full in cash, at the make-whole premium amount described below. |
| **Make-whole premium** | The Secured Convertible PIK Notes shall be subject to a make-whole premium (on customary terms and conditions) due and payable upon the occurrence of acceleration following an Event of Default (as defined herein) in the amount equal to the accreted value of the Secured Convertible PIK Notes at maturity, discounted at the applicable Treasury Rate (which Treasury Rate shall match the tenor of the Secured Convertible PIK Notes at the time the make-whole premium is due and payable) + 50 basis points. |
| **Other Covenants** | Additional covenants as are reasonable and customary in similar issuances of convertible PIK notes, including as to payment of principal and interest, payment of taxes, maintenance of corporate existence, continuation of business in current nature and reasonably related extensions thereof, restrictions on liens (other than customary permitted liens), and similar matters, which covenants shall be no more restrictive than corresponding covenants contained in the Credit Facility and the New Secured Notes.  For the avoidance of doubt, the Secured Convertible PIK Notes will not be subject to any maintenance covenants. |
| **Trustee** | [_____][3] |
| **Definitive Documents and Due Diligence** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of definitive documents, which documents shall be substantially consistent with the terms of this Term Sheet.  The definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions |

---

[3] The Trustee will be determined by the Issuer and the Ad Hoc Committee.

| Term: | Description:[1] |
|---|---|
|  | described herein consistent with the terms of this Term Sheet. |

**Vantage Drilling Company**

**Summary Of Proposed Post-Emergence Compensation**

November 30, 2015

| | Key MIP Terms |
|---|---|
| Qualified Liquidity Event ("QLE") | • Any of the following: (a) A transaction or series of related transactions pursuant to which any "person" (or group of persons) acquires more than 50% of the voting power of the Company's then outstanding securities (other than transfers among the shareholders of the company at the time of recapitalization); (b) sale of all or substantially all of the company's assets; or (c) Listing of 25% or more of the Company's shares on public stock exchange, in aggregate; provided, however, that in the event of a listing of less than 50% (but greater than 25%) each participant has the right to defer the QLE until 50% of the equity is listed |
| Allocation | • Approximately $44.5 million in grant date value, subject to time- and performance-based vesting as outlined below |
| Vehicles Used | • RSU based on the value a unit of Secured Convertible PIK Notes and Common Equity |
| Vesting Schedule | • 30% time-based, vesting ratably annually over 4 years<br>  – In the event of a QLE within the first two years of recapitalization with a value of less than 2.0X TEV, 50% of the time-based RSUs to accelerate and vest<br>  – In the event of a QLE after the second anniversary of the recapitalization, management to vest according to the schedule set forth above<br>    ○ For example, in the event of a QLE of less than 2X TEV on the third anniversary of the recapitalization, management to vest in 75% of the time-based RSUs<br>  – In the event of a QLE at any time with a value of 2X TEV or greater, 100% of the time-based RSUs to accelerate and vest<br>• 70% performance-based, as follows:<br>  – 0% to vest absent an QLE of less than 1.5X Total Enterprise Value ("TEV")<br>  – 10% to vest upon a QLE at 1.5X TEV<br>  – 25% to vest upon a QLE at 2X TEV<br>  – 50% to vest upon a QLE at 2.5X TEV<br>  – 75% to vest upon a QLE at 3X TEV<br>  – 100% to vest upon a QLE at 4X (or greater) TEV<br>  – Straight-line interpolation between these points<br>*Note: Any reinvestment of the Petrobras arbitration award will be excluded from the calculation of TEV for the purposes of determining the percentage of performance-based RSUs that would vest upon a QLE. However, excess cash from operations generated above the beginning excess cash of $150 million (excess cash at Plan value) to be included in* |

| | |
|---|---|
| | *the calculation of TEV for the purposes of determining the percentage of performance-based RSUs that would vest.* |
| Dividends | • Unvested time-based RSUs to accrue dividend equivalents, paid upon settlement Vested RSUs receive a proportionate share of dividends paid with respect to common shares<br>• Customary anti-dilution protection to be agreed upon with regard to any special dividends |
| Monetization Of Compensatory RSUs | • Monetization to be earliest dates possible in accordance with applicable tax law and to be finalized in later documentation; provided it will not occur until at least one of the QLE elements or the 7th anniversary of grant has occurred. |
| Restrictive Covenants | • Long-term incentive participants will be bound by typical restrictive covenants, including, but not limited to, non-competition, non-solicitation, non-disclosure, non-disparagement<br>• Non-compete/non-solicitation duration to be determined from the date of termination through the specified term<br>    – For clarity, if an executive were to be terminated on January 1, 2016, the period of non-competition/non-solicitation would commence on January 1, 2016 |
| Projected Value | • Upon a QLE equal to at least 1.50X TEV, equity to yield between $15.0 million and $25.2 million, depending upon the timing of the QLE<br>• Upon a QLE equal to at least 1.75X TEV, equity to yield between $21.8 million and $33.8 million to management, depending upon timing of the QLE<br>• Upon a QLE equal to at least 2.00X of TEV, management yield to be approximately $43.6 million<br>• Upon a QLE equal to at least 2.5X of TEV, management yield to be approximately $75.1 million<br>• Upon a QLE equal to at least 3.00X of TEV, management yield to be approximately $114.9 million<br>• Upon a QLE equal to at least 4.00X of TEV, management yield to be approximately $186.6 million |
| Petrobras Litigation Participation | • Management to be awarded 3.25% of the net proceeds of any arbitration award in connection with the Petrobras litigation, award to be granted in cash or restricted stock ("RS") at the sole discretion of the Board of Directors<br>• Award (either cash or RS) to be subject to the same time-vesting schedule as the "emergence" time-based RSU grants (four-year ratable annual vesting)<br>    – For example, if there is an arbitration award at the two-year anniversary of the recapitalization, 50% of the award would be vested upon the date of grant<br>• Individual grants made in connection with the Petrobras arbitration award, if granted in RS, may be "net settled" to cover the income taxes due upon the delivery of the vested RS, subject to any credit agreement restrictions<br>• Executives also may net settle upon each future vesting event to |

| | cover any income tax obligations (if awards are granted in RS), subject to any credit agreement restrictions<br><br>*Note: The arbitration award will be dividended out as a special dividend; however, and may be re-invested (in total or in part) at the election of the Board of Directors at no less than the then fair market value. As stated above under "Vesting Schedule" any amounts reinvested at the time of reinvestment (with no adjustment or discounting of such amount) will be excluded from the calculation of TEV for the purposes of determining the percentage of performance-based RSUs that would vest upon a QLE.* |
|---|---|
| Monetization of "Petrobras" RS | • Monetization to be earliest dates possible in accordance with applicable tax law and to be finalized in later documentation, provided it will not occur until at least one of the QLE elements or the 7th anniversary of grant has occurred. |
| Non-Compete | • Non-compete period of 12 months from date of departure/ severance/*etc.*; provided, however, that in the event of a sale of all or substantially all of the assets or equity, the non-compete no longer applies |
| Other Terms | • Market competitive, to be detailed later |