## EXHIBIT B

**Blackline**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------------x | : | |
| In re | : | **Chapter 11** |
| | : | |
| **OFFSHORE GROUP** | : | **Case No. 15-12422 (BLS)** |
| **INVESTMENT LIMITED,** *et al.*,[1] | : | Case No. 15-_____ (___) |
| | : | **Jointly Administered** |
| Debtors. | : | (Joint Administration Requested) |
| | : | |
| ------------------------------------------------------------x | | |

### AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF
### OFFSHORE GROUP INVESTMENT LIMITED AND ITS AFFILIATED DEBTORS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Offshore Group Investment Limited; Vantage Delaware Holdings, LLC; Dragonquest Holdings Company; Emerald Driller Company; P2020 Rig Co.; P2021 Rig Co.; PT. Vantage Drilling Company Indonesia; Sapphire Driller Company; Vantage Deepwater Company; Vantage Deepwater Drilling, Inc. (3668); Vantage Driller I Co; Vantage Driller II Co; Vantage Driller III Co; Vantage Driller IV Co.; Vantage Driller VI Co.; Vantage Driller ROCO S.R.L.; Vantage Drilling Africa; Vantage Drilling (Malaysia) I Sdn. Bhd.; Vantage Drilling Labuan I Ltd.; Vantage Drilling Netherlands B.V.; Vantage Holding Hungary Limited Liability Company; Vantage Holdings Cyprus ODC Limited; Vantage Holdings Malaysia I Co; and Vantage International Management Co.  The Debtors' mailing address is 777 Post Oak Boulevard, Suite 800, Houston, Texas 77056.

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Ronit J. Berkovich
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

RICHARDS, LAYTON & FINGER,
P.A.
Mark D. Collins (No. 2981)
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors and*
*Debtors in Possession*

Dated:    ~~December 1~~January 11, 201~~5~~6
          Wilmington, Delaware

## Table of Contents

**ARTICLE I.    Definitions and Interpretation.** ..................................................... ~~1~~6

    1.1       Definitions. ....................................................................................... ~~1~~6

    1.2       Interpretation; Application of Definitions; Rules of Construction. ......... ~~13~~19

    1.3       Reference to Monetary Figures. ....................................................... ~~14~~19

    1.4       Consent Rights of Restructuring Support Parties. ............................. ~~14~~20

    1.5       Controlling Document. ...................................................................... ~~14~~20

**ARTICLE II.   Administrative Expense Claims, Fee Claims, and Priority Tax Claims.** ~~14~~20

    2.1       Treatment of Administrative Expense Claims. .................................... ~~14~~20

    2.2       Treatment of Fee Claims. ................................................................. ~~15~~20

    2.3       Treatment of Priority Tax Claims. ...................................................... ~~15~~21

**ARTICLE III.  Classification of Claims and Interests.** ........................................ ~~15~~21

    3.1       Classification in General. .................................................................. ~~15~~21

    3.2       Formation of Debtor Groups for Convenience Only. .......................... ~~15~~21

    3.3       Summary of Classification of Claims and Interests. .......................... ~~16~~21

    3.4       Separate Classification of Other Secured Claims. ............................ ~~16~~22

    3.5       Elimination of Vacant Classes. ......................................................... ~~16~~22

    3.6       Voting; Presumptions; Solicitation. ................................................... ~~16~~22

    3.7       Cramdown. ...................................................................................... ~~17~~23

    3.8       No Waiver. ....................................................................................... ~~17~~23

**ARTICLE IV.  Treatment of Claims and Interests.** ............................................. ~~17~~23

    4.1       Class 1: Priority Non-Tax Claims. ..................................................... ~~17~~23

    4.2       Class 2: Other Secured Claims. ....................................................... ~~18~~24

    4.3       Class 3: Revolving Credit Facility Claims. ........................................ ~~18~~24

    4.4       Class 4: Secured Debt Claims. ........................................................ ~~18~~24

| 4.5 | Class 5: General Unsecured Claims. | ~~19~~25 |
| 4.6 | Class 6: Intercompany Claims. | ~~19~~25 |
| 4.7 | Class 7: Subordinated Claims. | ~~19~~25 |
| 4.8 | Class 8: Existing OGIL Interests. | ~~20~~26 |
| 4.9 | Class 9: Intercompany Interests. | ~~20~~26 |
| 4.10 | Debtors' Rights in Respect of Unimpaired Claims. | ~~20~~26 |
| 4.11 | Treatment of Vacant Classes. | ~~20~~26 |
| **ARTICLE V.** | **Means for Implementation.** | ~~20~~26 |
| 5.1 | Continued Corporate Existence. | ~~20~~26 |
| 5.2 | Plan Funding. | ~~21~~27 |
| 5.3 | Cancellation of Existing Securities and Agreements. | ~~21~~27 |
| 5.4 | Cancellation of Certain Existing Security Interests. | ~~22~~29 |
| 5.5 | Officers and Boards of Directors. | ~~22~~29 |
| 5.6 | Management Incentive Program. | ~~23~~29 |
| 5.7 | New Shareholders Agreement. | ~~23~~29 |
| 5.8 | Authorization, Issuance, and Delivery of New Common Shares. | ~~23~~30 |
| 5.9 | Amended and Restated Credit Facility. | ~~23~~30 |
| 5.10 | New Secured Convertible PIK Notes. | ~~23~~30 |
| 5.11 | New Intercreditor Agreement. | ~~24~~30 |
| 5.12 | Rights Offering. | ~~24~~30 |
| 5.13 | Registration Rights. | ~~24~~31 |
| 5.14 | Intercompany Interests; Corporate Reorganization. | ~~25~~31 |
| 5.15 | Tax Matters. | ~~25~~32 |
| 5.16 | Restructuring Transactions. | ~~25~~32 |
| 5.17 | Separability. | ~~25~~32 |

WEIL:\95567965\1\78787.0004 WEIL:\95567965\7\78787.0004

**ARTICLE VI. Distributions.**                                                                 ~~26~~33

6.1       Distributions Generally.                                                       ~~26~~33

6.2       No Postpetition Interest on Claims.                                             ~~26~~33

6.3       Date of Distributions.                                                          ~~26~~33

6.4       Distribution Record Date.                                                       ~~26~~33

6.5       Disbursing Agent.                                                               ~~27~~34

6.6       Delivery of Distributions.                                                      ~~27~~34

6.7       Unclaimed Property.                                                             ~~27~~35

6.8       Satisfaction of Claims.                                                         ~~28~~35

6.9       Manner of Payment Under Plan.                                                   ~~28~~35

6.10      Fractional Shares and Notes and De Minimis Cash Distributions.                  ~~28~~35

6.11      No Distribution in Excess of Amount of Allowed Claim.                           ~~28~~36

6.12      Allocation of Distributions Between Principal and Interest.                     ~~28~~36

6.13      Exemption from Securities Laws.                                                 ~~29~~36

6.14      Setoffs and Recoupments.                                                        ~~29~~36

6.15      Rights and Powers of Disbursing Agent.                                          ~~29~~37

6.16      Withholding and Reporting Requirements.                                         ~~30~~37

6.17      Hart-Scott-Rodino Antitrust Improvements Act.                                   ~~30~~38

**ARTICLE VII.       Procedures for Resolving Claims.**                                         ~~31~~38

7.1       Disputed Claims Process.                                                        ~~31~~38

7.2       Objections to Fee Claims.                                                        ~~31~~38

7.3       Estimation of Claims.                                                            ~~31~~38

7.4       Claim Resolution Procedures Cumulative.                                          ~~31~~39

7.5       No Distributions Pending Allowance.                                              ~~32~~39

7.6       Distributions After Allowance.                                                   ~~32~~39

WEIL:\95567965\1\78787.0004 WEIL:\95567965\7\78787.0004

**ARTICLE VIII.    Executory Contracts and Unexpired Leases.**                                    ~~32~~39

    8.1        General Treatment.                                                     ~~32~~39

    8.2        Determination of Cure Disputes and Deemed Consent.                    ~~32~~40

    8.3        Survival of the Debtors' Indemnification Obligations.                ~~33~~40

    8.4        Compensation and Benefit Plans.                                      ~~33~~40

    8.5        Insurance Policies.                                                   ~~33~~41

    8.6        Reservation of Rights.                                                ~~34~~41

**ARTICLE IX. Conditions Precedent to the Occurrence of the Effective Date.**                      ~~34~~41

    9.1        Conditions Precedent to the Effective Date.                          ~~34~~41

    9.2        Waiver of Conditions Precedent.                                      ~~35~~43

    9.3        Effect of Failure of a Condition.                                    ~~36~~43

**ARTICLE X. Effect of Confirmation.**                                                            ~~36~~44

    10.1      Binding Effect.                                                       ~~36~~44

    10.2      Vesting of Assets.                                                    ~~36~~44

    10.3      Discharge of Claims Against and Interests in the Debtors.            ~~37~~44

    10.4      Pre-Confirmation Injunctions and Stays.                              ~~37~~45

    10.5      Injunction Against Interference with Plan.                           ~~37~~45

    10.6      Plan Injunction.                                                      ~~37~~45

    10.7      Releases.                                                             ~~38~~46

    10.8      Exculpation.                                                          ~~40~~47

    10.9      Injunction Related to Releases and Exculpation.                      ~~40~~48

    10.10    Subordinated Claims.                                                  ~~40~~48

    10.11    Retention of Causes of Action and Reservation of Rights.             ~~41~~48

    10.12    Ipso Facto and Similar Provisions Ineffective.                       ~~41~~49

    10.13    Indemnification and Reimbursement Obligations.                       ~~41~~49

**ARTICLE XI. Retention of Jurisdiction.** 4149

    11.1    Retention of Jurisdiction. 4149

**ARTICLE XII.    Miscellaneous Provisions.** 4351

    12.1    Exemption from Certain Transfer Taxes. 4351

    12.2    Dates of Actions to Implement This Plan. 4351

    12.3    Amendments. 4351

    12.4    Revocation or Withdrawal of Plan. 4452

    12.5    Severability. 4452

    12.6    Governing Law. 4552

    12.7    Immediate Binding Effect. 4553

    12.8    Successors and Assigns. 4553

    12.9    Entire Agreement. 4553

    12.10    Computing Time. 4553

    12.11    Exhibits to Plan. 4553

    12.12    Notices. 4553

    12.13    Reservation of Rights. 4755

Each of Offshore Group Investment Limited; Vantage Delaware Holdings, LLC; Dragonquest Holdings Company; Emerald Driller Company; P2020 Rig Co.; P2021 Rig Co.; PT. Vantage Drilling Company Indonesia; Sapphire Driller Company; Vantage Deepwater Company; Vantage Deepwater Drilling, Inc.; Vantage Driller I Co; Vantage Driller II Co; Vantage Driller III Co; Vantage Driller IV Co.; Vantage Driller VI Co.; Vantage Driller ROCO S.R.L.; Vantage Drilling Africa; Vantage Drilling (Malaysia) I Sdn. Bhd.; Vantage Drilling Labuan I Ltd.; Vantage Drilling Netherlands B.V.; Vantage Holding Hungary Limited Liability Company; Vantage Holdings Cyprus ODC Limited; Vantage Holdings Malaysia I Co.; and Vantage International Management Co. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following amended joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

## ARTICLE I.          DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

***2017 Secured Term Loan Agent*** means Cortland Capital Market Services LLC, as successor administrative agent to Citibank, N.A., solely in its capacity as administrative agent under the 2017 Secured Term Loan Agreement.

***2017 Secured Term Loan Agreement*** means that certain Term Loan Agreement, dated as of October 25, 2012, as amended and restated as of November 22, 2013, by and among OGIL, as borrower, Delaware Holdings, as co-borrower, the guarantors named therein, the lenders party thereto from time to time, the 2017 Secured Term Loan Agent, Wells Fargo Bank, National Association, as collateral agent, and Citigroup Global Markets Inc., as sole lead arranger, sole bookrunning manager, syndication agent, and documentation agent, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

***2017 Secured Term Loan Claim*** means any Claim arising under the 2017 Secured Term Loan Agreement, including any unsecured Claim pursuant to section 506 of the Bankruptcy Code.

***2017 Secured Term Loan Collateral Agent*** means Wells Fargo Bank, National Association, solely in its capacity as collateral agent under the 2017 Secured Term Loan Agreement.

***2019 Secured Term Loan Agent*** means Cortland Capital Market Services LLC, as successor administrative agent to Citibank, N.A., solely in its capacity as administrative agent under the 2019 Secured Term Loan Agreement.

*2019 Secured Term Loan Agreement* means that certain Second Term Loan Agreement, dated as of March 28, 2013, by and among OGIL,  as borrower, Delaware Holdings, as co-borrower, the guarantors named therein, the lenders party thereto from time to time, the 2019 Secured Term Loan Agent, Wells Fargo Bank, National Association, as collateral agent, and various other financial institutions as joint lead arrangers, joint bookrunning managers, co-syndication agents, and co-documentation agents, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

*2019 Secured Term Loan Claim* means any Claim arising under the 2019 Secured Term Loan Agreement, including any unsecured Claim pursuant to section 506 of the Bankruptcy Code.

*2019 Secured Term Loan Collateral Agent* means Wells Fargo Bank, National Association, solely in its capacity as collateral agent under the 2019 Secured Term Loan Agreement.

*7.125% Secured Notes* means the 7.125% Senior Secured First Lien Notes due April 1, 2023 issued pursuant to the 7.125% Secured Notes Indenture in the aggregate principal amount outstanding of seven hundred twenty-seven million six hundred twenty-two thousand dollars ($727,622,000) plus all accrued prepetition interest ~~,~~and unpaid fees, ~~and other expenses~~costs, expenses, and other "Obligations" (as defined in the 7.125% Secured Notes Indenture) due under the 7.125% Secured Notes Indenture.

*7.125% Secured Notes Claim* means any Claim arising under the 7.125% Secured Notes and the 7.125% Secured Notes Indenture, including any unsecured Claim pursuant to section 506 of the Bankruptcy Code.

*7.125% Secured Notes Indenture* means that certain Indenture, dated as of March 28, 2013, by and among OGIL, as issuer, the guarantors named therein, and the 7.125% Secured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

*7.125% Secured Notes Indenture Trustee* means Wells Fargo Bank, National Association, solely in its capacity as indenture trustee and noteholder collateral agent under the 7.125% Secured Notes Indenture.

*7.5% Secured Notes* means the 7.5% Senior Secured First Lien Notes due November 1, 2019 issued pursuant to the 7.5% Secured Notes Indenture in the aggregate principal amount outstanding of One Billion Eighty-Six Million Eight Hundred Fifteen Thousand Dollars ($1,086,815,000) plus all accrued prepetition interest ~~,~~and unpaid fees, ~~and other expenses~~costs, expenses, and other "Obligations" (as defined in the 7.5% Secured Notes Indenture) due under the 7.5% Secured Notes Indenture.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

*7.5% Secured Notes Claim* means any Claim arising under the 7.5% Secured Notes and the 7.5% Secured Notes Indenture, including any unsecured Claim pursuant to section 506 of the Bankruptcy Code.

*7.5% Secured Notes Indenture* means that certain Indenture, dated as of October 25, 2012, by and among OGIL, as issuer, the guarantors named therein, and the 7.5% Secured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

*7.5% Secured Notes Indenture Trustee* means Wells Fargo Bank, National Association, solely in its capacity as indenture trustee and noteholder collateral agent under the 7.5% Secured Notes Indenture.

*Ad Hoc Committee* means that certain ad hoc committee consisting of certain holders of the Secured Debt Claims and represented by Milbank, Tweed, Hadley & McCloy LLP.

*Administrative Expense Claim* means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Allowed* means, with respect to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge has been interposed prior to the Effective Date or (b) as to which all such challenges have been determined by a Final Order to the extent such challenges are determined in favor of the respective holder; (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a final order of the Bankruptcy Court; or (iii) any Claim or Interest expressly allowed hereunder; *provided*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

*Amended and Restated Credit Facility Agreement* means that certain Second Amended and Restated Credit Agreement, to be dated as of the Effective Date, by and among Reorganized OGIL, the other Reorganized Debtors, and the holders of the Revolving Credit Facility Claims, the form of which shall be contained in the Plan Supplement and the terms of which shall include substantially those set forth in the term sheet for such agreement attached as Exhibit 1 to Exhibit A to the Restructuring Support Agreement.

*Amended By-Laws* means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws (including any articles of association or similar constitutional document, if any, required under the laws of such

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

Reorganized Debtor's jurisdiction of organization), a substantially final form of which will be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

**Amended Certificate of Incorporation** means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation (including any memorandum of association or similar constitutional document, if any, required under the laws of such Reorganized Debtor's jurisdiction of organization), a substantially final form of which will be contained in the Plan Supplement.

**Asset** means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

**Backstop Agreement** means that certain Backstop Agreement, dated as of December [●]3, 2015, by and among Vantage Parent, OGIL, and the Backstop Parties.

**Backstop Commitment Premium** means a premium to be paid to the Backstop Parties on the Effective Date pursuant to the Backstop Agreement in an amount equal to Two Million Two-Hundred-Fifty Thousand Dollars ($2,250,000), one-half of which will be paid in Cash and one-half of which will be paid in New Second Lien Notes; *provided*, *however*, that to the extent the Backstop Agreement is terminated in accordance with the terms thereof other than as a result of certain defaults by the Backstop Parties which did not result from any action or inaction by Vantage Parent or the Debtors, the Backstop Commitment Premium shall be paid entirely in Cash.

**Backstop Parties** means those parties that agree to backstop the Rights Offering under the Backstop Agreement, each in its capacity as such.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

**Cayman Proceeding** means, the winding up proceedings commenced against Vantage Parent in the Grand Court of the Cayman Islands.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on December 3, 2015 in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code, and styled *In re Offshore Group Investment Limited, et al.*, Ch. 11 Case No. 15-[●]12422 ([●]BLS).

**Charging Lien** means any lien or other priority in payment to which (i) the Secured Notes Indenture Trustees are entitled under the 7.5% Secured Notes Indenture and the 7.125% Secured Notes Indenture or any other ancillary documents, instruments, or agreements and (ii) the Prepetition Secured Collateral Agents are entitled under the Prepetition Intercreditor Agreement or any other ancillary documents, interests, or agreements.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Collateral** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary (a) to cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) to permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Debtor** has the meaning set forth in the introductory paragraph of this Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**Delaware Holdings** means Vantage Delaware Holdings, LLC, a Delaware limited liability company.

**Disallowed** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of this Plan not to be Allowed.

**Disbursing Agent** means any entity in its capacity as a disbursing agent under section 6.5 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

**Disclosure Statement** means the Disclosure Statement for this Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law.

**Disputed** means, with respect to a Claim, (a) any Claim, proof of which was timely and properly filed, which is disputed under section 7.1 of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order and (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.  To the extent the Debtors dispute only the Allowed amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Distribution Record Date** means, except with respect to publicly issued securities, the Effective Date.

**DOJ** means the United States Department of Justice.

**DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**Effective Date** means the date which is the first Business Day selected by the Debtors, with the consent of the Ad Hoc Committee (such consent not to be unreasonably withheld), on which (a) all conditions to the effectiveness of this Plan set forth in section 9.1 hereof have been satisfied or waived in accordance with the terms of this Plan and (b) no stay of the Confirmation Order is in effect.

**Estate** means the estate of a Debtor created under section 541 of the Bankruptcy Code.

**Exchange Act** means the Securities Exchange Act of 1934, as amended.

**Exculpated Parties** means collectively, and in each case in their capacities as such during the Chapter 11 Cases, every fiduciary of the Debtors and their Estates in the Chapter 11 Cases, including the Debtors' directors, officers, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided, however,* that Hsin-Chi-Su (a/k/a "Nobu Su"), and any Person or entity owned by, controlled by, or otherwise affiliated with Hsin-Chi-Su, including, without limitation, the company affiliated with Hsin-Chi-Su known as Today Makes Tomorrow and the company affiliated or held out as being affiliated with Hsin-Chi-Su known as Taiwan Maritime Transportation Co., Ltd., and the respective affiliates of each, are not Exculpated Parties in any capacity.

**Existing OGIL Interests** means all Interests in OGIL immediately prior to the commencement of OGIL's Chapter 11 Case, including all equity, options, warrants, and common shares.

**Existing Securities Law Claim** means any Claim, regardless of whether such Claim is the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any securities of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) except as otherwise provided for in this Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim.

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by Professional Persons.

**Final Order** means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by

appeal or by writ of *certiorari*; *provided*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

*General Unsecured Claim* means any unsecured Claim, other than an Intercompany Claim, an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Subordinated Claim, or any deficiency portion of a Secured Debt Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than OGIL held by another Debtor or an affiliate of a Debtor.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Majority Revolving Credit Facility Claimholders* means, as of any date of determination, holders of Revolving Credit Facility Claims that collectively hold greater than 50% of all Revolving Credit Facility Claims.

*Management Incentive Program* means the management incentive plan to be established on the Effective Date for certain members of the Reorganized Debtors' management, a copy of which shall be included in the Plan Supplement.

*New Board* means the initial board of directors of Reorganized OGIL.

*New Common Share* means one of the ordinary shares, par value $0.001 per share, of Reorganized OGIL to be issued on the Effective Date.

*New Intercreditor Agreement* means that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the Revolving Credit Facility Agent, the New Second Lien Notes Indenture Trustee, and the New Secured Convertible PIK Notes Indenture Trustee, the form of which shall be contained in the Plan Supplement and the terms of which shall include substantially those applicable to such agreement as are set forth in the term sheet attached as Exhibit 1 to Exhibit A to the Restructuring Support Agreement.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

**New Second Lien Notes** means the Senior Secured Second Lien Notes due December 31, 2020, bearing interest at a rate of 10% per annum payable in cash, issued pursuant to the New Second Lien Notes Indenture in the aggregate principal amount of Seventy-Five Million Dollars ($75,000,000) plus One Million One Hundred Twenty-Five Thousand Dollars ($1,125,000) payable as the Backstop Commitment Premium, and secured by a second-priority security interest in and lien on substantially all of the Reorganized Debtors' assets, all substantially as set forth in the term sheet for such agreement attached as Exhibit 2 to Exhibit A to the Restructuring Support Agreement.

**New Second Lien Notes Indenture** means that certain Indenture, to be dated as of the Effective Date, by and among Reorganized OGIL, the guarantors party thereto, and the New Second Lien Notes Indenture Trustee, the form of which shall be contained in the Plan Supplement and the terms of which shall include substantially those set forth in the term sheet for such agreement attached as Exhibit 2 to Exhibit A to the Restructuring Support Agreement.

**New Second Lien Notes Indenture Trustee** means [●]U.S. Bank National Association, solely in its capacity as indenture trustee under the New Second Lien Notes Indenture.

**New Secured Convertible PIK Notes** means the Secured Convertible PIK Notes due December 31, 2030, issued pursuant to the New Secured Convertible PIK Notes Indenture in the initial aggregate principal amount of $750,000,000, which shall be secured by a third-priority security interest in and lien on substantially all of the Reorganized Debtors' assets and will be "stapled" to New Common Shares, all substantially as set forth in the term sheet for such agreement attached as Exhibit 3 to Exhibit A to the Restructuring Support Agreement.

**New Secured Convertible PIK Notes Indenture** means that certain Indenture, to be dated as of the Effective Date, by and among Reorganized OGIL, as issuer, the guarantors party thereto, and the New Secured Convertible PIK Notes Indenture Trustee, the form of which shall be contained in the Plan Supplement and the terms of which shall include substantially those set forth in the term sheet for such agreement attached as Exhibit 2 to Exhibit A to the Restructuring Support Agreement.

**New Secured Convertible PIK Notes Indenture Trustee** means [●]U.S. Bank National Association, solely in its capacity as indenture trustee under the New Secured Convertible PIK Notes Indenture.

**New Secured Debt Agreements** means, collectively, the New Secured Convertible PIK Notes Indenture, the New Secured Convertible PIK Notes, the New Second Lien Notes Indenture, the New Second Lien Notes, and the Amended and Restated Credit Facility.

**New Shareholders Agreement** means that certain Shareholders Agreement, dated as of the Effective Date, by and among Reorganized OGIL and the holders of the New Common Shares.

*Nondebtor Service Subsidiaries* means, collectively, Vantage Energy Services, Inc., a Delaware corporation, and Vantage International Management Company Pte. Ltd., a private company limited by shares and incorporated in the Republic of Singapore.

*OGIL* means Offshore Group Investment Limited, a Cayman Islands Exempted Company.

*Other Secured Claim* means any Secured Claim (which shall include all Vantage Parent Secured Promissory Note Claims) against a Debtor other than a Revolving Credit Facility Claim, a Secured Term Loan Claim, or a Secured Notes Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code, or other entity (as defined in section 101(15) of the Bankruptcy Code).

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this amended joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, exhibits, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

*Plan Distribution* means the payment or distribution of consideration to holders of Claims and Interests under this Plan.

*Plan Document* means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement, the New Shareholders Agreement, the Amended and Restated Credit Facility Agreement, the New Secured Convertible PIK Notes Indenture, the New Second Lien Notes Indenture, the New Intercreditor Agreement, the Amended Certificates of Incorporation of the applicable Reorganized Debtors, the Amended By-Laws of the applicable Reorganized Debtors, and the Management Incentive Plan.

*Plan Supplement* means a supplemental appendix to this Plan containing, among other things, substantially final forms of the Amended and Restated Credit Facility Agreement, the New Secured Convertible PIK Notes Indenture, the New Second Lien Notes Indenture, the New Intercreditor Agreement, the Management Incentive Program, the New Shareholders Agreement, the Amended Certificates of Incorporation, the Amended By-Laws, and, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support

Agreement.  The Plan Supplement shall be filed with the Bankruptcy Court not later than ten days prior to the end of the solicitation period for this Plan.

*Prepetition Intercreditor Agreement* means that certain Amended and Restated Intercreditor Agreement, dated as of October 25, 2012, by and among (i) Wells Fargo Bank, National Association, as Pari Passu Collateral Agent (as defined therein); (ii) Wells Fargo Bank, National Association, as trustee under the New Indenture (as defined therein); (iii) Royal Bank of Canada, as administrative agent for the Credit Agreement Secured Parties (as defined therein); (iv) Wells Fargo Bank, National Association, as collateral agent for the Credit Agreement Secured Parties (as defined therein); (v) Citibank, N.A., as administrative agent for the Term Loan Secured Parties (as defined therein); (vi) Wells Fargo Bank, National Association, as trustee under the Existing Indenture (as defined therein); (vii) OGIL; (viii) Vantage Parent; and (ix) each Guarantor (as defined therein), as amended, restated, or otherwise modified prior to the Petition Date.

*Prepetition Intercreditor Pari Passu Collateral Agent* means Wells Fargo Bank, National Association, solely in its capacity as Pari Passu Collateral Agent (as defined in the Prepetition Intercreditor Agreement).

*Prepetition Secured Collateral Agents* means, collectively, the 2017 Secured Term Loan Collateral Agent, the 2019 Secured Term Loan Collateral Agent, the Prepetition Intercreditor Pari Passu Collateral Agent, and the Revolving Credit Facility Collateral Agent.

*Priority Non-Tax Claim* means any Claim (other than an Administrative Expense Claim or a Priority Tax Claim) that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

*Priority Tax Claim* means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

*Registration Rights Parties* means Reorganized OGIL, each ~~Backstop Party~~member of the Ad Hoc Committee (and any affiliates or related funds thereof that receive New Common Shares or New Secured Convertible PIK Notes under the Plan), and, except for Vantage Parent, each recipient of New Common Shares and New Secured Convertible PIK Notes who, together with its affiliates and related funds, receives 10% or more of the New Common Shares and/or New Secured Convertible PIK Notes under the Plan.

**Released Parties** means, collectively, and in each case in their capacities as such: (i) the Debtors; (ii) Vantage Parent; (iii) ~~the Debtors' other non-Debtor affiliates~~Vantage Energy Services, Inc.; (iv) Vantage International Management Company Pte. Ltd.; (v) the Restructuring Support Parties; (~~v~~vi) the Backstop Parties; (vii) any member of the Ad Hoc Committee who served in such capacity at any time between the Petition Date and the Effective Date; and (viii) with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such; *provided, however*, that Hsin-Chi-Su (a/k/a "Nobu Su"), and any Person or entity owned by, controlled by, or otherwise affiliated with Hsin-Chi-Su, including, without limitation, the company affiliated with Hsin-Chi-Su known as Today Makes Tomorrow and the company affiliated or held out as being affiliated with Hsin-Chi-Su known as Taiwan Maritime Transportation Co., Ltd., and the respective affiliates of each, are not Released Parties in any capacity.

**Reorganized Debtors** means the Debtors, as reorganized as of the Effective Date in accordance with this Plan.

**Reorganized OGIL** means OGIL, as reorganized on the Effective Date in accordance with this Plan.

**Required Restructuring Support Parties** means the ~~Requisite~~Majority Consenting Debtholders, as defined in the Restructuring Support Agreement.

**Restructuring** means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

**Restructuring Expenses** means the reasonable and documented fees and expenses incurred by the Restructuring Support Parties in connection with the Restructuring, as provided in the Restructuring Support Agreement or Backstop Agreement, including the fees and expenses of PJT Partners Inc.; Milbank, Tweed, Hadley & McCloy LLP; Kobre & Kim; Morris, Nichols, Arsht & Tunnell LLP; Latham & Watkins LLP; and Young, Conaway, Stargatt & Taylor LLP (in each case, as financial advisor or counsel to certain Restructuring Support Parties), payable without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed in full as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit.

**Restructuring Support Agreement** means that certain Restructuring Support Agreement (including all exhibits thereto), dated as of December [●]1, 2015, by and among OGIL; Vantage Parent; certain other affiliates of OGIL specified therein; and the Restructuring Support Parties, as may be amended, restated, or otherwise modified in accordance with its terms.

17

*Restructuring Support Parties* means, collectively, the holders of Secured Debt Claims that are parties to the Restructuring Support Agreement; and the holders of the Revolving Credit Facility Claims that are parties to the Restructuring Support Agreement.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the consummation of the transactions provided for under or contemplated by the Restructuring Support Agreement; (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Restructuring Support Agreements; and (d) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate.

*~~Revolving Credit Facility~~* ~~means, collectively, all advances made to the Debtors under the Revolving Credit Agreement.~~

*~~Revolving Credit Facility Agent~~* ~~means Royal Bank of Canada, solely in its capacity as administrative agent under the Revolving Credit Agreement.~~

*Revolving Credit Agreement* means that certain Amended and Restated Credit Agreement, dated as of March 28, 2013, by and among OGIL and Vantage Parent, as borrowers, Vantage Parent and certain subsidiaries named therein, as guarantors, the lenders party thereto from time to time, the Revolving Credit Facility Agent, and RBC Capital Markets, as sole lead arranged and sole bookrunner, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

*Revolving Credit Facility* means, collectively, all advances made to the Debtors under the Revolving Credit Agreement.

*Revolving Credit Facility Agent* means Royal Bank of Canada, solely in its capacity as administrative agent under the Revolving Credit Agreement.

*Revolving Credit Facility Claims* means any Claims arising under the Revolving Credit Agreement or any other Loan Documents (as such term is defined in the Revolving Credit Agreement).

*Revolving Credit Facility Collateral Agent* means Wells Fargo Bank, National Association, solely in its capacity as collateral agent under the Revolving Credit Agreement.

18

*Rights Offering* means that certain rights offering pursuant to which each holder of Allowed Secured Debt Claims is entitled to receive Subscription Rights to acquire the New Second Lien Notes in accordance with the Rights Offering Procedures.

*Rights Offering Procedures* means the procedures for the implementation of the Rights Offering approved by the Bankruptcy Court.

*Secured Claim* means a Claim to the extent (i) secured by property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

*Secured Debt Claims* means, collectively, the Secured Term Loan Claims and the Secured Notes Claims.

*Secured Notes Claims* means, collectively, the 7.5% Secured Notes Claims and the 7.125% Secured Notes Claims.

*Secured Notes Indenture Trustees* means, collectively, the 7.125% Secured Notes Indenture Trustee and the 7.5% Secured Notes Indenture Trustee.

*Secured Term Loan Claims* means, collectively, the 2017 Secured Term Loan Claims and the 2019 Secured Term Loan Claims.

*Securities Act* means the Securities Act of 1933, as amended.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Subordinated Claim* means the Existing Securities Law Claims and any Claim that is subject to (i) subordination under section 510(b) of the Bankruptcy Code or (ii) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

*Subscription Rights* means the subscription rights offered in accordance with the Rights Offering Procedures.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

WEIL:\95567965\1\78787.0004 WEIL:\95567965\7\78787.0004

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*U.S. Trustee* means the United States Trustee for Region 3.

*Vantage Parent* means Vantage Drilling Company, a Cayman Islands Exempted Company.

*Vantage Parent Secured Promissory Note* means that certain Secured Promissory Note, dated as of December [●]2, 2015, by and between OGIL, as promisor, and Vantage Parent, as holder, issued in the initial aggregate principal amount of sixty-one million four-hundred seventy-seven thousand dollars ($61,477,000).

*Vantage Parent Secured Promissory Note Claims* means all Claims arising under the Vantage Parent Secured Promissory Note, all of which shall be Allowed Claims under this Plan.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Consent Rights of Restructuring Support Parties.*

Notwithstanding anything herein to the contrary, any and all consent rights of the respective Restructuring Support Parties set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, the other Plan Documents, and any other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in section 1.1 hereof) and fully enforceable as if stated in full herein.

### 1.5 *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1 *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2 *Treatment of Fee Claims.*

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and

including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.3 *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1 *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2 *Formation of Debtor Groups for Convenience Only.*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

### 3.3    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under this Plan; (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Yes |
| Class 4 | Secured Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 7 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 8 | Existing OGIL Interests | Impaired | Yes |
| Class 9 | Intercompany Interests | Impaired | No (Deemed to reject) |

### 3.4    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within this Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject this Plan and receiving Plan Distributions.

### 3.5    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.6    *Voting; Presumptions; Solicitation.*

(a)    <u>Acceptance by Certain Impaired Classes</u>.  Only holders of Allowed Claims in Classes 3, 4, and 8 are entitled to vote to accept or reject this Plan.  An

Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 3 and 4 will receive ballots containing detailed voting instructions.

(b)    Deemed Acceptance by Unimpaired Classes.  Holders of Claims and Interests in Classes 1, 2, 5, and 6 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)    Deemed Rejection by Certain Impaired Classes.  Holders of Claims and Interests in Classes 7 and 9 will neither receive nor retain any property under this Plan and are therefore conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

### 3.7    *Cramdown.*

If any Class of Claims entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.

### 3.8    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.


**ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.**

### 4.1    *Class 1: Priority Non-Tax Claims.*

(a)    Treatment: The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    Impairment and Voting: Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not

entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.2 *Class 2: Other Secured Claims.*

(a)    Treatment: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(b)    Impairment and Voting: Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### 4.3 *Class 3: Revolving Credit Facility Claims.*

(a)    Treatment: On the Effective Date, each holder of an Allowed Revolving Credit Facility Claim shall receive, on account of such Allowed Claim and at the option of the Debtors or Reorganized Debtors, as applicable, its Pro Rata share of (i) payment in full in Cash to the extent the Debtors elect to refinance the Revolving Credit Facility in its entirety with one or more third-party lenders or (ii) a new or amended and restated senior secured term loan and letter of credit facility and, in the case of the holders of Allowed Revolving Credit Facility Claims (other than the issuer of any letter of credit under the Revolving Credit Agreement), a payment of Seven Million Dollars ($7,000,000) in Cash.

(b)    Impairment and Voting: Revolving Credit Facility Claims are Impaired.  Holders of Allowed Revolving Credit Facility Claims are entitled to vote on this Plan.

### 4.4 *Class 4: Secured Debt Claims.*

(a)    Treatment: Secured Debt Claims shall be Allowed in the following amounts of outstanding principal:  2017 Secured Term Loan Claims ($323,543,429); 2019 Secured Term Loan Claims ($341,250,000); 7.5% Secured Notes Claims ($1,086,815,000); and 7.125% Secured Notes Claims ($727,622,000), plus, in each case, accrued interest, fees, expenses, costs, and other "Obligations" (as defined in the respective underlying documents governing the Secured Debt Claims).  On the Effective Date, on account of its Allowed Secured Debt Claims, each holder of an Allowed Secured Debt Claim shall

receive: (i) its Pro Rata share of the New Secured Convertible PIK Notes; (ii) up to its Pro Rata share of the $75,000,000 New Second Lien Notes to be issued in the Rights Offering, to the extent it elects to exercise its Subscription Rights thereunder, which Subscription Rights will be made available to each holder of an Allowed Secured Debt Claim on a Pro Rata basis and in accordance with the Rights Offering Procedures; and (iii) its Pro Rata share of the New Common Shares, subject to dilution by New Common Shares issued upon the conversion of the New Secured Convertible PIK Notes, on account of the Vantage Parent Secured Promissory Note, and under the Management Incentive Program.  The New Secured Convertible PIK Notes will be "stapled" to (and thus only transferred with) a holder's New Common Shares.

   (b) <u>Impairment and Voting</u>: Secured Debt Claims are Impaired. Holders of Allowed Secured Debt Claims are entitled to vote on this Plan.

### 4.5 *Class 5: General Unsecured Claims.*

   (a) <u>Treatment</u>: The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

   (b) <u>Impairment and Voting</u>: Allowed General Unsecured Claims are either Unimpaired or deemed Unimpaired, as applicable.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed General Unsecured Claims.

### 4.6 *Class 6: Intercompany Claims.*

   (a) <u>Treatment</u>: On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, in their sole discretion.  All Intercompany Claims between any Debtor and a nondebtor affiliate shall be Unimpaired under this Plan.

   (b) <u>Impairment and Voting</u>: All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Claims.

### 4.7 *Class 7: Subordinated Claims.*

   (a) <u>Treatment</u>: Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(b)    Impairment and Voting: Subordinated Claims are Impaired and shall receive no distribution under this Plan.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Subordinated Claims.

### 4.8    *Class 8: Existing OGIL Interests.*

(a)    Treatment: On the Effective Date, on account of its Existing OGIL Interests, each holder of an Existing OGIL Interest shall receive the releases from the Debtors set forth in section 10.7(a) hereof.  All Existing OGIL Interests (together with any certificates or other instruments evidencing such Existing OGIL Interests) shall be (i) deemed consensually foreclosed upon by ~~all parties entitled to do so~~the Prepetition Secured Collateral Agents; (ii) immediately upon the issuance of the New Common Shares, surrendered to OGIL; and (iii) thereafter deemed cancelled by operation of the law of the Cayman Islands, all without further action by or order of the Bankruptcy Court.

(b)    Impairment and Voting: Existing OGIL Interests are Impaired. Holders of Existing OGIL Interests are entitled to vote on this Plan.

### 4.9    *Class 9: Intercompany Interests.*

(a)    Treatment: Intercompany Interests are Impaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.14 hereof.

(b)    Impairment and Voting: Intercompany Interests are Impaired. And shall receive no distribution under this Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Interests.

### 4.10    *Debtors' Rights in Respect of Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### 4.11    *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.5 of this Plan shall receive no Plan Distribution.

# ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1    *Continued Corporate Existence.*

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Shareholders Agreement, the Amended Certificates of Incorporation, and the Amended By-Laws.  On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents and the New Secured Debt Agreements, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates of incorporation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law or the New Secured Debt Agreements.

### 5.2    *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering.

### 5.3    *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, and other documents evidencing any Claim or Interest (other than certain

Intercompany Interests that are not modified by this Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. Notwithstanding such cancellation and discharge, each of the 7.5% Secured Notes Indenture, the 7.125% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, the 2019 Secured Term Loan Agreement, ~~and~~ the Revolving Credit Agreement (and, for the avoidance of doubt, the Prepetition Intercreditor Agreement) shall continue in effect (i) to the extent necessary to allow the Reorganized Debtors, the ~~7.5%~~ Secured Notes Indenture Trustee~~s, the 7.125% Secured Notes Trustee, the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, and the Revolving Credit Facility~~, and the Prepetition Secured Collateral Agents to make distributions pursuant to this Plan on account of the 7.5% Secured Notes Claims, the 7.125% Secured Notes Claims, the 2017 Secured Term Loan Claims, the 2019 Secured Term Loan Claims, and the Revolving Credit Facility Claims, respectively~~; (ii~~, including pursuant to the Prepetition Intercreditor Agreement, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; (ii) to maintain, enforce, and exercise their respective Charging Liens against such distributions; (iii) to appear in the Chapter 11 Cases; (iv) to allow holders of Secured Debt Claims (or their respective agents) to enforce the terms of the Prepetition Intercreditor Agreement (*provided*, that the Prepetition Intercreditor Agreement shall not govern the New Secured Debt Agreements); (v) with respect to any obligations thereunder governing the relationship between and among each of the following groups of Persons (and not as between such groups or as between such groups and the Debtors): (a) the Revolving Credit Facility Agent and the other holders of Revolving Credit Facility Claims, (b) the 7.5% Secured Notes Trustee and the holders of 7.5% Secured Notes Claims, (c) the 7.125% Secured Notes Trustee and the holders of 7.125% Secured Notes Claims, (d) the 2017 Secured Term Loan Agent and the holders of 2017 Secured Term Loan Claims, ~~and~~ (d~~e~~) the 2019 Secured Term Loan Agent and the holders of 2019 Secured Term Loan Claims, and (f) the Prepetition Intercreditor Pari Passu Collateral Agent and holders of Secured Debt Claims, and in the case of the immediately preceding clauses (a) through (d~~f~~), including but not limited to those provisions relating to rights to fee and expense reimbursement, indemnification, and similar amounts, or that may survive termination or maturity of the Revolving Credit Agreement, 7.5% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, or the 2019 Secured Term Loan Agreement, as applicable, in accordance with the terms thereof; and (iii~~vi~~) to the extent necessary to allow the Secured Notes Indentures Trustee (on behalf of holders of Secured Debt Claims) and the holders of Secured Debt Claims and Revolving Credit Facility Claims and their agents, respectively, to assert~~ and~~, prosecute~~,~~ and exercise their rights and discharge their obligations (a) against Vantage Parent ~~, if any~~d its nondebtor subsidiaries and affiliates (other than the Nondebtor Service Subsidiaries) and (b) in connection with the Cayman Proceeding. The holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan. Except as provided pursuant to this Plan, each of the 7.5% Secured Notes Trustee, the 7.125% Secured Notes Trustee, the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, the Revolving Credit Facility Agent, the Prepetition Secured Collateral Agents, and their respective agents, successors, and assigns shall be discharged of all of their obligations associated with the 7.5% Secured Notes Indenture, the 7.125% Secured Notes Indenture, the 2017 Secured Term Loan Agreement, the 2019 Secured Term Loan Agreement, ~~and~~ the Revolving Credit

Agreement, ~~respectively~~and the Prepetition Intercreditor Agreement, respectively.  With respect to the Debtors, the Secured Notes Indenture Trustees and the Prepetition Secured Collateral Agents shall be discharged and have no further obligation or liability except as otherwise provided for in the Plan or Confirmation Order, and after the performance by Secured Notes Indenture Trustees and the Prepetition Secured Collateral Agents and their respective representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Secured Notes Indenture Trustees and the Prepetition Secured Collateral Agents shall be relieved of and released from any obligations and duties arising thereunder.  Nothing in this Plan shall affect any party's rights against Vantage Parent or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries) under any contractual arrangement or in connection with the Cayman Proceeding.

### 5.4    *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed ~~Other~~ Secured Claim, or promptly thereafter, the holder of such Allowed ~~Other~~ Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed ~~Other~~ Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory liens, or lis pendens, or similar interests or documents.

### 5.5    *Officers and Boards of Directors.*

(a)    The composition of each board of directors of a Reorganized Debtor shall be disclosed prior to the entry of the order confirming this Plan in accordance with 11 U.S.C. § 1129(a)(5).

(b)    Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such member will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.6    *Management Incentive Program.*

The holders of Secured Debt Claims party to the Restructuring Support Agreement have agreed that they shall cause the New Board to adopt the Management Incentive Plan pursuant to the Management Incentive Program. The New Common Shares issued pursuant to the Management Incentive Program shall dilute all other New Common Shares to be issued pursuant to this Plan.

### 5.7   *New Shareholders Agreement.*

On the Effective Date, Reorganized OGIL and all of the holders of New Common Shares then outstanding (other than New Common Shares received pursuant to the Management Incentive Program) shall be deemed to be parties to the New Shareholders Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than Reorganized OGIL.  The New Shareholders Agreement shall be binding on Reorganized OGIL and all parties receiving, and all holders of, New Common Shares of Reorganized OGIL; *provided*, that regardless of whether such parties execute the New Shareholders Agreement, such parties will be deemed to have signed the New Shareholders Agreement, which shall be as binding on such parties as if they had actually signed it.

### 5.8   *Authorization, Issuance, and Delivery of New Common Shares.*

(a)   On the Effective Date, Reorganized OGIL is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of this Plan and the New Shareholders Agreement without the need for any further corporate or shareholder action.

(b)   After the Effective Date, OGIL will file documents with the Securities and Exchange Commission as a voluntary filer under the Exchange Act but does not intend to list the New Common Shares for trading on any national securities exchange. Distribution of New Common Shares will be made by registration of such issued New Common Shares in the register of members of the Company by the transfer agent for the New Common Shares or by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, as provided in section 6.4 of this Plan.

### 5.9   *Amended and Restated Credit Facility.*

On the Effective Date, the Debtors will enter into the Amended and Restated Credit Facility Agreement unless the Debtors elect to refinance the Revolving Credit Facility in its entirety in accordance with section 4.3 hereof; *provided*, that any such refinancing shall be acceptable to the Ad Hoc Committee.

### 5.10   *New Secured Convertible PIK Notes.*

On the Effective Date, OGIL shall issue seven-hundred-fifty million dollars ($750,000,000) of New Secured Convertible PIK Notes.

### 5.11   *New Intercreditor Agreement.*

On the Effective Date, the Revolving Credit Facility Agent, the New Secured Convertible PIK Notes Indenture Trustee, and the New Second Lien Notes Indenture Trustee shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.  Each other party to one or more of the New Secured Debt Agreements shall be

deemed to have directed the applicable agent ~~or~~, New Second Lien Notes Indenture Trustee, or New Secured Convertible PIK Notes ~~i~~Indenture ~~t~~Trustee to execute the New Intercreditor Agreement and shall be bound to the terms of the New Intercreditor Agreement from and after the Effective Date as if it were a signatory thereto.

### 5.12    *Rights Offering.*

(a)    <u>Terms</u>.  Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith.  On the Effective Date, the Debtors shall consummate the Rights Offering.  The Rights Offering will be fully backstopped by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Agreement.  The right to participate in the Rights Offering may not be sold, transferred, or assigned.

(b)    <u>Purpose</u>.  On the Effective Date, the proceeds of the sale of the New Second Lien Notes shall be used: (i) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (ii) to fund Plan Distributions; and (iii) to fund administrative expenses of the Chapter 11 Cases payable on or after the Effective Date.

(c)    <u>Backstop Commitment</u>.  In accordance with the Backstop Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its Investor Percentage (as defined in the Backstop Agreement) of the Unsubscribed Notes (as defined in the Backstop Agreement).

(d)    <u>Backstop Commitment Premium</u>.  In exchange for providing the Backstop Commitment for the Rights Offering, the Backstop Parties will receive the Backstop Commitment Premium.  Upon entry of an order by the Bankruptcy Court authorizing the Debtors' performance of their obligations under the Backstop Agreement, the Backstop Commitment Premium will be immediately and automatically deemed earned and payable.

### 5.13    *Registration Rights.*

On the Effective Date, the Registration Rights Parties shall enter into a registration rights agreement in form and substance acceptable to (i) the Required Restructuring Support Parties and (ii) the Debtors or Reorganized Debtors, as applicable.  The registration rights agreement shall provide the Registration Rights Parties with certain demand registration rights and with piggyback registration rights.  The registration rights agreement shall also provide that on or before the date that is 90 days after the Effective Date, Reorganized OGIL shall file, and shall thereafter use its commercially reasonable efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the New Common Shares and New Secured Convertible PIK Notes held by the Registration Rights Parties.  The Registration Rights Agreement shall contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

In addition, on the Effective Date, Vantage Parent ~~shall~~and Reorganized OGIL shall enter into a registration rights agreement pursuant to which Vantage Parent will have the right to require Reorganized OGIL to file, on or prior to the date that is 90 days after the Effective Date, and thereafter use its commercially reasonable efforts to cause to become effective as promptly as practicable, a registration statement on Form S-1 (or other applicable form) for the distribution or sale of New Common Shares it receives in respect of the Vantage Parent Secured Promissory Note pursuant to Vantage Parent's official liquidation proceeding in the Cayman Islands, subject to the right of Vantage Parent to postpone the filing of such registration statement to accommodate the schedule of its liquidation proceeding.

### 5.14    *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests held by OGIL or a direct or indirect subsidiary of OGIL shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors that are subsidiaries of OGIL; *provided*, that (i) shares in Vantage Driller I Co., Vantage Driller II Co., and Vantage Driller IV Co. will be transferred to OGIL in accordance with applicable share pledge agreements, and (ii) the existing shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be cancelled and new shares, quota, or other applicable equity interest in Vantage Holding Hungary Kft. shall be distributed to OGIL in accordance with this Plan.

### 5.15    *Tax Matters.*

All parties (including the Reorganized Debtors, all holders of Allowed Secured Debt Claims who receive New Secured Convertible PIK Notes pursuant to this Plan, the New Secured Convertible PIK Notes Indenture Trustee and all other parties to the New Secured Convertible PIK Notes Indenture) shall treat the New Secured Convertible PIK Notes and the New Common Shares to which such notes will be "stapled" (and thus only transferred) together as constituting a single instrument treated as common stock of Reorganized OGIL for U.S. federal income tax purposes (subject to definitive guidance from the U.S. Internal Revenue Service or a court of competent jurisdiction to the contrary), and the New Secured Convertible PIK Notes Indenture shall so provide. To the extent permitted by applicable law, all parties shall report consistent therewith for U.S. state and local income tax purposes.

### 5.16    *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

### 5.17    *Separability.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code with the consent of the Required Restructuring Support Parties and the Majority Revolving Credit Facility Claimholders (which consents shall not be unreasonably withheld).

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

### 6.2    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in this Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3    *Date of Distributions.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### 6.4    *Distribution Record Date.*

(a)        As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class (other than the Secured Notes Claims), as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     The Senior Notes Indenture Trustees and the Prepetition Secured Collateral Agent and their respective agents, successors and assigns or such entity appointed by such Secured Notes Indenture Trustees or such Prepetition Secured Collateral Agents shall facilitate the making of distributions to holders of Allowed Secured Notes Claims in accordance with the 7.125% Secured Notes Indenture, the 7.5% Secured Notes Indenture, and the Prepetition Intercreditor Agreement, as applicable.  Plan distributions on account of Allowed Secured Debt Claims shall be made by the Disbursing Agent to (i) the applicable Secured Notes Indenture Trustee or Prepetition Secured Collateral Agent or (ii) with prior written consent of the applicable Secured Notes Indenture Trustee and Prepetition Secured Collateral Agent (such consent not to be unreasonably withheld), through the facilities of DTC in accordance with DTC's practices or other agent.   Nothing in this Plan shall be deemed to impair, waive, or discharge the Charging Lien pursuant to the 7.125% Secured Notes Indenture, the 7.5% Secured Notes Indenture, or the Prepetition Intercreditor Agreement.

(c)     The Revolving Credit Facility Agent and its respective agents, successors, and assigns or such entity appointed by the Revolving Credit Facility Agent shall facilitate the making of distribution to holders of Allowed Revolving Credit Facility Claims in accordance with the Revolving Credit Agreement.  Plan Distributions on account of Allowed Revolving Credit Facility Claims shall be made by the Revolving Credit Facility Agent. Nothing in this Plan shall be deemed to impair, waive, or discharge the Charging Lien pursuant to the Revolving Credit Agreement.

(d)     (b) Notwithstanding anything in this Plan to the contrary and subject to section 6.4(b) hereof, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with holders of Allowed Secured Notes Claims, New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares to the extent consistent with the customary practices of DTC used in connection with such distributions.  With respect to the New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares (including the stapled securities comprising units of New Secured Convertible PIK Notes and New Common Shares together) to be distributed under this Plan through the facilities of DTC, all of such New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares are permitted to be held through DTC's book-entry system; and *provided*, *further*, that to the extent the New Secured Convertible PIK Notes, New Second Lien Notes, or New Common Shares are not eligible for distribution in accordance with DTC's customary practices, Reorganized OGIL will take all such reasonable actions as may be required to cause distributions of the New Secured Convertible PIK Notes, New Second Lien Notes, and New Common Shares under this Plan.

**6.5    *Disbursing Agent.***

All distributions under this Plan shall be made by the Disbursing Agent or, if applicable, its agent on and after the Effective Date as provided herein.  The Disbursing Agent

WEIL:\95567965\1\78787.0004 WEIL:\95567965\7\78787.0004

shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.16 hereof.

### 6.6    *Delivery of Distributions.*

Subject to section ~~6.4(b)~~ 6.4(d) of this Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001 or, to the extent applicable, the Secured Notes Indenture Trustees, Prepetition Secured Collateral Agents, or Revolving Credit Facility Agent.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 6.7    *Unclaimed Property.*

One year from the later of: (i) the Effective Date and (ii) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 374(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.8    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9    *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

36

### 6.10   *Fractional Shares and Notes and De Minimis Cash Distributions.*

No fractional New Common Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Common Shares to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $50.00 in Cash.  Fractional New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized OGIL.  The New Secured Convertible PIK Notes and New Second Lien Notes each shall be issued in denominations of one dollar ($1) or any integral multiples thereof and any other amounts shall be rounded down.

### 6.11   *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of this Plan).

### 6.12   *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan and subject to section 6.2 of this Plan, to the extent that any Allowed Secured Debt Claim or Allowed Vantage Parent Secured Promissory Note Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 6.13   *Exemption from Securities Laws.*

The issuance of and the distribution under this Plan of the New Secured Convertible PIK Notes, the Subscription Rights (including the New Second Lien Notes issued pursuant to the exercise thereof in the Rights Offering), and the New Common Shares issued to holders of Allowed Secured Debt Claims and the issuance of New Common Shares upon the conversion of the New Secured Convertible PIK Notes shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145

exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the New Second Lien Notes to the Backstop Parties under the Backstop Agreement (including the New Second Lien Notes comprising the Backstop Commitment Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

### 6.14    *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or it successor or assign may possess against such holder.

### 6.15    *Rights and Powers of Disbursing Agent.*

(a)      Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)      Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

### 6.16    *Withholding and Reporting Requirements.*

In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under this Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution. The Reorganized Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

The Reorganized Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder. If the Reorganized Debtors make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

### 6.17    *Hart-Scott-Rodino Antitrust Improvements Act.*

Any New Common Shares to be distributed under this Plan to an entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

## ARTICLE VII.    PROCEDURES FOR RESOLVING CLAIMS.

### 7.1    *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all General Unsecured Claims under this Plan, all holders of Claims need not file proofs of Claim filed in the Chapter 11 Cases shall be deemed objected to, and all such Claims Disputed, without further action by the Debtors or with the Bankruptcy Court. Upon the Effective Date, all proofs of Claim filed in the Chapter 11 Cases, regardless of the time of filing, and including proofs of Claim filed after the Effective Date, shall be deemed

automatically withdrawn, without prejudice to the rights of the holders of such Claims to assert any Cause of Action it may have in any appropriate forum as though, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced; *provided,* that.  If a holder of a Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Disputed Claims, which shall be resolved on a case-by-case basis as through settlements or Claim objections (or, if necessary, as through adversary proceedings) by the Reorganized Debtors and in accordance with a litigation schedules to be determined by the applicable parties and the Bankruptcy Court. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2    *Objections to Fee Claims.*

Any objections to Fee Claims shall be served and filed (a) no later than thirty (30) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 7.3    *Estimation of Claims.*

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.4    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.5 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.6 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1 *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 8.2 *Determination of Cure Disputes and Deemed Consent.*

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof. Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and setting forth the proposed Cure Amount (if any). If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be Zero Dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other

matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within 15 days of the filing thereof, shall be deemed to have assented to such assumption and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 8.3    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, that the Reorganized Debtors shall not indemnify directors of the Debtors for any ~~Cc~~laims or Causes of Action arising out of or relating to any act or omission that (i) is a criminal act ~~or~~, (ii) constitutes intentional fraud, or, (iii) with regard to those Reorganized Debtors organized under the laws of the Cayman Islands, constitutes "willful default" (as a matter of Cayman Islands law). All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.4    *Compensation and Benefit Plans.*

All employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code ~~subject to the reasonable consent of the Required Restructuring Support Parties (such consent to apply only with respect to non-material economic terms and non-economic terms)~~. For the avoidance of doubt, any awards granted under the Management Incentive Program will be governed by such program and will not be subject to any provisions of the foregoing assumed plans, programs, or arrangements.

### 8.5    *Insurance Policies.*

All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter

in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

### 8.6    *Reservation of Rights.*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as otherwise provided in this Plan, nothing shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.    CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE.

### 9.1    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Plan Documents are reasonably satisfactory in all respects to the Debtors, the Required Restructuring Support Parties, and, solely on Plan Documents over which the holders of Revolving Credit Facility Claims (or a subset thereof) have consent rights under the Restructuring Support Agreement, also such holders of Revolving Credit Facility Claims (or subset thereof) with such consent rights;

(b)    the New Shareholders Agreement has been entered into by Reorganized OGIL and shall be in full force and effect and binding on all entities that will receive New Common Shares;

(c)    the Bankruptcy Court has entered the Confirmation Order;

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

(d)    the conditions to effectiveness of the Backstop Agreement have been satisfied or waived in accordance with the terms thereof, and the Backstop Agreement is in full force and effect and binding on all parties thereto;

(e)    unless the Debtors refinance the Revolving Credit Facility in full in Cash  on or prior to the Effective Date in accordance with section 4.3 hereof (in which case the conditions to effectiveness of such financing agreement have been satisfied or waived in accordance with the terms thereof, and such financing agreement is in full force and effect and binding on all parties thereto), the conditions to effectiveness of the Amended and Restated Credit Facility Agreement have been satisfied or waived in accordance with the terms thereof, and the Amended and Restated Credit Facility Agreement is in full force and effect and binding on all parties thereto;

(f)    the conditions to effectiveness of the New Second Lien Notes Indenture have been satisfied or waived in accordance with the terms thereof, and the New Second Lien Notes Indenture is in full force and effect and binding on all parties thereto, and shall have been qualified under section 307 of the Trust Indenture Act of 1939, as amended, as of the issuance date of such Notes;

(g)    the conditions to effectiveness of the New Secured Convertible PIK Notes Indenture have been satisfied or waived in accordance with the terms thereof, and the New Secured Convertible PIK Notes Indenture is in full force and effect and binding on all parties thereto, and shall have been qualified under section 307 of the Trust Indenture Act of 1939, as amended, as of the issuance date of such Notes;

(h)    the conditions to effectiveness of the New Intercreditor Agreement have been satisfied or waived in accordance with the terms thereof, and such conditions have not been amended without the consent of the Debtors and the Required Restructuring Support Parties, and the New Intercreditor Agreement is in full force and effect and binding on all parties thereto;

(i)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(j)    the Amended Certificate of Incorporation of Reorganized OGIL shall have been filed with the appropriate governmental authority; and

(k)    all material drilling contracts in effect on or after the Petition Date are in good standing, but for any default or threatened default relating directly or indirectly to the commencement of the Chapter 11 Cases, any other insolvency-related defaults under U.S. or any other applicable laws, or any of the transactions contemplated by this Plan or the Restructuring Support Agreement.

### 9.2    *Waiver of Conditions Precedent.*

(a)    Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors together with the Required Restructuring Support Parties, subject to the consent rights set forth in the Restructuring Support Agreement.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, ~~the waiver of~~each party agreeing to waive such condition precedent shall ~~benefit from the "equitable mootness" doctrine, and~~be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date ~~shall foreclose any ability to challenge this Plan in any court~~on the basis that such condition was not satisfied.  If this Plan is confirmed for fewer than all of the Debtors as provided for in section ~~5.15~~ 5.16 of this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3    *Effect of Failure of a Condition.*

If the conditions listed in sections 9.1 are not satisfied or waived in accordance with section 9.2 on or before the first Business Day that is more than 60 days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.


## ARTICLE X.        EFFECT OF CONFIRMATION.

### 10.1    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under this Plan and whether such holder has accepted this Plan.

### 10.2    *Vesting of Assets.*

Except as otherwise provided in this Plan, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective

Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3    *Discharge of Claims Against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.  For the avoidance of doubt, no such discharge shall affect or otherwise impair claims of a holder of Secured Debt Claims, or any trustee or agent on behalf of such holder, including the Secured Notes Indenture Trustees and Prepetition Secured Collateral Agents, against a non-debtor in the Cayman Proceeding or non-debtor subsidiaries or affiliates of Vantage Parent (other than the Nondebtor Service Subsidiaries).

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

### 10.6    *Plan Injunction.*

(a)    **Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan.**

(b)    By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by this Plan, including, without limitation, the injunctions set forth in this section.

### 10.7    *Releases.*

(a)    **Releases by the Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all claims, obligations, suits, judgments, damages, demands, debts rights, Causes of Action, losses, or liabilities**

47

whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, **gross negligence, or willful misconduct**.  Notwithstanding the foregoing, such release and discharge shall not operate as a release or discharge of any right of any holder of a Secured Debt Claim **(or agent or trustee acting on such holder's behalf)** to assert and prosecute its rights against Vantage Parent **or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries) (including in connection with the Cayman Proceeding)**, and nothing in this Plan shall affect any party's rights against Vantage Parent **or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries)** for any contractual obligation.  Nothing in this Plan shall constitute a release of any claim by Vantage Parent or its nondebtor subsidiaries **or affiliates** against a Debtor as set forth on the books and records of the Debtors as of the Petition Date or any defense of any Debtor to such a claim.  Nothing in this Plan shall constitute a release of any claim by a Debtor against Vantage Parent **or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries)** as set forth on the books and records of the Debtors as of the Petition Date.

(b)      **Releases by Holders of Claims and Interests**.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by (i) the holders of all Claims and Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, (iii) holders of Claims or Interests whose vote to accept or reject this Plan is solicited but who do not vote either to accept or to reject this Plan, (iv) holders of Claims or Interests who vote to reject this Plan but do not opt out of granting the releases set forth herein, (v) Vantage Parent (to the fullest extent permitted by applicable law), (vi) the 2017 Secured Term

48

Loan Agent,  the 2019 Secured Term Loan Agent, the 7.125% Secured Notes Indenture Trustee, (vii) the 7.5% Secured Notes Indenture Trustee, and (viii) the Revolving Credit Facility Agent, except in each case with respect to any contractual obligations, from any and all claims, obligations, suits, judgments, damages, demands, debts rights, Causes of Action, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, the Backstop Agreement, or the Rights Offering, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.  Notwithstanding the foregoing, such release and discharge shall not operate as a release or discharge of (x) any right of any holder of a Secured Debt Claim (or agent or trustee acting on such holder's behalf) to assert and prosecute its rights against Vantage Parent or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries), (y) any contractual obligation, or (z) any Claim of the United States government or any of its agencies; and nothing in this Plan shall affect any party's rights against Vantage Parent or its nondebtor subsidiaries and affiliates (other than the Nondebtor Service Subsidiaries) under any applicable document (including in connection with the Cayman Proceeding).

### 10.8    Exculpation.

To the extent permitted by applicable law, no ~~Released~~Exculpated Party shall have or incur, and each ~~Released~~Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the New Second Lien Notes Indenture, the New Secured Convertible PIK Notes Indenture, the Amended and Restated Credit Facility Agreement, the New Shareholders Agreement, the New By-Laws, the Management Incentive Program, the Backstop Agreement, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, this Plan, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the conducting of the Rights Offering; the issuance of securities under or in connection with this Plan; or the transactions in

49

furtherance of any of the foregoing; except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The ~~Released~~Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of securities thereunder.

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan.

### 10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto (other than with respect to the Prepetition Intercreditor Agreement).

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Subject to section 10.7 of this Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**10.12** *Ipso Facto and Similar Provisions Ineffective.*

Any term of any policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of this Plan, including any change of control that will occur as a result of such consummation; or (iv) the Restructuring; *provided*, that the foregoing shall not operate as a release or discharge of any right of any holder of a Secured Debt Claim to assert and prosecute its rights against Vantage Parent or its nondebtor subsidiaries or affiliates (other than the Nondebtor Service Subsidiaries), and nothing in this Plan shall affect any party's rights against Vantage Parent for any contractual obligation.

**10.13** *Indemnification and Reimbursement Obligations.*

For purposes of this Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

# ARTICLE XI.    RETENTION OF JURISDICTION.

**11.1** *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine applications for the assumption of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all Fee Claims;

(j)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, exculpation, or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

(p)      to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)      to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)      to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.      MISCELLANEOUS PROVISIONS.

### 12.1     *Exemption from Certain Transfer Taxes.*

To the fullest extent permitted by applicable law, the issuance, transfer, or exchange of any security hereunder, as well as all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, and any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 12.2     *Dates of Actions to Implement This Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3     *Amendments.*

(a)      <u>Plan Modifications</u>.  This Plan may be amended, modified, or supplemented by the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any

53

holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)     <u>Certain Technical Amendments</u>.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

### 12.4   *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.5   *Severability.*

Subject to section ~~5.15~~ 5.16 of this Plan, if, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

### 12.6   *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

### 12.7    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.8    *Successors and Assigns.*

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 12.9    *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.10    *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.11    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full herein.

### 12.12    *Notices.*

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

Offshore Group Investment Limited
c/o Vantage Energy Services, Inc.
777 Post Oak Boulevard
Suite 800
Houston, Texas  77056
Attn: Paul A. Bragg
Telephone:  (281) 404-4702
Facsimile:  (281) 404-4749

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq., Daniel J. DeFranceschi, Esq., and Zachary I. Shapiro, Esq.
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors*

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn: Ray C. Schrock, P.C. and Ronit J. Berkovich, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities much file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary*.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

*[The balance of this page has been intentionally left blank.]*

56

**12.13** *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated:         ~~December 1~~January 11, 201~~5~~6
               Houston, Texas


**OFFSHORE GROUP INVESTMENT LIMITED**

**VANTAGE DRILLING (MALAYSIA) I SDN. BHD.**

**VANTAGE DRILLING LABUAN I LTD.**

**VANTAGE DRILLING NETHERLANDS B.V.**

**DRAGONQUEST HOLDINGS COMPANY**

**EMERALD DRILLER COMPANY**

**P2020 RIG CO.**

**P2021 RIG CO.**

**SAPPHIRE DRILLER COMPANY**

**VANTAGE DEEPWATER COMPANY**

**VANTAGE DEEPWATER DRILLING, INC.**

**VANTAGE DELAWARE HOLDINGS, LLC**

**VANTAGE DRILLER I CO.**

**VANTAGE DRILLER II CO.**

**VANTAGE DRILLER III CO.**

**VANTAGE DRILLER IV CO.**

**VANTAGE DRILLER VI CO.**

**VANTAGE DRILLING AFRICA**

**VANTAGE HOLDINGS MALAYSIA I CO.**

**VANTAGE INTERNATIONAL MANAGEMENT CO.**


By: _/s/ Christopher G. DeClaire
Name: Christopher G. DeClaire
Title Authorized Officer

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

**VANTAGE HOLDING HUNGARY KFT.**

By: /s/ Linda J. Ibrahim
Name: Linda J. Ibrahim
Title: Managing Director

Dated:        ~~December 1~~January 11, 201~~5~~6
                Singapore

**PT. VANTAGE DRILLING COMPANY INDONESIA**

By: /s/ Guy Dawson-Smith
Name: Guy Dawson-Smith
Title: President Director

**VANTAGE DRILLER ROCO S.R.L.**
**VANTAGE HOLDINGS CYPRUS ODC LIMITED**

By: /s/ Ronald J. Nelson
Name: Ronald J. Nelson
Title: Director

WEIL:\95567965\1\78787.0004WEIL:\95567965\7\78787.0004

**Exhibits and Schedules to the Plan**

[TBD]

| Summary report: Litéra® Change-Pro TDC 7.5.0.112 Document comparison done on 1/11/2016 11:14:35 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://WEILDMS/WEIL/95567965/1 | |
| **Modified DMS:** iw://WEILDMS/WEIL/95567965/7 | |
| **Changes:** | |
| Add | 245 |
| Delete | 189 |
| Move From | 9 |
| Move To | 9 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 453 |