## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------x | : | **Chapter 11** |
| **In re** | : | |
| | : | **Case No. 15-12422 (BLS)** |
| **OFFSHORE GROUP** | : | |
| **INVESTMENT LIMITED,** *et al.,* | : | **Jointly Administered** |
| | : | |
| Debtors.[1] | : | **Hearing Date: January 14, 2016** |
| | : | **at 10:30 AM (ET)** |
| ------------------------------------------------------x | | |

## REPLY OF DEBTORS TO NOBU SU OBJECTION
## TO PLAN CONFIRMATION AND ADEQUACY OF THE DISCLOSURE STATEMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Offshore Group Investment Limited; Vantage Delaware Holdings, LLC; Dragonquest Holdings Company; Emerald Driller Company; P2020 Rig Co.; P2021 Rig Co.; PT. Vantage Drilling Company Indonesia; Sapphire Driller Company; Vantage Deepwater Company; Vantage Deepwater Drilling, Inc. (3668); Vantage Driller I Co; Vantage Driller II Co; Vantage Driller III Co; Vantage Driller IV Co.; Vantage Driller VI Co.; Vantage Driller ROCO S.R.L.; Vantage Drilling Africa; Vantage Drilling (Malaysia) I Sdn. Bhd.; Vantage Drilling Labuan I Ltd.; Vantage Drilling Netherlands B.V.; Vantage Holding Hungary Kft.; Vantage Holdings Cyprus ODC Limited; Vantage Holdings Malaysia I Co; and Vantage International Management Co.  The Debtors' mailing address is 777 Post Oak Boulevard, Suite 800, Houston, Texas 77056.

## TABLE OF CONTENTS

Preliminary Statement................................................................................................1

I.    The Objection Should Be Overruled Because Nobu Su Has No Right to Be Heard...................................................................................................4

    A.    Nobu Su Cannot Seek Relief from this Court While Claiming Not to Be Subject to Its Jurisdiction. ...................................................4

    B.    Nobu Su Lacks Standing to Object to Confirmation of the Prepackaged Plan. ...........................................................................5

II.    The Objection Should Be Overruled Because Its Arguments Lack Merit.............10

    A.    Delay Would Cause Great Harm and Little Benefit. .................................10

    B.    Vantage Parent Is Hopelessly Out of the Money........................................12

    C.    The Releases and Exculpation in the Prepackaged Plan Are Appropriate. ........................................................................................14

    D.    The Timetable of These Cases Is Appropriate And Has Been Approved By The Court...................................................................17

    E.    The Prepackaged Plan Has Been Proposed in Good Faith. .......................20

    F.    The Prepackaged Plan Is Feasible...............................................................23

    G.    There Were No Improper Transfers.............................................................25

    H.    The Debtors Satisfy the Eligibility Requirements of Section 109 of the Bankruptcy Code................................................................29

    I.    Appointment of the Proposed Board of Directors Is Consistent with Public Policy. ...............................................................................31

    J.    No Basis Exists to Include Reservation of Rights Language in Favor of Mr. Su and F3 Capital. ...............................................................33

    K.    The Objection Misstates Facts or Mischaracterizes the Nature and Goals of the Restructuring. ........................................................34

    L.    The Postpetition Interest Provision in the Prepackaged Plan Is Appropriate. ........................................................................................36

    M.    The Debtors Are Not Obligated to File Schedules or Statements. ............36

    N.    The Disclosure Statement Satisfies Section 1125 of the Bankruptcy Code..............................................................................38

    O.    The Objection Was Filed for an Improper Purpose. ..................................40

III.    Conclusion ..........................................................................................45

Offshore Group Investment Limited ("**OGIL**")[2] and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully submit this reply to the objection ("**Objection**") of Hsin Chi Su a/k/a Nobu Su ("**Nobu Su**") to confirmation of the *Amended Joint Prepackaged Chapter 11 Plan of Offshore Group Investment Limited and Its Debtor Affiliates* [Docket No. 166] (the "**Prepackaged Plan**") and represent as follows:

## Preliminary Statement

1.      The Court should confirm the Prepackaged Plan and overrule the lone remaining objection.  The Prepackaged Plan is the result of extensive, arm's length, and good faith negotiations between the Debtors and their secured creditors, the true economic stakeholders in these chapter 11 cases, and will result in the reorganization of the Debtors' operations for the benefit of the Debtors' employees and their other stakeholders in the midst of one of the worst oil markets in recent memory.  With so much at stake in the face of overwhelming support and uncontroverted evidence, the Debtors respectfully submit that the choice for the Court is clear—the Debtors' Prepackaged Plan should be confirmed presently in accordance with the law, the equities and in compliance with the procedural rules of this Court.

2.      Among the myriad reasons supporting confirmation of the Prepackaged Plan and overruling the sole objection to the Prepackaged Plan, the Debtors would ask the Court to consider the following, among other reasons:

- The Prepackaged Plan is supported by 98.88% of the Debtors' secured term loan and noteholders and 100% of the Debtors' secured revolving lenders.  These are the only creditors entitled to vote on the Prepackaged Plan.  Unsecured claims remain unimpaired and no amount of delay will change this result.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Prepackaged Plan.

- Through the record of these chapter 11 cases and the filings made with the Court, including, without limitation, the recent declarations of Christopher DeClaire [Docket No. 168] (the "*DeClaire Confirmation Declaration*"), Brandon Aebersold [Docket No. 169] (the "*Aebersold Confirmation Declaration*"), and Jane Sullivan [Docket No. 170] (the "*Voting Certification*"), the Statement of James Eldridge [Docket No. 174] (the "*Second Eldridge Statement*"), the *Memorandum of Law Regarding Nobu Su's Lack of Standing in These Chapter 11 Cases* [Docket No. 175] (the "*Standing Memorandum*"), and the declarations of Richard Law and Seth Bullock and the statement of James Eldridge (the "*Third Eldridge Statement*") attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively, the evidence in support of the Prepackaged Plan will be uncontroverted and fully in support of the legal requirements set forth in section 1129 of the Bankruptcy Code.

- As the Standing Memorandum explains in detail and elaborated below, Mr. Su has no legal rights against any Debtor in these chapter 11 cases. Mr. Su is the shareholder of an entity (F3 Capital) that holds a disputed, unliquidated claim against and equity interest in Vantage Drilling Company ("*Vantage Parent*"), the nondebtor parent of OGIL. He refuses to submit himself to the jurisdiction of this Court and has refused to answer criminal charges in Brazil. He has never been an officer or director of any Debtor (including OGIL once he sold OGIL to Vantage Parent) and is not (and was not) a fiduciary of the Debtors. Mr. Su's rights against Vantage Parent will be addressed in the Cayman Islands' proceeding, along with the $1.5 billion deficiency claim of the Debtors' secured term loan lenders and noteholders that also exists in that proceeding.[3]

- Mr. Su has submitted *no evidence* in support of any statement, claim, or argument made in his Objection (or any other paper he has filed with this court). The Court should not countenance an Objection to confirmation of a properly solicited prepackaged plan of reorganization with overwhelming support from creditors holding the fulcrum security based entirely on conjecture and vague, self-serving accusations.

- As detailed below, not one of the arguments advanced in the Objection supports the conclusion that the Court should not confirm the Prepackaged Plan. The purported infirmities articulated in the Objection do not stand up to scrutiny. Among others, Mr. Su's argument with respect to the releases and exculpation provisions of the Prepackaged Plan lacks a single reference to the robust case law on this subject, which is hardly surprising given that the these provisions are consensual, customary, and proper. No material amendments were made to the Plan. In fact, the only change to the releases and exculpation was to narrow them at the request of the United States Trustee. Mr. Su

---

[3] Indeed, Mr. Su has now heeded the Debtors' repeated admonition that his interests should be prosecuted in the Cayman Islands: in the evening of January 13, 2015, after filing his objection to the Prepackaged Plan Mr. Su filed an "emergency" ex parte application with the Grand Cayman Court seeking an injunction that would prevent Vantage Parent from taking any action in these chapter 11 cases. It appears that Mr. Su is finally pursuing relief in the correct forum (albeit in an unnecessary and inappropriate manner under Cayman law). Of course, no action by Vantage Parent is required to confirm the Debtors' Prepackaged Plan.

WEIL:\95587914\3\78787.0004

misunderstood the inclusion of a new definition to add a new concept, but as we will explain, that is simply not the case.

- The Debtors face the very real prospect of harm to their business with any delay. The evidence is overwhelming on this point and ranges from the inability to bid for new business, to the real prospect of losing existing business and the entire Prepackaged Plan with any delay. The Debtors must emerge promptly and they have earned the right to that with the uncontroverted record before the Court. Despite misleading statements by Mr. Su in his Objection, and as the Court knows, at no point in these cases have the Debtors sought to reduce the time periods required for confirmation of a plan of reorganization under the Bankruptcy Code, Bankruptcy Rules, or Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. In contrast to the significant and adverse consequences of delay for the Debtors, a delay would provide little or no benefit to (and actually harm) the Debtors' (and Vantage Parent's) equity holders. The Vantage Parent is being issued stock in the reorganized Debtor OGIL and has substantial payments due on account of intercompany claims, which would be put at risk with any delay.

- The Debtors have pursued the Prepackaged Plan in good faith. There is nothing improper about the decision for the Debtors to pursue the Prepackaged Plan while Vantage Parent pursues liquidation under laws of the Cayman Islands. From this "parallel proceeding" structure, Mr. Su draws an unsubstantiated inference of improper conduct by the Debtors and Vantage Parent. Yet, as explained on the very first day of these cases, in the *Declaration of Christopher G. DeClaire in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 17] ("***First Day Declaration***"):

> Vantage Parent and the Debtors have elected to proceed with this structure, among other reasons, to facilitate the Debtors' need to reorganize and emerge from chapter 11 quickly. The Prepackaged Plan is premised on the notion that the Secured Debt Claims are significantly undersecured. Because the Secured Debt Claims are guaranteed by Vantage Parent, the holders of Secured Debt Claims have a large deficiency claim against Vantage Parent. That deficiency claim is believed to be much larger than any other unsecured claims against Vantage Parent. Thus, the same secured creditor constituency that would become the new equity holders under the Prepackaged Plan also will be the largest creditor constituency in the Cayman Proceeding and will ultimately receive their pro rata distribution of the remaining value of Vantage Parent upon its eventual liquidation. The Debtors are confident that this structure provides the most expeditious and fair way to reorganize the Debtors' enterprise.

(First Day Decl. ¶ 64.). This explanation was and remains correct.

   3.  And finally, like each of the preceding papers Mr. Su has submitted to this

Court, the Objection contains numerous statements and misstatements that obfuscate simple

3

issues of law and fact in an attempt to raise alarm with accusations of improper conduct on the part of the Debtors and/or Vantage Parent.  None of these statements are supported by evidence.  As before, these arguments underscore Mr. Su's lack of credibility and ultimately support the conclusion that the Objection should be overruled.

## I.    The Objection Should Be Overruled Because Nobu Su Has No Right to Be Heard.

### A.    Nobu Su Cannot Seek Relief from this Court While Claiming Not to Be Subject to Its Jurisdiction.

4.    Mr. Su continues to deny that he is subject to the jurisdiction of the Court, even though he requests affirmative relief in the form of a continuance of the confirmation hearing.  (Obj. 4, 17.)  Mr. Su states:

> F3 Capital's and Su's objection to the disclosure statement and plan is not a submission to the jurisdiction or authority of the Bankruptcy Court for the resolution of any matter involving F3 Capital and the Debtors, Vantage Parent Company or the non-Debtor affiliates.  Nor is this Objection a waiver of any objections to jurisdiction or venue.  All of the foregoing rights are expressly reserved and preserved, without exception, and without the intention or purpose of conceding jurisdiction in any way by this filing or by any other participation in this matter or in these chapter 11 cases.

(Obj. 1 n.2.)  This, despite his counsel's representation at the Second Day Hearing that: "there's been a mischaracterization of . . . the jurisdiction issue. . . . He's not denying coming or being involved in the Court."  (2d Day Hr'g Tr. 50:6–12.)  The Objection demonstrates that Mr. Su is *unequivocally* "denying coming or being involved in the Court."  (*Id.*)

5.    Mr. Su has made himself subject to the Court's jurisdiction under the waiver-by-conduct rule, which provides that "a party may consent to personal jurisdiction if he or she 'actually litigates the underlying merits or demonstrates a willingness to engage in extensive litigation in the forum.'"  *Emekekwue v. Offor*, No. 1:11–CV–01747, 2012 WL 5249414, at *4 n.6 (M.D. Pa. Oct. 24, 2012) (quoting *In re Tex. E. Transm'n Corp.* 15 F.3d 1230, 1236 (3d Cir.1994)).  "[W]here a party seeks affirmative relief from a court, it normally

4

submits itself to the jurisdiction of the court with respect to the adjudication of claims arising

from the same subject matter." *Emekekwue* , 2012 WL 5249414 at *4 n.6 (quoting *Bel–Ray Co.*

*v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999)).  "The Third Circuit has concluded that

affirmative relief is implicated where the court 'considers the merits or quasi-merits of a

controversy.'" *Emekekwue*, 2012 WL 5249414 at *4 n.6 (quoting *Ciolli v. Iravani*, 625 F. Supp.

2d 276, 291 (E.D. Pa. 2009)).  Courts consistently hold that a party cannot obtain affirmative

relief but refuse to submit to the court's jurisdiction.  *See, e.g.*, *In re Nat'l Cattle Congress*, 247

B.R. 259, 269 (Bankr. N.D. Iowa 2000) ("The Tribe shall elect to either (1) withdraw its claim

by filing a notice of withdrawal pursuant to Fed. R. Bankr. P. 3006 or (2) retract [its assertion of

the jurisdictional defense of sovereign immunity] from its Proof of Claim.").

      6.     Mr. Su should not be permitted to obtain affirmative relief while he

maintains that he is not subject to this Court's jurisdiction.

### B.    Nobu Su Lacks Standing to Object to Confirmation of the Prepackaged Plan.

      7.     Mr. Su has failed, despite *five* attempts, to demonstrate that he has

standing to object to confirmation of the Prepackaged Plan or otherwise be heard by the Court.

Under section 1128(b) of the Bankruptcy Code, only a "party in interest may object to

confirmation of a plan."  The Debtors hereby incorporate herein by reference their Standing

Memorandum, including all exhibits thereto, which addresses the standing arguments Mr. Su has

made prior to his Objection.  Here, the Debtors address his new arguments from the Plan

Objection.

      8.     Mr. Su first asserts that he "is a former fiduciary of OGIL and as such has

a separate claim to standing."  (Obj. 4.)  He asserts that "[t]he Plan attempts to treat him

differently than other officers and directors of OGIL [*sic*] which makes him an aggrieved party

with a pecuniary interest."  Yet Mr. Su is not a current officer, director, or other fiduciary of

WEIL:\95587914\3\78787.0004

OGIL and has not been in a fiduciary position with respect to the Debtors for more than seven

years. Although he was a director of Vantage Parent until 2011, Mr. Su has had no fiduciary

relationship with OGIL since Vantage Parent acquired OGIL from F3 Capital on June 12, 2008.

        9.      However, even if Mr. Su had been a fiduciary of OGIL or another Debtor,

that relationship alone would not confer standing to object to the Prepackaged Plan. Former

directors and officers of a debtor are not, without more, parties in interest. *See In re O.P.M.*

*Leasing Servs., Inc.*, 21, B.R. 983, 986 (Bankr. S.D.N.Y. 1981). Neither are current directors or

officers. *See In re WHET, Inc.*, 33 B.R. 438, 442 (Bankr. D. Mass 1983). As the *O.P.M.*

*Leasing* court stated:

> It should also be noted that Weissman's former position as an officer of O.P.M.
> does not create any inherent rights in this matter. In major bankruptcies, there are
> often hundreds of former officers of insolvent corporations, and there is no
> authority for the proposition that their former employment bestows any rights per
> se in the corporation's bankruptcy proceedings. Indeed, although Weissman
> argues as if he were a stockholder in O.P.M., in fact, he held stock in the parent
> corporation, Cali, and not in the subsidiary. A stockholder of the parent is not a
> party in interest entitled to intervene in the reorganization proceeding of one of its
> subsidiaries.

21 B.R. at 986; *see also In re Shubh Hotels Pittsburgh, LLC*, 495 B.R. 274, 284 (Bankr. W.D.

Pa. 2013) ("Mr. Lewis' personal interest in continuing to operate his businesses is an economic

concern, and does not present a legally protected interest which could be affected by this

proceeding. The Court therefore finds that Mr. Lewis is not a party in interest under section

1109(b).") (citing *O.P.M. Leasing*, 21 B.R. at 986; *WHET*, 33 B.R. at 442). Mr. Su stands in

precisely the same position as these other non-parties. He is not a party in interest here.

        10.     Mr. Su's cited authority is inapposite. In *In re Flagstaff Foodservice*

*Corp.*, 29 B.R. 215, 218 (Bankr. S.D.N.Y. 1983), four officers of the debtor had standing to seek

payment of unpaid payroll taxes where those officers would otherwise have been exposed to

personal liability for such taxes. Here, in contrast, Mr. Su faces no personal liability for any of

WEIL:\95587914\3\78787.0004

the Debtors' obligations.  In the other case he cites, *In re New Century TRS Holdings, Inc.*, 505

B.R. 431, 438–40 (Bankr. D. Del. 2014), the court denied standing to a person who was not a

debtor, a creditor of a debtor, or a creditor of the liquidating trust in that case.  *New Century TRS*

*Holdings* supports the Debtors' position, not Mr. Su's.

11.    Mr. Su asserts that he "would have a claim to indemnification from OGIL

for any alleged acts and such claims should be preserved."  (Obj. 4.)  Mr. Su has no such

claims—but even if he did, the Prepackaged Plan expressly preserves them.  (*See* Plan § 8.3.)

There is no injury to Mr. Su.  *See Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011)

("A party seeking constitutional standing must demonstrate an 'injury in fact' that is 'concrete',

'distinct and palpable', and 'actual or imminent.'" (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

155 (1990))).

12.    Mr. Su asserts that "OGIL's current officers and directors include parties

who [*sic*] Mr. Su has sued personally [and] are using their position to favor themselves over

others and treat similarly situated parties differently."  (Obj. 4.)  As stated above, Mr. Su is not

similarly situated.  He is not a former fiduciary of a Debtor.  He is *suing* the Debtors' fiduciaries.

(*Id.*)  And the implication that Mr. Su is somehow *entitled* to obtain a release under the Plan is

legally meritless (as well as factually absurd).  Under section 1123(b)(3)(A) of the Bankruptcy

Code, "a plan may provide for the settlement or adjustment of any claim or interest belonging to

the debtor or the estate."  The plain language of section 1123 is permissive: a plan need not

provide a release to anyone.  Mr. Su cites no authority to the contrary, and none exists.

13.    Mr. Su asserts that "the hard assets the Debtors seek to administer in this

case are the subject of the Harris County, Texas litigation and the pending arbitration."  (Obj. 5.)

Yet, they are not.  As described in the Debtors' Standing Memorandum, in that litigation (the

"*Texas Action*"), Mr. Su seeks only money damages. (Standing Mem. ¶ 7.) If Mr. Su prevails

on his counterclaims in the Texas Action, he will have a liquidated claim against Vantage

Parent—not a claim against specific property *of the Debtors*. Mr. Su's related assertions that F3

Capital has "rights to exercise collection efforts to the extent available under law against the res

– the Platinum Explorer" are similarly unfounded.[4] (Obj. 11.) F3 Capital is not a creditor of the

Debtors. Its rights are also against Vantage Parent. (Standing Mem. ¶¶ 5–9.) Neither Mr. Su

nor F3 Capital has the right to exercise remedies against the Debtors' property. Mr. Su does not

explain why the *Platinum Explorer* constitutes a "res," under what contract, or what significance

the term "res" has.[5]

14.     Mr. Su asserts that "the Debtors are aiding and abetting Vantage to

attempt to shield assets from litigation claims for the benefit of management, who are defendants

in the litigation, and other creditors." (Obj. 5.) As described below, every step of this

Restructuring has been proper under all applicable law, including Cayman Islands law. Mr. Su's

conclusory assertions—*completely* unsupported by evidence—are insufficient to establish that he

holds legal rights against the Debtors or defeat the Debtors' evidence in support of confirmation.

*See In re Safety-Kleen Corp.*, 381 B.R. 119, 125 (Bankr. D. Del. 2008) (disallowing claim based

on employment discrimination where, "[a]lthough [the employee] made some allegations that

---

[4] The *Platinum Explorer* is owned by Vantage International Management Co., a Debtor subsidiary of OGIL. (First Day Decl. ¶ 25.)

[5] Mr. Su asserts in a footnote: "Given the claims arise from contract actions related to vessels, there are potential maritime claims if the Court finds Vantage breached the agreements. . . . Nothing in the Plan should be deemed to attempt to cut off maritime lien rights of Su or any other party." (Obj. 2, 5 n.5.) Mr. Su does not explain what these purported claims are or how they give him rights against property of the Debtors. The Debtors are not aware of a single maritime claim against them—and Mr. Su's Objection does not specify one beyond his conclusory assertions. But even if such a claim did exist, it would be either (i) a post-emergence claim that is not subject to the Plan or (ii) a General Unsecured Claim, Administrative Expense Claim, or Other Secured Claim—all of which are Unimpaired. (Plan §§ 2.1, 4.2, 4.5.) There is simply no injury to Mr. Su such as would confer standing on him in these cases. *See Global Indus. Techs.*, 645 F.3d at 210.

could lead to an inference of race discrimination, they are no more than bald assertions, unsupported by factual evidence"); *cf. Podohnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine issue." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986))).  Again, however, if there were claims against the assets of the Debtors, those claims would continue to exist after the Effective Date of the Prepackaged Plan.  The Prepackaged Plan itself does not affect unimpaired claims against the Debtors.

        15.     Mr. Su's assertions that F3 Capital has standing in these cases are based on purported violations by the Debtors of Cayman Islands law (Obj. 6–11) and rest on conclusory assertions and misstatements of applicable law.  As explained below and in paragraph 15 of the Second Eldridge Statement, as well as the Third Eldridge Statement, Mr. Su's descriptions of Cayman Islands law are either incorrect or materially misapplied to the facts of this restructuring.

- Secured creditors of an insolvent Cayman Islands company—such as Wells Fargo—are entitled to petition for that company's liquidation, without prior notice to or the consent of that company's shareholders.  (3d Eldridge Stmt. ¶¶ 10–12.)  Wells Fargo's commencing the Cayman Proceeding, rather than Vantage Parent's shareholders, was proper.  (*Id.*)  It does not support an inference of "shareholder oppression" or any other "distinct and palpable" harm to Mr. Su.  *Global Indus. Techs., Inc.*, 645 F.3d at 210.

- The affidavits and winding-up petition should not be "deemed acts taken without authority."  (Obj. 10.)  These acts do not require shareholder approval under Cayman Islands law.  (3d Eldridge Stmt. ¶¶ 10–12.)

- Mr. Su's assertion that "[t]he Restructuring [Support] Agreement shows the clear intent to try to defy the shareholder's rights" (Obj. 10) is incorrect and is unsupported by any factual detail or admissible evidence.  (*See* DeClaire Confirmation Decl. ¶¶ 42–48.)

Mr. Su's assertions are not supported by any evidence and do not provide a basis for standing.

16.     Accordingly, for these reasons and the reasons set forth in the Standing

Memorandum, Mr. Su lacks standing to object to confirmation of the Prepackaged Plan.

## II.    The Objection Should Be Overruled Because Its Arguments Lack Merit.

### A.    Delay Would Cause Great Harm and Little Benefit.

17.     The Debtors wish to reiterate their consistent position, articulated in the

First Day Declaration (First Day Decl. ¶ 10–11), on the record at in the first-day hearing, and in

the Debtors' objection to Mr. Su's emergency motion (Obj. to Emergency Mot. ¶ 18–28):  the

Debtors face real, tangible, and irreparable harm if these chapter 11 cases are delayed, even for a

brief period.  (DeClaire Confirmation Decl. ¶ 12).  As stated in the DeClaire Confirmation

Declaration, any delay in the Debtors' emergence from these chapter 11 cases has the potential to

cause substantial harm to the Debtors' business and the value of their estates in a variety of ways.

The Debtors are at a critical juncture in two key contracts –the renegotiation of an existing

drilling contract with a major, long-term customer and the bidding process on a drilling contract

offered by another major historical customer—one of the few available contracts in the

extremely distressed oil industry.  (*Id.* ¶ 13, 18–21.)  As Mr. DeClaire notes, the existing

customer has been extremely focused on January 14, 2016 as the scheduled date for confirmation

and will likely terminate their existing contract with the Debtors if confirmation is delayed.  (*Id.*

¶ 19.)  Similarly, Mr. DeClaire explains that without the prompt emergence from bankruptcy,

they will likely not prevail on the bid for the new contract and will effectively be financially

disqualified from bidding on new contracts.  (*Id.* ¶ 20.)  Thus, if confirmation is delayed even

slightly, the Debtors face a very real possibility of liquidation.  (*Id.* ¶¶ 16–18, 25.)

18.     If the Debtors do not press forward with the current Court-approved

schedule, there entire restructuring may be at peril.  The Debtors' key agreements with their

secured creditors, the Restructuring Support Agreement and Backstop Agreement, contain

10

certain standard milestones, including that the Prepackaged Plan must be confirmed within 60

calendar days after the Petition Date (*i.e.*, by February 1, 2016).  Consequently, any delay

beyond that date would entitle the secured creditors to abandon the Prepackaged Plan, and the

secured creditors' agreement therein to pay all unsecured creditors in full, and jeopardize the

success of the Debtors' reorganization to the detriment of all stakeholders, including Vantage

Parent.  A similar termination right exists in the Backstop Agreement and could cause the

Backstop Parties to withdraw their commit to provide the Debtors the capital necessary for

emergence.  The Restructuring Support Agreement also contains a provision that would

terminate that contract in the event the Debtors lose an existing drilling contract.  The loss of an

agreement on a quick restructuring plan would only further exacerbate the aforementioned

business risks associated with losing existing and new customers.  Such an outcome would not

only be bad for the Debtors' business but also for its chances of a successful reorganization.

   19. In contrast to the significant and adverse consequences of delay for the

Debtors, a delay would provide little or no benefit to (and actually harm) the Debtors' (and

Vantage Parent's) equity holders.  These parties are so far out of the money that delaying these

cases provides no prospective benefit to Vantage Parent or its stakeholders.  As explained herein,

the reality of these cases is that the value of Vantage Parent's equity interest in the Debtors is

zero because the secured claims in these cases exceed the value of the Debtors' assets by

approximately $1.5 billion.  (*See* Aebersold Confirmation Decl. ¶ 10.)  Delaying confirmation

simply will not change that fact, except maybe to make Vantage Parent even more out-of-the-

money as the value of the business deteriorates as a result of the delay.  Mr. Su may not like what

this means for his equity interests and purported claims against Vantage Parent, but the ire of a

WEIL:\95587914\3\78787.0004

disgruntled non-party should not result in the frustration of the Debtors' reorganization efforts

and the destruction of real value for the true parties in interest in these chapter 11 cases.

**B.      Vantage Parent Is Hopelessly Out of the Money.**

20.      Mr. Su demonstrates a fundamental misunderstanding of the absolute

priority rule embodied in the Bankruptcy Code.  Mr. Su references Vantage's Form 8-K's in

what appears to be an attempt to show that there is significant value in the Debtors estates, and

that Vantage Parent and its shareholders were somehow deprived of that value.  The Debtors

agree on the first point: their "high specification assets" (as well as the enterprise and

management team that put those assets to work) do have significant value.  But, unfortunately for

Mr. Su (and unfortunately for all of the Debtors' stakeholders), the Debtors' assets, like all assets

in the oil and gas industry, are worth significantly less than they used to be.  The Debtors'

Estimated Enterprise Value only adds up to somewhere between $1.11 billion and $1.30 billion

(*See* Aebersold Confirmation Decl. ¶ 8).  Moreover, Mr. Su simply ignores the other side of the

equation – the Debtors have significant secured debt in the amount of approximately $2.643

billion.  This figure exceeds the Estimated Enterprise Value range by approximately $1.5 billion.

In addition, the equity in OGIL and the other Debtors in these cases was pledged as collateral to

the Debtors' secured creditors.

21.      As a consequence of the fact that the Debtors' debt significantly exceeds

its equity, the "divestment" of Vantage Parent's interest in the Debtors and their assets under the

Prepackaged Plan is not improper – it is a function of the absolute priority rule.  No shareholder

approval is required to give effect to the absolute priority rule.   Chapter 11 plans extinguish the

equity interests in debtors every single day.  That is not a taking or transfer of shareholders'

property, as Mr. Su suggests (and Mr. Su cites no cases to support his position that it is); it is the

WEIL:\95587914\3\78787.0004

proper application of the Bankruptcy Code.[6]  And the proper way for a shareholder to defeat

such a result is to present evidence that the valuation of the assets actually exceeds the debt such

that equity is entitled to a recovery.  Mr. Su has presented no such evidence.   The only evidence

before the Court is the uncontroverted testimony of Mr. Aebersold.

22.    Mr. Su also takes the position that Vantage Parent must have *some* value

because its equity trades in the over-the-counter pink sheets market.  Yesterday, those shares

closed at $0.0035 – one third of one penny.  http://www.otcmarkets.com/stock/VTGDF/quote

(last visited Jan.13, 2016).[7]  At a price that miniscule, the shares represent nothing more than

option value, especially in a world where it is virtually certain that equity is out of the money not

only in the Debtors' chapter 11 cases, but also in Vantage Parent's Cayman liquidation

proceeding as well.  As one court put it, the pink sheets' price quotations are "too uncertain,

shadowy, and speculative, to form any sound foundation for the determination of value."

*Pandolfo v. U.S.*, 128 F.2d 917, 921 (10th Cir. 1942).  Furthermore, even if the equity of Vantage

Parent did have value—which it does not—Mr. Su has not demonstrated that such value is

attributable to the shares of OGIL rather than Vantage Parent's other assets.  The Debtors'

valuation evidence shows that it clearly is not.  And Mr. Su's counsel conceded that the shares of

Vantage Parent have only "de minimis value."  (2d Day Hr'g Tr. 53:11–13.)  Mr. Su's reliance

on the pink sheets as evidence that Vantage Parent is not insolvent is patently insufficient.

---

[6] In addition, under the Plan, the holder of the pledge of the Debtors' equity owned by Vantage Parent
will be enforcing its security interests on that equity.  (Plan § 4.8).  As noted by Mr. Eldridge, such
enforcement of a security interest by secured creditors permitted under Cayman Islands law
notwithstanding Vantage Parent's liquidation proceedings (Third Eldridge Stmt. ¶ 24).  This is an
independent basis under which Vantage Parent's equity interests in the Debtors is being extinguished.

[7] In the Standing Memorandum, the Debtors erroneously quoted Vantage Parent's ticker symbol as
VTGBF, which trades in the "Grey Market."  Vantage Parent trades in the Pink Market as VTGDF.

13

### C.    The Releases and Exculpation in the Prepackaged Plan Are Appropriate.

23.    Mr. Su asserts that the releases, exculpation, and indemnification in the Prepackaged Plan are "overbroad and unreasonable," and that "there is an attempt to provide releases of non-debtors which is improper."  Mr. Su fails to address the governing legal standard for these provisions or explain his objection specifically.  Nevertheless, these provisions are consensual, customary, and proper.

24.    The Debtor release satisfies the standard set forth in *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) *and In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).  Citing those cases, this Court has stated:

> With respect to the Debtors' Releases, courts in this district have applied a five-factor test:
>
> 1. An identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> 2. Substantial contribution by the non-debtor of assets to the reorganization;
>
> 3. The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
>
> 4. An agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class of [claims] "overwhelmingly" votes to accept the plan; and
>
> 5. A provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.
>
> These factors are neither exclusive nor are they a list of conjunctive requirements. Instead, they are helpful in weighing the equities of the particular case after a fact-specific review.

*In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citations omitted).

"When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate."  *In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009)

WEIL:\95587914\3\78787.0004

(approving debtor releases where they were "an integral part of a comprehensive Plan that provides substantial value to the estates").

25.    Here, the Debtor release is appropriate.  The Debtors are releasing Vantage Parent, the Nondebtor Service Subsidiaries, the Restructuring Support Parties, the Backstop Parties, any member of the Ad Hoc Committee who served in such capacity at any time between the Petition Date and the Effective Date, and certain entities related to the foregoing.  (Plan § 1.1 ("Released Parties").)  Certain of these parties have an identity of interest with the Debtors.  Every one of these parties has provided a substantial contribution to the Debtors' reorganization by way of funding, services, and/or support for the Restructuring.  The release is essential to this Restructuring because it was a negotiated provision of the Debtors' Prepackaged Plan, which is the chapter 11 plan required by the Restructuring Support Agreement—the Debtors' best available means by which to reorganize and maximize value.  The only impaired classes of claims voted overwhelmingly to accept the Prepackaged Plan.  Further, the definition of "Released Parties" was changed as a result of negotiations with the U.S. Trustee, who does not object to the release in the Prepackaged Plan.  Mr. Su's vague assertion that the release is "overbroad and unreasonable" are insufficient.

26.    The third-party release is likewise appropriate because it is consensual. Section 10.7(b) of the Prepackaged Plan provides that the third-party release is granted by:

> (i) the holders of all Claims and Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, (iii) holders of Claims or Interests whose vote to accept or reject this Plan is solicited but who do not vote either to accept or to reject this Plan, (iv) holders of Claims or Interests who vote to reject this Plan but do not opt out of granting the releases set forth herein, (v) Vantage Parent (to the fullest extent permitted by applicable law), (vi) the 2017 Secured Term Loan Agent, the 2019 Secured Term Loan Agent, the 7.125% Secured Notes Indenture Trustee, (vii) the 7.5% Secured Notes Indenture Trustee, and (viii) the Revolving Credit Facility Agent.

15

Such a release is consensual under applicable case law and therefore "entirely appropriate under a contract theory." *In re Washington Mut. Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011); *see Indianapolis Downs*, 486 B.R. at 304–06; *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010). And in any event, Mr. Su is not among the parties granting this release and lacks standing to object to its breadth. *See Indianapolis Downs*, 486 B.R. at 304 (holding that only parties who are affected by a plan provision have standing to challenge that provision).

27. The exculpation in the Prepackaged Plan is appropriate because it is limited to fiduciaries of the chapter 11 estates. Under *In re PWS Holding Corporation*, 228 F.3d 224 (3d Cir. 2000), "a plan may exculpate a creditors' committee, its members, and estate professionals for their actions in the bankruptcy case, except where those actions amount to willful misconduct or gross negligence." *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011) (citing *PWS Holding Corp.*, 228 F.3d at 246). "The *PWS* court's reasoning thus implies that a party's exculpation is based upon its role or status as a fiduciary. . . That fiduciary standard, however, applies only to estate fiduciaries, no one else." *PTL Holdings*, 2011 WL 5509031 at *12 (quotation marks omitted) (citing *Washington Mut.*, 442 B.R. at 350). "The *Washington Mutual* court determined that exculpation clauses should be limited to fiduciaries who have served during the chapter 11 proceedings: estate professionals, committees and their members, and the debtors' directors and officers." *Indianapolis Downs*, 486 B.R. at 306 (citing *Washington Mut.*, 442 B.R. at 350–51). Here, the Prepackaged Plan exculpates Exculpated Parties, which are "every fiduciary of the Debtors and their Estates in the chapter 11 cases, including the Debtors' directors, officers, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals." (Plan § 1.1 ("Exculpated Parties").) The exculpation also expressly carves out

16

Nobu Su for the avoidance of any doubt in light of the pending litigation; he is not an estate fiduciary.  The exculpation is appropriate.

28.     Finally, it is unclear exactly what Mr. Su's objection is to the Prepackaged Plan's indemnification provisions.  He asserts only that they are "overbroad and unreasonable." (Obj. 17.)  Under section 8.3 of the Prepackaged Plan, the Debtors' obligations under their corporate organizational documents will be assumed and survive these chapter 11 cases to the extent permitted by law.  Section 10.13 provides that the Debtors' postpetition obligations to indemnify their directors or officers will be assumed and constitute Administrative Expense Claims.  These actions are authorized by section 365(a) of the Bankruptcy Code as an exercise of the Debtors' reasonable business judgment.  They are "supported by valid business justifications," including that they are part of a plan that has the consent of the Restructuring Support Parties under the Restructuring Support Agreement.  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006).  The indemnification provisions are appropriate.

**D.     The Timetable of These Cases Is Appropriate And Has Been Approved By The Court.**

29.     Mr. Su continually expresses his displeasure with the timing of these chapter 11 cases, arguing that the timetable is somehow extraordinarily accelerated or a calculated, manipulative scheme by the Debtors to trample shareholder rights.[8]  However, the

---

[8] To be clear, Mr. Su's allegations that the Debtors—a billion-dollar international enterprise facing significant liquidity issues in the midst of a historic market downturn—intentionally delayed their restructuring so as to encapsulate the holiday season for the purpose of inconveniencing Mr. Su is nonsensical.  Such an argument runs directly contrary to the evidence offered by the Debtors, namely, the critical need for an expeditious exit from chapter 11 and the potentially catastrophic effect any delay would have on the Debtors' business.  Further, as this Court is aware, the Amended Prepackaged Plan and the documents included in the Second Plan Supplement have been the subject of ongoing negotiations between the Debtors and the Ad Hoc Committee and were filed once they reached substantially final form so as to allow for the review by true parties in interest in these chapter 11 cases.  The timing of such filings, whether on Christmas Eve or otherwise, is completely coincidental.

WEIL:\95587914\3\78787.0004

timing of the milestones in these cases are driven by the exigencies of the Debtors' business and comply with the Bankruptcy Code and Bankruptcy Rules.

30.     The Rules permit a hearing to approve a disclosure statement to be held upon 35 days' notice.[9]  Despite the plain language of the Bankruptcy Rules, Mr. Su implies that setting the Confirmation Hearing less than 45 days after the Petition Date is somehow remarkable or extraordinary.  (*See* Obj. 1.)  That argument is inconsistent with law and should be rejected.  The confirmation timetable for these prepackaged chapter 11 cases, 42 days from the Petition Date to the Confirmation Hearing, is not a "rocket docket" as Mr. Su suggests, but rather is consistent with other prepackaged cases in this district.[10]  Further, it is common in complex chapter 11 cases such as these to file supplements and amendments to a plan in the days approaching the confirmation hearing.[11]

---

[9] Bankruptcy Rule 2002(b) governs notice relating to approval of a disclosure statement and chapter 11 plan and provides that "the debtor[s], the trustee, all creditors and indenture trustees" shall have "not less than 28 days notice by mail of the time fixed (1) for filing objections and the hearing to consider approval of a disclosure statement . . . and (2) for filing objections and the hearing to consider confirmation of a chapter 9, chapter 11, or chapter 13 plan." Fed. R. Bankr. P. 2002(b).  Further, though Bankruptcy Rule 3017 provides that a disclosure statement hearing must be held on at least 28 days' notice, Local Rule 3017–1 expands the notice period providing that "[t]he hearing date shall be at least thirty-five (35) days following service of the disclosure statement and the objection deadline shall be at least twenty-eight (28) days from service of the disclosure statement." Local Rule 3017–1(a).

[10] *See, e.g.*, *In re Allen Sys. Grp.*, Ch. 11 Case No. 15–10332 (KJC) (Bankr. D. Del) (combined disclosure statement and confirmation hearing held 36 days after petition date); *In re Hercules Offshore, Inc.*, Ch. 11 Case No. 15–11685 (KJC) (Bankr. D. Del) (combined disclosure statement and confirmation hearing held 42 days after petition date); *In re Sorenson Commcn's, Inc.*, Ch. 11 Case No. 14–10454 (BLS) (Bankr. D. Del) (combined disclosure statement and confirmation hearing held 38 days after petition date); *In re Vertis Holdings, Inc.*, Ch. 11 Case No. 08–11460 (CSS) (Bankr. D. Del) (combined disclosure statement and confirmation hearing held 42 days after petition date).

[11] *See, e.g.*, *In re Allen Sys. Grp.*, Ch. 11 Case No. 15–10332 (KJC) (Bankr. D. Del) (modified plan and plan supplement were filed one day and seven days, respectively, prior to confirmation hearing); *In re Hercules Offshore, Inc.*, Ch. 11 Case No. 15–11685 (KJC) (Bankr. D. Del) (revised plan supplement filed two days prior to confirmation hearing); *In re Sorenson Commcn's, Inc.*, Ch. 11 Case No. 14–10454 (BLS) (Bankr. D. Del) (revised plan supplement filed the day before confirmation hearing); *In re Vertis Holdings, Inc.*, Ch. 11 Case No. 08–11460 (CSS) (Bankr. D. Del) (revised plan supplement filed four days prior to confirmation hearing).

WEIL:\95587914\3\78787.0004

31.     Mr. Su alleges that these chapter 11 cases were timed to take advantage of the holiday period at the end of December.  This is untrue.  As disclosed in the Disclosure Statement section III, the Debtors' chapter 11 cases were precipitated by a confluence of unfortunate external factors beyond the Debtors' control.  The filing timeline was driven primarily by the expiration of the Debtors' grace period on the 7.5% Notes on December 2, 2015, while the overall timeline was driven by the Debtors' need to effect a prepackaged restructuring in order to minimize harm to the Debtors' business.

32.     If anything, in light of the holiday period, the Debtors' timeline actually provides for longer notice than what is required under the rules.  The Debtors established January 7, 2016 as their second day hearing – a full 35 days from the Petition Date rather than December 28, 2015 (the earliest date the Debtors could have asked the Court to enter final orders on their first day motions).  Furthermore, the Debtors also extended other deadlines in this case, including the voting deadline, which was extended to January 6, 2016 upon the request of the United States Trustee to accommodate the holiday period.

33.     It is not the Debtors who have sought emergency shortened relief in this case, it's Mr. Su.  Ultimately, neither the timing of these prepackaged cases nor any other manufactured circumstance, excuse Mr. Su from sitting on his rights and waiting until late in the restructuring process to intervene in either these cases or the Cayman Proceeding.  The manufactured emergency situation in which Mr. Su finds himself is entirely of his own making, despite his repeated attempts to cast aspersions and place blame on the Debtors, who unlike Mr. Su, have complied with the various requirements of the Bankruptcy Code and this Court so as to avail themselves of the benefits of timely chapter 11 relief.

WEIL:\95587914\3\78787.0004

### E.    The Prepackaged Plan Has Been Proposed in Good Faith.

34.    Mr. Su's assertion that the Prepackaged Plan has not been proposed in good faith[12] is unsubstantiated and without merit.  He cites no evidence to support this allegation, nor does he address the legal standard for good faith under section 11 U.S.C. § 1129(a)(3).  By contrast, the Debtors have presented affirmative evidence that the Prepackaged Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  (DeClaire Confirmation Decl. ¶¶ 43–48.)

35.    A court may only confirm a chapter 11 plan if it finds that the plan has been "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).[13] The "touchstone" of the good faith inquiry is "the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Frascella Enter., Inc.*, 360 B.R. 435, 446 (E.D. Pa. 2007) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)).  In assessing the totality of the circumstances, the court should "keep[] in mind [that] the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."  *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) (citing *Sun Country*, 764 F.2d at 408); *see also W.R. Grace*, 475 B.R. at 87 (same).  The court should consider whether the plan: (1) "fosters a result consistent with the [Bankruptcy] Code's

---

[12] (*See* Obj. 13–14 (stating that "[t]he Plan was based on a Restructuring Agreement which sought to oppress shareholders of Vantage and deny them a vote on liquidating Vantage" and that "the transfer of assets of Vantage in order to make the plan workable was by directors who had a conflict of interest and was while there was pending litigation with creditors in an effort to hinder and delay those creditors, such as Mr. Su, from collecting on any judgment").)

[13] The term "good faith" is not defined in the Bankruptcy Code.  *In re Lernout & Housie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2004).  However, "it has been established that a determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal."  *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) (citing *Brite v. Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).  Such inquiries must be conducted on a case-by-case basis, and a court has considerable discretion in finding good faith.  *Id.* (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

objectives," (2) "has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected," and (3) exhibits "fundamental fairness in dealing with the creditors." *Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001) (citations omitted).

36.　　With respect to the first factor, the United States Supreme Court has identified two objectives of chapter 11 as preserving going concerns and maximizing property available to satisfy creditors. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) (same); *W.R. Grace*, 475 B.R. at 88 (same). The real stakeholders in these cases, the Debtors' creditors (and future owners) have all "determined that the transactions reflected in the Debtors' Restructuring Support Agreement are *by far* the best way to maximize value under the circumstances." (DeClaire Confirmation Decl. ¶ 21 (emphasis in original).) The transactions that maintain the going-concern value of the Debtors are also in the best interests of the Debtors' other stakeholders, including their employees and vendors. (*Id.*)

37.　　A reorganization of the Debtors is unavoidable based on the state of the industry and the Debtors' capital structure. (*See* First Day Decl. ¶ 57.) The Debtors engaged in hard-fought negotiations with their largest creditors, resulting in the Restructuring Support Agreement and the Prepackaged Plan, which the Debtors determined was "the optimal method of maximizing value for all stakeholders—including stakeholders of Vantage Parent[.]" (DeClaire Confirmation Decl. ¶ 45.)

38.　　The second factor requires the plan to have been "proposed with the legitimate and honest purpose to reorganize and ha[ve] a reasonable hope of success." *Sun*

*Country*, 764 F.2d. 406, 408; *see also W.R. Grace*, 475 B.R. at 88.[14]  The parties' arm's-length

negotiations are a significant factor in determining that a plan was proposed in good faith.  *See*

*id.* at 89 (citing *In re U.S. Mineral Prods. Co.*, 2005 WL 589300, at *6, 20 (Bankr. D. Del. Nov.

29, 2005)).  As described above and in the DeClaire Confirmation Declaration, the Prepackaged

Plan is the result of arms' length negotiation with creditors and was proposed in furtherance of

the fundamental goals of the Bankruptcy Code by preserving going concern value and

maximizing property available to creditors.  (DeClaire Confirmation Decl. ¶ 43.)

39.    Mr. Su has not pointed to a single piece of evidence suggesting the

Debtors' motives in these chapter 11 cases have been anything but proper.  The purpose of the

restructuring is not, as Mr. Su suggests,[15] to harm the out-of-the-money shareholders of Vantage

Parent, but rather to preserve the value of the enterprise for the benefit of its economic

stakeholders.  (DeClaire Confirmation Decl. ¶ 45.)  The restructuring provides significant

benefits to the Vantage enterprise as a whole by dramatically reducing its overall debt and

interest burden, providing a new infusion of capital, and preserving the business relationships it

has so carefully built over the years.  (*See* First Day Decl. ¶¶ 4–17.)

40.    The third factor requires the court to consider whether "the debtor

exhibited a fundamental unfairness when dealing with its creditors."  *W.R. Grace*, 475 B.R. at

87.  Accordingly, "the plan must treat all parties fairly and ensure that its confirmation comports

---

[14] As explained by the Third Circuit, "[a]t its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy[.]"  *Integrated Telecom Express*, 384 F.3d at 119.  In determining whether a debtor has proposed a plan for honest and good reasons, "courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or [whether] no realistic probability for effective reorganization exists."  *W.R. Grace*, 475 B.R. at 88 (citing *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part and rev'd in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990)).

[15] (*See* Obj. 13–14.)

with due process." *Id.* (citing *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 39 (Bankr. D. Colo. 1999)).  The overwhelming support of the Prepackaged Plan by all creditor constituencies is evidence of its fairness.  Moreover, all classes of creditors have either consented to the Prepackaged Plan or are unimpaired by its terms.

41.  Furthermore, the only evidence before the Court demonstrates that the directors of Vantage Parent and OGIL took seriously their fiduciary responsibilities to ensure that all restructuring-related transactions were "mutually beneficial for Vantage Parent and the Debtors and appropriately reflected the Debtors' valuation and liabilities."  (DeClaire Confirmation Decl. ¶ 44–45.)  The directors worked closely and extensively with their legal and financial advisers to ensure their faithful execution of these fiduciary duties in compliance with applicable law.  (*See id.*)  The fact that the Debtors "were not able to achieve a greater recovery . . . does not mean that they did not meet their fiduciary duty to all constituents."  *In re Wash. Mut., Inc.*, 442 B.R. 314, 364 (Bankr. D. Del. 2011).

42.  Mr. Su has provided nothing more than "mere innuendo and speculation" that the Prepackaged Plan was not proposed in good faith, which is insufficient to establish a lack of good faith under section 1129(a)(3) of the Bankruptcy Code.  *See id.*  Indeed, he has failed even to raise a material issue of fact with respect to the issue.  Based on the foregoing and the DeClaire Confirmation Declaration, the Debtors have affirmatively established that the Prepackaged Plan was proposed in good faith.

**F.  The Prepackaged Plan Is Feasible.**

43.  Without contesting the accuracy or methodology of the Debtors' projections, Mr. Su alleges in conclusory fashion that the Prepackaged Plan is "speculative and uncertain."  (Obj. 16).  He cites no evidence in support of this assertion and fails to discuss the applicable legal standard.  Taking Mr. Su's argument to its logical conclusion, an oil and gas

23

company can only restructure when times are good.  This is patently false and antithetical to the ideals underlying the Bankruptcy Code.  It is also internally inconsistent with his argument that there is value for Vantage Parent.

44.    As described below and in the Aebersold Confirmation Declaration, the Prepackaged Plan satisfies the feasibility standard of 11 U.S.C. § 1129(a)(11).  Section 1129(a)(11) of the Bankruptcy Code permits confirmation of plan if "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11).  "The feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re American Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("[Section] 1129(a)(11) does not require a plan's success to be guaranteed[.]").

45.    As explained in detail in the Aebersold Confirmation Declaration, Lazard Frères & Co. LLC ("***Lazard***") advised the Debtors on restructuring-related valuation analyses, including feasibility.  (Aebersold Confirmation Decl. ¶¶ 7, 14).  The Debtors' financial projections show that they "will reduce their annual interest expense from over $180 million in calendar year 2015 to less than $30 million in calendar years 2016 through 2019." (*Id.* ¶ 15.) Furthermore, the Debtors' projected cash position will not fall below $150 million at any point in their financial projections, and the projections show that "the Debtors will have cash at all times in excess of current liabilities." (*Id.*)  The Debtors' pro forma balance sheet shows that the Debtors will have a positive shareholder equity value post-emergence. (*Id.*)  Based on the foregoing, Lazard determined that "the Debtors' reorganization under the Prepackaged Plan is unlikely to be followed by either a liquidation or further financial reorganization of the Debtors

24

and that the Prepackaged Plan is therefore feasible." (*Id.* ¶ 17.) Mr. Su has not presented any evidence to the contrary. Thus, his objection should be overruled.

46.     Mr. Su also contends that "the Plan is speculative and uncertain in that it involves transfers of assets of Vantage which are subject to potential preference actions under Cayman Islands Law and parties cannot rely that such transfers are final given the Bankruptcy Court does not have subject jurisdiction over non-debtor property." (Obj. 16). Setting aside the fact that Mr. Su has cited no evidence or law in support, his statement is factually inaccurate and misstates Cayman Islands law. First, the Prepackaged Plan does not provide for a transfer of assets by Vantage Parent to the Debtors. VESI and VIMCO were transferred outside of the Prepackaged Plan before the Petition Date, and the shares of Vantage Parent's Debtor subsidiaries will be transferred to OGIL under the Prepackaged Plan, and thus will not be subject to fraudulent transfer or preference actions. Second, even if the VESI and VIMCO transfers were eventually unwound after the Effective Date, the Prepackaged Plan would still feasible. Although it would be inconvenient for the Debtors' operations, the function provided by those subsidiaries is ultimately replaceable. As an aside, if the transaction is unwound, Vantage Parent and its stakeholders would lose their right to a distribution of equity in reorganized OGIL under the Prepackaged Plan – a valuable asset for the liquidation estate. In return, Vantage Parent's stakeholders would get equity in two service subsidiaries that are no longer providing services that have some parts that could be sold for scrap value– property that is objectively less valuable without the enterprise they support.

### G.     There Were No Improper Transfers.

47.     The assertion of lack of "fair value" in exchange for the Nondebtor Service Subsidiaries is baseless. (*See* Obj. 14.) Prior to these chapter 11 cases, it was determined that OGIL would purchase from Vantage Parent all of Vantage Parent's outstanding

equity in the Nondebtor Service Subsidiaries (the "***VESI/VIMCO Transaction***") in exchange for a secured promissory note issued by OGIL.  The purpose of the VESI/VIMCO Transaction was to minimize operational disruption and enhance organizational efficiencies for the reorganized Debtors, given that each of the Nondebtor Service Subsidiaries is valuable to the Debtors because (i) VESI provides administrative support, such as accounting, information technology, legal, treasury management, insurance, human resources, tax, and other services to the Debtors, as well as purchases goods and services for the Debtors' operating entities and (ii) VIMCO Singapore serves as the management company of the enterprise by retaining rig-level employees and purchasing rig- related goods and services on behalf of the Debtors' operating entities, as well as managing a capital spares program for the Debtors' fleet.  (Law Decl. ¶ 4.)  In contrast, Vantage Parent would not need those entities after the Petition Date because of its planned liquidation proceedings in the Cayman Islands.

48.    To ensure that the VESI/VIMCO Transaction provided fair consideration to both parties, on October 28, 2015, Vantage Parent engaged Alvarez & Marsal Valuation Services, LLC ("***A&MVS***") to provide valuation consulting services related to its equity interests in the Nondebtor Service Subsidiaries, and A&MVS provided the Valuation Analysis to Vantage Parent's restructuring advisers on November 24, 2015.  (Law Dec. ¶¶ 3, 6.)  The analysis was performed as of November 15, 2015 (the "***Valuation Date***") using the most current balance sheet (i.e., September 30, 2015) at the time of the Valuation Analysis.  (Law Dec. ¶ 6.)

49.    A&MVS's valuation is reasonable and supported by well-known and commonly used valuation methods, as discussed in greater detail in the Law Declaration. Contrary to Mr. Su's objection, soliciting bids and marketing the sale of an asset or business is not the sole methodology for determining fair market value.  (*See* Obj. 14.)  In fact, in this case,

26

there likely would have been no other going-concern buyers for the Vantage-tailored Non-Debtor

Service Subsidiaries had value been determined in that way.  (Law Decl. ¶ 25.)

50.    As of the Valuation Date, A&MVS concluded that the estimated fair

market value of the net assets (excluding intercompany payables and receivables) of the Non-

Debtor Service Subsidiaries was $59,477,000 (VIMCO Singapore:  $35,565,000; VESI:

$23,912,000).  If the book value of intercompany payables and receivables were included,

notwithstanding that such book value did not equal fair market value, the fair market value of the

net assets of the Non-Debtor Service Subsidiaries would have been $63,594,000 (VIMCO

Singapore:  $62,655,000; VESI:  $939,000).  (Law Decl. ¶ 27.)

51.    If anything, the evidence showed that OGIL overpaid Vantage Parent for

the Nondebtor Service Subsidiaries.  A&MVS concluded that, had it been assumed that the

existing intercompany service agreements and transfer pricing policies would not continue,

OGIL would have paid Vantage Parent less than the amounts determined to be fair market value

for certain Nondebtor Service Subsidiaries' significant assets such as PP&E, assets under

construction, and unrecorded intangible assets.  (Law Decl. ¶ 23.)  In addition, according to

A&MVS, another buyer of these assets would, in any case, pay an amount below book value due

to the economic obsolescence associated with the severe downturn in the offshore drilling and oil

and gas industry.  (Law Decl. ¶ 24.)  Vantage Parent would also likely not be able to obtain

nearly as much value for the Nondebtor Service Subsidiaries from any other buyer, because

those subsidiaries were "tailor-made" for OGIL's business.  (*Id.*)

52.    Vantage Parent and its subsidiaries historically kept track of all

intercompany transfers and maintained intercompany balances.  In connection with the valuation

of the Nondebtor Service Subsidiaries, Alvarez & Marsal North America, LLC ("**A&M**"), the

WEIL:\95587914\3\78787.0004

Debtors' court-approved financial advisers, along with the Debtors' legal advisers, analyzed the intercompany balances and determined that necessary adjustments that had to be made to such balances in connection with the VESI/VIMCO Transaction to reflect true value. The Disclosure Statement and the Bullock Declaration set forth the relevant intercompany payables and receivables among each of (i) VESI, (ii) VIMCO Singapore, (iii) the Debtors, and (iv) the non-Debtors (which includes Vantage Parent but excludes the Nondebtor Service Subsidiaries) in the company's books and records as of September 30, 2015, the most recent available information at that time and describes how they were treated. (Bullock Decl. ¶ 9.)

53.    The restructuring advisers concluded that the treatment of intercompany receivables/payables is fair to the non-Debtors. This is largely because the non-Debtors' claims against the Debtors and/or Nondebtor Service Subsidiaries are either (i) unimpaired under the Prepackaged Plan or (ii) being settled for liquidation value.

54.    Accordingly, the secured promissory note of $61,477,000 representing the sum of the (i) estimated fair market value of the net assets of VIMCO Singapore and VESI, as appraised by A&MVS (excluding intercompany claims) ($155,477,000) and (ii) the amount of $2,000,000, representing Vantage Parent's contribution of certain intercompany claims to the capital of VESI, along with the other settlement of intercompany claims, represents the fair market value of the Nondebtor Service Subsidiaries transferred to OGIL.

55.    Mr. Su improperly suggests that OGIL's insolvency means the note is not for fair value. The secured promissory note is secured by a first lien on the equity interests of the Nondebtor Service Subsidiaries, so it necessarily has a value equal to the value of those equity interests at any point in time. In addition, at the time the parties entered into the VESI/VIMCO Transaction, they had negotiated a prepackaged plan that had the support of the majority of

28

creditors, which provided a certain degree of comfort that the Prepackaged Plan would likely be consummated and Vantage Parent would receive New Common Shares of Reorganized OGIL equal to the value of Vantage Parent's equity interests in the Nondebtor Service Subsidiaries. Further, the note earns interest at 10% annually, and is payable by its terms in shares of the Reorganized Debtors on the Effective Date of the Prepackaged Plan.  In contrast, Mr. Su provides no evidence or facts to suggest that fair value was not provided to Vantage Parent in the transaction.

> **H.** **The Debtors Satisfy the Eligibility Requirements of Section 109 of the Bankruptcy Code.**

56.    Mr. Su alleges that the Debtors have not met the eligibility requirements under section 109 of the Bankruptcy Code.  (*See* Obj. 15.)  Section 109(a) of the Bankruptcy Code provides: "Notwithstanding any other provisions of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title."  11 U.S.C. § 109(a).  Satisfaction of any one eligibility criteria is sufficient to render an entity an eligible debtor.

57.    The Debtors meet the eligibility requirements for several reasons.  First, courts in this district and elsewhere have found that bank accounts constitute "property" for purposes of section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 38 (Bankr. D. Del. 2000) ("The Debtors did have property in the United States on the petition date, however, namely funds in various bank accounts." (citing *In re McTague*, 198 B.R. 428, 429 (Bankr. W.D.N.Y. 1996)).  The same is true for retainers paid to law firms on behalf of a group of debtors.  *See, e.g.*, *id*. at 39 ("The Debtors assert that they all have an interest in the escrow funds which were paid to counsel on all [Debtors'] behalf.  We agree.  The retainers were paid on behalf of all the Debtors and, therefore, all the Debtors have an interest in

WEIL:\95587914\3\78787.0004

those funds.  It is not relevant who paid the retainer, so long as the retainer is meant to cover the

fees of the attorneys for all the Debtors, as it clearly was in these cases.") (citing *In re Indep.*

*Eng'g Co.*, 232 B.R. 529, 533 (1st Cir. BAP 1999) (holding that a retainer paid to debtors'

attorney by a third party was property of the debtors' estate))); *In re Marco Polo Seatrade B.V.*,

Ch. 11 Case No. 11–13634, 489–91 (Bankr. S.D.N.Y. Oct. 26, 2011) (following *Global Ocean*

and holding that the retainer qualifies as "property" for purposes of section 109(a)).

58.    Further, courts in this District have found that debtors with employees or

conducting business in the United States satisfy the "place of business" element for purposes of

eligibility under section 109.  *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 201

(Bankr. D. Del. 2015) (noting that the presence of employees and conducting business in the

United States was sufficient to satisfy the eligibility requirement of section 109) (citing *In re*

*Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 845 (Bankr. D.N.J. 2011) ("The place of business

requirement in § 109(a) need not be a principal place of business.  A principal place of business

is not required to satisfy Section 109(a)'s requirement, rather it is merely a place of business.

Further, a person has a place of business in the United States if such person conducts business in

the United States or business is conducted in the United States on the person's behalf." (internal

quotations and citations omitted)).

59.    Weil holds a retainer for the benefit of all Debtors.[16]  Further, in addition

to the retainer, certain Debtors have bank accounts located in the United States.[17]  Additionally,

---

[16] *See Declaration of Ray C. Schrock, P.C. In Support of Application of Debtors for Authority to Retain and Employ Weil, Gotshal & Manges LLP as Attorneys for the Debtors Nunc Pro Tunc to the Petition Date Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014–1* [Docket No. 82-3] ¶ 16 ("Weil has a remaining credit balance in favor of the Debtors for future professional services to be performed, and expenses to be incurred, in connection with these chapter 11 cases in the approximate amount of $1.6 million."), Annex 3 ("Summary of Payments" reflecting a balance of $1.6 million as of Nov. 30, 2015).

30

OGIL's senior management, which has overall responsibility for all of the Debtors, is based in

the Vantage headquarters located in Houston, Texas.  Finally, certain Debtors (Vantage

Deepwater Drilling, Inc. and Vantage Delaware Holdings LLC) are deemed to reside in the

United States by virtue of being formed under the laws of the State of Delaware.  Accordingly,

each Debtor satisfies the eligibility requirements of section 109(a) of the Bankruptcy Code.

I.    **Appointment of the Proposed Board of Directors Is Consistent with Public
Policy.**

60.     In accordance with Section 1129(a)(5) of the Bankruptcy Code and the

Prepackaged Plan, the Debtors disclosed the identity of the individuals proposed to serve as

directors and officers for the Reorganized  Debtors.  *See Notice of Filing of Third Supplement to*

*Amended Joint Prepackaged Chapter 11 Plan of Offshore Group Investment Limited and Its*

*Affiliated Debtors* [Docket No. 180] (the "***Third Plan Supplement***").  The directors to be

appointed at reorganized OGIL (and certain other Reorganized Debtors) are:  (i) Nils E. Larsen;

(ii) L. Spencer Wells; (iii) Esa Ikaheimonen; (iv) Scott McCarty; (v) Matthew Bonanno; and (vi)

Paul Bragg.[18]  Their biographical information is included in the Third Plan Supplement.  Mr.

Larsen, Mr. Wells, and Mr. Ikaheimonen are have no prior connection with the Debtors,

---

[17] (*See* First Day Decl. ¶¶ 75 ("The Cash Management System utilizes a total of 19 domestic Bank
Accounts maintained at JPMorgan Chase & Co. ("***JPM***")"), 79–97 (describing the Debtors' bank
accounts);  *see also* Schedule 1 to *Final Order (I) Authorizing Debtors to (A) Continue Existing Cash
Management System, (B) Establish Transitional Credit Card Program, (C) Maintain Business Forms and
Existing Bank Accounts, and (D) Continue Intercompany Arrangements; (II) Extending the Debtors' Time
to Comply With Section 345(b) of the Bankruptcy Code Pursuant to Sections 105(a), 345(b), 363(b)(1),
and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004; and (III) Granting Related
Relief* [Docket No. 127-1] (listing Debtors' bank accounts, including several that are maintained by JPM
in Houston, Texas).)

[18] The Ad Hoc Committee is currently vetting candidates for the seventh director position and expects to
select a suitable, independent director prior to the Effective Date.  The Debtors filed List of Reorganized
D&Os was filed promptly after the directors were selected by the Ad Hoc Committee and, as is common
practice in this Court, filed before the commencement of the hearing on confirmation of the Prepackaged
Plan.

WEIL:\95587914\3\78787.0004

economic or otherwise.  Mr. McCarty and Mr. Bonanno are affiliated with holders of Secured

Debt Claims that are members of the Ad Hoc Committee.  Paul Bragg is the current Chairman of

the Board of Directors and Chief Executive Officer of OGIL.  Accordingly, there is no

uncertainty that the board of reorganized OGIL will include multiple independent directors.

61.    Mr. Bragg, however, is the true focus of Mr. Su's objection to the

appointment of directors for the Reorganized Debtors.  In the Objection, Mr. Su attempts to

disqualify Mr. Bragg from serving as a director and officer of reorganized OGIL (and certain

other Reorganized Debtors).  Mr. Su offers no evidence that Mr. Bragg is unfit for a role on the

board other than to advance a number of contractual arguments relating to Mr. Bragg's

employment agreement.  Not only are these arguments irrelevant for the purpose of determining

whether the appointment of Mr. Bragg is consistent with public policy, but they are also neutered

by the simple fact, acknowledged by Mr. Su in his Objection, that Mr. Bragg is currently

employed pursuant to an agreement with OGIL.

62.    On December 2, 2015, Mr. Bragg, as well as other members of the

Debtors' management team, executed an amended and restated employment agreement that,

among other things, substituted OGIL for Vantage Parent and released Mr. Bragg's claims

against Vantage Parent, including any claims to damages or severance based on a change of

control.  These were publically filed with the SEC.  (*See* Form 8-K, Ex. 10.1, at ¶16 (December

11, 2015).)[19]  Consequently, Mr. Su's arguments regarding non-compete and change of control

provisions fall flat as they turn on enforcing of the very agreement Mr. Su proposes to void.

---

[19] The amendment and restatement of employment agreements was also disclosed in the Disclosure
Statement.  *See* Disc. Stmt. Art. V.E ("[A]s part of their pre-bankruptcy planning, and to ensure the
continuation of business under Reorganized OGIL, the Debtors have transferred, or prior to the Petition
Date will transfer, certain significant contracts with non-Debtors to OGIL and the Nondebtor Service
Subsidiaries, including certain insurance policies, benefit plans, credit card agreements, consulting
agreements, *employment agreements*, and indemnification agreements.") (emphasis added).

32

Also unconvincing is Mr. Su's argument that the amended and restated employment agreement indicates "self-dealing."  On the contrary, the amendment and restatement of employment agreements was done in accordance with the terms of the heavily negotiated Restructuring Support Agreement and was an important step in ensuring that the existing management could continue the Debtors' operations in chapter 11 and preserve the Debtors' business as a going concern.  (*See* Disc. Stmt. 27 (stating that certain agreements, including employment agreements, "are essential to the continued business under Reorganized OGIL and do not generally provide value to Vantage Parent.").  Despite the agreement being public, Mr. Su points to no provision that is improper.

      **J.**      **No Basis Exists to Include Reservation of Rights Language in Favor of Mr. Su and F3 Capital.**

      63.      Mr. Su's lack of standing aside, his rationale for including reservation of rights language in his favor as well as that of F3 similar to that requested by the United States government is premised on a mischaracterization—that the Debtors have not disclosed all assets and liabilities (ascribing some ill-motive to the non-disclosure)—and a misstatement of fact—that the Debtors are "attempting to include non-debtor property in the administration of the estate even when they claim certain parties like Vantage are transferring assets while also being insolvent." (Obj. 12.)  To the extent that the Prepackaged Plan does provide releases of claims, such releases are supported by applicable law, as described above.

      64.      As discussed below in more detail, in asserting that the Debtors have not disclosed all assets and liabilities, Mr. Su fails to acknowledge that the Court authorized the Debtors to extend the time to file their statement of financial affairs and schedules of assets and liabilities and waive their filing upon confirmation of the Prepackaged Plan.  [Docket No. 37.]  If a creditor indeed holds a General Unsecured Claim, that claim, under the clear terms of the

33

Prepackaged Plan, will remain unimpaired and, to the extent the claim was not previously paid by the Debtors in the ordinary course, will be enforceable against the Reorganized Debtors. Schedules were unnecessary for creditors in a case like this.

65.     Mr. Su also incorrectly argues as justification for the reservation of rights language beneficial to him that the Debtors seek to include non-debtor property in the Debtors' estates and asserts the existence of a purported avoidable transfer by Vantage Parent (which is a matter for Cayman law and is factually incorrect because Vantage Parent is a creditor of OGIL). As discussed above, the Prepackaged Plan does not include assets that are not the Debtors' assets, and the Court only has jurisdiction over the Debtors' assets.  Moreover, OGIL's purchase of Vantage Parent's equity in the Nondebtor Service Subsidiaries was, as discussed more fully below, one for fair market value.

**K.      The Objection Misstates Facts or Mischaracterizes the Nature and Goals of the Restructuring.**

66.     The Objection purports to describe key terms of the Restructuring Agreement, the Prepackaged Plan, and the nature and goals of the Restructuring.  In an attempt to do so, however, the Objection misstates facts or misapprehends the nature and goals of these chapter 11 cases by, among other things, mischaracterizing the Restructuring as an "attempt[] to divest Vantage of [its] modern fleet of 'high specification assets'" and to "transfer valuable litigation claims from Vantage to the subsidiaries, including the Petrobras claim."  (Obj. 8.)  The Restructuring is not aimed at depriving Vantage Parent of value.  To the contrary, the Prepackaged Plan benefits Vantage Parent.  First, the shares to be issued by reorganized OGIL under the Prepackaged Plan will be issued to Vantage Parent as the holder of the Vantage Parent Secured Promissory Note, which is treated as an unimpaired "Other Secured Claim."  These shares have real value, unlike the current shares Vantage Parent holds in OGIL because (i) OGIL

34

will be returned to solvency under the Prepackaged Plan and (ii) the new shares will be unencumbered.  Second, Vantage Parent is less likely to be subject to guarantee claims as a result of guaranteeing obligations of the Debtors because the Debtors will emerge with a clean slate as a result of the Restructuring.  Third, the Prepackaged Plan provides for the assumption of employee agreements with Vantage Parent by OGIL, thereby relieving Vantage Parent of the obligations under those contracts.  Fourth, and most significantly, Vantage Parent holds intercompany claims against the Debtors, which are unimpaired by the Prepackaged Plan, despite the existence of $2.6 billion of Secured Claims ahead of it.

67.    Rather than acknowledge the benefits to Vantage Parent, the Objection, by sleight of hand, confuses the issue by misstating the truth.  For example, the Objection states that valuable litigation claims, such as those arising from the Petrobras arbitration were transferred from Vantage Parent to its subsidiaries.  (Obj. ¶ 8.)  Although it is true that certain litigation claims exist, they are not held by Vantage Parent.  As the Disclosure Statement makes clear, certain Debtors are party to the Petrobras contract, not Vantage Parent; it is those Debtors who hold any claims arising from the Petrobras arbitration.  Moreover, the Prepackaged Plan only purports to cover assets owned by a Debtor; to the extent Vantage Parent has a claim against Petrobras, the Prepackaged Plan does not affect Vantage Parent's ability to assert those claims.

68.    The Objection also notes the existence of a "fiduciary out" by the board of directors of Vantage Parent in section 7.03(b) of the Restructuring Support Agreement, implying that the board's fiduciary obligations would allow it to terminate the agreement under these circumstances.  To the contrary, complying with the Restructuring Support Agreement is consistent with the board's fiduciary duties—the alternative would be to abandon the Prepackaged Plan to the detriment of the Debtors and all of their stakeholders.

WEIL:\95587914\3\78787.0004

L.    **The Postpetition Interest Provision in the Prepackaged Plan Is Appropriate.**

69.    Mr. Su asserts that "the voting process appears to be defective" because section 6.2 of the Prepackaged Plan eliminates postpetition interest on claims—thereby purportedly impairing unsecured claims—yet the votes of unsecured creditors were not solicited. (Obj. 13.)  Mr. Su does not hold a General Unsecured Claim or any other claim against a Debtor and therefore lacks standing to raise this objection.  *See Global Indus. Techs.*, 645 B.R. at 210 (requiring an "injury in fact"); *Indianapolis Downs*, 486 B.R. at 304 ("In the context of a confirmation hearing, creditors 'have standing *only* to challenge those parts of a reorganization plan that affect their direct interests." (quoting *In re Orlando Investors, L.P.*, 103 B.R. 593, 596–97 (Bankr. E.D. Pa. 1989) (emphasis added))).  It is also unclear why, as a creditor of the shareholder supposedly championing the interests a liquidator of Vantage Parent would seek to protect, he is seeking to ensure that postpetition interest is paid to general unsecured creditors of the Debtors.

70.    Even if he had standing, he remains substantively wrong.  Section 6.2 of the Prepackaged Plan provides that, "[u]nless otherwise specifically provided for in this Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims . . . ."  But the Prepackaged Plan also "otherwise specifically provide[s]" that "[t]he legal, equitable, and contractual rights of the holders" of unimpaired claims "are unaltered by this Plan."  (Plan §§ 4.1, 4.2, 4.5.)  To the extent that a holder of such a claim has a right to postpetition interest, that right is preserved. Mr. Su's assertions are incorrect and do not render the Prepackaged Plan unconfirmable.

M.    **The Debtors Are Not Obligated to File Schedules or Statements.**

71.    Mr. Su's points regarding disclosure being improper because the Court entered an order granting the Debtors a deadline extension and conditional waiver of the

36

requirement to file schedules and statements[20] are nothing more than a frivolous delay tactic and should be overruled. As described in detail in paragraphs 42–47 of the Debtors' scheduling motion [Docket No. 15], filed on the Petition Date, the extension and conditional waiver were appropriate under the circumstances and complied with all relevant Bankruptcy Code provisions, Bankruptcy Rules, and Local Rules. The Court agreed and entered an order granting the motion.[21] Such relief is routinely granted in prepackaged cases where, as here, the benefits of filing the schedules and statements would be heavily outweighed by the costs to the Debtors' estates and the actual parties in interest.[22]

72.    No party in interest was prejudiced by such relief because holders of unsecured claims—the very parties the schedules and statements are designed to benefit—will remain unimpaired under the Prepackaged Plan and such claims, to the extent not paid already as

---

[20] (*See* Obj. 10–13(arguing that the Debtors are "try[ing] to shut shareholders out of the Bankruptcy process" by "seeking extensions to file Schedules and Statements of Financial Affairs and/or be relieved of the duty all together [*sic*] if the Plan is confirmed before February 1, 2016, which would conceal from public disclosure the actual creditors, assets and liabilities of each entity, etc.").)

[21] *Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Prepackaged Plan; (II); Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving Form and Manner of Notice of Commencement; (IV) Authorizing, But Not Directing, Filing of Consolidated List of Creditors; (V) Extending Time, and Upon Plan Confirmation, Waiving Requirement of Filing Statement of Financial Affairs and Schedules of Assets and Liabilities; (VI) Waiving Requirement to Convene the Section 341 Meeting of Creditors; (VII) Approving (A) The Rights Offering Procedures, (B) The Backstop Agreement, and (C) The Backstop Premium Consideration, Transaction Expenses, and Indemnification Obligations in Connection Therewith* [Docket No. 37].

[22] *See, e.g.*, *In re Hercules Offshore, Inc.*, Ch. 11 Case No. 15-11685 (KJC) (Bankr. D. Del. Aug. 14, 2015) [Docket No. 42] (granting debtors' motion extending time, and, upon plan confirmation, waiving the requirement to file schedules and statements); *In re The Dolan Co.*, Ch. 11 Case No. 14-10614 (BLS) (Bankr. D. Del. Mar. 25, 2014) [Docket No. 69] (permanently waiving the requirement to file schedules and statements); *In re Dex One Corp.*, Ch. 11 Case No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) [Docket No. 54] (granting debtors' motion extending time, and, upon plan confirmation, waiving the requirement to file schedules and statements); *In re Hawkeye Renewables, LLC*, Ch. 11 Case No. 09-19961 (KK), 2010 WL 2745975, at *24 (Bankr. D. Del. June 2, 2010) (granting debtor's motion waiving, upon confirmation of the debtor's prepackaged chapter 11 plan, the requirement to file schedules and statements); *In re Elec. Components Int'l, Inc.*, 2010 WL 3350305, at *25 (Bankr. D. Del. May 11, 2010) (same).

previously authorized by the Court, will be enforceable against the Reorganized Debtors.

Indeed, Mr. Su has pointed to no actual harm suffered by any party as a result of the Debtors not

having filed the schedules.  Even if there was a later dispute between the Debtors and any other

party (including Vantage Parent) as to whether a particular asset was property of the Debtors,

confirmation and implementation of the Plan would not affect that dispute.  The Plan does not

purport to include assets that are not the Debtors' assets, and the Court only has jurisdiction over

the Debtors' assets.  Moreover, Su did not object to the motion or move for reconsideration of

the Court's ruling granting the extension and waiver, and making this objection at the

confirmation stage is both procedurally inappropriate and substantively meritless.

## N.    The Disclosure Statement Satisfies Section 1125 of the Bankruptcy Code.

73.    In the Objection, Mr. Su asserts that the Disclosure Statement does not

contain adequate information, arguing:  (a) the Disclosure Statement is "biased" by not providing

information regarding the relationship between Petrobras and the Debtors' management;

(b) there is insufficient evidence that "secured creditors are entitled to an approved claim" absent

filing a proof of claim, schedules, or documentation to support "a properly perfected security

interest;" (c) the Debtors have failed to disclose "certain information" in violation of a purported

duty of candor;[23] (d) there is inadequate information on intercompany claims; and (e) there is

insufficient information to support feasibility.  (*See* Obj. 12–13.)

74.    Section 1125(a) of the Bankruptcy Code defines the term "adequate

information" to mean information "of a kind, and in sufficient detail, as far as is reasonably

practicable in light of the nature and history of the debtor and the condition of the debtor's books

---

[23] Mr. Su's allegations that the Debtors failed to candidly disclose "certain information" is too vague to
warrant a response at this time.  The Debtors expressly reserve the right to respond to any objections
predicated upon an alleged failure to satisfy any applicable duty of candor once Mr. Su provides
clarification as to the nature his objection.

WEIL:\95587914\3\78787.0004

and records, that would enable a hypothetical reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan . . . ."  11 U.S.C. § 1125(a).  For the reasons set forth below, the Disclosure Statement satisfies section 1125 of the Bankruptcy Code.

75.    The Debtors have made adequate disclosures relating to their relationship with Petrobras in the Disclosure Statement.  Specifically, the Disclosure Statement:  (a) provides background and context relating to Operation Carwash; (b) describes the Debtors' relationship with Mr. Hamylton Padilha; (c) summarizes the substance of Mr. Padilha's written plea agreement and the report issued by the Brazilian authorities to the extent such documents relate to the Debtors and their management team; and (d) discloses that Vantage Parent's audit committee is conducting an internal investigation.  *See* Disclosure Statement § III.B.  Such disclosures are more than sufficient to satisfy the Debtors' duties under section 1125, particularly in light of the relationship between the Petrobras investigation and the Prepackaged Plan and the fact that all unsecured claims are riding through unimpaired.  Further, Mr. Su has failed to offer evidence supporting his inflammatory allegations regarding the relationship between Petrobras and the Debtors' management.  It is, in fact, Mr. Su who is under indictment in Brazil.  Even if such statements had proper evidentiary support, they are wholly irrelevant to the key inquiry, whether the Disclosure Statement contains information sufficient to allow a hypothetical investor to make an informed decision on whether to accept or reject the Prepackaged Plan.

76.    Likewise, the Disclosure Statement provides sufficient information regarding Secured Claims and Intercompany Claims.  (*See* Discl. Stmt. §§ II.F.2 (discussion of Debtors' prepetition indebtedness), V.C. (discussion of the Nondebtor Service Subsidiaries including multiple charts setting forth the various receivables and payables between the parties);

WEIL:\95587914\3\78787.0004

*see also* First Day Decl. ¶¶ 31–42.)  The extensive discussion of the Secured Claims and

Intercompany Claims in the Disclosure Statement provides information sufficient to allow a

hypothetical investor to make an informed decision on whether to accept or reject the

Prepackaged Plan, and accordingly, satisfies section 1125 of the Bankruptcy Code.[24]

      77.     Finally, as discussed further below, the Debtors not only make adequate

disclosure regarding the feasibility of the Prepackaged Plan, they offer reliable evidence that the

Prepackaged Plan is in fact feasible as required by section 1129(a)(11) of the Bankruptcy Code.

### O.    The Objection Was Filed for an Improper Purpose.

      78.     In determining how much weight to give statements from Mr. Su's

counsel about his supposed reasons for seeking delay in these cases and opposing confirmation

(*i.e.*, that he wants time for a liquidator to be appointed to investigate whether the Prepackaged

Plan is a good deal for the insolvent Debtors' parent), the Court should consider Mr. Su's

previous litigation tactics and interactions with the law both in these cases and elsewhere.  This

is especially true where Mr. Su is the only stakeholder of Vantage Parent making these

arguments and has presented no evidence to support the extraordinary relief he seeks.  Mr. Su is

a serial litigant against Vantage Parent and its directors.  (Discl. Stmt. 24–25; *see, e.g.*, Standing

Mem. Ex. A at 9–10, 14 (detailing portions of Mr. Su's history of litigation against Vantage

Parent).).  This is no regular objector whose motives and credibility are casually being called into

question—Mr. Su's persistent, improper conduct directly contributed to the financial distress of

---

[24] Further, pursuant to the *Final Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, and (III) Granting Related Relief* [Docket No. 158] (the "**Cash Collateral Order**"), the Debtors have stipulated to validity and enforceability of the claims and liens of the Prepetition Secured Parties (as defined in the Cash Collateral Order) and the Court ordered that such parties are not required to file proofs of claim.  To the extent Mr. Su wishes to contest the enforceability of such claims and liens, he must do so in accordance with the procedures set forth in the Cash Collateral Order.

Vantage Parent and the Debtors' need to commence these chapter 11 cases.  (*See* Discl. Stmt.
14–15, 22–25.).  He should not be permitted to damage the business even further by derailing or
sabotaging the Prepackaged Plan.

79.    Mr. Su's interactions with the law in the past few years do not present a
positive picture of his character or credibility.  First, a Texas state court has found it probable
that he breached his fiduciary duties as a former director of Vantage Parent.  *See, e.g.*, Cash
Collateral Reply [Docket No. 111] Ex. A at 23–25 (affirming the grant of a preliminary
injunction against Nobu Su in favor of Vantage Parent).

80.    Second, Mr. Su has been indicted in Brazil for his involvement in corrupt
practices there relating to, among other things, the contracting of *Titanium Explorer* with
Petrobras.  To date, Nobu Su has failed to appear and answer the charges against him.  (Discl.
Stmt. 14–15; *see* Cash Collateral Reply Ex. B (Brazilian indictment of Nobu Su), Ex. C (*Wall
Street Journal* article describing indictment and stating that "Mr. Su is believed to be in
China").)

81.    Third, at least one other bankruptcy court has expressed frustration with
his litigation tactics.  Specifically, Mr. Su's reliance on similar wasteful litigation was recently
cited by the United States Bankruptcy Court for the Southern District of Texas in connection
with his motion to convert the chapter 11 cases of debtors in which he actually has an interest to
cases under chapter 7:

> Su's concern over the accumulation of professionals' fees is of particular interest
> given that the majority of the fees appear to be *caused* by Su and F3 Capital.  The
> parties have stipulated that of the $548,308.61 in fees incurred by the estate from
> November 2014 to March 2015, $342,843.00 are considered "related to Mr. Su."
> . . . The only party seeking conversion in this case has been instrumental in
> causing the accumulation of professionals' fees.

41

Mem. Op. at 12, *In re TMT Procurement Corp.*, Ch. 11 Case No. 13-33763 (Bankr. S.D. Tex. Aug. 14, 2015) (ECF No. 2546) (emphasis in original).

82.    Fourth, the High Court of Justice of England and Wales has held Mr. Su in contempt and described him as "a man with little regard for his obligations or the truth" in an unrelated dispute brought against Mr. Su.[25]  In determining Mr. Su's credibility, one cannot ignore the extraordinary observations made by the High Court of Justice of England and Wales in its final judgement:

> [Nobu Su] was not a man whose evidence was easy to accept without some contemporaneous document which corroborated it.  More often than not, when he did give a direct response, his evidence under cross-examination was directly contradictory to the contemporary emails from his Blackberry or from TMT ….  Mr. Su's failures … made him an altogether unsatisfactory witness who was not, in my view, honest or credible.  ***On every conflict of evidence as to which took place between him and [the claimants], I rejected his evidence in favor of what was shown by the contemporary documents and the evidence of the claimants' witnesses which was consistent with them***.

*Lakatamia  Shipping Co. v. Nobu Su/Hsin-Chi Su*, Cause No. 2011 Folio 357, *slip op.* at ¶ 49 (High Court of Justice, Queen's Bench Div., Commercial Court, May 11, 2014) (emphasis added).

83.    Even his actions in these chapter 11 cases call into question his credibility and integrity.  One example is his timing.  Mr. Su's eleventh-hour attempt to involve himself in these prepackaged cases on the eve of plan confirmation serves no purpose but to harass the Debtors and their management.   Importantly, despite having had notice that the chapter 11 cases had commenced within a couple of days after they were filed (*See* Zhang Aff. 23.) and having retained Cayman Island counsel at least as early as December 15, 2015 (2d Eldridge Stmt. ¶ 50),

---

[25] *Lakatamia  Shipping Co. v. Nobu Su/Hsin-Chi Su*, Cause No. 2011 Folio 357, *slip op.* at ¶¶ 47–49 (High Court of Justice, Queen's Bench Div., Commercial Court, May 11, 2014), a copy of which is attached as Exhibit A to the Debtors objection to Mr. Su's emergency motion [Docket No. 150].

WEIL:\95587914\3\78787.0004

Mr. Su waited until December 31, 2015 to reach out to the Debtors in relation to the chapter 11 cases. And he waited until the week before confirmation to seek affirmative relief (in the form of delay) from this Court. While Mr. Su sat on his hands during the whole month of December, the Debtors and their stakeholders were busy, devoting substantial resources and time to finalizing the Plan Supplement documents to ensure that they can emerge from chapter 11 on the expeditious timeframe that best preserves the value of the business.

84. His inconsistent positions are another example of his questionable credibility. For instance, when it suited his interests, in August 2015, Mr. Su acknowledged in the United States Bankruptcy Court for the Southern District of Texas, in an objection to the debtors' emergency motion to acquire his shares of Vantage Parent, that those shares had little value.[26] Mr. Su now makes the exactly opposite argument in this case—that confirmation should be delayed so that the liquidator of Vantage Parent can "investigate" the Debtors on behalf of Vantage Parent's own penny-stock shareholders. Even Mr. Su's internally inconsistent arguments in his Objection (*e.g.*, that there is sufficient value at the Debtors to provide a recovery to Vantage Parent (6–7, 15), while at the same time the Prepackaged Plan is not feasible because it is "speculative" in light of the "volatile oil and gas market where there are many uncertainties" (16)) demonstrate that his real motive is to throw out arguments and hope something sticks, rather than having a sincerely held (let alone valid) belief about the issues he is raising. Moreover, his continued misstatements of Cayman Islands law (*see, e.g.*, 3d Eldridge Stmt. *passim*) demonstrate his lack of credibility.

---

[26] Am. Obj. to Emergency Mot. for Auth. to Acquire Vantage Shares (Doc No. 2530) ¶¶ 4–6, *In re TMT Procurement Corp.*, Ch. 11 Case No. 13-33763 (Bankr. S.D. Tex. Aug. 3, 2015) (ECF No. 2540) (arguing that "[t]here [wa]s no emergency to purchase the [shares]" because the share price "has been in a continuing downward spiral" and "[i]t [wa]s very possible that the Vantage share price could go even lower" than its then-current price of fourteen cents.) A copy of Mr. Su's court filing is annexed as Exhibit D to the Debtors' objection to Mr. Su's emergency motion [Docket No. 150].

43

85.    The Debtors submit that rather than being for a noble purpose (or even an understandable purpose of pursuing true economic interests), Mr. Su's actions in these cases have been nothing more than transparent attempt to disrupt these prepackaged chapter 11 cases on the eve of confirmation in order to harass the Debtors and their management.  Mr. Su has no economic interest in the Debtors, their business, their estates, or any other aspect of this restructuring.  He simply has an ax to grind.  The Court should consider that the delay Mr. Sue seeks is at no cost to himself but at significant risk to the success of the Debtors' restructuring and future business—a true moral hazard situation.

WEIL:\95587914\3\78787.0004

### III.     Conclusion

86.     For the reasons set forth above and in the Debtors' related filings, the

Court should overrule Nobu Su's Objection, approve the Disclosure Statement, and confirm the

Prepackaged Plan.

Dated: January 13, 2016
     Wilmington, Delaware

                                */s/ Zachary I. Shapiro*
                                RICHARDS, LAYTON & FINGER, P.A.
                                Mark D. Collins (No. 2981)
                                Daniel J. DeFranceschi (No. 2732)
                                Zachary I. Shapiro (No. 5103)
                                One Rodney Square
                                920 North King Street
                                Wilmington, Delaware 19801
                                Telephone:  (302) 651-7700
                                Facsimile:  (302) 651-7701

                                -and-

                                WEIL, GOTSHAL & MANGES LLP
                                Ray C. Schrock, P.C.
                                Ronit J. Berkovich
                                767 Fifth Avenue
                                New York, New York  10153
                                Telephone:  (212) 310-8000
                                Facsimile:  (212) 310-8007

                                *Attorneys for the Debtors*
                                *and Debtors in Possession*